**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

|  |  |  |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : | Case No. 2:20-CV-00025-WOB-CJS |
|  | : |  |
| Plaintiff, | : | Judge William O. Bertelsman |
|  | : | Magistrate Judge Candace J. Smith |
| vs. | : |  |
|  | : |  |
| ABC NEWS, INC., | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| ABC NEWS INTERACTIVE, INC., | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| THE WALT DISNEY COMPANY, | : |  |
|  | : |  |
| Defendants. |  |  |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

i

## INTRODUCTION

ABC recognizes that neither this lawsuit nor this motion arises in a vacuum.  However, Plaintiff appears to have construed this Court's prior decisions in his defamation cases as a license to sue any news organization that published any news report which included Nathan Phillips' statement that Plaintiff "blocked" him, regardless of the context in which it reported those words.  That view is mistaken because, as this Court noted in the course of its rulings, it is a basic principal of defamation law that whether Phillips' words are defamatory must not be considered in isolation, but rather must be assessed within the particular context of each news report in which they appeared, reading each story as a whole.

None of the ABC news articles and companion television reports at issue here, viewed as a whole, assert that Plaintiff blocked Nathan Phillips.  Rather, each quoted other news organizations' reports of Phillips' blocking allegation in the context of reporting statements by Plaintiff and a fellow student that Plaintiff did *not* block Phillips.  More broadly, the gist of the ABC reports was that more information was emerging about what had happened on the Mall, including other videos of the incident, that raised questions about whether initial accounts of those events were accurate, including (but not limited to) Phillips' blocking statement. Therefore, as a matter of law, the Complaint must be dismissed because it fails to plead a statement that is capable of a defamatory meaning, which is the first element of any defamation claim.  In fact, many of the video excerpts and items of information the Complaint alleges that journalists *should* have reported actually *were* included in the ABC reports.

Importantly, this motion does not ask the Court to reconsider its prior rulings.  To the contrary, this motion asks the Court to apply to the specific ABC news reports at issue here the same well-established principles of defamation law that it applied in those rulings.  Because none

1

of the ABC articles and embedded television reports, viewed as a whole, accuse Plaintiff of blocking Phillips, they are not defamatory. Alternatively, the Complaint should be dismissed as time-barred, and because readers would construe Phillips' statement as presented by the ABC Articles as just one of multiple, conflicting opinions about the incident.

## FACTUAL BACKGROUND

The facts of the incident underlying this case are well known to the Court and need no repetition here. This action against ABC arises out of four online articles ABC published on January 20 and 21, 2019, and three television news reports that are embedded within three of those articles. D.E. 1 ("Compl.") ¶ 2, Exs. G-J (the "Articles"). To be clear about what the term "embedded" means, on the abcnews.com website upon which the articles were published, a television video report is often placed within the body of an article, between the article's headlines and its text, and readers can access the video story by clicking on the white arrow that is prominently displayed in the center of the screen. Each of the ABC television reports is part of ABC's reporting in the Articles. For example, this is a copy of the first page of what the Complaint calls "ABC's Second Online Article," which, as it also alleges, includes an embedded *Good Morning America* television report.[1] *See* Compl. ¶¶ 215-216 & Ex. 1 at 1 to this motion:

---

[1] In addition to the three ABC News television reports that are embedded at the top of three of the ABC Articles, some of the Articles also contain video clips from or hyperlinks to video posted on other websites, such as YouTube, Twitter, and Instagram, that relate to something stated in the Articles and enable the reader to access more information about the subject. For example, in the fourth paragraph of the First Article, the words "video shot inches from the other side of Philips' face" are underlined, and if the reader clicks on any of those words it takes them to a video posted on YouTube. Ex. 1 at 1. ABC is submitting a DVD in support of this motion which contains the three ABC television reports that are embedded within three of the Articles. Because the Complaint specifically alleges that the ABC articles embedded those news reports and they are part of ABC's reporting, *see, e.g.*, Compl. ¶ 199, they are properly before the Court for purposes of a motion to dismiss. *See, e.g.*, *Sandmann v. WP Co.*, 401 F. Supp. 3d 781, 787 (E.D. Ky. 2019). For the Court's convenience, the DVD also contains each of the four ABC Articles that are attached as Exhibits G-J to the Complaint, as well all the videos from sites like



## I.    THE ABC NEWS REPORTS AT ISSUE

### A.    The First Online Article and Included *Good Morning America* Report

#### 1.    The Text of the First Article

The First Article was published on the ABC News website on January 20, 2019.  Compl. ¶ 203 & Ex. G; Ex. 1 to this motion.  With regard to whether Plaintiff "blocked" Phillips, the Article first set out *verbatim* Phillips' statement to *The Washington Post*, attributing it to the *Post*.  Ex. 1 at 2-3.  To make clear that Phillips' allegation to the *Post* was hotly disputed, the next three paragraphs in the article quoted a statement provided to ABC News by another Covington Catholic High School student who had been at the rally, who said (among other things) that "he and his classmates were initially targeted by a middle-aged African-American

---

YouTube that may be accessed by clicking on links within the Articles.  When the DVD is opened, the Articles are listed in the DVD's directory as Exhibits 1-4, while the videos related to each Article are listed in the directory below the corresponding Article as Exhibits 1-A, 1-B, etc.  All of the Articles, television reports, and videos on the DVD are also identified in the Declaration of Nathan Siegel, which is attached as Exhibit A to this memorandum.  For the Court's further convenience, ABC is also attaching transcripts of the three television reports.  *See* Exs. 5-7.

man with a megaphone who yelled racial slurs at them." *Id.* at 3.  The student said that it was

Phillips who had approached Plaintiff, and that Plaintiff "didn't say anything or move – he just

stood there," before Phillips eventually walked away.  *Id.*

> The Article then briefly quoted Kaya Taitano, identified as a college student who posted

one of the original "viral videos" of the confrontation, who said the Native American group did

not call anyone names.  That was followed by excerpts of the statement issued by Plaintiff:

> Sandmann, a junior at Covington Catholic High School in Park Hills, defended his
> actions in a statement on Sunday and said he never heard "any students chant 'build
> that wall' or anything hateful or racist at any time."
>
> "I realized everyone had cameras and that perhaps a group of adults was trying to
> provoke a group of teenagers into a larger conflict," Sandmann said.  "I was not
> intentionally making faces at the protestor.  I did smile at one point because I
> wanted him to know that I was not going to become angry, intimidated or be
> provoked into a larger confrontation," he added.

