**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 20-23-WOB-CJS**

**NICHOLAS SANDMANN, by and**
**through his parents and natural guardians,**
**TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**THE NEW YORK TIMES COMPANY**
**d/b/a THE NEW YORK TIMES**                                              **DEFENDANT**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

**CIVIL ACTION NO. 20-24-WOB-CJS**

**NICHOLAS SANDMANN, by and**
**through his parents and natural guardians,**
**TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**CBS NEWS, INC., et al.**                                                        **DEFENDANTS**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

**CIVIL ACTION NO. 20-25-WOB-CJS**

**NICHOLAS SANDMANN, by and**
**through his parents and natural guardians,**
**TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**ABC NEWS, INC., et al.**                                                        **DEFENDANTS**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

**CIVIL ACTION NO. 20-26-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**GANNETT CO., INC., et al.**                    **DEFENDANTS**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

**CIVIL ACTION NO. 20-27-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**ROLLING STONE, LLC, et al.**                    **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF NICHOLAS SANDMANN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**[ORAL ARGUMENT REQUESTED]**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ............................................................................................ 1

II.  UNDISPUTED FACTS ................................................................................... 3

   A.   The January 18 Incident. ......................................................................... 3

   B.   The Defendants' Publications. ............................................................... 10

   C.   This Court's Prior Rulings. .................................................................... 12

III. LEGAL STANDARD .................................................................................... 14

IV.  ARGUMENT ................................................................................................ 15

   A.   Summary of Argument. .......................................................................... 15

   B.   Summary of Evidence in Support. .......................................................... 15

   C.   Videographic Evidence is Particularly Compelling for Summary Judgment. ................... 17

   D.   There is No Genuine Dispute of Material Fact on the Issue of Falsity; the Blocked/Retreat Statements are False. ................................................................... 18

      1.   The Blocked/Retreat Statements Were Not True Nor "Substantially True." ................ 18

      2.   Phillips Used and Intended to Convey the Term "Block" In Its Active Sense, As Evidenced by the Context in Which He Used the Term. ..................................... 19

   E.   That Sandmann Did Not "Block" Phillips Cannot Be Disputed. ...................... 22

V.   CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Buckman v. Morris,*
    736 Fed. App'x. 852, 853-54 (11th Cir. 2018) ...................................................17

*Croce v. New York Times Company,*
    345 F. Supp. 3d 961, 983 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787, 798 (6th Cir. 2019).....19

*Hall v. Wash. Metro. Area Transit Auth.,*
    33 F. Supp. 3d 630, 632 (D. Md. 2014) ...........................................................17

*Kentucky Kingdom Amusement Co., v. Belo Kentucky, Inc.,*
    179 S.W.3d 785, 791-92 (Ky. 2005)..................................................................18

*Masson v. New Yorker Magazine, Inc.,*
    501 U.S. 496, 512-13 (1991) .........................................................................19

*National College of Kentucky, Inc., v. Wave Holdings, LLC,*
    536 S.W.3d 218, 223-24 (Ky. Ct. App. 2017)..................................................19

*Scott v. Harris,*
    550 U.S. 372, 381 (2007).............................................................................17

*Stringer v. Wal-Mart Stores, Inc.,*
    151 S.W.3d 781, 795 (Ky. 2004) ..................................................................18

*Tannerite Sports, LLC v. NBC Universal Media LLC,*
    135 F. Supp. 3d 219, 233 (S.D.N.Y. 2015)............................................18, 19

*Yancey v. Hamilton,*
    786 S.W.2d 854, 857 (Ky. 1989) ..................................................................18

**Other Authorities**                                                        **Page(s)**

Fed. R. Civ. P. 56(a) ...........................................................................14

Fed. R. Civ. P. 56(c) ...........................................................................14

Fed. R. Evid. 702 ..............................................................................20

Fed. R. Evid. 902 ..............................................................................10

## I.    <u>INTRODUCTION</u>

On January 18, 2019, while awaiting a bus to take him and his high-school classmates home after a day in Washington, D.C., the plaintiff Nicholas Sandmann ("Nicholas" or "Sandmann") was confronted on the Washington Mall by Nathan Phillips ("Phillips"), a Native American political activist. Phillips walked up to Sandmann, stood inches in front of him, and beat his drum. Sandmann remained silent, smiling awkwardly throughout. In a few brief minutes, the encounter was over. Yet in publications in the aftermath of this encounter, the defendants, all news media corporations, described Sandmann's behavior in aggressive terms, quoting Phillips to state that Sandmann was "blocking" Phillips and "wouldn't let him retreat," "stop[ping] his exit," and otherwise preventing his escape. These statements were loaded with defamatory implications. In the heated political climate in which they were made, the statement that a white teenager from a private Catholic school wearing a red "MAGA" hat was physically blocking the progress or regress of a peaceful Native protestor, a Vietnam war veteran, carried unmistakable connotations of racism, intolerance, intimidation, and insensitivity. The consequences for Sandmann were catastrophic and immediate. While he slept unaware on his bus ride home, his face, bearing that awkward and embarrassed smile, became a target for invective and hatred, his name and reputation forever tarnished. This result was a foreseeable consequence of the defendants' defamation.

The parties in the five above-captioned cases have agreed to a discovery plan consisting of two phases.[1] Phase one was limited to the issue of "truth"; specifically, to "whether Nathan Phillips' statements that Plaintiff 'blocked' him or 'prevented him from retreating' (sometimes

---

[1] *Sandmann v. The New York Times Co.,* Case No. 2:20-cv-23 (Doc. 38); *Sandmann v. CBS News, Inc., et al.*, Case No. 2:20-cv-24 (Doc. 44); *Sandmann v. ABC News, Inc.,* Case No. 2:20-cv-25 (Doc. 49); *Sandmann v. Gannett Co., Inc.,* Case No. 2:20-cv-26 (Doc. 50); *Sandmann v. Rolling Stone, LLC*, Case No. 2:20-cv-27 (Doc. 45).

referred to herein as the "Blocked/Retreat Statement(s)") are true or substantially true, or otherwise not actionable based on the undisputed facts developed during initial discovery and the issues defined in the Court's prior decisions."[2] This motion for partial summary judgment occurs at the end of phase one. The Court has already ruled that the Blocked/Retreat Statements, if false, are libelous *per se*.[3] In so holding, the Court has, in practical effect, ruled that the Blocked/Retreat Statements (if false) are actionable as a matter of law and constitute statements of fact, not mere opinion or rhetorical hyperbole. This phase of discovery is relevant to the (presumed) plan of the defendants to plead "truth or substantial truth" as an affirmative defense.