*Id.*  In addition to reporting that both Plaintiff and a fellow student said that Phillips approached

Plaintiff to instigate a confrontation, not the other way around, the Article also noted and linked

to a video that could arguably support the students' account.  Specifically, after the First Article

linked to the main "viral video," *id.* at 1-2 & Ex. 1-B, it reported that "[a]nother video showed

Phillips appear to approach the group of students before the stare down."  Ex. 1 at 2; Ex. 1-C.

That sentence about "another video" linked to the same video that paragraph 84 of the Complaint

alleges should have been reported by journalists:

Screenshot at Compl. ¶ 84     Screenshot From Video the First Article Links To (Ex. 1-C at 0:02)

   

The First Article ended by reporting comments critical of the students from several sources, including a congresswoman, Kentucky's Secretary of State, the Diocese of Covington, and the school.  *Id.* at 3-7.

2.     The *Good Morning America* Report

The Complaint further alleges that "[t]he First Online Article prominently republished and embedded ABC's Good Morning America broadcast . . . ." Compl. ¶ 204; Ex. 1-A (the "First GMA Story"). The only arguable reference to "blocking" in that broadcast was to quote the same statement from a fellow student that Plaintiff *did not obstruct anyone*.

An ABC News anchor introduced the First GMA Story by explaining the report would be about "[t]his video sparking heated social media debates with criticism on both sides."  Ex. 1-A at 00:10-00:13.  Correspondent Erielle Reshef then began her report by explaining, "[t]his morning, new questions about the troubling incident at the foot of the Lincoln memorial." *Id.* at 00:18-00:22.  She reported there is "[n]ew fallout and confusion this morning after this upsetting incident now going viral." *Id.* at 00:32-00:36.  Reshef explained the controversy began when

initial video of the incident showed "[a] group of teenagers, some Catholic high school students, seen wearing Make America Great Again hats, *appearing* to face off with Nathan Phillips." *Id.* at 00:39-00:47 (emphasis added). After showing a clip of Phillips, Reshef explained:

> Overnight, new video calling into question just how this encounter began. Appearing to show Phillips approaching the crowd of boys as they chant their school letters. ABC News has tried to identify and contact the students in the video. The parent of a boy who says he was there and wants to remain anonymous sent us a statement that reads in part, "An indigenous American man with a few other men approached the center of the boys and in particular one boy. The boy from my school didn't say anything or move. He just stood there. As time went on, the man with the drum got closer to his face. After a couple of minutes of the man standing there beating the drum in the boy's face, he walked away."

*Id.* at 01:36-02:15. The broadcast also played the same video showing Phillips approaching the students that the Complaint (¶ 84) alleges journalists should have reported. *Id.* at 01:36-01:46.

After quoting Martin Luther King's daughter and another excerpt from Phillips that had been posted online, Reshef concluded by contrasting Phillips' statement with one from another Native American protestor who said "some of the students actually ended up joining the Native American men and women that were singing there. And it ended up defusing peacefully. So that's what we don't see in some of the video." *Id.* at 02:51-02:58. Anchor Dan Harris commented that the incident was "[m]ore complicated than it appears." *Id.* at 03:01-03:03. And to emphasize that the report raised questions about whether the initial viral video accurately captured the full context of what happened, a caption with the question "WHAT SPARKED THE MOMENT ON VIDEO?" appeared on the screen for most of the report:



**B.    The Second Article and *Good Morning America* Report**

      1.    <u>The Text of the Second Article</u>

The Second Article was also published on January 20, 2019.  Compl. ¶ 215 & Ex. H;

Ex. 2 to this motion.  That Article focused on Plaintiff's statement, which had been released that

evening, and quoted at length from it.  Specifically regarding "blocking", the Article quoted

Phillips' statement to *The Washington Post*, then explained that "Sandmann disputed those

claims in his statement on Sunday and said he never heard 'any students chant "build that wall"

or anything hateful or racist at any time.'"  Ex. 2 at 2.  The Article continued (*id*. at 3):

> "The protestor everyone has seen in the video began playing his drum as he waded
> into the crowd, which parted for him," Sandmann said.  "I did not see anyone try to
> block his path.  He locked eyes with me and approached me, coming within inches
> of my face.  He played his drum the entire time he was in my face."
>
> "I believed that by remaining motionless and calm, I was helping to diffuse the
> situation," he added.

      2.    <u>The *Good Morning America* Story</u>

The Second Article included an embedded video of another *Good Morning America*

report on the Incident (the "Second GMA Story").  Compl. ¶ 216; Ex. 2-A.  The Second GMA

Story primarily focused on a longer video suggesting that the incident may have been

precipitated by a group of Black Hebrew Israelites hurling insults at the Covington Catholic

students.  ABC News anchor Cecilia Vega introduced the Second GMA Story by saying:

> Let's turn to new developments in that confrontation that went viral.  You probably
> saw it.  Teens in "Make America Great Again" hats, face to face with that Native
> American protestor.  The scene quickly sparked outrage online.  But now another
> video is raising new questions about what really happened before the incident.  And
> the teen at the center of it all is now speaking out.