This partial motion for summary judgment is limited to resolving a key issue: that the statements accusing Sandmann of blocking Phillips and preventing his retreat from the January 18 Incident are not "true or substantially true," but instead are false. The evidence obtained during phase one discovery makes clear that there is no genuine dispute of fact on this issue. The statements are false, and this motion for partial summary judgment should be granted. In this matter, summary resolution on the issue of "falsity" is unusually straightforward. Unlike most issues of fact, which can only be established by consideration of multiple pieces of evidence, most of it circumstantial, this case has clear video evidence, taken simultaneously and from several angles. The video record is substantial and unambiguous. It requires no interpretation, no mediating explanation, no spin. The video evidence unmistakably proves that the claim that Sandmann blocked Phillips or that he prevented his escape is not true, nor even close to true. No

---

[2] *Sandmann v. The New York Times Co.,* Case No. 2:20-cv-23 (Doc. 38); *Sandmann v. CBS News, Inc., et al.*, Case No. 2:20-cv-24 (Doc. 44); *Sandmann v. ABC News, Inc.,* Case No. 2:20-cv-25 (Doc. 49); *Sandmann v. Gannett Co., Inc.,* Case No. 2:20-cv-26 (Doc. 50); *Sandmann v. Rolling Stone, LLC*, Case No. 2:20-cv-27 (Doc. 45).

[3] See Section II.C, *infra*.

jury need to be charged to determine what is an utterly patent conclusion: that Sandmann did not block Phillips, nor prevent his retreat from the January 18 Incident.

## II.    UNDISPUTED FACTS

### A.  The January 18 Incident.

On January 18, 2019, Plaintiff Nicholas Sandmann, a 16-year-old high school student, traveled from northern Kentucky to Washington, D.C. on a school field trip to attend the March for Life with a group of students from his high school, Covington Catholic High School.[4] (Sandmann Dep. 37-38, 99-100, 174).[5] It was the first time Nicholas had ever been to Washington, D.C. and the first time he had participated in the March for Life. (*Id.* at 35; 47-48). Nicholas and his classmates boarded buses and departed northern Kentucky in the late evening on January 17, 2019. (*Id.* at 37). They arrived in Washington around 10:00 a.m. on the morning of January 18, 2019. (*Id.* at 37-38). On arrival, the school chaperones instructed the group to meet at the steps of the Lincoln Memorial at the National Mall by 5:00 p.m. to catch their buses for the return trip to Kentucky. (*Id.* at 39). After receiving those instructions, the group was free to join the March for Life or do their own sightseeing. (*Id.* at 38; 40). Nicholas and a small group of his friends decided to do their own sightseeing before rejoining the bigger group for the March for Life. (*Id.* at 39-40). They went to the Washington Monument and the White House. (*Id.* at 40-41). After leaving the White House, they went to the White House gift shop. (*Id.* at 41). Nicholas considered purchasing White House golf balls as a souvenir, but he bought a red Make American Great Again hat instead. (*Id.* at 41).

---

[4] Covington Catholic High School is sometimes referred to herein as "CovCath" or "CCH."
[5] Excerpts of the redacted transcript of the Deposition of Nicholas Sandmann are attached as ***Exhibit A*** hereto.

3

After leaving the gift shop, Nicholas and his friends joined the March for Life. (*Id.* at 45). They caught up with their classmates in the final stretch of the rally, which ended at the east side of the Capitol. (*Id.* at 45). At the Capitol, Nicholas was separated from his group of friends. (*Id.* at 45). He tried to text them to coordinate a meet-up spot, but his cell phone was not working. (*Id.* at 46). He was unsure of what time it was. (*Id.* at. 46). Afraid that he might get left behind in Washington if he was not back at the Lincoln Memorial by 5:00 p.m., Nicholas ran from the Capitol to the Lincoln Memorial to rejoin his larger school group. (*Id.* at 46).

When he arrived at the Lincoln Memorial, Nicholas went up the stairs to get a better view of the Abraham Lincoln statue. (*Id.* at 47). After viewing the statue, he walked back down the stairs and noticed that a small group of African American individuals, whom he later learned were Black Hebrew Israelites ("Hebrew Israelites"), were verbally and aggressively berating Nicholas' student group and other people on the lower steps of the Lincoln Memorial. (*Id.* at 49-50, 99; Stip. Video 4). Nicholas also noticed that an organized group of Native Americans were standing out in the distance, but no one in his student group was interacting with them. (Sandmann Dep. 47-48; 133). Nicholas would later learn that that group of Native Americans was part of the Indigenous Peoples' March happening on the same day. (*Id.* at 338).

Nick descended the stairs and rejoined his friend group within the larger student group. (*Id.* at 47). The Hebrew Israelites, grown men, were directing insults to the high school students, calling them, among other things, "incest babies" (*Id.* at 79; Stip. Video 4 at 01:07:49), "trailer park babies" (Sandmann Dep. 79; Stip. Video 4 at 01:07:55), "child molesting faggots" (Stip. Video 4 at 00:46:59), "crackers" (Sandmann Dep. 79; Stip. Video 4 at 00:49:31), and "school shooters" (Sandmann Dep. 79; Stip. Video 4 at 00:50:34). One of the Hebrew Israelites called out to the student group who appeared to be walking away, "you little dirty ass crackers, your day (sic)

4

coming. Your day (sic) coming." (Stip. Video 4 at 00:11:48). The same Hebrew Israelite called

out to the students, "I will stick my foot in your little ass." (Stip. Video 4 at 00:12:04). The Hebrew

Israelites were also directing hateful epithets to other groups at the Lincoln Memorial that day.