Ex. 1-D at 00:00-00:21.  The only specific reference the Second GMA Story made to "blocking"

was to note that Phillips seemed to offer a different explanation for what happened:  "When

Phillips, seen beating his drum, approached the crowd.  Phillips later telling 'The Detroit Free Press,' he was trying to calm the situation."  *Id.* at 01:30-01:37.

Otherwise, Reshef began the report by summarizing and quoting from excerpts of Plaintiff's statement, to emphasize that Plaintiff was "saying these initial images don't tell the whole story".  *Id.* at 00:33-00:34.  The Second GMA Story then showed another video excerpt that could arguably support Plaintiff's view, which showed that while Phillips and Plaintiff were looking at each other, one of the Native American demonstrators was heard shouting, "white people go back to Europe."  *Id.* at 00:35-00:36.  Reshef then explained there is "new video shedding light on the moments before and after the distressing incident. A separate group of protesters can be heard hurling slurs at the young Kentucky students gathered at the March for Life."  *Id.* at 01:16-01:26.  The report showed one of the Black Hebrew Israelite protestors shouting: "a bunch of future school shooters!" *Id.* at 01:27-01:29.  The broadcast ended with the following exchange between Reshef and the anchors (*id.* at 02:03-02:35):

> George Stephanopoulos:  This is such a cautionary tale, I have to say, I saw that first image on Saturday morning, and it seemed absolutely outrageous.

> Erielle Reshef:  It seemed clear.

> George Stephanopoulos:  But it shows what you can do with editing footage, a single image.  This was a much, much more complicated story.  And it appears, at least, that this young man was trying to do the right thing in some measure, maybe he didn't do it perfectly, but trying.

> Erielle Reshef:  Yeah, there was definitely a rush to judgment by a lot of people.  And I think it's a teachable moment in our country and about the fact that this country is so polarized.

> Robin Roberts:  It was a very lengthy video, didn't you say...

> Erielle Reshef:  Yes. An hour and 45 minutes, I watched.

> Robin Roberts:  So it's hard just to take a snippet from it.

> Cecilia Vega:  And it goes viral that quickly.

Erielle Reshef: It does, yeah.

### C.    The Third Article and ABC7 Local Television Story

#### 1.    The Text of the Third Article

The Third Article was published on January 21, 2019 on the website of ABC7, ABC's local New York City station, and was also published on the websites of other local stations owned by ABC.  Compl. ¶¶ 225, 231 & Ex. I; Ex. 3 to this motion.  Regarding "blocking," the Article focused on the video of the Black Hebrew Israelites and reported that it showed that Phillips "approaches the group along with another drummer."  Ex. 3 at 2.  The Article reported that Plaintiff denied blocking anyone, and that Phillips "eventually comes face to face with Sandmann, who claims he was the one trying to deescalate the situation."  *Id*. at 3.  It also quoted Plaintiff's explanation that "I believed that by remaining motionless and calm, I was helping to diffuse the situation."  *Id*.

The Third Article also detailed the "dueling accounts [that] emerged as the nation picked apart footage from dozens of cellphones that recorded the incident," including Phillips' assertion to the Associated Press that "some students backed off, but one student wouldn't let him move."  *Id*.  The Article contrasted that with Plaintiff's statement that he did not block him (*id.*):

> Sandmann said he heard no student chant anything beyond school spirit chants, and that he hadn't even been aware of the Native American group until Mr. Phillips approached him.
>
> "The protester everyone has seen in the video began playing his drum as he waded into the crowd, which parted for him. I did not see anyone try to block his path," Sandmann wrote.  "He locked eyes with me and approached me, coming within inches of my face.  He played his drum the entire time he was in my face."

More broadly, the Third Article focused heavily on the videos of the Black Hebrew Israelites, and explained that those videos "reveal a fuller picture of what led up the clash and seem[] to show the students being verbally attacked first, by a different group of demonstrators at the Lincoln Memorial."  *Id*. at 1.  The Article explained that the video shows "a small group of

black men who identify themselves as Hebrew Israelites first shouting hateful and racially combative things at everyone – the Native Americans, other black men, the Covington Catholic students who were in town for the anti-abortion Right to Life March, and even a priest." *Id*. The Article gave multiple examples of specific epithets the group shouted at the students, such as "a bunch of child molesting (expletive)" and "a bunch of incest babies." *Id*. The Third Article then quoted Plaintiff's explanation that the students were performing "school spirit chants to counter the hateful things that were being shouted at our group." *Id*. at 2.

The Article also reported that "Sandmann said one of the Native American protesters yelled at them that they 'stole our land' and they should 'go back to Europe,' but that he never spoke to or interacted with Phillips. 'To be honest, I was startled and confused as to why he had approached me.'" *Id*. The Article even displayed Plaintiff's statement in its entirety. *Id*. at 2.

### 3.    The ABC7 Eyewitness News Story

The Third Article was accompanied by an embedded video of an ABC7 television news report about the incident ("the ABC7 Story"). Compl. ¶ 226; Ex. 3-A. The only mention of "blocking" the ABC7 Story made was to report Plaintiff's statement that he was not blocking anyone. Correspondent Liz Cho reported that the video of the Black Hebrew Israelites showed that it was Phillips who first approached the students, and her story showed an excerpt of an interview with Phillips who said he did that to try to get in between the two groups. Cho then reported that "Phillips, a Vietnam veteran, walks around and eventually comes face-to-face with Sandmann, who says he was the one trying to de-escalate the situation saying, 'I believed that by remaining motionless and calm, I was helping to diffuse a situation.'" Ex. 3-A at 02:08-02:20.

Otherwise, the ABC7 Story focused on the video of the Black Hebrew Israelites, which Cho reported "seems to show the students being verbally attacked first by a different group of

demonstrators at the Lincoln Memorial." *Id*. at 00:06-00:15.  Cho said the video showed "a

small group of black men who identify themselves as Hebrew Israelites first shouting hateful and

racially combative things at everyone," and the ABC7 Story then showed multiple examples of

what they shouted.  *Id*. at 00:36-01:08.  Cho noted that the "students at first just watch and did

not engage."  *Id*. at 01:08-01:13.