They called an African American CovCath student an "Uncle Tom" (Sandmann Dep. 65-66, 81-

82; Stip. Video 4 at 00:49:31, 00:47:57) and told him that the other white students were going to

"harvest his organs." (Sandmann Dep. 81-82). The Hebrew Israelites called other African

Americans at the Mall "Super Sambos" (Sandmann Dep. 66; Stip. Video 4 at 00:49:37) and

"Pepper Boys" (Sandmann Dep. 68; Stip. Video 4 at 00:49:52). Prior to Nicholas' arrival at the

Lincoln Memorial, the Hebrew Israelites were also directing insults and epithets towards Native

Americans, calling them "Uncle Tomahawks," and saying, "Indian means savage," among other

things. (Sandmann Dep. 52, 67, 145; Stip. Video 4 at 00:02:32, 00:03:11, 00:37:03). At one point,

one of the Hebrew Israelites, in response to a woman who appeared to be part of the Native

American group and had approached the Hebrew Israelites to challenge their racially charged

epithets about Native Americans, stated to the camera:

> Hey, you see this? This is the problem Israel. There's always our
> (sic) women coming up with their loud mouth thinking they can run
> and (indiscernible) things. Thinking they can come and distract
> things with their loud ass mouth cause (sic) they're not used to
> dealing with no (sic) real men.

(Stip. Video 4 at 00:08:39). Nicholas also believes that the Hebrew Israelites shouted out, "Build

That Wall." (Sandmann Dep. 72).

After being hatefully attacked by the Hebrew Israelites for a long period of time, Nicholas

and the group of students moved away from the Hebrew Israelites, putting enough distance

between the two groups in an attempt to mitigate or reduce the hateful statements being directed

at them. (Sandmann Dep. 92; Stip. Video 4 at 00:50:42). At this point, there were about 40 feet

between the two groups. (Sandmann Dep. 92; Stip. Video 4 at 00:53:53). After distancing themselves proved unsuccessful, a couple of students approached one of the school chaperones, Matthew Hansman, to ask permission to do school spirit chants to drown out the hateful statements being hurled at them. (Sandmann Dep. 88, 91). Nick was not among the students who asked the chaperones to perform school spirit chants. (*Id.* at 89). The students were granted permission and began performing school spirit chants. (*Id.* at 89). The students chanted, among other things, "we've got spirit, yes, we do; we've got spirit, how about you?" (*Id.* at 95; 105) and the letters of their school acronym, "C-C-H, C-C-H, C-C-H" (Stip. Video 18). Nicholas was wearing the Make America Great Again Hat that he purchased earlier that day, and some of Nicholas' fellow classmates were also wearing pro-President Donald Trump attire. (Sandmann Dep. 69-70, 180; Stip. Video 2).

After some time, an older Native American man, who Nicholas later learned was Nathan Phillips ("Phillips"), approached the two groups from a distance with a group of companions who appeared to be participants in the Indigenous Peoples' March happening on the same day. (Sandmann Dep. 132-33, 163; Stip. Videos 1-18; Roberts Dep. 145-48).[6] Phillips and his group walked from the northeast to the south by approximately 40 to 50 feet to approach the student group. (Sandmann Dep. 137; Stip. Video 12; Roberts Dep. Ex. A). In walking towards the students, Phillips ignored the Hebrew Israelites and focused on the students. (Stip. Video 17 at 00:01-01:30; Roberts Dep. at 152, Ex. A). Phillips' companions were holding cameras pointed towards the students. (Stip. Video 15 at 00:32). Nicholas first noticed Phillips when Phillips was walking past the Hebrew Israelites towards the student group. (Sandmann Dep. 133). As Phillips and his

---

[6] Excerpts of the transcript of the Deposition of Dr. Craige Roberts, Ph.D. are attached as ***Exhibit B*** hereto.

companions began approaching the crowd of students, Phillips was beating a drum and singing loudly. (Stip. Video 12 at 00:08-38). At this point, Nicholas was confused about Phillips' intentions. (Sandmann Dep. 141).

When Phillips and his companions reached the crowd of students, Phillips was still traveling on his northeast-to-south trajectory. (Stip. Video 4 at 01:12:18; Stip. Video 5 at 03:55; Stip. Video 12; Stip. Video 15 at 00:37-00:40; Stip. Video 17 at 01:18; Roberts Dep. Ex. A). In traveling on this trajectory, Phillips bypassed and ignored clear pathways on his right (to the West) leading to the top of the Lincoln Memorial. (Stip. Video 12 at 00:01-00:35; Roberts Dep. Ex. A). When he reached the crowd of students, Phillips walked from the right along the front edge of the group of the CovCath students, drumming and chanting loudly. (Stip. Video 4 at 01:12:18; Stip. Video 5 at 03:55; Stip. Video 12; Stip. Video 15 at 00:30; Stip. Video 17 00:01-01:30). Phillips then waded into the crowd of students, coming closer and closer to Nicholas, who was standing three or four rows into the crowd on an icy step. (Sandmann Dep. 147, 158, 161, 193, 203-204, 213; Stip. Video 4 at 00:38:57 (icy step visible); Stip. Video 17 at 02:33; Roberts Dep. at 160). As Phillips entered the crowd of students, he bumped up against one student standing in front of Nicholas, coming into physical contact with him. (Sandmann Dep. 135; 137). As he continued to wade through the crowd, Phillips nearly walked past Nicholas, who was standing on Phillips' right and slightly above him, in the place he had been standing prior to Phillips walking through the crowd. (Stip. Video 2 00:41-00:46; Roberts Dep. at 165-68, Ex. A). Just before Phillips walked past Nicholas, Phillips stopped, turned right, locked eyes with Nicholas, moved towards him, and stopped within inches of his face. (Stip. Video 2 at 00:41-00:46; Roberts Dep. at 155, 165-68, Ex. A). At the time Phillips turned right to lock eyes with Nicholas, there was a three-foot opening to Nicholas' left and to Phillips' right. (Stip. Video 2 at 00:54; Stip. Video 16 at 00:06). This opening

7

provided a clear path for Phillips to continue ascending the stairs to the Lincoln Memorial statue. (Stip. Video 2 at 00:54; Stip. Video 16 at 00:06; Sandmann Dep. 170). Phillips could have also walked out the same way he walked in, but Phillips never tried to do so. (Sandmann Dep. 149, 166-67, 170, 277). Instead, Phillips intentionally stood in front of Nicholas and did not move other than to beat his drum and sing. (Sandmann Dep. 339; Stip. Video 2 at 00:52-03:45).