### D.     The Fourth Article

The Fourth Article was also published on local station ABC7's website on January 20,

2019, and it included one of the "viral videos."  Compl. ¶¶ 235-236 & Ex. J; Ex. 4 to this motion.

Regarding "blocking," the Fourth Article included the statements by Plaintiff and a fellow

student, as well as two different statements made to the news media by Phillips which the

Complaint alleges would supposedly alert readers to Phillips' inconsistency.  Compl. ¶¶ 146,

149.  The Article began by reporting that Phillips told the Associated Press that "he felt

compelled to get between two groups with his ceremonial drum to defuse a confrontation." *Id.* at

1.  The Article then reported about the Black Hebrew Israelites disparaging the students,

followed by Plaintiff's perspective, including:

> I believed that by remaining motionless and calm, I was helping to diffuse the
> situation…. I never felt like I was blocking the Native American protestor.  He did
> not make any attempt to go around me.  It was clear to me that he had singled me
> out for a confrontation, although I am not sure why.

*Id.* at 2.  The Article turned back to the claims of Phillips and another Native American protestor,

including another statement by Phillips to the Associated Press that "[s]ome students backed off,

but one student wouldn't let him move."  *Id*. at 3.  The Article then quoted the same statement

from another Covington Catholic student at the rally that was in the First Article, claiming that it

was Phillips who approached Plaintiff as the Black Hebrew Israelites accosted the students, and

that Plaintiff merely stood there while Phillips beat a drum in his face.  *Id*.  The Article

concluded with a statement from the Diocese of Covington criticizing the students.  *Id*.

## II.    THIS ACTION

Plaintiff asserts a cause of action for defamation arising out of the four ABC Articles and

embedded video reports.  The Complaint principally alleges the Articles defamed him because

they included Phillips' allegations to other news outlets that Plaintiff "blocked" him or "wouldn't

let him move."  Compl. ¶¶ 207, 218, 228, 238.  The Complaint also appears to allege the Articles

defamed Plaintiff by reporting Phillips' statements that he heard some students chanting "build

that wall."  Compl. ¶¶ 209, 220, 228, 238.  Plaintiff seeks $95 million in damages.

### ARGUMENT

This motion is guided by the Court's rulings following motion practice in Plaintiff's first

three cases.  In Kentucky, the first element of a defamation claim requires "a false and

defamatory statement concerning another."  *Washington Post*, 401 F. Supp. 3d at 787.  As this

Court noted, this element incorporates several distinct requirements: that a statement be "of and

concerning" the plaintiff; that the words state verifiable facts, not opinions; and that the

statement be false and *defamatory*, or as alleged in this case, defamatory *per se*.  *Id.* at 788-90.

A key question identified by the Court was whether Phillips' statement to *The

Washington Post* that Plaintiff allegedly "blocked" him or "would not allow him to retreat"

expressed an opinion within the context in which it was reported.  However, to grant ABC's

motion, it is not necessary to address how the fact-opinion distinction applies here.  Rather, this

case may be dismissed for the threshold reason that the ABC Articles are not defamatory,

because, when read as a whole, none of them say that Plaintiff blocked Phillips.  Instead, the

Articles reported that the "blocking" comment Phillips made to other media was being called

into question by Plaintiff, by another student who said that Plaintiff *did not* block Phillips, and by

other information that could support Plaintiff's position, such as video showing that it was

Phillips who approached the students.  Because the gist of each article does not carry the

defamatory meaning Plaintiff alleges, the Complaint may be dismissed on that ground alone.

**I.    THE ABC ARTICLES ARE NOT DEFAMATORY BECAUSE THEIR GIST DOES NOT ASSERT THAT PLAINTIFF BLOCKED PHILLIPS**

   **A.    Each ABC Article Must Be Analyzed as a Whole to Assess Whether It Asserts that Plaintiff Blocked Phillips**

The principles of law that govern this motion are not controversial.[2]  Whether a

challenged statement is defamatory, as Plaintiff alleges here, is a question of law to be

determined by the Court.  *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003);

*Washington Post*, 401 F. Supp. 3d at 789-95; *Chaterjee v. CBS Corp.*, 2020 WL 592324, at *8

(E.D. Ky. Feb. 6, 2020).  Specifically, the Court's task is to "determine[] whether a

communication is capable of bearing a particular meaning" alleged by the plaintiff, and, if so,

"whether that meaning is defamatory."  *Desai v. Charter Commc'ns, LLC*, 381 F. Supp. 3d 774,

787 (W.D. Ky. 2019) (quoting Restatement (Second) of Torts § 614), *appeal filed*, No. 19-5467

(6th Cir. May 1, 2019).  A statement may not be read in isolation, but rather a court must

"analyze the article in its entirety and determine if its gist or sting is defamatory."  *Washington*

*Post*, 401 F. Supp. 3d at 790 (quoting *McCall v. Courier-Journal & Louisville Times Co.*, 623

S.W.2d 882, 884 (Ky. 1981)); *see also McCall*, 623 S.W.2d at 884 ("It is an elementary principle

of the law of libel that the defamatory matter complained of should be construed as a whole.");

---

[2]  Generally, to survive a motion to dismiss, Plaintiff must plead facts sufficient to support every element of his claim that are "enough to raise a right to relief above the speculative level" to survive a motion to dismiss under Rule 12(b)(6).  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint must be dismissed where the facts alleged, accepted as true for purposes of the motion, would not "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

*Chatterjee*, 2020 WL 592324, at *8 ("As Kentucky law instructs, the Court assesses the language within the overall published piece.").