When he locked eyes with Nicholas, Phillips brought his drum up to approximately 4 to 6 inches in front of Nicholas' face, beating the drum stick loudly and causing it to bounce violently in front of Nicholas' face. (Stip. Video 17 at 06:48). Phillips put his drum so close to Nicholas' face that the bottom of the drum made physical contact with Nicholas' jacket collar near his shoulder. (Stip. Video 17 at 05:50, 06:50; Sandmann Dep. 169). Nicholas did not move, but stood stock still, smiling and blinking slightly. (Stip. Video 2 at 00:51-03:45). Nicholas clasped his hands behind his back. (Stip. Video 14 at 00:03). Phillips continued to beat his drum in Nicholas' face for over two and a half minutes, never trying to move away. (Stip. Video 2 at 00:51-03:45). Nicholas felt like Phillips was trying to intimidate him and the student group. (Sandmann Dep. 169). During the long period of time, Phillips' companions got close to Nicholas and Phillips and pointed large cameras with lights at the two of them. (Stip. Video 2 at 03:00, 03:39).

During the entirety of the encounter between Nicholas and Phillips, the stipulated videos show that Phillips never tried to move up the stairs after he turned to face Nicholas; that Phillips never moved to one side or the other to go around Nicholas; that Phillips never attempted to continue along his previous trajectory; and that Phillips never turned to see whether he could retrace his path either back to the north the way he had come or east toward the Hebrew Israelites. (*See* Stip. Videos 1-18; Sandmann Dep. 173, 277, 279-80; Roberts Dep. Ex. A;). Had Phillips tried

to move away from Nicholas (which he did not), Nicholas would not have tried to stop him or hinder his movement in any way. (Sandmann Dep. 199).

The confrontation between Nicholas and Phillips (which was instigated by Phillips) ended when a CovCath chaperone, Barbara Hagedorn, approached the students from Nicholas' right (Phillips' left) and called for all students to move to the south side of the Lincoln Memorial, towards the school buses. (Sandmann Dep. 346-47, 358, 450; Stip. Video 11 at 01:00-20). In response, Nicholas and other students begin to walk away to the south, in the direction Ms. Hagedorn was pointing. (Sandmann Dep. 346-47, 358, 450; Stip. Video 11 at 01:00-20). Immediately after Ms. Hagedorn called for the students to walk south, Phillips' companions appear to instigate a confrontation with her. (Stip. Video 11 at 01:00-20). One of Phillips' companions, who held a camera to film the encounter between Phillips and Nicholas, was standing right next to Phillips, and was wearing a red hat, angrily called out to Ms. Hagedorn: "Ma'am! We had a demonstration here, and you come here and you do this, alright?" (Stip. Video 11 at 01:08-23).

As Nicholas and the students were leaving, Phillips turned away from the Lincoln Memorial back towards his companions. (Stip. Video 11 at 01:25-40). The same companion who moments earlier described the interaction between Phillips and Nicholas as a "demonstration" yelled, "I got him man," apparently referring to Nicholas. (Stip. Video 11 at 01:29). The same companion told another companion, as he grabbed Phillips' right arm, "he won, man; he fucking won, man!", apparently referring to Phillips. (Stip. Video 11 at 01:42; Stip. Video 3 at 03:18-03:33). Moments later, the same companion put his left fist into the air and shouted out, "we won, grandpa; we fucking won, grandpa!", apparently referring again to Phillips. (Stip. Video 11 at 01:58). After a few more moments, Phillips stopped drumming, and the group around him cheered and raised their arms in triumph. (Stip. Video 3 at 03:27). Phillips raised his arms and called

something to the crowd, ostensibly in support of what his companions were saying. (Stip. Video 3 at 03:55). Then the crowd gradually moved away, and Hebrew Israelites stayed where they were throughout, continuing to interact with the remaining visitors. (Stip. Video 11 at 01:01-02:25; Stip. Video 3 at 02:25-09:15).

**B. The Defendants' Publications.**

Each of the defendants published statements made by Phillips that falsely accuse Nicholas of blocking Phillips and preventing his retreat from the January 18 Incident.[7] All of the statements published by the defendants and referenced below are sometimes referred to herein as the "Blocked/Retreat Statement(s)."

The New York Times published:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,'" Mr. Phillips told The Post. "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

(NY Times Compl. ¶ 206 (Ex. G, H)); *Sandmann v. The New York Times Co.*, Case No. 2:20-cv-23 (Doc. 28; Page ID# 217).

Defendant CBSN published:

> PHILLIPS: "[Nicholas] just stood in front of me, and when the others were moving aside and letting me go, he decided that he wasn't gonna do that. You know, I tried to, when I was coming up the steps, I seen him start putting himself in front of me, so I slided [sic] to the right, and he slided [sic] to the right. I slided [sic] to the left and he slided [sic] to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me so that he stopped my exit."
>
> and

---

[7] The news articles attached to the respective complaints and cited herein are self-authenticating and may be considered by the Court. Fed. R. Evid. 902.

> Phillips said Sandmann "positioned himself" in front of him, stopping his exit. … "When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slided [sic] to the right, and he slided [sic] to the right. I slided [sic] to the left and he slided [sic] to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of [sic] stopped my exit."

(CBSN Compl. ¶¶ 223, 233 (Ex. G)); *Sandmann v. CBS News, Inc., et al.*, Case No. 2:20-cv-24

(Doc. 34; Page ID# 276).

Defendant ABC published:

> In a separate interview with the Washington Post, Phillips said that the dozens of teens began to swarm around his group as they concluded their march and were getting ready to leave. "It was getting ugly," he told the newspaper. "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

> and

> "It was getting ugly," [Phillips] said, describing his confrontation with Sandmann, who was wearing a red "Make America Great Again" hat at the time. "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

(ABC Compl. ¶¶ 207, 218 (Ex. G, H)); *Sandmann v. ABC News, Inc., et al.*, Case No. 2:20-cv-25

(Doc. 36; Page ID# 316).