In its prior rulings, the Court applied these principles to the specific *Washington Post*, NBC, and CNN news reports that were at issue in those cases.  Many of those news reports did not include the same kind of information that directly disputed Phillips' blocking statement.  *See, e.g.*, *Washington Post*, No. 2:19-cv-00019, D.E. 65-7, 65-8, 65-9; *NBC*, No. 2:19-cv-00056, D.E. 23-8, 23-12; *CNN*, No. 2:19-cv-00031, D.E. 39-8, 39-9.  In that context, in one of its orders the Court held that Phillips' blocking statement could plausibly be defamatory *per se* for purposes of a preliminary motion.  *NBC*, D.E. 43 at 2.  But just because the gist of one news report containing a particular statement may be defamatory does not mean all news reports are.  Rather, the ABC stories must be analyzed separately to determine whether their gist is defamatory based on what each one, read in its entirety, actually reported.

The Sixth Circuit's recent decision in *Croce v. N.Y. Times Co.*, 930 F.3d 787 (6th Cir. 2019), is particularly instructive.  While *Croce* applied Ohio law, Ohio applies the same test as Kentucky for the issue relevant to this motion:  the court must "read[ ] the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory."  *Id.* at 792-93.  Applying that test, the Court affirmed dismissal of a defamation claim arising out of a newspaper article that reported on serious allegations of misconduct because "stating that there are allegations against someone and raising these concerns does not necessarily imply guilt."  *Id*. at 794.

The article at issue in *Croce* reported on "years of ethics charges" against a cancer researcher.  The Sixth Circuit recognized that, standing alone, these allegations could have been defamatory, and even that "the mere publication of a denial" would not necessarily change that.

14

*Id*. at 795 (quoting *Connaughton v. Harte-Hanks Commc'ns*, 842 F.2d 825, 837-38 n.6 (6th Cir. 1988)).  But the Court concluded that the article was not actionable because it "does more" by presenting contrary information and viewpoints, not just from the plaintiff but from others as well.  *Id*. at 794-95.  The Court found that, read as a whole, the article did "not say Dr. Croce is guilty of any of these allegations and charges of scientific misconduct, nor does the article suggest that these allegations are true."  *Id*. at 794.  "In its full and proper context . . . the article reports newsworthy allegations with appropriate qualifying language." *Id*. at 795.  "[A] reasonable reader would therefore interpret the article as presenting two sides of this controversy," and not as defamatory.  *Id*.[3]

Courts around the country have adopted similar reasoning.  In *Chapin v. Knight-Ridder, Inc.*, the Fourth Circuit affirmed dismissal of a libel claim arising out an article that "pointedly questioned the finances" of the plaintiff's charity.  993 F.3d 1087, 1091 (4th Cir. 1993). Although portions of the article "invited the public to ask" how the charity handled donor funds, and "could certainly arouse a reader's suspicion," the court held that "[t]his invitation, rather than a libel, is the paradigm of a properly functioning press."  *Id*. at 1094, 1096.  Quoting the district court, the Fourth Circuit concluded that the article was not defamatory because it was "a story constructed around questions, not conclusions," and "advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct.  From this, a reasonable reader would not be likely to

---

[3]  After first holding that the *New York Times* article at issue was not actionable under Ohio's general principles of defamatory meaning (which are the same as Kentucky's), the Court proceeded to also affirm on the alternative ground that Ohio also recognizes an "innocent construction" rule.  *Croce*, 930 F.3d at 796-97.  Kentucky has not recognized a similar rule, and ABC does not seek to invoke it here because, as in *Croce*, Kentucky's general rule requiring that publications be read as a whole suffices to require that the Complaint be dismissed.

conclude that one answer is true and the other false." *Id.* at 1098; *see also Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 90-91 (2d Cir. 2003) (article discussing war crime allegation against plaintiff was not defamatory because the article provided affirmative reasons to doubt the truth of the allegations); *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 649 (8th Cir. 1985) (article repeating rape allegation against plaintiff was not actionable because it "cannot be read to imply that Newsweek espoused the validity of the rape allegation").

The reasoning of *Croce* and similar cases elsewhere is consistent with the analysis applied by Kentucky courts to the issue of defamatory meaning. In *Better Built Garages, Inc. v. Kentucky New Era, Inc.*, 2008 WL 4531037 (Ky. Ct. App. Oct. 10, 2008), the Kentucky Court of Appeals considered several news reports about a creditor demolishing a residence that included statements that were sharply critical of the creditor, including claiming the creditor "maliciously destroyed everything." *Id.* at *3. The court emphasized that "[t]he alleged defamatory publication should be construed as a whole" and "the Court must analyze the publication in its entirety to determine whether its gist or sting is defamatory." *Id.* at *2. After viewing each report as a whole, the court held that none were defamatory.

In *McCall*, the Kentucky Supreme Court applied the same analysis and concluded that the article at issue was defamatory, but the facts of *McCall* stand in sharp contrast to those here and further illustrate why ABC's Articles are not defamatory. *McCall* involved a newspaper article that reported an allegation that the plaintiff, an attorney, had solicited a potential client by offering to bribe a judge to fix her case. 623 S.W.2d at 883-84. Analyzing the "the gist of the article" as a whole, the Court explained that in addition to including that basic allegation, the article reported that the potential client and another witness provided sworn affidavits to the newspaper supporting the charge and it repeated references to fixing, bribery, payoffs, and illegal

conduct by the plaintiff in nine different paragraphs throughout its text.  *Id.* at 884-85.  The Court

concluded the article's allegations of bribery were therefore "so overwhelming" that a reasonable

reader would conclude the plaintiff offered to bribe the judge.  *Id.* at 885.  It also noted that the

context of the article did not involve reporting on some pre-existing controversy, but rather that it

was the article itself that first brought the allegation to the attention of the public.  *Id.* at 883-84.

By contrast, the ABC Articles reported about a pre-existing controversy and, read as a whole,

called into question Phillips' "blocking" comment with multiple references to contrary

statements, videos, and other information.