Defendant Gannett published:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,' Phillips told The Washington Post. "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

(Gannett First Am. Compl. ¶¶ 226 (Ex. I), 244, 251 (Ex. K), 255, 258 (Ex. L), 274 (Ex. N) ("While

Sandmann said he wished the students had walked away, Phillips explained he tried to walk away

11

and was blocked."), 278, 282 (Ex. O) (same), 291, 295 (Ex. P), 303, 307 (Ex. Q) ("Most credibly, an Indigenous eyewitness states: 'We were surrounded by the boys, and we were alarmingly outnumbered. As we attempted to continue our path and move through the crowd, the boys closed in around us, until finally one particular boy stood in front of Nathan and refused to let us pass … There were so many boys that I couldn't see around them.").

Defendant Rolling Stone published:

> It was getting ugly, Phillips, a former Marine, told the Washington Post. I was thinking: I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial. I started going that way, and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.

(Rolling Stone Compl. ¶ 202, Ex. G); *Sandmann v. Rolling Stone, LLC, et al.,* Case No. 2:20-cv-27 (Doc. 35; Page ID# 276).

### C. This Court's Prior Rulings.

This Court has held that "statements that plaintiff 'blocked' Phillips or did not allow him to retreat, if false, meet the test of being libelous *per se* …." *Sandmann v. NBCUniversal, LLC,* Cov. Case No. 2:19-cv-56 (Doc. 43; Page ID# 755), *adopted by reference and reaffirmed in Sandmann v. The New York Times Co.,* Case No. 2:20-cv-23 (Doc. 28; Page ID# 217) ("[T]he Court has ruled in companion cases that the [blocked/retreat] statement is libelous. The Court continues to hold that opinion for the reason stated in such preceding cases."); *Sandmann v. CBS News, Inc., et al.,* Case No. 2:20-cv-24 (Doc. 34; Page ID# 273) ("[T]he Court has ruled in companion cases that similar publications are libelous. The Court continues to hold that opinion for the reasons stated in such preceding cases."); *Sandmann v. ABC News, Inc., et al.,* Case No. 2:20-cv-25 (Doc. 36; Page ID# 315) ("[T]he Court has ruled in companion cases that the [blocked/retreat] statement is libelous. The Court continues to hold that opinion for the reasons

12

stated in such preceding cases."); *Sandmann v. Rolling Stone, LLC,* Case No. 2:20-cv-27 (Doc. 35; Page ID# 276) ("[T]he Court has ruled in companion cases that the [blocked/retreat] statement is libelous. The Court continues to hold that opinion for the reason stated in such preceding cases.").

Moreover, in oral arguments previously held by the Court regarding Washington Post's original motion to dismiss, counsel for the Washington Post, Kevin Baine, admitted that the Blocked/Retreat Statement was "inaccurate" and that, if taken literally, the statement "can't possibly be true" because Phillips "decided not to" "take a step to the side and walk forward":

> THE COURT: Let me stop you there and back it up a bit. I've got it marked here in my notes the paragraph – and I agree with you, this seems to be the most important paragraph in the case. "It was getting ugly, and I was thinking that" -- this is Mr. Phillips. "It was getting ugly, and I was thinking I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial, Phillips recalled. I started going that way, and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."
>
> Okay. Now, this turned out to be inaccurate. You agree with that, don't you?
>
> MR. BAINE: If you were to interpret it to mean that Mr. Phillips was literally prevented from moving in any direction, ***that would be inaccurate.***  But in the context of the article, what I think that means is that Mr. Phillips approached Mr. Sandmann, Mr. Sandmann stood still, blocked his path forward. And when Mr. Phillips says, wouldn't allow me to retreat, I think what he meant was wouldn't allow me to get up past Mr. Sandmann to the Memorial.
>
> But literally, ***that can't possibly be true***. The steps are hundreds of feet wide. All [Phillips] had to do was take a step to the side and walk forward, which he decided not to do.
> …

*Sandmann v. WP Company, LLC,* E.D. Ky. Case No. 2:19-v-19 (Doc. 46; Page ID# 397-98) (emphasis added). Earlier in the same argument, Mr. Baine stated, "And by the way, one could not reasonably think that on the broad expansive steps in front of the Lincoln Memorial, that one person standing still was literally physically preventing the other gentleman from moving…." (*Id.*

at Page ID# 397). The instant cases all involve substantially the same, if not identical, statements of fact. As such, the patent falsity of Phillips statements, when considered against the undisputed facts of the January 18 Incident, require that summary judgment be granted to Sandmann on the issue of falsity.

## III.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 supplies the legal standard. Rule 56 states that the Court "shall grant" the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 also requires the movant to cite to "particular parts" in the evidentiary record to support the motion. Fed. R. Civ. P. 56(c). The previously filed stipulated videos[8] and deposition testimony provide ample support for the movant's proposition. These materials constitute admissible evidence: Sandmann's deposition reflects his relevant testimony of the factual events that form the basis for this suit; the video evidence has been authenticated by stipulation of the parties and is relevant; the statements one hears on the video constitute non-hearsay or, if hearsay, are excited utterances and/or are not offered to prove their truth; and the deposition testimony of the expert linguist, Dr. Craige Roberts, Ph.D., will form the basis for her expert opinion testimony on a relevant issue.

---

[8] The stipulated videos have been conventionally filed in each respective case and can also be electronically accessed by clicking on the Dropbox links on the following filings: *Sandmann v. The New York Times Co.,* Case No. 2:20-cv-23 (Doc. 48; PageID# 364-65); *Sandmann v. CBS News, Inc., et al.*, Case No. 2:20-cv-24 (Doc. 54; Page ID# 473-74); *Sandmann v. ABC News, Inc.,* Case No. 2:20-cv-25 (Doc. 61; PageID# 476-77); *Sandmann v. Gannett Co., Inc.,* Case No. 2:20-cv-26 (Doc. 61; PageID# 882-83); *Sandmann v. Rolling Stone, LLC*, Case No. 2:20-cv-27 (Doc. 57; PageID# 440-41).