### B.    The ABC Articles Do Not Assert that Plaintiff Blocked Phillips When Each Article is Considered as a Whole

The well-established principles applied in the above cases require that this one be

dismissed.  The Complaint alleges that ABC "publish[ed] without any investigation Phillips'

narrative as if it were a truthful, factual account of the January 18 incident or of Phillips' feelings

or reactions during those events" (Compl. ¶ 107); that its "coverage emphasized that Nicholas

blocked Phillips' retreat" (*id.* ¶ 165); and that "ABC published specific imputations of specific

conduct, such as that Nicholas 'blocked' Phillips' 'retreat'" (*id.* ¶ 202).  But when each is read as

a whole, the ABC Articles and included television reports simply do not say that.

Far from reporting Phillips' blocking allegation as the definitive account of what

occurred on the Mall, each of the four Articles presented it as one of Phillips' initial statements

to other news organizations that was now being directly disputed by Plaintiff and another student

witness,[4] and was also being called into question by other evidence including video that differed

---

[4]  *See, e.g.*, Ex. 1 at 3 (noting Plaintiff "defending his actions in a statement on Sunday and stated that "I was not intentionally making faces at the protestor."); *id.* (quoting another student that Plaintiff "didn't say anything or move – he just stood there," before letting Phillips "walk[] away"); Ex. 2 at 3 (quoting Plaintiff that "I never interacted with this protestor.  I did not speak

from the original "Viral Video" that had sparked the controversy.[5]  Each of the ABC Articles not

only provides an abundance of exactly the sort of "qualifying language" that distinguishes

protected reporting on public controversies from defamation, *see Croce*, 930 F.3d at 795, they

also affirmatively include specific statements and other information that contrast with Phillips'

comment.  And unlike cases like *McCall*, ABC did not obtain affidavits or anything of the kind

to substantiate that Plaintiff blocked Phillips, nor did any Article repeat nine times that Phillips

was blocked, nor did any of the ABC Articles first bring Phillips' "blocking" comments to the

public's attention.  To the contrary, each of the Articles reported on a pre-existing controversy by

pointing to a "blocking" comment that Phillips had made to other media in the context of

reporting about other statements and video which raised questions about or conflicted with it.

 The First GMA Story even prominently displayed throughout the broadcast a *question*

("What Sparked the Moment on Video?") to make clear that the story raised questions about

whether the original "Viral Video" told the complete story.  "It is generally settled as a matter of

---

to him.  I did not make any hand gestures or other aggressive moves," and that "I did not see anyone try to block his path."); Ex. 3 at 3 ("Phillips eventually comes face to face with Sandmann, who claims he was the one trying to deescalate the situation.  'I believe that by remaining motionless and claim, I was helping to diffuse the situation,' he said in his statement."); Ex. 4 at 2 ("I never felt like I was blocking the Native American protestor.  He did not make any attempt to go around me."); *id.* at 3 (quoting student supporting Plaintiff).

[5]  *See, e.g.*, Ex. 1 at 2 ("Another video showed Phillips appear to approach the group of students before the stare down."); Ex. 1-A at 01:36-01:40 ("Overnight, new video calling into question just how this encounter began."); Ex. 2-A at 00:13-17, 01:11-01:20  ("But now another video is raising new questions about what really happened before the incident . . . . Phillips claims the teens were chanting build that wall. So far no footage has surfaced backing up that claim, but this morning, new video shedding light on the moments before and after the distressing incident."); Ex. 3 at 1 (videos of Black Hebrew Israelites "reveal a fuller picture of what led up the clash and seem[] to show the students being verbally attacked first"); Ex. 3-A at 00:06-00:15 ("The video seems to show the students being verbally attacked first by a different group of demonstrators at the Lincoln Memorial."); Ex. 4 at 1 ("Other videos also showed members of the religious group, who appear to be affiliated with the Black Hebrew Israelite movement, yelling disparaging and profane insults at the students . . .").

defamation law" that it is not defamatory for a defendant to raise questions by reporting about a controversy, even where – unlike here – the defendant does not present both sides.  *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015).  As the D.C. Circuit noted, "just imagine the severe infringement on free speech that would ensue" if courts punished defendants merely for raising questions.  *Id*. at 1339; *see also Chatterjee*, 2020 WL 592324, at *9 (question in news broadcast about whether plaintiff knew that doctors at his clinic were performing unnecessary procedures was not defamatory under Kentucky law because it "permits a range of answers (negative included)" and "Chatterjee denied knowledge, on camera").  In fact, some portions of the ABC reports went so far as to expressly support *Plaintiff's* version of events.  The Second GMA Story concluded with ABC News anchor George Stephanopoulos's comment that "it appears, at least, that this young man was trying to do the right thing in some measure, maybe he didn't do it perfectly, but trying."  Ex. 2-A at 02:16-02:21.

That the ABC Articles do not support the defamatory meaning Plaintiff alleges may be further demonstrated by comparing some of the specific allegations of the Complaint with the actual Articles and embedded broadcasts.  Large portions of Plaintiff's 60-page Complaint against ABC are just cut-and-pasted from the First Amended Complaints Plaintiff filed last year, except the name of the defendant is changed to "ABC."  *Compare, e.g.*, Compl. ¶¶ 34-91, 92-129, 131-158 & 164-173 *with NBC*, D.E. 23 ¶¶ 64-122, 132-169, 171-198, 207-218.  But when applied to the ABC Articles, those recycled allegations lack merit.