IV.   **ARGUMENT**

   **A.  Summary of Argument.**

Sandmann is entitled to summary judgment on the issue of falsity because: (1) there is no genuine dispute of fact that Phillips approached Sandmann from a distance and beat a drum inches from Sandmann's face for over two and a half minutes; (2) there is no genuine dispute of fact that Sandmann, once confronted by Phillips, stood stock still and did not move from the position he had been standing prior to Phillips' approach, (3) there is no genuine dispute that Phillips, in confronting Sandmann, bypassed clear pathways to the top of the Lincoln Memorial (his purported destination), (4) there is no genuine dispute that, despite those clear pathways, Phillips never attempted to move past or around Sandmann; (5) there is no genuine dispute that, if Phillips had tried to make such a movement around Sandmann, Sandmann would have let Phillips pass by him, (6) an expert linguist has reviewed the Blocked/Retreat Statements and has concluded that Phillips accused Sandmann of "blocking" him in an active, intentional sense, not a passive sense, and (7) the evidence clearly establishes that Sandmann did not "block" Phillips and that it was in fact Phillips who instigated a confrontation with Sandmann in an attempt to intimidate him and his fellow classmates.

   **B.  Summary of Evidence in Support.**

Separately and together, the evidence in the record provides ample support for summary judgment. First, the video evidence is clear and unambiguous: Sandmann never blocked Phillips. He never moved, never once seeking to prevent or even influence Phillips' progress or his egress. It was Phillips, not Sandmann, who initiated the encounter, walking up to Sandmann and invading his personal space, stopping mere inches from his face while beating a drum and ultimately making physical contact with Sandmann's jacket collar. Second, Sandmann's deposition testimony, given

under oath, states unequivocally that he never had it in mind to block nor did in fact block Phillips. Instead, the deposition testimony makes clear that it was Sandmann, not Phillips, who was the target of this aggressive action by Phillips. Third, the deposition testimony provided by Dr. Roberts, a distinguished academic linguist and professor emerita at The Ohio State University, concludes that to describe Sandmann's actions as "blocking," as did the defendant publications, would be "false," according to the standard of a reasonable native speaker of English. Each of these pieces of evidence is compelling; taken together, the conclusion they point to is beyond dispute. The Blocked/Retreat Statements published by the defendants were false.

It is difficult conceptually to cite to one instance in a lengthy video to support the assertion that Sandmann did not move when he literally did not move during the entirety of the relevant part of the incident. Nonetheless, to assist the Court in identifying the specific instances of relevant evidence, Sandmann refers to the following particular parts of the record; the citations to the record appear in Section II (A), above.

1. The videos show Sandmann did not move.

2. The videos show Phillips approached Sandmann.

3. The videos show Phillips had available to him several alternative avenues or clear pathways to advance or retreat on the steps of the Memorial.

4. The videos show Phillips invading Sandmann's personal space, moving to within inches of him, and beating his drum in Sandmann's face.

5. The videos show Sandmann standing with his hands clasped behind his back, saying nothing, hoping with his smile to convey respect and peacefulness.

6. The videos never show Phillips attempting to move around or away from Sandmann.

7. The videos show Phillips celebrating and his accomplice stating "we win!" and that they were trying to film a "demonstration."

8. Sandmann's deposition states that Sandmann did not block Phillips nor prevent him from retreating, nor did he endeavor to do so.

9. The deposition of Dr. Roberts states that, in her expert opinion, the statements that Sandmann blocked Phillips and prevented his escape are false.

**C. Videographic Evidence is Particularly Compelling for Summary Judgment.**

All factual issues concerning the movement or position of Sandmann or Phillips are easily resolvable. The entire episode was captured on video recordings. The footage is authentic, clear, and available from several angles or perspectives. The video footage is not plausibly open to more than one interpretation; there is no ambiguity about the physical movement of Phillips and the stationary position of Sandmann.

Video evidence presents an especially favorable evidentiary basis for summary judgment. The United States Supreme Court has instructed that when the record contains video footage that is not open to more than one interpretation and contradicts the non-movant's assertions, the Court must "view the facts in the light depicted by the videotape." *Hall v. Wash. Metro. Area Transit Auth.*, 33 F. Supp. 3d 630, 632 (D. Md. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)); *Buckman v. Morris*, 736 Fed. App'x. 852, 853-54 (11th Cir. 2018) (holding summary judgment appropriate where video contradicted prisoner's claims that he had been unconscious when hit by an officer's cell extraction shield and that he did not attempt to resist, and video contradicted prisoner's claim that officers repeatedly hit and kicked prisoner). There is no ambiguity in the video evidence. Sandmann stood still, at most shifting his weight in place. Phillips made no effort to go around Sandmann; indeed, as was revealed subsequently, it was Phillips' intention not to go

17

around Sandmann, but instead to seek out a white student wearing "MAGA" attire to, as his companion described it, "win" the "demonstration."

### D.  There is No Genuine Dispute of Material Fact on the Issue of Falsity; the Blocked/Retreat Statements are False.

#### 1.  The Blocked/Retreat Statements Were Not True Nor "Substantially True."

For a statement to be "true or substantially true," and thus satisfy an affirmative defense to defamation, the statement must meet a clear standard. The traditional defense is "truth." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004) ("[i]n this state, truth is a complete defense"). The secondary concept of "substantial truth" should not be read to conclude that there is an entire category of statements that fall somewhere in a nebulous ground between truth and falsity. Instead, "substantial truth" is a doctrine that is meant to address merely incidental information not essential to the content itself. *Kentucky Kingdom Amusement Co., v. Belo Kentucky, Inc.*, 179 S.W.3d 785, 791-92 (Ky. 2005) ("The doctrine of 'substantially true' is a convenient and necessary phrase invented by lawyers and judges to apply in very narrow and limited circumstances and relates only to incidental information and not to essential content."). Under the substantial truth doctrine, "the defendant is held only to a standard of substantial, not literal, accuracy." *E.g.*, *Tannerite Sports, LLC v. NBC Universal Media LLC*, 135 F. Supp. 3d 219, 233 (S.D.N.Y. 2015). Truth is not a mystery. "Truth is a relatively easy concept to ascertain. It is generally defined as accuracy or correctness." *Kentucky Kingdom*, 179 S.W.3d at 792. "Truth as contrasted to falsehood is the basis for a defamation claim." *Id.*

This case presents no plausible argument that the defendants' publications, and in particular the Blocked/Retreat Statements, are themselves ambiguous or are susceptible to varying connotations. The statements are that Sandmann both blocked Phillips and prevented his escape. No reasonable reader whose native language is English would have any trouble understanding

precisely what those words mean. These words are to be understood as their plain meaning; the standard is the "average reader" or "reasonable reader." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989) (statement is defamatory if "the full content of the statement would 'influence the average reader's readiness to infer that a particular statement has factual context'"); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 512-13 (1991) (discussing "reasonable reader" standard).