For example, the Complaint alleges that in the First Article, "ABC paints the false picture that it was Nicholas and the CovCath students who first approached Phillips and the other Native Americans."  *Id.* at ¶ 210.  In fact, the *only* statement in the First Article that said anything about who approached who was Phillips' statement to the *Washington Post* that "the dozens of teens

19

began to swarm around his group," which did not even specifically reference Plaintiff.  Ex. 1 at 2; *see Washington Post*, 401 F. Supp. 3d at 791 (holding statements referring to "the teens" are not of and concerning Plaintiff).  Otherwise, even before quoting that statement, the First Article reported that "[a]nother video showed Phillips appear to approach the group of students before the stare down" and included a link to that video.  Ex. 1 at 2; Ex. 1-C.  The First Article also reported that one of Plaintiff's classmates told ABC News that "an Indigenous American man with a few other men approached the center of the boys and in particular one boy," and it reported Plaintiff's statement that "perhaps a group of adults [was] trying to provoke a group of teenagers into a larger conflict."  Ex. 1 at 3.  Moreover, the First GMA Story reported there was "new video calling into question just how this encounter began, appearing to show Phillips approaching the crowd of boys as they chant their school letters", and it aired that video.  Ex. 1-A at 01:36-01:47.  In short, the First Article did not "paint" the "picture" that Plaintiff approached Phillips, nor did any of the other ABC articles.

Finally, it is also telling that many of the key videos and other information the Complaint alleges journalists *should* have reported actually *were* included in the ABC news reports.  To note just a few of the numerous examples:

- The Complaint (¶ 262) alleges ABC should have sought information from people at the scene, such as Plaintiff and other classmates.  In fact, all the ABC Articles quoted Plaintiff's statement, and the First and Fourth Articles also quoted a classmate.

- The Complaint (¶¶ 83-84) alleges ABC should have been aware of a video that showed Phillips approaching the students.  In fact, the First Article reported on and linked to that very video, and the First GMA Story played it.  *See* Ex. 1 at 2; Ex. 1-C; Ex. 1-A at 01:36-01:47.

20

• The Complaint (¶¶ 80-81) alleges that a video of the Black Hebrew Israelites should have been aired.  The Second GMA Story aired portions of it, as did the ABC7 Story, and the Third and Fourth Articles reported about it.  *See* Ex. 2-A at 01:20-01:32; Ex 3-A at 00:00-00:15, 00:31-01:13. Ex. 3 at 1-3; Ex. 4 at 1; *compare also* Compl. ¶ 80 (describing the "1 hour and 46 minute video") *with* Ex. 2-A at 02:28-02:32 (GMA anchor Robin Roberts:  "It was a very lengthy video, didn't you say?"; Correspondent Erielle Reshef: "Yes, an hour and 45 minutes, I watched it.").

• The Complaint (¶ 60) alleges that another Native American protestor shouted, "white people, go back to Europe."  The Third Article reported that, Ex. 3 at 2 ("Sandmann said one of the Native American protesters yelled at them that they "stole our land" and they should "go back to Europe"), and the Second GMA Story aired those very words (Ex. 2-A at 00:33-00:34):



• The Complaint (¶¶ 146-158) alleges that Phillips made inconsistent statements to the media, such as *The Washington Post*, Associated Press, and *The Detroit Free Press*.  The ABC Articles included those statements, so readers were in a position to make that judgment for themselves.  *See* Ex. 2-A at 01:30-01:37; Ex. 4 at 1.

Indeed, the facts of this case illustrate why courts do not hold news reporting like the ABC Articles to be defamatory.  If the law were otherwise, it would be impossible for news organizations to report on public controversies with competing narratives.  *See Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 510 (6th Cir. 2015) ("[A] vast amount of what is published in the

daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did.") (quoting *Time, Inc. v. Pape*, 401 U.S. 279, 285 (1971)).  Plaintiff's statement would be incomprehensible to ABC's audience if the allegations he was responding to could not be reported.  Moreover, not just Plaintiff, but everyone on all sides of this controversy could sue ABC over the same articles.  Phillips could sue ABC for reporting Plaintiff's side, claiming that by including those statements ABC implicitly called Phillips a liar.  Others who spoke out on each side could do the same.  It is not Kentucky law that the more sides of an issue the press presents, the more lawsuits it subjects itself to.  The Complaint should be dismissed.

## II.    THE ALLEGED DEFAMATORY MEANING IS NON-ACTIONABLE OPINION IN THE CONTEXT OF THE ABC ARTICLES

Alternatively, if the Court were to consider the fact-opinion distinction in this case as well, the Complaint should be dismissed because the ABC Articles did not report Phillips' blocking statement as a factual account of what happened at the Lincoln Memorial.  As this Court explained in its prior decisions, a statement is not actionable if it is understood by reasonable readers as opinion. *Washington Post*, 401 F. Supp. 3d at 791-92.  Statements of opinion are distinctly protected by both the First Amendment and Kentucky law. *Id.*  In its prior decisions, the Court ultimately ruled that Plaintiff had plausibly alleged that as it had been reported by the other news organizations, Phillips' "blocking" comment was a false statement of fact, and discovery into the circumstances alleged by Phillips would be necessary before the Court could resolve that issue.  For example, the Court noted allegations in the First Amended Complaints alleging that Phillips was an interested advocate who was lying.

But here too, there is no "one size fits all" approach to whether words are fact or opinion.  Rather, as this Court has previously ruled, a statement must be assessed from the perspective of "a reasonable person reading the statement in the context of the whole article" to determine

whether it constitutes opinion.  *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881 (E.D. Ky. 2006) (citation omitted), *aff'd*, 280 F. App'x 503 (6th Cir. 2008).  The ABC Articles included Phillips' "blocking" comment as just one part of one side of a raging controversy that was being called into question by other accounts, and ABC also disclosed underlying facts which explained why there were conflicting accounts.  For example, ABC reported about video taken from different angles at different points in time, the epithets hurled by the Black Hebrew Israelites, a Native American protestor appearing to shout "white people, go back to Europe," and video suggesting that Phillips approached the students.