Phillips did not speak in figurative, non-literal language that might be construed to be "substantially accurate." Phillips did not speak in metaphor when he made the factual claims that Sandmann blocked him. This is not a case where the "substantial truth" argument is relevant. *Compare, e.g., National College of Kentucky, Inc., v. Wave Holdings, LLC*, 536 S.W.3d 218, 223-24 (Ky. Ct. App. 2017) (finding published statement that plaintiff was "under fire" was "substantially true"; although the plaintiff was not literally on fire, the plaintiff was in fact under investigation by the Attorney General); *Tannerite Sports*, 135 F. Supp. 3d at 235-36 (finding that a news reporter characterizing an exploding rifle target as "basically a bomb" was figurative language, not literal; the rifle target was not literally a bomb, but the gist of the statement was "substantially true"); *Croce v. New York Times Company*, 345 F. Supp. 3d 961, 983 (S.D. Ohio 2018), *aff'd*, 930 F.3d 787, 798 (6th Cir. 2019) (to find "that the gist or sting of the statement is substantially true[,] the court looks past even minor inaccuracies to find the gist . . .."); *Masson*, 501 U.S. at 516 ("the common law of libel overlooks minor inaccuracies").

### 2. Phillips Used and Intended to Convey the Term "Block" In Its Active Sense, As Evidenced by the Context in Which He Used the Term.

Sandmann has produced expert evidence from a highly qualified and well-respected linguist, Dr. Roberts, who specializes in semantics, the study of meaning in linguistics. (Roberts

Dep. at 18).[9]  Dr. Roberts' knowledge, skill, and experience allow her to testify about the plain meaning of Blocked/Retreat Statements at issue. (*Id.*). Although the Court need not rely on expert testimony to determine whether the Blocked/Retreat Statements are false, the opinion testimony of Dr. Roberts is probative of the linguistic intent, the meaning of the words used by Phillips, and how a native speaker of English would interpret the words used by Phillips. (*Id.* at 95).[10] Dr. Roberts reviewed Videos 1-18 of the parties' stipulation, the articles, the Blocked/Retreat Statements, and various dictionaries. (Roberts Dep. at 68, 182-83, 204, 217, Ex. A). Dr. Roberts did not merely look up the words in the dictionary. (Roberts Dep. 101-02, 107, 196-99). After assessing the statements in their context, Dr. Roberts concluded that a reasonable native speaker of English reading each passage would take it to be false in the circumstances captured in the videos of the January 18 Incident. (Roberts Dep. at 101-06 Ex. A). Dr. Roberts concluded that Phillips "misrepresented the situation." (Roberts Dep. at 90). Dr. Roberts has agreed to testify at trial for Sandmann in support of her conclusions. (Roberts Dep. at 65, Ex. A).

Importantly, Dr. Roberts' conclusions are in part based upon her finding that Phillips likely intended or expected his audience to understand him as meaning that the Blocked/Retreat

---

[9] Dr. Roberts is qualified to render this opinion pursuant to Fed. R. Evid. 702. (Roberts Dep. at 14-104, Ex. A) (discussing qualifications, experience, and reliability of testimony).

[10] In her deposition, Dr. Roberts said, "I am not inferring intentions. I'm looking at the meanings of the words that Phillips said in his – those two statements (the Blocked/Retreat Statements). I know what the meanings are, the expertise that bears on that. Then I look at the videos and I see, given the truth conditions, what would have to be the case for those two statements to be true. I'd look at what I see in the video and I decide whether that seems to be true, given that video evidence. I have no – I do not bring any evidence of intent to bear here except for linguistic intent. Phillips uttered the statement. He was conscious. He's a native speaker of English. He know (sic) what they mean. I take him to mean what he meant, so that's intention. Apart from that, I attribute no intention no (sic) anyone in my report." (Roberts Dep. at 94-95).

Statements to convey an active, physical type of blocking, as opposed to a passive kind.[11] She

stated:

> In the first passage, the one in question 1 at the bottom of page 1, Mr. Phillips is heard as saying, "He" – Sandmann – "just blocked my way and wouldn't allow me to retreat." Now, as you pointed out "blocked" is ambiguous or it has not – well, you'd say it was ambiguous. Anyway, it has some very – two or three closely related senses that one might – that one might take to relevant to a circumstance like this.
>
> One of them is a more passive sense so you can say an inanimate objected blocked your way like the construction, you know – the crane blocked my way, right? Or the crane, you know – was in the way, in effect, without the crane – without attributing any intention to the crane, correct? But in [the Blocked/Retreat Statement] there's another active sense of block, which is moved to block or intended to block my way, okay? And I thought that in this context it was more probable – likely, that Phillips intended or would expect his audience to understand him as meaning that Sandmann actively blocked his way.
>
> If you look at the second conjunct, it said "Wouldn't allow me to retreat," which does attribute intention to refuse to let Phillips do what he wanted to do. So I took the first conjunct, the sense of block to have the active sense of intending to be in the way.

(Roberts Dep. at 117-19). However, Roberts further explained that Nicholas did not block Phillips

or stop him from exiting, regardless of whether the passive or active form of "block" applies.