And because Phillips' statement was reported as just one part of a larger picture, it must be assessed within the full context of how ABC reported all of that information about the blocking issue, which is replete with subjective assessments.  ABC reported that Plaintiff said "I never felt like I was blocking anyone," "I believed that by remaining motionless and calm I was helping to diffuse the situation," and "perhaps a group of adults was trying to provoke a group of teenagers into a larger conflict."  *See, e.g.*, Ex. 1 at 2; Ex. 2 at 3; Ex. 3 at 3: Ex. 4 at 2.  Another student saw it as "he [Plaintiff] just stood there."  *See, e.g.*, Ex. 1 at 2; Ex. 4 at 3.  And the general tenor of ABC's reporting was that there were "dueling accounts" and videos filmed at different times from different vantage-points which "appeared" to show different things and were "calling into question" initial reports about the confrontation.  *See, e.g.*, Ex. 1 at 1; Ex. 1-A at 01:36-01:39; Ex. 3 at 3.  Because the ABC Articles presented Phillips' comment as just one part of varying accounts of a controversial and "confusing" event, reasonable readers would construe it as one of multiple subjective perspectives.  Courts assessing similar reporting in the context of impassioned statements on all sides of a public controversy have held that particular statements made by each side should be treated as opinion.  *See, e.g.*, *Riley v. Harr*, 292 F.3d 282, 291-92

(1st Cir. 2002) (author's inclusion of lawyer's allegation that plaintiff lied under oath was not a statement of fact because the book "makes plain both the strengths and the weaknesses of the case against Riley"); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (because "the format of the Sixty Minutes Program is an exploration of both sides of controversial topics and individuals," dueling statements "on opposite sides of the heated debate" would be understood as opinion); *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1136 (W.D. Wash. 2007) (author's "reproduction of [defendant's] statements in the course of presenting both sides of the argument is thus protected by the First Amendment" as non-actionable opinion).  The Complaint should be dismissed on this ground as well.

## III.   THE COMPLAINT ALSO FAILS TO STATE A CLAIM BASED ON ANY OTHER ALLEGEDLY DEFAMATORY STATEMENTS

The Complaint also makes cursory references to other allegedly defamatory statements in addition to the blocking statement, all of which were dismissed by this Court's prior rulings in the context of Plaintiffs' first three cases.[6]  It is not clear to ABC whether Plaintiff  intends to ignore those rulings and proceed against ABC in any event, but if so the Complaint should be dismissed for the same reasons those allegations failed in Plaintiff's earlier lawsuits: they are not "of and concerning" Plaintiff, nor defamatory, and most are merely rhetorical hyperbole and opinion.  *See Washington Post*, 401 F. Supp. 3d at 790-97.  Most specifically, the Complaint alleges that ABC falsely accused Plaintiff of chanting "build that wall," thereby implying he is a racist.  Compl. ¶¶ 167-172, 209, 220, 229, 239.  That claim was also previously dismissed, and

---

[6]  *See* Compl. ¶ 3 (that Plaintiff "confronted and threateningly instigated a confrontation"); ¶ 5 (he "physically assaulted and harassed Native Americans"); ¶ 6 (he committed "a hate crime"); ¶ 7 (engaged in "menacing racial intimidation"); ¶ 211(a-c) (same); ¶ 221(a-c) (same); ¶ 230 (a-c) (same); ¶ 240 (a-c) (same).

should be here for the same reasons: no one alleged Plaintiff shouted that, nor would that statement be defamatory even if someone had.  *Washington Post*, 401 F. Supp. 3d at 795.

Moreover, even if those theories of defamation had not previously been dismissed, they would fail here for the same reason as the "blocking" statement.  Read as a whole, the Articles did not accuse Plaintiff of threatening, assaulting, harassing or racially intimidating Phillips, nor did they accuse him of a hate crime.  Nor did they accuse anyone, let alone Plaintiff personally, of chanting "build that wall."  The ABC reports are replete with statements denying or calling into question that allegation.  *See, e.g.*, Ex. 1 at 3 (Sandmann said "he never heard any students chant build that wall"); *id.* (another student said "[t]he boy from my school didn't say anything . . ."); Ex. 2 at 3 (same Sandmann statement); *id.* Ex. I at 3 (same); Ex. 4 at 3 (same statement from student); Ex. 1-A at 01:56-02:16 (same); Ex. 2-A at 01:11-01:20  ("Phillips claims the teens were chanting 'Build That Wall.'  So far no footage has surfaced backing up that claim.").

## IV.    THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

Finally, this lawsuit was filed on March 2, 2020, while all the ABC reports at issue were allegedly published on January 20 and 21, 2019.  Since Plaintiff has already filed suit over this incident, the one-year statute of limitations for defamation claims is not tolled by his status as a minor.  *See Tallman v. City of Elizabethtown*, No. 2006-CA-00712, 2007 WL 3227599 (Ky. Ct. App. Nov. 2, 2007); Ky. Rev. Stat. Ann. § 413.140(1)(d).  This issue is fully briefed in the motions to dismiss by other media defendants, *see, e.g.*, *CBS* (No. 2:20-cv-00024), and, rather than repeat the same arguments here, ABC refers the Court to those motions.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their motion and dismiss the Complaint with prejudice.

Respectfully submitted,


*/s/ Robert B. Craig*
Robert B. Craig (15590)
TAFT STETTINIUS & HOLLISTER LLP
1717 Dixie Highway, Suite 910
Covington, KY 41011
Phone: (859) 547-4300
Fax: (513) 381-6613
craigr@taftlaw.com

Nathan Siegel (*pro hac vice*)
Adam Lazier (*pro hac vice* forthcoming)
Nicolette Vairo (*pro hac vice* forthcoming)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave NW Suite 800,
Washington, DC 20006
Phone: (202) 973-4237
Fax: (202) 973-4437
nathansiegel@dwt.com
adamlazier@dwt.com
nicolettevairo@dwt.com

Counsel for Defendants
ABC News, Inc., ABC News Interactive,
Inc., and The Walt Disney Company

27127618.1