(Roberts Dep. at 176-77). Sandmann did not block Phillips in the passive sense because Sandmann

never moved from the location he was already standing prior to Phillips' approach (Stip. Video 2

00:41-00:46; Roberts Dep. at 165-68, Ex. A), and during the encounter there was a corridor to

Sandmann's left (Phillips' right) that would have allowed Phillips to move up the steps if he had

---

[11] Importantly, the expert witness is not merely testifying to the meaning of the words used in the dictionary; the witness has stated in her deposition, and will testify at trial, that the linguistic explication of the plain meaning of these passages must be accomplished by considering the dictionary definitions of terms used in a sentence, considering the syntactic structure of the sentence, considering semantic judgments, and studying the ways that context influences interpretation. (Roberts Dep. 21-27, 101-02, 107, 196-99).

tried to (which he did not). (Roberts Dep. at 176-77; Stip. Video 2 at 00:54; Stip. Video 16 at 00:06). The fact that Phillips had space but never tried to move around or away from Sandmann but instead locked eyes with him for several minutes, which is evident from the stipulated videos, makes it impossible for Sandmann to have passively (or actively) blocked Phillips from moving up the steps. (*See id.*). Moreover, Sandmann did not actively block Phillips in the sense that Sandmann intentionally put himself or moved in the way of Phillips. (Roberts Dep. at 177). The stipulated videos clearly show that Sandmann stood still for the entire encounter and did not move from the location he had already been standing to block Phillips from moving up the steps or prevent him from "retreating" or "exiting" the encounter. (Stip. Video 2 at 00:51-03:45; Stip. Video 3 at 00:01-02:50). Sandmann never "slided to the left" or "slided to the right" to "stop Phillips' exit" as he was accused by CBS of doing. (*Id.*) (CBSN Compl. ¶¶ 223, 233 (Ex. G)); *Sandmann v. CBS News, Inc., et al.*, Case No. 2:20-cv-24 (Doc. 34; Page ID# 276).

### E.  That Sandmann Did Not "Block" Phillips Cannot Be Disputed.

The defendants will argue that Sandmann "blocked" Phillips because Sandmann didn't himself move out of the way. This characterization of events stretches the meaning of "blocked" beyond semantical coherence. A person's failure to get out of the way might be called a "block" if it occurred in a narrow hallway or at the threshold of a door. But to allege a "block" in the context of the wide steps of a national monument, indeed one of the most beloved monuments in America, stretches the word beyond all plausible meaning. The famous 58 steps, which are climbed and descended by millions of tourists each year, lead to a building that is 190 feet wide.[12] The steps comprise most of that width. It makes no sense to say that any one person was "blocked" from proceeding or retreating in any direction on those steps. As the video evidence makes plain, there

---

[12] This Court should take judicial notice of the immense size of the Lincoln Memorial.

was plenty of room for everyone; indeed, as Phillips' fabricated encounter was taking place, many tourists can be seen ascending and descending the steps freely and without hindrance. Phillips was no more blocked than a lone-standing tree can be said to block progress through an open field.

As the videos, deposition testimony, and expert evidence make clear, Sandmann did not block Phillips nor prevent his escape from the January 18 Incident. Sandmann stood with his group of classmates as they waited for the buses to arrive to take them home. (Sandmann Dep. 47). While they waited, the Hebrew Israelites hurled racist invectives at them. (*Id.* at 79; Stip. Video 4). To drown out the hateful invective, they began doing school spirit cheers. (Sandmann Dep. 88-89, 91, 95, 105). Then, from the northeast, walking past the Black Israelites, was Phillips, accompanied by several from his group. Phillips advanced toward the group of CovCath students, beating his drum and chanting. As he waded through the crowd of students, Phillips almost passed Sandmann, but then he stopped, moved back, and moved directly in front of Sandmann, locking eyes with him (Stip. Video 2 at 00:41-00:46; Roberts Dep. at 155, 165-68, Ex. A), and thereby instigating a confrontation, which one of his companions described as a "demonstration." (Stip. Video 11 at 01:02-18). Phillips beat his drum right in front of Sandmann, actually brushing his drum against Sandmann's outerwear. (Stip. Video 17 at 05:50, 06:50; Sandmann Dep. 169). Desiring to be respectful and not intimidated by Phillips' aggressive action, Sandmann smiled awkwardly, stood where he was, said nothing, and did his best to handle a very uncomfortable situation with dignity. (Stip. Video 2 at 00:51-03:45; Stip. Video 14 at 00:03; Sandmann Dep. 199). He showed remarkable maturity for a young person.

In no sense is the "blocking statement" true or substantially true. On the wide steps of the Lincoln Memorial, Phillips walked right up to Sandmann. His progress forward or a route to "escape" or retreat was in no way blocked or even hindered. Phillips could have chosen to proceed

23

up the steps, which he claimed to be his initial intention, along any one of the wide-open pathways clear of people. Yet he chose to walk directly into the gathering of CovCath students standing together in place, waiting for their bus. Obviously, as the video evidence and Sandmann deposition make clear, Phillips was trying to instigate a confrontation. In no literal sense, or even figuratively, is it accurate to blame Sandmann by claiming Sandmann "blocked" him or "prevented his escape." Yet that is what Phillips said, that is what the defendants' publications, without even the pretense of investigation or mere modicum of reasonable care, printed or broadcast to the world-wide public. The blocking statement was unquestionably false, and that falsehood led immediately to the massive public outcry that forever doomed Sandmann, an underage minor, to a lifetime of shame and ostracization.

There is no jury issue here. The blocking statement is not true, nor is it even colorably true. It was a lie when uttered, as Phillips and his accomplices knew it was. The media publications, who should know better, especially when reporting on an underage minor who is a private figure, repeated these false claims when reasonable care, indeed any level of care, would have led them to review the videos of the entire chain of events on the Mall that day and would have shown them, as the Court can now see, that clearly Phillips' factual description of the encounter was patently false.

## V.   <u>CONCLUSION</u>

In light of the above, Sandmann's Motion for Partial Summary Judgment should be granted. A proposed Order is attached for the Court's convenience.

Respectfully submitted,

*/s/ Todd V. McMurtry* _____
Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, KY 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff,*
*Nicholas Sandmann*

### <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 20, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

*/s/ Todd V. McMurtry* _____
Todd V. McMurtry, Esq.