EXHIBIT B



# Transcript of Craige Roberts, Ph.D.

**Date:** December 7, 2021
**Case:** Sandmann, et al. -v- NBCUniversal Media, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

```
1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2              NORTHERN DIVISION AT COVINGTON

3

4    ------------------------------X

5    NICHOLAS SANDMANN, by and      :
     Through his parents and natural
6    Guardians,  TED SANDMANN and   :
     JULIE SANDMANN,
7                   Plaintiff,  : Case No.
                 V                   19-CV-00056-WOB-CJS
8    NBCUNIVERSAL MEDIA, LLC,       :
                      Defendant.
9                                   :

10   ------------------------------ X

11   NICHOLAS SANDMANN, by and      :
     Through his parents and natural
12   Guardians, TED SANDMANN and    :
     JULIE SANDMANN,
13                  Plaintiff,  : Case No.
                 V                   20-CV-00023-WOB-CJS
14                                  :
     THE NEW YORK TIMES COMPANY
15   D/B/A THE NEW YORK TIMES,      :
                      Defendant.
16   ------------------------------ X

17

     NICHOLAS SANDMANN, by and      :
18   Through his parents and natural
     Guardians, TED SANDMANN and    :
19   JULIE SANDMANN,
                    Plaintiff,  : Case No.
20               V                   20-CV-00024-WOB-CJS
                                    :
21   CBS NEWS, INC., et al.,
                      Defendants. :
22   ------------------------------ X

23   Job No.:  416134

24   Pages 1 - 224

25   Reported by:  Lisa M Barrett
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          2

```
1    (continued caption)

2    ------------------------------ X

3    NICHOLAS SANDMANN, by and        :
     through his parents and natural
4    Guardians, TED SANDMANN and      :
     JULIE SANDMANN,
5                     Plaintiff,      : Case No.
                       V                2:20-CV-00025-WOB-CJS
6                                      :
     ABC NEWS, INC., et al.,
7                     Defendants.      :

8    ------------------------------ X

9    NICHOLAS SANDMANN, by and        :
     Through his parents and natural
10   Guardians, TED SANDMANN and      :
     JULIE SANDMANN,
11                   Plaintiff,        : Case No.
             V                           2:20-CV-00026-WOB-CJS
12
     GANNETT CO.,INC. AND GANNETT     :
13   SATELLITE INFORMATION NETWORK,
     LLC,
14                   Defendants.       :

15   ------------------------------ X

16   NICHOLAS SANDMANN, by and        :
     Through his parents and natural
17   Guardians, TED SANDMANN and      :
     JULIE SANDMANN,
18                   Plaintiff         : Case No.
             V                           2:20-CV-00027-WOB-CJS
19                                     :
     ROLLING STONE, LLC, et al.,
20                   Defendants.       :

21   ------------------------------ X

22         Deposition of CRAIGE ROBERTS, Ph.D.

23         Conducted in-person and virtually

24      Tuesday, December 7, 2021 at 9:30 a.m.

25
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              3

1                    Deposition of CRAIGE ROBERTS, Ph.D.,

2        conducted in-person and virtually,

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                    Pursuant to Notice, before Lisa M

23       Barrett, Notary Public for the State of

24       Maryland.

25

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    4

```
1              A P P E A R A N C E S:

2    Tuesday, December 7, 2021:

3    ON BEHALF OF THE PLAINTIFF:

4            TODD V. McMURTRY, ESQUIRE

5            WILL HUBER, ESQUIRE

6            HEMMER DEFRANK WESSELS, PLLA

7            250 Grandview Drive, Suite 500

8            Ft. Mitchell, Kentucky 41017

9            859.344.1188

10   ON BEHALF OF THE DEFENDANTS ABC NEWS, INC.,
     ABC NEWS INTERACTIVE, INC. AND THE WALT DISNEY
11   COMPANY:

12           MEENAKSHI KRISHNAN, ESQUIRE

13           DAVIS WRIGHT TREMAINE, LLP

14           1301 K Street, Northwest,

15           Suite 500 Washington, DC 20005

16           202.973.4499

17   ON BEHALF OF THE DEFENDANTS CBS NEWS, INC.,
     VIACOMCBS, INC., AND CBS INTERACTIVE, INC.:
18

19           JESSICA LAURIN MEEK, ESQUIRE

20           DENTONS BINGHAM GREENBAUM, LLP

21           10 West Market Street, Suite 2700

22           Indianapolis, Indiana 46204

23           317.635.8900

24

25       A P P E A R A N C E S (Continued)
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    5

```
 1   ON BEHALF OF THE DEFENDANTS CBS NEWS, INC.,
     VIACOMCBS, INC., AND CBS INTERACTIVE, INC.:
 2

 3            NATALIE J. SPEARS, ESQUIRE

 4            DENTONS US, LLP

 5            233 South Wacker Drive Suite 5900

 6            Chicago, Illinois 60606

 7            312.876.8000

 8

 9   ON BEHALF OF THE DEFENDANT ROLLING STONE, LLC
     AND PENSKE MEDIA CORPORATION:
10

11            KEVIN T. SHOOK, ESQUIRE

12            RYAN GOELLNER, ESQUIRE

13            FROST BROWN TODD, LLC

14            10 West Broad Street

15            Columbus, Ohio 43215

16            615.565.1222

17

     ON BEHALF OF THE DEFENDANTS GANNETT CO., INC.
18   AND GANNETT SATELLITE INFORMATION NETWORK, LLC:

19            MICHAEL P. ABATE, ESQUIRE

20            KAPLAN JOHNSON

21            ABATE & BIRD, LLP

22            710 West Main Street 4th Floor

23            Louisville, Kentucky 40202

24            502.540.8280

25         A P P E A R A N C E S:   (Continued)
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          6

```
1    ON BEHALF OF THE DEFENDANTS GANNETT CO., INC.
     AND GANNETT SATELLITE INFORMATION NETWORK, LLC:
2

3              MICHAEL J. GRYGIEL, ESQUIRE

4              GREENBERG TRAURIG, LLP

5              54 State Street 6th Floor Albany,

6              New York 12207

7              518.689.1400

8    ON BEHALF OF THE DEFENDANTS NBCUNIVERSAL MEDIA, LLC
     AND THE NEW YORK TIMES COMPANY D/B/A
9    THE NEW YORK TIMES:

10             DARREN W. FORD, ESQUIRE

11             GRAYDON HEAD & RITCHEY, LLP

12             2400 Chamber Center Drive, Suite 300

13             Ft. Mitchell, Kentucky 41017

14             859.578.3071

15

16   Also present:  David Hernandez, Videographer,

17             Socrates Matthews, Planet Depos AV Technician

18

19

20

21

22

23

24

25
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    14

| # | | Time |
|---|---|---|
| 1 | Terre Haute, Indiana.  Can you hear me now? | 10:06:50 |
| 2 | COURT REPORTER:  Yes. | 10:06:57 |
| 3 | BY MS. SPEARS: | 10:06:57 |
| 4 | Q    Okay, great.  And that's where you grew | 10:06:58 |
| 5 | up? | 10:07:01 |
| 6 | A    I did. | 10:07:02 |
| 7 | Q    And where's Terre Haute in Indiana? | 10:07:04 |
| 8 | A    Terre Haute is on the western border of | 10:07:04 |
| 9 | Indiana with Illinois, about 200 miles due south | 10:07:04 |
| 10 | of Chicago. | 10:07:07 |
| 11 | Q    And did you go to high school in Terre | 10:07:08 |
| 12 | Haute? | 10:07:10 |
| 13 | A    I did.  Wiley High School. | 10:07:13 |
| 14 | Q    What high school is that? | 10:07:13 |
| 15 | A    Wiley.  No longer exists.  My great | 10:07:13 |
| 16 | grandfather went there so... | 10:07:17 |
| 17 | Q    Was it a public high school? | 10:07:19 |
| 18 | A    Yes. | 10:07:21 |
| 19 | Q    You went to University in Indiana, as | 10:07:21 |
| 20 | well? | 10:07:25 |
| 21 | A    I did. | 10:07:25 |
| 22 | Q    And where did you study? | 10:07:26 |
| 23 | A    Indiana University as part of the | 10:07:27 |
| 24 | undergraduate. | 10:07:29 |
| 25 | Q    And what was your undergraduate degree? | 10:07:30 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    15

| 1 | A    My degree was in theater. | 10:07:32 |
| 2 | Q    And when did you graduate? | 10:07:34 |
| 3 | A    I graduated in 1978, my undergraduate. | 10:07:37 |
| 4 | Q    Did you attend graduate school? | 10:07:45 |
| 5 | A    Yes, I did. | 10:07:47 |
| 6 | Q    Where? | 10:07:48 |
| 7 | A    I studied for another year at Indiana | 10:07:48 |
| 8 | University.  Then I went to the University of | 10:07:52 |
| 9 | Massachusetts in Amherst for my Ph D. | 10:07:54 |
| 10 | Q    And when you studied another year at | 10:07:57 |
| 11 | Indiana University, what did you study? | 10:07:59 |
| 12 | A    I was studied linguistics at that time. | 10:08:01 |
| 13 | Q    Okay, and that was part of graduate | 10:08:04 |
| 14 | training? | 10:08:06 |
| 15 | A    Yes.  That was working towards a | 10:08:06 |
| 16 | Master's degree, but the Master's really didn't | 10:08:08 |
| 17 | matter for my graduate education, so much as the | 10:08:11 |
| 18 | classwork that I took there. | 10:08:16 |
| 19 | So, when I was admitted to University | 10:08:17 |
| 20 | of Massachusetts of Amherst, I went there the | 10:08:20 |
| 21 | following year and didn't complete the Master's. | 10:08:23 |
| 22 | Q    So the year that you did in 1979 to | 10:08:29 |
| 23 | '80 at Indiana State, that was part of your | 10:08:31 |
| 24 | training in linguistics? | 10:08:36 |
| 25 | A    Yes, at the time while I was taking | 10:08:37 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              16

| | | |
|---|---|---|
| 1 | coursework there I also had studied lexicography, | 10:08:39 |
| 2 | dictionary making and I worked as a research | 10:08:46 |
| 3 | assistant on the dictionary of Haitian Creole, | 10:08:49 |
| 4 | French and English under Professor Arthur | 10:08:49 |
| 5 | (inaudible). | 10:08:53 |
| 6 | Q    And what is lexicography? | 10:08:54 |
| 7 | A    Lexicography is the study of how to | 10:08:57 |
| 8 | make dictionaries. | 10:08:59 |
| 9 | Q    And how did you get interested in | 10:09:01 |
| 10 | lexicography? | 10:09:03 |
| 11 | A    Well, that's a long story.  But I had | 10:09:05 |
| 12 | been living in New York prior to -- I took some | 10:09:07 |
| 13 | time off.  After my junior year of college, I came | 10:09:10 |
| 14 | here and lived. | 10:09:14 |
| 15 | I thought I might be interested in the | 10:09:15 |
| 16 | arts, but instead I got interested in linguistics | 10:09:17 |
| 17 | and met someone who was a very famous collector | 10:09:19 |
| 18 | and seller of dictionaries and got very interested | 10:09:27 |
| 19 | in that work and she told me, you know, there's a | 10:09:31 |
| 20 | place where people pay to do that instead of being | 10:09:33 |
| 21 | an expensive hobby, so I went to graduate school. | 10:09:36 |
| 22 | Q    And what interested you about | 10:09:43 |
| 23 | lexicography? | 10:09:45 |
| 24 | A    I'd always been interested in meaning | 10:09:46 |
| 25 | and I realized that there was a way to study | 10:09:50 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    17

| | | |
|---|---|---|
| 1 | meaning in a more systematic way that touched on | 10:09:53 |
| 2 | deeper issues about -- philosophical issues about | 10:09:55 |
| 3 | meaning in a way that could be conveyed. | 10:09:59 |
| 4 | Q    Then you went to University of | 10:10:07 |
| 5 | Massachusetts at Amherst? | 10:10:09 |
| 6 | A    Yes. | 10:10:11 |
| 7 | Q    And you studied linguistics there? | 10:10:12 |
| 8 | A    Yes.  At the time U Mass Amherst -- | 10:10:14 |
| 9 | well still it's one of the top universities in the | 10:10:18 |
| 10 | world to study in my area.  Not just linguistics | 10:10:21 |
| 11 | but linguistic semantics, the study of meaning. | 10:10:23 |
| 12 | And at the time my advisor there Barbara H Partee | 10:10:24 |
| 13 | was and still is one of the top people in the | 10:10:30 |
| 14 | field, so I wanted to work with her. | 10:10:33 |
| 15 | Q    Let's back up there a little bit.  Tell | 10:10:35 |
| 16 | me what is linguistics. | 10:10:36 |
| 17 | A    Linguistics is a scientific study of | 10:10:39 |
| 18 | language.  It's a very large field, not in terms | 10:10:41 |
| 19 | of number of people in it, but in terms of the | 10:10:44 |
| 20 | range of issues that people study.  Everything | 10:10:46 |
| 21 | from the history of languages, from the grammars | 10:10:48 |
| 22 | of particular languages.  But in modern | 10:10:53 |
| 23 | linguistics we are more interested in how people | 10:10:57 |
| 24 | learn and convey linguistic meaning to each other. | 10:11:03 |
| 25 | That's a complicated subject and I | 10:11:10 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    18

| | | |
|---|---|---|
| 1 | wanted to study not just sound patterns or syntax | 10:11:14 |
| 2 | or grammar but meaning.  How we convey meaning. | 10:11:18 |
| 3 |     Q   What types of questions do linguists | 10:11:22 |
| 4 | have special expertise to answer? | 10:11:27 |
| 5 |        -- (overspeaking) -- | 10:11:30 |
| 6 |     A   Well, it depends on the linguist.  I | 10:11:30 |
| 7 | wouldn't be here -- I purport to have no special | 10:11:33 |
| 8 | knowledge about historical grammar, how language | 10:11:36 |
| 9 | has changed or the relationships between different | 10:11:38 |
| 10 | languages historically.  That's not my expertise. | 10:11:41 |
| 11 | But in my particular case we -- I am able to bring | 10:11:43 |
| 12 | evidence to bear about the plain meaning of | 10:11:50 |
| 13 | expressions of a variety of languages but English | 10:11:54 |
| 14 | in particular. | 10:12:00 |
| 15 |     Q   Does the type of linguistic study you | 10:12:00 |
| 16 | consider yourself an expert in, have a name? | 10:12:04 |
| 17 |     A   Semantics.  Formal semantics. | 10:12:10 |
| 18 |     Q   What is semantics? | 10:12:11 |
| 19 |     A   Semantics is the study of meaning in | 10:12:13 |
| 20 | linguistics. | 10:12:16 |
| 21 |     Q   How is semantics different from | 10:12:16 |
| 22 | linguistics? | 10:12:20 |
| 23 |     A   It's a subfield of linguistics.  As I | 10:12:21 |
| 24 | said, linguistics is complex.  There's historical | 10:12:24 |
| 25 | linguistics, cycle linguistics, phonology.  The | 10:12:27 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    19

| | |
|---|---|
| 1 | study of the sound patterns.  Semantics is the | 10:12:29 |
| 2 | study of meaning.  I can tell you more about the | 10:12:31 |
| 3 | study, if you are interested. | 10:12:34 |
| 4 | Q    So, when you were you refer to yourself | 10:12:37 |
| 5 | as a linguist, do you refer to yourself as a | 10:12:39 |
| 6 | semantics linguist? | 10:12:43 |
| 7 | A    No, if you are saying you are a | 10:12:45 |
| 8 | physicist, then you can study particle physics or | 10:12:47 |
| 9 | nuclear physics or, you know, a variety of other | 10:12:53 |
| 10 | subfields in which your expertise would primarily | 10:12:56 |
| 11 | lie and mine is semantics within the -- I'm a | 10:12:59 |
| 12 | linguist who studies semantics so you can say I'm | 10:13:03 |
| 13 | a semanticist or a formal semanticist. | 10:13:05 |
| 14 | Q    Okay, and what kinds of data or | 10:13:11 |
| 15 | information do linguists who specialize in | 10:13:11 |
| 16 | semantics rely upon when you undertake an | 10:13:16 |
| 17 | analysis? | 10:13:19 |
| 18 | A    Well, we are scientists so we have | 10:13:20 |
| 19 | certain empirical methodologies that we use to | 10:13:22 |
| 20 | study the ways in which we convey meaning. | 10:13:27 |
| 21 | So that, itself, is (phone sounds.) | 10:13:30 |
| 22 | Q    Sorry.  The telephone just went off in | 10:13:38 |
| 23 | the room, but you can pick up where you left off. | 10:13:39 |
| 24 | A    Yeah.  So, for example, you might say | 10:13:42 |
| 25 | that the meaning of a sentence that I utter is a | 10:13:45 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          20

| | | |
|---|---|---|
| 1 | function of several factors. | 10:13:49 |
| 2 | Primarily the meanings of the words | 10:13:51 |
| 3 | that I utter, but also the syntactic structure. | 10:13:53 |
| 4 | As I said in my report, John loves Mary means | 10:13:57 |
| 5 | something very different than Mary loves John, so | 10:14:01 |
| 6 | you have to know that John's the subject of one, | 10:14:03 |
| 7 | the object of the other, etcetera, so you have to | 10:14:06 |
| 8 | know the meanings of the words. | 10:14:07 |
| 9 | The syntactic structure in which they | 10:14:10 |
| 10 | obtain in that utterance and the way in which | 10:14:13 |
| 11 | syntax puts the meanings of words together to | 10:14:16 |
| 12 | compose more complex meanings.  And then in | 10:14:20 |
| 13 | addition you have to look at various contextual | 10:14:23 |
| 14 | factors.  In particular, if there's a pronoun or | 10:14:26 |
| 15 | ellipsis in the sentence, we study the ways in | 10:14:30 |
| 16 | which people rely and really treat the meaning of | 10:14:34 |
| 17 | "he."  We say "He looks hungry," that means | 10:14:37 |
| 18 | something very different if I've been talking | 10:14:39 |
| 19 | about John versus a male alligator.  Right.  It | 10:14:40 |
| 20 | depends on the question under discussion and the | 10:14:45 |
| 21 | context of utterance and -- | 10:14:47 |
| 22 | Q    So, let me stop you there for a second. | 10:14:49 |
| 23 | So my question there was:  What kind of data or | 10:14:51 |
| 24 | information do you rely on?  You mention the | 10:14:54 |
| 25 | meaning of words, syntactic structure. | 10:14:56 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           21

| | | |
|---|---|---|
| 1 | -- (overspeaking) -- | 10:14:59 |
| 2 | What type of data? | 10:15:00 |
| 3 | -- (inaudible) -- | 10:15:00 |
| 4 | A   What data do we work on? | 10:15:01 |
| 5 | Q   Yes. | 10:15:03 |
| 6 | A   In the case of lexicography, this I | 10:15:03 |
| 7 | studied -- it's an old study, I studied this with | 10:15:07 |
| 8 | Professor Edward Gates, who was a lexicographer | 10:15:10 |
| 9 | that worked for Merriam-Webster Company in | 10:15:14 |
| 10 | Springfield, Massachusetts.  And classical | 10:15:17 |
| 11 | lexicographic procedure consists in finding usages | 10:15:21 |
| 12 | of the term that you are studying in, collecting | 10:15:25 |
| 13 | those from a wide variety of sources, literature, | 10:15:27 |
| 14 | newspaper reporting, essays. | 10:15:32 |
| 15 | Today we use radio programs, television | 10:15:35 |
| 16 | programs and the web, of course, to collect all | 10:15:37 |
| 17 | these usages. | 10:15:42 |
| 18 | They used to have shoeboxes full of | 10:15:43 |
| 19 | them.  Huge rooms full of shoeboxes of collections | 10:15:45 |
| 20 | of usages.  These are ordinary usages by people | 10:15:46 |
| 21 | who are native speakers of the language under | 10:15:52 |
| 22 | study and then the lexicographer attempts to | 10:15:54 |
| 23 | organize these into different possible sentences, | 10:15:59 |
| 24 | looking at context and evidence interpretation in | 10:16:02 |
| 25 | those passages in which they occur. | 10:16:05 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                22

| | | |
|---|---|---|
| 1 | And then they develop sensors or | 10:16:07 |
| 2 | dictionary definitions, some people call them. | 10:16:12 |
| 3 | Now a dictionary definition then is a reflection | 10:16:14 |
| 4 | of one of the meanings that ordinary people take | 10:16:17 |
| 5 | the given term to have. | 10:16:22 |
| 6 | Q    Okay, so what you just described | 10:16:25 |
| 7 | essentially as what lexicographers do, putting | 10:16:27 |
| 8 | together dictionaries, correct? | 10:16:31 |
| 9 | A    I talked to you about the data that | 10:16:32 |
| 10 | they use. | 10:16:33 |
| 11 | Q    Yeah, they use data to put together | 10:16:33 |
| 12 | dictionaries. | 10:16:35 |
| 13 | A    Right. | 10:16:36 |
| 14 | Q    So dictionaries are one form of | 10:16:37 |
| 15 | data that -- | 10:16:39 |
| 16 | A    One form. | 10:16:39 |
| 17 | Q    -- linguists use. | 10:16:40 |
| 18 | A    Right. | 10:16:43 |
| 19 | Q    What other data or is dictionary the | 10:16:43 |
| 20 | main data? | 10:16:44 |
| 21 | A    Well, no.  I mean, as I said there are | 10:16:45 |
| 22 | three prongs at least, major parts of the meaning | 10:16:47 |
| 23 | of a sentence I might utter. | 10:16:49 |
| 24 | -- (overspeaking) -- | 10:16:52 |
| 25 | Q    Okay, so what other data? | 10:16:52 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    23

| | | |
|---|---|---|
| 1 | A     So, the second prong is the syntactic | 10:16:54 |
| 2 | structure and linguists have been studying syntax | 10:16:59 |
| 3 | for centuries.  But in particular, since the | 10:17:02 |
| 4 | advent of generative grammar in the 1950s, | 10:17:05 |
| 5 | enormous progress has been made to study the many | 10:17:09 |
| 6 | and sometimes very complex and tactic structures | 10:17:12 |
| 7 | of a language, and the evidence that people draw | 10:17:15 |
| 8 | on again are texts and usages that are found in | 10:17:18 |
| 9 | the plain language of the speakers of the | 10:17:22 |
| 10 | language.  In other words -- | 10:17:25 |
| 11 | -- (overspeaking) -- | 10:17:27 |
| 12 | Q     Which you would find in dictionaries. | 10:17:27 |
| 13 | A     No, dictionaries do not record | 10:17:30 |
| 14 | syntactic structure.  You would go to -- I mean | 10:17:32 |
| 15 | the grammarians, the syntacticians in this case, | 10:17:36 |
| 16 | draw on actual usage.  They find the uses that | 10:17:40 |
| 17 | people make that are -- that other people who are | 10:17:44 |
| 18 | native speakers say, now that's sensible, that | 10:17:48 |
| 19 | sounds like English.  So now you'll find people -- | 10:17:51 |
| 20 | this is more recent because of the advent of | 10:17:55 |
| 21 | crowd-sourcing on the web, they use tools like | 10:17:59 |
| 22 | Mechanical Turk.  It's a very commonly used one to | 10:18:03 |
| 23 | do linguistic research on the web and get native | 10:18:07 |
| 24 | speakers to give judgments about whether they | 10:18:12 |
| 25 | think a particular structure of a certain word and | 10:18:15 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    24

| | | |
|---|---|---|
| 1 | the syntactic structure sounds like English.  Does | 10:18:17 |
| 2 | it sound fine or not and, if so, what does it | 10:18:20 |
| 3 | mean? | 10:18:22 |
| 4 | So, now we use -- we can use | 10:18:23 |
| 5 | crowd-sourcing, but that's a relatively recent | 10:18:26 |
| 6 | tool.  Just like lexicographers, syntacticians | 10:18:29 |
| 7 | have been studying the actual usages that you find | 10:18:33 |
| 8 | in both spoken and written English by native | 10:18:36 |
| 9 | speakers and studying what the native speakers | 10:18:42 |
| 10 | take them to mean and what the structures are | 10:18:42 |
| 11 | listed in English.  So it's listed in English to | 10:18:44 |
| 12 | say John has an apple, but now John has apple of | 10:18:46 |
| 13 | ... meaning -- | 10:18:53 |
| 14 | --(overspeaking) -- | 10:18:54 |
| 15 | Q    Okay, so dictionary's syntactic | 10:18:55 |
| 16 | structure -- | 10:18:56 |
| 17 | A    Syntax -- | 10:18:57 |
| 18 | -- (overspeaking) -- | 10:18:58 |
| 19 | Q    -- is the second thing -- | 10:18:58 |
| 20 | -- (overspeaking) -- | 10:18:59 |
| 21 | A    -- semantics -- | 10:18:59 |
| 22 | Q    And what is -- yeah.  You have to wait | 10:19:00 |
| 23 | until I'm done. | 10:19:03 |
| 24 | Thank you, Mr. McMurtry. | 10:19:04 |
| 25 | So, in considering data that linguists | 10:19:06 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    25

| | | |
|---|---|---|
| 1 | would use we talked about number one, | 10:19:08 |
| 2 | dictionaries, two syntactic structures and | 10:19:12 |
| 3 | resources that talk about syntactic structure. | 10:19:15 |
| 4 | Anything else? | 10:19:17 |
| 5 | A   So I was not quite finished with the | 10:19:18 |
| 6 | syntax.  The results of all this study is -- are | 10:19:20 |
| 7 | recorded in grammars by sophisticated linguistic | 10:19:21 |
| 8 | syntacticians.  And they're excellent grammars of | 10:19:27 |
| 9 | English starting -- well, actually starting in the | 10:19:32 |
| 10 | early -- late 19 -- early 20th century, but | 10:19:33 |
| 11 | certainly starting in the 1950s.  And these are -- | 10:19:36 |
| 12 | these are books that gather that information, | 10:19:40 |
| 13 | compile it and talk about underlying relationships | 10:19:45 |
| 14 | between these different syntactic structures.  And | 10:19:47 |
| 15 | that's what a generative grammar is.  A generative | 10:19:51 |
| 16 | grammar is a set of recursive rules that aims to | 10:19:54 |
| 17 | generate all and only the grammatical licit (?) | 10:19:58 |
| 18 | sentences of the language, so you find that in | 10:20:02 |
| 19 | grammar. | 10:20:04 |
| 20 | That's not the sort of thing that most | 10:20:05 |
| 21 | ordinary people read, but it's used by people, for | 10:20:06 |
| 22 | example, who are making natural language | 10:20:09 |
| 23 | understanding tools for computers, for human | 10:20:11 |
| 24 | computer interface.  So that's the second kind of | 10:20:16 |
| 25 | tool and the second kind of data that I can draw | 10:20:19 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    26

| | | |
|---|---|---|
| 1 | on. | 10:20:21 |
| 2 | The third kind are semantic judgments. | 10:20:21 |
| 3 | So, as I said, when you use Mechanical Turk, you | 10:20:23 |
| 4 | might be exploring what sounds like elicit, | 10:20:29 |
| 5 | meaning grammatical sentence of the language you | 10:20:34 |
| 6 | are studying, say English here, but you might also | 10:20:36 |
| 7 | ask, what does this mean and by exploring the | 10:20:39 |
| 8 | meanings of sentence in this way and what the | 10:20:42 |
| 9 | entailments are, people like me make judgments | 10:20:45 |
| 10 | about the ways in which the meanings of the words | 10:20:48 |
| 11 | interact with the syntactic structure to compose a | 10:20:53 |
| 12 | more complex meaning to the meaning of the | 10:20:58 |
| 13 | sentence. | 10:21:02 |
| 14 | Q    Anything else or that's the primary? | 10:21:03 |
| 15 | A    No, besides that we study the ways that | 10:21:04 |
| 16 | context influences interpretation so one of the | 10:21:06 |
| 17 | things I'm most well known for is my work on the | 10:21:09 |
| 18 | question under discussion. | 10:21:13 |
| 19 | If you Google "question under | 10:21:14 |
| 20 | discussion" Craige Roberts will come up.  So I | 10:21:15 |
| 21 | study the ways in which we encode the kinds of | 10:21:19 |
| 22 | factors in context, this utterance -- the context | 10:21:25 |
| 23 | that we have in this discourse, the kinds of | 10:21:32 |
| 24 | factors that come to bear on resolving | 10:21:35 |
| 25 | context-sensitive expressions in an utterance. | 10:21:38 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    27

| | | |
|---|---|---|
| 1 | And context-sensitive expressions, as I | 10:21:41 |
| 2 | said, include things like pronouns and ellipses, | 10:21:43 |
| 3 | etcetera. | 10:21:46 |
| 4 | Q    Thank you.  Anything else in terms of | 10:21:48 |
| 5 | data or those are the main things? | 10:21:50 |
| 6 | A    That's the data for evidence about the | 10:21:51 |
| 7 | way that meaning is composed as a function of the | 10:21:53 |
| 8 | parts in the context in -- yeah. | 10:21:57 |
| 9 | Q    So, the -- just getting back to my | 10:21:58 |
| 10 | initial question, the kinds of data that linguists | 10:22:00 |
| 11 | rely on when they undertake an analysis, those are | 10:22:06 |
| 12 | the types that we just talked about.  Those are | 10:22:10 |
| 13 | the kinds of data, correct? | 10:22:11 |
| 14 | A    The primary kinds of data, yes. | 10:22:12 |
| 15 | Q    Okay.  And as a linguist when you | 10:22:16 |
| 16 | write -- you've written a lot, I take it. | 10:22:18 |
| 17 | A    I have. | 10:22:21 |
| 18 | Q    I've looked at your CV, correct? | 10:22:21 |
| 19 | A    Yes. | 10:22:23 |
| 20 | Q    And when you write, you're careful | 10:22:23 |
| 21 | about words you use and the meanings they have . | 10:22:25 |
| 22 | -- (overspeaking) -- | 10:22:28 |
| 23 | A    I am -- | 10:22:28 |
| 24 | Q    -- as a linguist; right? | 10:22:28 |
| 25 | A    Yes. | 10:22:30 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          28

| | | |
|---|---|---|
| 1 | MR. McMURTRY:  Let her finish her | 10:22:31 |
| 2 | question first. | 10:22:31 |
| 3 | THE WITNESS:  I'm sorry. | 10:22:31 |
| 4 | MR. McMURTRY:  Yeah, it's -- | 10:22:31 |
| 5 | -- (overspeaking) -- | 10:22:31 |
| 6 | THE WITNESS:  I don't intend to foul | 10:22:31 |
| 7 | up.  Sorry. | 10:22:31 |
| 8 | BY MS. SPEARS: | 10:22:31 |
| 9 | Q    Thank you.  So, you also talk about, in | 10:22:40 |
| 10 | your report, pragmatics.  What is -- that you | 10:22:48 |
| 11 | specialize in pragmatics as well, correct? | 10:22:52 |
| 12 | A    Yes. | 10:22:54 |
| 13 | Q    What is pragmatics? | 10:22:55 |
| 14 | A    Pragmatics is the study of the way in | 10:22:58 |
| 15 | which context influences interpretation. | 10:23:00 |
| 16 | Q    And what is -- when you use it in that | 10:23:03 |
| 17 | way, what is context? | 10:23:08 |
| 18 | A    Context, it could be -- it depends on | 10:23:12 |
| 19 | the theory that you look at, the way in which it's | 10:23:15 |
| 20 | defined, actually.  This is a technical debate | 10:23:18 |
| 21 | within the field.  I have a theory of context. | 10:23:21 |
| 22 | Loosely and formally, you could say that the | 10:23:26 |
| 23 | context is the information that interlocutors | 10:23:28 |
| 24 | share in the course of a discourse and hence | 10:23:33 |
| 25 | information that might potentially be drawn upon | 10:23:35 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    29

| | | |
|---|---|---|
| 1 | to help resolve context sensitive aspects of the | 10:23:37 |
| 2 | meaning of them. | 10:23:41 |
| 3 | Q    When you say "interlocutors," what do | 10:23:43 |
| 4 | you mean by that? | 10:23:44 |
| 5 | A    Interlocutors in a discourse are people | 10:23:46 |
| 6 | that are speaking with each other. | 10:23:48 |
| 7 | Q    And why is context important to | 10:23:50 |
| 8 | linguists? | 10:23:53 |
| 9 | A    As I said, there are many | 10:23:55 |
| 10 | context-sensitive expressions in a language and | 10:23:56 |
| 11 | also other ways in which context comes to bear. | 10:24:00 |
| 12 | Would you like me to give an example | 10:24:02 |
| 13 | besides pronouns and ellipses? | 10:24:04 |
| 14 | Q    Sure. | 10:24:08 |
| 15 | A    Yeah.  So if I say to you, John only | 10:24:08 |
| 16 | introduced Sue to Bill, that could be true in a | 10:24:13 |
| 17 | context in which it would be false that John only | 10:24:16 |
| 18 | introduced Sue to Bill. | 10:24:20 |
| 19 | I'll say the two utterances again. | 10:24:24 |
| 20 | John only introduced Sue to Bill, versus John only | 10:24:26 |
| 21 | introduced Sue to Bill. | 10:24:31 |
| 22 | So suppose that there's several people | 10:24:33 |
| 23 | at a party and John introduced several different | 10:24:35 |
| 24 | people to Bill.  Then -- but the only person that | 10:24:39 |
| 25 | Sue met was Bill.  One of those will be true. | 10:24:46 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                30

| | | |
|---|---|---|
| 1 | John only introduced Sue to Bill but the other one | 10:24:52 |
| 2 | was false. | 10:24:57 |
| 3 |        John only introduced Sue to Bill | 10:24:57 |
| 4 | because Bill met several people.  So all I did | 10:25:00 |
| 5 | there was I put emphasis on one of the different | 10:25:04 |
| 6 | objects, Sue versus Bill. | 10:25:08 |
| 7 |    Q   So in that example you gave, that is an | 10:25:10 |
| 8 | example of how context -- | 10:25:12 |
| 9 |       -- (overspeaking) -- | 10:25:15 |
| 10 |    A   And -- | 10:25:17 |
| 11 |       -- (overspeaking) -- | 10:25:17 |
| 12 |    Q   Hold on.  I have to finish the | 10:25:17 |
| 13 | question.  So that's an example of the way in | 10:25:19 |
| 14 | which context can impact meaning when it's spoken | 10:25:22 |
| 15 | by somebody by virtue of how they emphasize a | 10:25:25 |
| 16 | certain word, correct? | 10:25:28 |
| 17 |    A   No. | 10:25:29 |
| 18 |    Q   No. | 10:25:30 |
| 19 |    A   You misunderstood, but you didn't let | 10:25:30 |
| 20 | me finish. | 10:25:32 |
| 21 |    Q   Okay. | 10:25:33 |
| 22 |    A   So what I did was give you the | 10:25:33 |
| 23 | utterances but my point was that the emphasis on | 10:25:35 |
| 24 | the accent on "Bill" versus "Sue" is said in the | 10:25:40 |
| 25 | theory, actually, the theory based on my work to | 10:25:45 |

| | | |
|---|---|---|
| 1 | be a reflection of which alternatives are under | 10:25:48 |
| 2 | consideration and that reflects the question under | 10:25:51 |
| 3 | discussion. | 10:25:53 |
| 4 | So, if I put it -- so that is a | 10:25:54 |
| 5 | contextual factor.  So if the question is: Who did | 10:25:57 |
| 6 | Bill introduce to Sue?  Who did Bill introduce to | 10:26:02 |
| 7 | Sue?  John only introduced -- I'm sorry, who did | 10:26:06 |
| 8 | John -- my names confused. | 10:26:11 |
| 9 | Who did John introduce to Sue?  By | 10:26:13 |
| 10 | saying:  John only introduced Bill to Sue, that's | 10:26:16 |
| 11 | an appropriate answer to that question. | 10:26:19 |
| 12 | Notice if I say:  Who did John | 10:26:21 |
| 13 | introduce to Bill?  And I say John only introduced | 10:26:23 |
| 14 | Sue to Bill, that would be an odd answer to that | 10:26:29 |
| 15 | question.  So there's a correlation between which | 10:26:32 |
| 16 | words I put the emphasis on among the objects and | 10:26:36 |
| 17 | the question under discussion.  And that's one way | 10:26:40 |
| 18 | that you can see that which question's under | 10:26:42 |
| 19 | discussion and that is a contextual factor. | 10:26:45 |
| 20 | It has a bearing both on the felicity | 10:26:47 |
| 21 | of the accent placement and which of the | 10:26:50 |
| 22 | utterances is appropriate, answers that question | 10:26:54 |
| 23 | and hence which is true.  Which is false. | 10:26:55 |
| 24 | Q    So, I may be a little confused now. | 10:27:00 |
| 25 | -- (overspeaking) -- | 10:27:02 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          32

| | | | |
|---|---|---|---|
| 1 | A | That's a complex question. | 10:27:03 |
| 2 | | -- (overspeaking) -- | 10:27:04 |
| 3 | Q | But let me ask you -- that's a complex | 10:27:04 |
| 4 | | question whether -- | 10:27:07 |
| 5 | | -- (overspeaking) -- | 10:27:07 |
| 6 | A | No, let me -- | 10:27:08 |
| 7 | Q | Whether Bill -- | 10:27:09 |
| 8 | A | No  -- (overspeaking) -- | 10:27:09 |
| 9 | Q | -- only introduced John to Sue, is it? | 10:27:09 |
| 10 | A | Oh, it's difficult to explain, but | 10:27:12 |
| 11 | | native speakers have no problems with it at all. | 10:27:14 |
| 12 | | That's the interesting thing. | 10:27:18 |
| 13 | Q | An average person can understand that | 10:27:19 |
| 14 | | type of -- | 10:27:21 |
| 15 | | -- (overspeaking) -- | 10:27:21 |
| 16 | A | Oh, yeah, yeah -- | 10:27:22 |
| 17 | | -- (overspeaking) -- | 10:27:22 |
| 18 | Q | -- sentence structure. | 10:27:22 |
| 19 | A | -- not explanation.  They understand | 10:27:22 |
| 20 | | the English. | 10:27:24 |
| 21 | Q | Right. | 10:27:26 |
| 22 | A | And the difference is which English | 10:27:26 |
| 23 | | utterance is felicitous and what the two | 10:27:28 |
| 24 | | in-utterances mean. | 10:27:30 |
| 25 | Q | And so I mean, boiling that down what | 10:27:32 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    33

| | | |
|---|---|---|
| 1 | you are essentially saying is that context can | 10:27:35 |
| 2 | impact the way in which a word is used in the | 10:27:37 |
| 3 | sentence or the way in which an accent on a | 10:27:41 |
| 4 | certain word is used in a sentence, correct? | 10:27:45 |
| 5 | A    That would be reduction beyond -- no, | 10:27:48 |
| 6 | that's not what I'm -- so -- | 10:27:51 |
| 7 | Q    Okay. | 10:27:53 |
| 8 | A    What I mean is -- may I? | 10:27:54 |
| 9 | Q    Sure. | 10:27:55 |
| 10 | A    Let me try again.  I meant that given | 10:27:56 |
| 11 | the whole utterance, and I'm going to say it now | 10:27:59 |
| 12 | without accent:  John only introduced Sue to Bill. | 10:28:01 |
| 13 | Okay?  That's the utterance. | 10:28:07 |
| 14 | How you can understand that, one way I | 10:28:09 |
| 15 | could say it which reflects one kind of question | 10:28:11 |
| 16 | under discussion, could be true and it's not a | 10:28:15 |
| 17 | function of the words.  The same words are in both | 10:28:18 |
| 18 | the sentences, whether I put accent on Bill or | 10:28:21 |
| 19 | Sue.  So it's not the words.  The accent reflects | 10:28:24 |
| 20 | the context and the context tells you what we call | 10:28:27 |
| 21 | the truth conditions, when it's true and when it's | 10:28:32 |
| 22 | false.  And one of those accents as a function of | 10:28:35 |
| 23 | the question under discussion that it reflects, | 10:28:39 |
| 24 | can yield something that's true while the other | 10:28:43 |
| 25 | accent could be false, given the same actual | 10:28:45 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    34

| | |
|---|---|
| 1 | circumstances in which we assess it's true. | 10:28:48 |
| 2 | Q    Okay, and context can also be the | 10:28:51 |
| 3 | situation in which the statements are made, | 10:28:56 |
| 4 | correct? | 10:28:58 |
| 5 | A    Yes, in fact, that's what I said. | 10:28:58 |
| 6 | Q    External to the words themselves, | 10:29:01 |
| 7 | correct? | 10:29:03 |
| 8 | A    Yes, that's right, as long as we have | 10:29:03 |
| 9 | access to it as interlocutors, okay?  And that's | 10:29:06 |
| 10 | one reason why I said the information available to | 10:29:10 |
| 11 | the interlocutors. | 10:29:12 |
| 12 | So if the context of utterance is one | 10:29:14 |
| 13 | in which you have access to information that I | 10:29:18 |
| 14 | don't, that access that we don't -- that | 10:29:20 |
| 15 | information we don't share will not be part of | 10:29:23 |
| 16 | what I, as the person listening to you, take into | 10:29:26 |
| 17 | consideration in interpreting what you've said. | 10:29:31 |
| 18 | It's only shared context that is | 10:29:33 |
| 19 | brought to bear on meaning in a licit way, in | 10:29:36 |
| 20 | interaction. | 10:29:41 |
| 21 | Q    Right.  Okay. So -- or I should say | 10:29:45 |
| 22 | "understood." | 10:29:47 |
| 23 | Let's go back to talking about your | 10:29:48 |
| 24 | employment history. | 10:29:52 |
| 25 | A    Yeah. | 10:29:53 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    35

| | | |
|---|---|---|
| 1 | Q    So, I just want to wrap that up.  You | 10:29:53 |
| 2 | did a postdoctoral fellowship after your graduate | 10:29:58 |
| 3 | work, correct? | 10:30:03 |
| 4 | A    It's a post doctoral fellowship.  I was | 10:30:04 |
| 5 | for two years at the Center for the Study of | 10:30:07 |
| 6 | Language and Information at Stanford University, | 10:30:10 |
| 7 | which is one of the first institutions for | 10:30:11 |
| 8 | cognitive science.  The study -- the | 10:30:14 |
| 9 | inter-disciplinary study of -- | 10:30:16 |
| 10 | -- (overspeaking) -- | 10:30:20 |
| 11 | A    -- language. | 10:30:20 |
| 12 | Q    Okay, then after that, what did you do? | 10:30:20 |
| 13 | A    I accepted a position at Ohio State | 10:30:22 |
| 14 | University in the linguistics department. | 10:30:24 |
| 15 | Q    And from what years to what years were | 10:30:29 |
| 16 | you at the Ohio State University? | 10:30:32 |
| 17 | A    I went there in 1988 and I retired in | 10:30:35 |
| 18 | 2016. | 10:30:37 |
| 19 | Q    And you taught undergraduate and | 10:30:38 |
| 20 | graduate courses at Ohio State? | 10:30:42 |
| 21 | A    I did. | 10:30:45 |
| 22 | Q    And on your resume it says you taught | 10:30:46 |
| 23 | undergraduate and graduate courses and seminars in | 10:30:50 |
| 24 | syntax, semantics and pragmatics.  What does | 10:30:54 |
| 25 | syntax mean? | 10:31:00 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    36

```
1          A    I mentioned that before.  That's the        10:31:01
2     study of what, in a given language -- which ways      10:31:03
3     of putting words together is deemed grammatical       10:31:06
4     for that language.                                    10:31:10
5          Q    You are a visiting professor at the         10:31:12
6     University of Amsterdam and the University of         10:31:14
7     Michigan?                                             10:31:16
8          A    Yes.                                         10:31:17
9          Q    Correct.  In philosophy; is that            10:31:18
10    correct?                                              10:31:21
11         A    That's the department I was in at           10:31:21
12    Michigan.                                             10:31:23
13         Q    And did you teach philosophy?               10:31:23
14         A    I taught a seminar on philosophy of         10:31:25
15    language.  Philosophy of language.                    10:31:28
16         Q    And how does philosophy relate to          10:31:30
17    linguistics?                                          10:31:34
18         A    Well, remember, I mentioned I was at a      10:31:34
19    cognitive science center as my post-doc at            10:31:36
20    Stanford.  And cogni-science brings together          10:31:40
21    several fields that have -- that study things         10:31:44
22    about human cognition generally but language in       10:31:44
23    particular.  And those fields are linguistics, of     10:31:48
24    course, but also philosophy because there are         10:31:50
25    people who have studied language in philosophy for    10:31:52
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    37

| | | |
|---|---|---|
| 1 | centuries and psychology and computer science | 10:31:56 |
| 2 | because of competition linguistics and sociology. | 10:32:01 |
| 3 | Sometimes anthropology. | 10:32:04 |
| 4 | So, in particular, the people who | 10:32:09 |
| 5 | study -- I said I was a formal semanticist and we | 10:32:11 |
| 6 | use logical tools to capture the ways that | 10:32:17 |
| 7 | different languages encode meaning.  This is very | 10:32:21 |
| 8 | useful as a way of capturing the meaning, | 10:32:26 |
| 9 | independent of a language in which you are doing | 10:32:30 |
| 10 | the analysis, okay?  And it's very helpful if | 10:32:32 |
| 11 | you're, for example, a computational linguist. | 10:32:36 |
| 12 | Q    Well, let me stop you there for a | 10:32:41 |
| 13 | second because I just want to -- at a high-level, | 10:32:44 |
| 14 | how does philosophy relate to linguistics? | 10:32:46 |
| 15 | A    I'm trying to explain to you. | 10:32:49 |
| 16 | Q    Okay. | 10:32:51 |
| 17 | A    Okay, so philosophers are interested in | 10:32:51 |
| 18 | a variety of things including thought and language | 10:32:54 |
| 19 | and the way that language reflects thought. | 10:32:56 |
| 20 | So for 200 years philosophers have | 10:32:58 |
| 21 | studied the way in which they think that language | 10:33:01 |
| 22 | relates to thought and as a consequence, they have | 10:33:04 |
| 23 | studied -- especially logicians are very | 10:33:07 |
| 24 | interested in expressions like the word "the" or | 10:33:11 |
| 25 | the word "every," etcetera.  So they have very | 10:33:14 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    38

| | | |
|---|---|---|
| 1 | detailed analyses of these words and they have had | 10:33:18 |
| 2 | a bearing on the analyses that linguistics -- | 10:33:21 |
| 3 | linguists take into consideration, so we interact | 10:33:26 |
| 4 | with people who have a common interest in | 10:33:30 |
| 5 | academia. | 10:33:31 |
| 6 | Q    You developed and taught a class called | 10:33:32 |
| 7 | "Language in the Law"? | 10:33:36 |
| 8 | A    Yes. | 10:33:37 |
| 9 | Q    In 2005 to 2016? | 10:33:37 |
| 10 | A    Yes. | 10:33:38 |
| 11 | Q    What was the focus of that course? | 10:33:42 |
| 12 | A    That was an advanced undergraduate | 10:33:44 |
| 13 | course for students who were interested in going | 10:33:44 |
| 14 | into the law, law enforcement related to fields. | 10:33:46 |
| 15 | It was a writing course so it was a | 10:33:50 |
| 16 | very demanding course for the students and it was | 10:33:52 |
| 17 | a course in which we tried to talk -- first of | 10:33:57 |
| 18 | all, give them some basic information about the | 10:33:59 |
| 19 | way that "we" is understood by native speakers and | 10:34:02 |
| 20 | how you might bring that information to bear on | 10:34:03 |
| 21 | assessing the plain meaning of some -- of a given | 10:34:15 |
| 22 | expression. | 10:34:17 |
| 23 | Then we looked at case law and some of | 10:34:19 |
| 24 | the sort of standard ways in which attorneys | 10:34:22 |
| 25 | approached language and tried to think about how | 10:34:28 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           39

| | | |
|---|---|---|
| 1 | linguistic tools could be useful in assessing | 10:34:39 |
| 2 | meaning in contentious cases. | 10:34:44 |
| 3 | Q    What law did you look at for that | 10:34:46 |
| 4 | course? | 10:34:48 |
| 5 | A    I would have look at my notes.  If | 10:34:48 |
| 6 | you'd like, I can do that at my computer here. | 10:34:51 |
| 7 | Q    That's all right -- | 10:34:53 |
| 8 | -- (overspeaking) -- | 10:34:53 |
| 9 | A    -- of course it is. | 10:34:53 |
| 10 | -- (overspeaking) -- | 10:34:54 |
| 11 | Q    -- just what you recall sitting here. | 10:34:54 |
| 12 | A    I -- for example, one of the books I | 10:34:56 |
| 13 | used a lot was a book by Larry Solan called "The | 10:34:57 |
| 14 | Language of Judges." Larry Solan is an | 10:35:01 |
| 15 | interesting -- I think he's a Professor at | 10:35:05 |
| 16 | Brooklyn, was it?  I can't remember.  John J. | 10:35:06 |
| 17 | College or Brooklyn College, one of these places | 10:35:08 |
| 18 | here in New York, but he has a Ph D. in | 10:35:08 |
| 19 | linguistics actually from the same school that I | 10:35:08 |
| 20 | went to, University of Massachusetts in Amherst | 10:35:16 |
| 21 | and he's taught language in the law for a long | 10:35:18 |
| 22 | time -- | 10:35:21 |
| 23 | Q    Any specific area of law? | 10:35:22 |
| 24 | A    Well -- | 10:35:23 |
| 25 | Q    Or is he just focused on writing and | 10:35:24 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    40

| | | |
|---|---|---|
| 1 | language? | 10:35:28 |
| 2 | A    I'm sorry, I don't understand the | 10:35:29 |
| 3 | question. | 10:35:30 |
| 4 | Q    Sure.  My question I was trying to get | 10:35:30 |
| 5 | at is were you, in your class "Language and the | 10:35:32 |
| 6 | Law" were you focused on any specific area? | 10:35:35 |
| 7 | A    No, we looked pretty broadly at the | 10:35:39 |
| 8 | variety of the kinds of cases. | 10:35:42 |
| 9 | I'm not sure what the question is | 10:35:44 |
| 10 | trying to get at.  Sorry. | 10:35:45 |
| 11 | Q    So is it criminal law or civil law? | 10:35:46 |
| 12 | A    Yeah, both. | 10:35:49 |
| 13 | Q    Both? | 10:35:51 |
| 14 | A    Yeah. | 10:35:53 |
| 15 | Q    Did you teach anything about defamation | 10:35:53 |
| 16 | law in your class? | 10:35:56 |
| 17 | A    Not particularly.  I think we might | 10:35:59 |
| 18 | have looked at one or two cases in which | 10:36:01 |
| 19 | defamation was an issue, but that wasn't one of | 10:36:04 |
| 20 | the focuses. | 10:36:06 |
| 21 | Q    From 2016 to 2019, you were a visiting | 10:36:07 |
| 22 | Professor at NYU in the linguistics department; is | 10:36:09 |
| 23 | that correct? | 10:36:13 |
| 24 | A    Yes. | 10:36:14 |
| 25 | Q    And you said you -- have you retired | 10:36:14 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          41

| | | |
|---|---|---|
| 1 | from there or what's your -- | 10:36:18 |
| 2 | -- (overspeaking) -- | 10:36:20 |
| 3 | Q    -- status? | 10:36:20 |
| 4 | A    -- (overspeaking) -- linguistics | 10:36:21 |
| 5 | professors don't retire. | 10:36:23 |
| 6 | They are just hired -- they are not | 10:36:24 |
| 7 | even hired for long term.  It's just, you know, | 10:36:25 |
| 8 | for a semester or a year, yeah, and they only | 10:36:27 |
| 9 | hired me to teach one course. | 10:36:30 |
| 10 | Q    Okay, and what did you teach? | 10:36:31 |
| 11 | A    I taught a course on indexicality. | 10:36:33 |
| 12 | Q    What's indexicality? | 10:36:38 |
| 13 | A    Indexi -- indexicals are a certain | 10:36:40 |
| 14 | class of context-sensitive expressions that | 10:36:43 |
| 15 | include:  I, you, we, here, now, yesterday, | 10:36:46 |
| 16 | tomorrow.  And they are sensitive to context in a | 10:36:49 |
| 17 | very particular way and I've been developing a | 10:36:52 |
| 18 | novel theory of the relationship between those | 10:36:55 |
| 19 | expressions and context. | 10:36:58 |
| 20 | Q    The -- strike that.  You are currently | 10:37:03 |
| 21 | Professor Emerita at OSU? | 10:37:07 |
| 22 | A    Yes. | 10:37:12 |
| 23 | Q    What does that mean? | 10:37:12 |
| 24 | A    It means I'm not just retired, but I'm | 10:37:13 |
| 25 | still eligible to serve on graduate committees. | 10:37:15 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                42

| | | |
|---|---|---|
| 1 | I have access to university resources from my | 10:37:18 |
| 2 | research. | 10:37:21 |
| 3 |         It's an honored position, you know, a | 10:37:24 |
| 4 | position of respect that says I'm still an active | 10:37:28 |
| 5 | member of the research community, even though I | 10:37:31 |
| 6 | retired from teaching. | 10:37:33 |
| 7 |     Q    And do you hold any other current | 10:37:40 |
| 8 | positions, teaching positions? | 10:37:41 |
| 9 |     A    Not teaching positions.  I actually | 10:37:43 |
| 10 | have just have received an invitation to be a | 10:37:45 |
| 11 | Research Scholar at Barnard College starting in | 10:37:48 |
| 12 | January of 2022. | 10:37:52 |
| 13 |     Q    You also list you are an affiliate of | 10:37:55 |
| 14 | Rutgers -- | 10:37:58 |
| 15 |     A    Yes. | 10:37:59 |
| 16 |     Q    -- for Cognitive Science?  What's that? | 10:37:59 |
| 17 |     A    The cognitive science is an | 10:38:01 |
| 18 | interdisciplinary study of a variety of things | 10:38:02 |
| 19 | having to do with human cognition, but as I said, | 10:38:05 |
| 20 | in particular they're interested in language. | 10:38:07 |
| 21 | Because I have a long history of working in an | 10:38:09 |
| 22 | interdisciplinary way with psychologists, | 10:38:12 |
| 23 | philosophers and computer scientists, when I moved | 10:38:17 |
| 24 | here I knew the people well at Rutgers and they | 10:38:20 |
| 25 | invited me to be part of their cognitive science | 10:38:23 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    43

| | | |
|---|---|---|
| 1 | center. | 10:38:25 |
| 2 | Q    And what does it mean to be an | 10:38:27 |
| 3 | affiliate? | 10:38:28 |
| 4 | A    I have -- they don't give me any money. | 10:38:29 |
| 5 | This is all for glory and -- but they deem me -- | 10:38:32 |
| 6 | it's really a way of saying that I'm a respected | 10:38:36 |
| 7 | member of the community.  I'm a resource that they | 10:38:40 |
| 8 | would like their faculty and students to draw on. | 10:38:42 |
| 9 | For example, even though it's not | 10:38:45 |
| 10 | official anymore, I am still an affiliate at NYU. | 10:38:47 |
| 11 | I go to courses and seminars there all the time. | 10:38:50 |
| 12 | I'm on committees for graduate students.  I'm | 10:38:53 |
| 13 | writing letters for one of them right now. | 10:38:56 |
| 14 | Q    Okay, so is this basically -- have we | 10:38:59 |
| 15 | gone through your basic employment and teaching | 10:39:02 |
| 16 | history.  Have I left anything out? | 10:39:04 |
| 17 | A    Many other things but that'll do. | 10:39:07 |
| 18 | Q    Any other important positions you've | 10:39:11 |
| 19 | held that I've left out. | 10:39:12 |
| 20 | A    Those are my principle positions, yes. | 10:39:14 |
| 21 | Q    And obviously with all of your | 10:39:16 |
| 22 | extensive research and training as a linguist and | 10:39:18 |
| 23 | you've gone through, even in your answers very | 10:39:23 |
| 24 | deeply into, you know, the thought process here, | 10:39:25 |
| 25 | when you are reading something in everyday life | 10:39:28 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    44

| | | |
|---|---|---|
| 1 | does your training sort of impact how you read or | 10:39:31 |
| 2 | interpret things? | 10:39:35 |
| 3 |     A   No, not unless there's an issue that | 10:39:37 |
| 4 | comes up.  So, may I explain?  If I was reading | 10:39:39 |
| 5 | and I'm an avid reader, I read constantly, I just | 10:39:43 |
| 6 | read like you do.  I'm looking for content. | 10:39:46 |
| 7 |         If it's beautiful, I'm reading poetry | 10:39:48 |
| 8 | and I'm impressed and moved by the form.  When | 10:39:50 |
| 9 | something doesn't work, then probably more likely | 10:39:54 |
| 10 | than you, I'm more likely than you to stop and | 10:39:57 |
| 11 | think about why it doesn't work, what was | 10:39:59 |
| 12 | infelicitous or seemed out of place or | 10:40:03 |
| 13 | ungrammatical, but that's because I have that | 10:40:09 |
| 14 | training to look at that. | 10:40:11 |
| 15 |     Q   Yeah, I would think that in reading | 10:40:13 |
| 16 | things, just given your background, what you do | 10:40:14 |
| 17 | for a living that's a prism through which you are | 10:40:17 |
| 18 | constantly looking, right? | 10:40:19 |
| 19 |     A   Not really.  That would kind of spoil | 10:40:20 |
| 20 | it for me, no.  And I don't like Scrabble.  I | 10:40:22 |
| 21 | don't like word games. | 10:40:24 |
| 22 |     Q   Do you -- you said you're an avid | 10:40:28 |
| 23 | reader. | 10:40:31 |
| 24 |     A   Yeah. | 10:40:32 |
| 25 |     Q   How often do you read and watch the | 10:40:32 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    45

| | | |
|---|---|---|
| 1 | news? | 10:40:34 |
| 2 | A    Umm... I read the news every day.  I | 10:40:36 |
| 3 | mostly read the news.  I look at things online, as | 10:40:40 |
| 4 | well, videos, etcetera, yeah. | 10:40:43 |
| 5 | Q    Are there particular newspapers that | 10:40:48 |
| 6 | you subscribe to? | 10:40:50 |
| 7 | A    New York Times and Washington Post. | 10:40:52 |
| 8 | Q    Any others? | 10:40:54 |
| 9 | A    Not subscribe. | 10:40:55 |
| 10 | Q    Are there particular news programs that | 10:40:56 |
| 11 | you watch regularly? | 10:41:01 |
| 12 | A    I don't watch the news.  I look at | 10:41:02 |
| 13 | streaming.  If there's an article either in the | 10:41:05 |
| 14 | New York Times or the Washington Post or if one of | 10:41:10 |
| 15 | my friends might post something on Facebook from | 10:41:12 |
| 16 | The Guardian or some other local newspaper that | 10:41:16 |
| 17 | they read and it looks like an interesting story, | 10:41:21 |
| 18 | I'll go there and if there's a video or streaming | 10:41:23 |
| 19 | I'll watch that. | 10:41:26 |
| 20 | Q    Do you watch TV? | 10:41:27 |
| 21 | A    No. | 10:41:28 |
| 22 | Q    Do you have any special expertise in | 10:41:33 |
| 23 | video analysis? | 10:41:35 |
| 24 | A    No. | 10:41:37 |
| 25 | Q    Do you have any special expertise in | 10:41:42 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              46

| | | |
|---|---|---|
| 1 | reconstructing events through analysis and videos? | 10:41:44 |
| 2 | A    No. | 10:41:48 |
| 3 | Q    Let's go to your -- I want to mark your | 10:41:48 |
| 4 | expert report and I have a copy here.  We are | 10:41:56 |
| 5 | going to mark it as Exhibit A to this deposition. | 10:41:58 |
| 6 | (Exhibit A was marked for | 10:42:01 |
| 7 | identification.) | 10:42:01 |
| 8 | BY MS. SPEARS: | 10:42:12 |
| 9 | Q    I'm marking Exhibit A to the deposition | 10:42:12 |
| 10 | and that is a copy of Plaintiff's 26(a)2 | 10:42:15 |
| 11 | disclosures, Phase I followed by Exhibit A to that | 10:42:22 |
| 12 | disclosure which is a report dated November 10th, | 10:42:29 |
| 13 | 2021; do you recognize this? | 10:42:35 |
| 14 | A    Yes, I do. | 10:42:37 |
| 15 | Q    Is this the report you wrote in this | 10:42:38 |
| 16 | case? | 10:42:41 |
| 17 | A    Yes. | 10:42:41 |
| 18 | Q    I should say "in these cases"? | 10:42:42 |
| 19 | A    Yes, that's right. | 10:42:44 |
| 20 | -- (indiscernible) -- | 10:42:48 |
| 21 | Q    If you would look at page 2 to 3 of | 10:42:48 |
| 22 | your report, so it starts in sort of a letter form | 10:42:51 |
| 23 | on page 1, "Dear Mr. McMurtry."  Do you see that? | 10:43:03 |
| 24 | A    Yes. | 10:43:06 |
| 25 | Q    And if you go to page -- the appendix | 10:43:07 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    47

| 1 | of the report, essentially. | 10:43:13 |
| 2 | A    Sure. | 10:43:16 |
| 3 | Q    It's actually page 1 of the appendix | 10:43:26 |
| 4 | which is at the back.  It says November of 2021, | 10:43:29 |
| 5 | Craige Roberts' brief. | 10:43:30 |
| 6 | A    Sorry, are you talking about page 16? | 10:43:31 |
| 7 | Q    No, it's page 1. | 10:43:33 |
| 8 | A    Oh, my CV.  Is that what you are | 10:43:35 |
| 9 | talking about? | 10:43:38 |
| 10 | Q    Mm-hmm.  Your CV. | 10:43:39 |
| 11 | A    Yes. | 10:43:43 |
| 12 | Q    So that we're on the same page, it's | 10:43:43 |
| 13 | your CV brief. | 10:43:45 |
| 14 | A    Yeah. | 10:43:47 |
| 15 | Q    CV November 2021, page 1. | 10:43:47 |
| 16 | A    Yes. | 10:43:51 |
| 17 | Q    It's at the back of your report.  Do | 10:43:52 |
| 18 | you see that? | 10:43:53 |
| 19 | A    Yes. | 10:43:54 |
| 20 | Q    You list several publications here, | 10:43:55 |
| 21 | starting on page 2 and over to page 3. | 10:43:59 |
| 22 | In any of these publications -- you can | 10:44:06 |
| 23 | take a minute to look -- | 10:44:08 |
| 24 | A    Yeah. | 10:44:09 |
| 25 | Q    -- did you analyze videos of live | 10:44:10 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    48

| | | |
|---|---|---|
| 1 | action or events to determine the veracity of | 10:44:13 |
| 2 | statements? | 10:44:16 |
| 3 | A    No. | 10:44:17 |
| 4 | Q    Do any of those publications discuss | 10:44:17 |
| 5 | how to approach a video analysis review, such as | 10:44:20 |
| 6 | how to review videos of live events? | 10:44:24 |
| 7 | A    No. | 10:44:26 |
| 8 | Q    Page 2, down at the very first list | 10:44:27 |
| 9 | under books, it says "Haitian Creole English | 10:44:32 |
| 10 | French Dictionary."  I think you mentioned that | 10:44:36 |
| 11 | when you were speaking earlier, correct? | 10:44:39 |
| 12 | A    Yes. | 10:44:41 |
| 13 | Q    I assume that provides translations | 10:44:42 |
| 14 | between Haitian, Creole, English or French? | 10:44:44 |
| 15 | A    Correct. | 10:44:47 |
| 16 | Q    Do you speak Haitian Creole and French? | 10:44:49 |
| 17 | A    Yes. | 10:44:52 |
| 18 | Q    Do you speak any other languages? | 10:44:53 |
| 19 | A    Not well. | 10:44:55 |
| 20 | Q    Do you speak Haitian Creole and French | 10:44:57 |
| 21 | well? | 10:45:01 |
| 22 | A    French pretty well, yes.  Haitian not | 10:45:01 |
| 23 | as well because I haven't had occasion to use it | 10:45:05 |
| 24 | much since I did the dictionary. | 10:45:07 |
| 25 | Q    And that was in 1981? | 10:45:09 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    49

| | | |
|---|---|---|
| 1 | A     I worked on the dictionary from '78 to | 10:45:11 |
| 2 | '80, when I was first an undergraduate and then a | 10:45:15 |
| 3 | graduate assistant at Indiana University on the | 10:45:17 |
| 4 | dictionary project. | 10:45:19 |
| 5 | I wrote an article that was a | 10:45:23 |
| 6 | dictionary procedure article which was one of my | 10:45:25 |
| 7 | first published articles, but I didn't include it | 10:45:28 |
| 8 | here that was a procedures manual for the | 10:45:31 |
| 9 | dictionary. | 10:45:35 |
| 10 | Q     That's okay.  You know, I just wanted | 10:45:36 |
| 11 | to establish the timeframe. | 10:45:37 |
| 12 | A     Okay. | 10:45:39 |
| 13 | Q     If we have more time I could hear more | 10:45:39 |
| 14 | about the Haitian Creole dictionary, but I'm going | 10:45:41 |
| 15 | to pass. | 10:45:44 |
| 16 | So I take it you speak French as a | 10:45:49 |
| 17 | foreign language, obviously; you're a native | 10:45:52 |
| 18 | English speaker, correct? | 10:45:56 |
| 19 | A     Correct. | 10:45:57 |
| 20 | Q     Are you able to distinguish languages | 10:45:57 |
| 21 | from other human sounds? | 10:46:00 |
| 22 | A     It depends on the language.  I think I | 10:46:01 |
| 23 | could always tell if it was a human language from | 10:46:03 |
| 24 | various things, but that's a weird question. | 10:46:05 |
| 25 | Sorry. | 10:46:08 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    50

| | | |
|---|---|---|
| 1 | Q    That's okay.  I've been accused of | 10:46:10 |
| 2 | asking weird questions before.  Page 3.  You -- | 10:46:12 |
| 3 | the second one down has domain selection and | 10:46:17 |
| 4 | dynamic semantics in quantification and natural | 10:46:20 |
| 5 | language.  What is natural language? | 10:46:26 |
| 6 | A    Natural language is -- it's in | 10:46:28 |
| 7 | contraposition to artificial languages which would | 10:46:32 |
| 8 | be languages like logic, which is a kind of | 10:46:35 |
| 9 | language or a computer languages. | 10:46:38 |
| 10 | Q    I see.  Down a little bit further, | 10:46:39 |
| 11 | midway on page 3, I see a publication of yours | 10:46:42 |
| 12 | entitled "Domain selection" in -- | 10:46:46 |
| 13 | A    That's the same one. | 10:46:52 |
| 14 | Q    Oh, that's the same one.  Sorry. | 10:46:52 |
| 15 | "Discourse Context and Dynamic interpretation." | 10:46:52 |
| 16 | A    Yes. | 10:46:54 |
| 17 | Q    What's discourse context? | 10:46:55 |
| 18 | A    As I said -- I mean, there's a lot of | 10:46:57 |
| 19 | kinds of context in the world, but I'm talking | 10:47:01 |
| 20 | about the context that bears on the interpretation | 10:47:03 |
| 21 | of language, so we call that discourse context | 10:47:05 |
| 22 | because it's the context in which a discourse | 10:47:08 |
| 23 | takes place between interlocutors.  I wasn't | 10:47:10 |
| 24 | speaking specifically of the kind of context | 10:47:18 |
| 25 | that's relevant for interpretation of language. | 10:47:19 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    51

| | | |
|---|---|---|
| 1 | Q    What does dynamic interpretation mean? | 10:47:24 |
| 2 | A    Yeah.  Context changes in the course of | 10:47:28 |
| 3 | interpretation of a single complex sentence | 10:47:31 |
| 4 | sometimes.  I could give you examples and so you | 10:47:35 |
| 5 | call that dynamic context.  The context that | 10:47:37 |
| 6 | changes while the sentence is being spoken.  I | 10:47:39 |
| 7 | could give you a simple example.  I could say | 10:47:43 |
| 8 | "Give me a copy of that," pointing in one | 10:47:46 |
| 9 | direction; that, pointing in another direction | 10:47:49 |
| 10 | and; that, pointing in a third direction.  And the | 10:47:52 |
| 11 | context in which I'm pointing -- the context | 10:47:55 |
| 12 | includes my pointing and the information that you | 10:47:57 |
| 13 | get from the pointing about what I'm pointing at | 10:48:01 |
| 14 | in that, you know, visual context. | 10:48:04 |
| 15 | So there the context has changed | 10:48:05 |
| 16 | because one point when I said "that" I was | 10:48:07 |
| 17 | pointing in one direction.  Another point, I'm | 10:48:10 |
| 18 | pointing in different and then a third.  So that's | 10:48:12 |
| 19 | a dynamic context, but there are many more complex | 10:48:14 |
| 20 | ways in which a complex syntactic structure leads | 10:48:19 |
| 21 | to the possibility of updating contextual | 10:48:22 |
| 22 | information in the course of interpretation and | 10:48:25 |
| 23 | that's one of my areas of expertise. | 10:48:27 |
| 24 | Q    By the way, you mentioned earlier that | 10:48:32 |
| 25 | there was a technical debate in your field related | 10:48:34 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    52

| | | |
|---|---|---|
| 1 | to some -- some of the works you've -- or some of | 10:48:38 |
| 2 | the specialities that you focused on.  What were | 10:48:44 |
| 3 | you referencing? | 10:48:46 |
| 4 |      A    Well, for example, I told you I'm | 10:48:47 |
| 5 | teaching a course on indexicality, and there's a | 10:48:48 |
| 6 | famous theory of indexicality due to a | 10:48:54 |
| 7 | philosopher -- you don't need to know all | 10:48:57 |
| 8 | the details Caplan in the '80s.  And I'm arguing | 10:48:58 |
| 9 | that if you looked across the wide variety of | 10:49:01 |
| 10 | human languages, there's empirical evidence from | 10:49:03 |
| 11 | those languages that his theory makes the wrong | 10:49:07 |
| 12 | predictions in a number of cases and so is | 10:49:10 |
| 13 | inadequate, so I have a better theory to offer. | 10:49:11 |
| 14 |      Q    Are there any theories of yours in | 10:49:15 |
| 15 | linguistics that are the subject of debate in your | 10:49:19 |
| 16 | field? | 10:49:21 |
| 17 |      A    Sure.  Of course.  If you are an | 10:49:29 |
| 18 | interested theorist, there are.  So mine, I have a | 10:49:29 |
| 19 | theory about "the." I'm actually you're at the | 10:49:32 |
| 20 | table with one of the world's foremost experts on | 10:49:32 |
| 21 | the English word "the" which is the most common | 10:49:32 |
| 22 | word in English language.  And there's a ferocious | 10:49:32 |
| 23 | debate going back to Russell and Whitehead and | 10:49:42 |
| 24 | Frega (?) in the late 19th, early 20th century | 10:49:45 |
| 25 | about the meaning of "the."  And I have a stance | 10:49:46 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    53

1    about that which is still controversial.                    10:49:48

2         Q    Anything else in your work that is                10:49:50

3    controversial?                                              10:49:52

4         A    Oh, controversial.  I mean, I told you            10:49:54

5    my work on the question under discussion's very,            10:49:56

6    very influential.  There's a large -- if you go to          10:49:58

7    my web page, there's a large bibliography, you can          10:50:02

8    link from there that goes to about half of the              10:50:06

9    work that's been written about the question under           10:50:08

10   discussion.                                                 10:50:11

11        Q    Can you tell me just briefly what is              10:50:11

12   the debate about your theory of the question under          10:50:13

13   discussion?                                                 10:50:15

14        A    Whether I have the right theory of the            10:50:16

15   question under discussion.  I characterize it in a          10:50:19

16   certain, very precise formal way, which I could             10:50:22

17   give you a lecture about, if you wanted.                    10:50:25

18        Q    No thanks.                                        10:50:28

19        A    I don't think you want it, but, but is            10:50:28

20   that the right way to do it.                                10:50:30

21             So one of the students that I'm writing           10:50:32

22   letters for now has an alternative to one aspect            10:50:35

23   of my theory which I think improves on it but, of           10:50:37

24   course, in science, and I'm a scientists, we have           10:50:40

25   a hypothesis not because we think we're always              10:50:43

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    54

1   right, but because we think that's the best          10:50:48

2   explanation we have to give at this point.           10:50:50

3           If new data comes to bear, we revise         10:50:52

4   our hypothesis, so in that sense, all theory is      10:50:54

5   always, in science, up for revision.                 10:50:57

6           The virtue of a good theory is its           10:51:03

7   clarity so that we can understand exactly what it    10:51:05

8   predicts.                                            10:51:08

9       Q    On page 5 of your CV, in a couple of        10:51:09

10  talks you've given on character assassination?       10:51:17

11      A    Mm-hmm.                                      10:51:21

12      Q    What are those?                              10:51:21

13      A    It's a joke.  It's a linguistic joke.       10:51:22

14           I told you about the guy's name Caplan,     10:51:25

15  whose work on indexicality is the most influential   10:51:28

16  and famous in the field and he calls the meaning     10:51:33

17  of an indexical its character.  It's a technical     10:51:37

18  term, has a very specific meaning in that theory.    10:51:40

19  And so I called my talk -- I called my work          10:51:43

20  character assassination because I'm dissing his      10:51:45

21  theory of character.                                 10:51:49

22      Q    Got it.  So, that's helpful.  Thank         10:51:50

23  you.  It's funny as well.                            10:51:52

24      A    (Laughter)                                   10:51:56

25      Q    You have a talk towards the bottom of       10:51:56

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    55

| | | |
|---|---|---|
| 1 | page 5, "OSU Pragmatics Group Slurs" from very -- | 10:52:02 |
| 2 | A     Yeah. | 10:52:11 |
| 3 | Q     Well, a year ago. | 10:52:12 |
| 4 | A     Yeah. | 10:52:12 |
| 5 | Q     Very recently.  What's this group | 10:52:14 |
| 6 | about? | 10:52:16 |
| 7 | A     The OSU Pragmatics Group is something I | 10:52:16 |
| 8 | started when I was there.  It's a working group | 10:52:19 |
| 9 | for non-credit for graduate students who are | 10:52:22 |
| 10 | interested in pragmatics, and it's very important | 10:52:24 |
| 11 | for their professional development. | 10:52:26 |
| 12 | Q     And what's the slurs -- | 10:52:28 |
| 13 |         -- (overspeaking) -- | 10:52:29 |
| 14 | A     So I was -- I was attending by Zoom and | 10:52:29 |
| 15 | their subject of that discussion is slurs, which | 10:52:32 |
| 16 | are offensive terms in natural language.  And | 10:52:38 |
| 17 | I have some things to say about the meaning of | 10:52:42 |
| 18 | slurs and how I think they come to bear and bear | 10:52:45 |
| 19 | on the truth condition of the utterance, that is | 10:52:53 |
| 20 | to say whether it's true or false. | 10:52:56 |
| 21 | Q     And do slurs have universal meaning? | 10:52:58 |
| 22 | A     No, they are very particular to the | 10:53:00 |
| 23 | group that uses them, I would say. | 10:53:02 |
| 24 | Q     And does the perspective of the | 10:53:05 |
| 25 | listener or the interlocutor hearing the slur also | 10:53:08 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    56

| | | |
|---|---|---|
| 1 | matter? | 10:53:11 |
| 2 | A    Well, yes, I said "the group."  So | 10:53:12 |
| 3 | if -- if we're in crowd in a certain ethnic group | 10:53:13 |
| 4 | sometimes a term that would be used by an outsider | 10:53:21 |
| 5 | as an offensive slur can be used as an in-crowd | 10:53:24 |
| 6 | group as almost a badge of pride, so it depends on | 10:53:28 |
| 7 | who you're talking to what the slur -- not just | 10:53:33 |
| 8 | what it means truth conditionally but the | 10:53:33 |
| 9 | implications and the emotional connotations, yes. | 10:53:33 |
| 10 | Q    And cultural differences can -- | 10:53:42 |
| 11 | -- (overspeaking) -- | 10:53:42 |
| 12 | A    And cultural differences come to bear, | 10:53:43 |
| 13 | that's correct. | 10:53:45 |
| 14 | Q    Let's look to your CV, page 2.  Have | 10:53:50 |
| 15 | you ever testified in a defamation case before? | 10:54:01 |
| 16 | You list a bunch of cases where you've | 10:54:07 |
| 17 | been engaged as a -- as an expert to do expert | 10:54:08 |
| 18 | work. | 10:54:11 |
| 19 | A    No. | 10:54:11 |
| 20 | Q    Have you ever testified in a defamation | 10:54:11 |
| 21 | case before? | 10:54:14 |
| 22 | A    I don't believe so, no, I have not. | 10:54:15 |
| 23 | Q    Is this case listed at the bottom of | 10:54:16 |
| 24 | your list of cases on page 2 or is that a | 10:54:19 |
| 25 | different case? | 10:54:22 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    57

| | | | |
|---|---|---|---|
| 1 | A | This is this case. | 10:54:23 |
| 2 | Q | So that's Hemmer DeFrank Wessels -- | 10:54:24 |
| 3 | A | Yes. | 10:54:27 |
| 4 | Q | -- Attorneys at Law, Ft. Mitchell. | 10:54:27 |
| 5 | A | Yes. | 10:54:28 |
| 6 | Q | Retained as expert witness in a | 10:54:28 |

defamation suit, preparing a report.                                    10:54:28

Have you ever been retained by Hemmer                     10:54:33
DeFrank Wessels before?                                                 10:54:35

| | | | |
|---|---|---|---|
| 10 | A | No. | 10:54:37 |
| 11 | Q | Have you ever been asked to review | 10:54:43 |

videos in connection with any expert testimony                         10:54:45
before?                                                                10:54:46

| | | | |
|---|---|---|---|
| 14 | A | No. | 10:54:48 |
| 15 | Q | In how many matters have you provided | 10:54:56 |

expert testimony?                                                      10:54:58

17     A     You mean in the courtroom and           10:54:59
deposition or what do you mean by "provided expert                     10:55:00
testimony"?                                                            10:55:03

20     Q     Yeah, let me clarify that.  In how many   10:55:04
matters have you provided an expert opinion in an                      10:55:06
report?                                                                10:55:09

23     A     I would have to count.  I don't -- I      10:55:10
never -- I haven't kept track of the number.  Out                      10:55:11
of the cases you see listed here probably 7 or 10.                     10:55:15

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    58

| | | |
|---|---|---|
| 1 | I'm sorry, I don't know exactly the number. | 10:55:19 |
| 2 | Q   Does this list here that we see on | 10:55:22 |
| 3 | pages 1 and 2 contain a complete list of your | 10:55:25 |
| 4 | work -- legal work -- excuse me, expert work for | 10:55:30 |
| 5 | legal cases? | 10:55:31 |
| 6 | A   I suspect it does.  I don't remember. | 10:55:32 |
| 7 | Remember, this is a brief curriculum vitae so I | 10:55:35 |
| 8 | might have taken out something that didn't seem | 10:55:37 |
| 9 | very important. | 10:55:41 |
| 10 | Q   Have you ever been excluded as an | 10:55:42 |
| 11 | expert? | 10:55:44 |
| 12 | A   Excluded, meaning by a judge? | 10:55:44 |
| 13 | Q   Sure, let me rephrase that.  Has your | 10:55:46 |
| 14 | report ever been excluded in a case? | 10:55:48 |
| 15 | A   Sorry, I'm just not sure the technical | 10:55:51 |
| 16 | sense.  May I try to clarify? | 10:55:53 |
| 17 | Q   Let me try to clarify, and I could ask | 10:55:55 |
| 18 | the question a little better, so thank you. | 10:55:59 |
| 19 | Have you ever given a report or provided a report | 10:56:01 |
| 20 | as an expert in a case and your report has been | 10:56:04 |
| 21 | rejected by the court? | 10:56:08 |
| 22 | A   May I put it a different way?  It | 10:56:12 |
| 23 | was -- was my testimony ever ruled, after the | 10:56:14 |
| 24 | fact, inadmissible?  Yes. | 10:56:16 |
| 25 | Q   Okay.  When? | 10:56:18 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    59

| | | |
|---|---|---|
| 1 | A     In the second case here, you have the | 10:56:20 |
| 2 | Deters, Benzinger LaVelle, etcetera, in the case | 10:56:22 |
| 3 | pertaining to licensure of healthcare facilities. | 10:56:27 |
| 4 | I testified at a magistrate's hearing.  It was a | 10:56:30 |
| 5 | very interesting testimony. | 10:56:33 |
| 6 | My attorney knew at the time that my -- | 10:56:34 |
| 7 | because they had very strict legal tradition in | 10:56:37 |
| 8 | Kentucky of sticking to the plain meaning of the | 10:56:46 |
| 9 | terms in question, and that there was a | 10:56:49 |
| 10 | possibility that my testimony would be deemed | 10:56:51 |
| 11 | inadmissible because I was testifying as a | 10:56:53 |
| 12 | linguistic expert.  But the judge -- the | 10:56:58 |
| 13 | magistrate, rather, wanted to hear my testimony so | 10:57:00 |
| 14 | he did and it rang the bell.  Even though he | 10:57:03 |
| 15 | legally decided it wasn't admissible, I think it | 10:57:08 |
| 16 | had influence on the case's outcome.  I was very | 10:57:11 |
| 17 | proud of my testimony in that case. | 10:57:14 |
| 18 | Q     In that case, the magistrate ruled your | 10:57:16 |
| 19 | testimony inadmissible though? | 10:57:18 |
| 20 | A     They ruled that -- not because of what | 10:57:20 |
| 21 | I said, but because I was a linguistics expert | 10:57:22 |
| 22 | that the testimony was not admissible. | 10:57:27 |
| 23 | Q     Any other cases that you issued a | 10:57:38 |
| 24 | report in your testimony where your report was | 10:57:40 |
| 25 | deemed inadmissible? | 10:57:44 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    60

```
 1        A    No.  Let me say this: If it was, I      10:57:45

 2   don't know.  No one ever said, oh that was deemed  10:57:52

 3   inadmissible.                                       10:57:54

 4        Q    Fair enough.  You have a report listed   10:57:56

 5   at -- or I'm sorry, not a report but it says        10:58:08

 6   testified in court on the first listing on page 1   10:58:13

 7   there.                                              10:58:16

 8        A    Yes.                                      10:58:16

 9        Q    With Dinsmore & Shohl.                    10:58:16

10        A    Yes.                                      10:58:16

11        Q    Trademark law and interpretation of an   10:58:16

12   advertising slogan.                                 10:58:16

13        A    Yes.                                      10:58:20

14        Q    What were your opinions in that case?    10:58:24

15        A    Let me see if I can remember the         10:58:26

16   details.  It was a fascinating case.  In Ohio we   10:58:28

17   have Nationwide Insurance which has this            10:58:33

18   well-known advertising slogan:  "Nationwide at     10:58:35

19   your side."  I think that's it.                     10:58:40

20        Q    I'm familiar with it.                    10:58:41

21        A    Yes, every everybody is.  And there was  10:58:42

22   a little bank in New England.  I can't remember     10:58:44

23   which one, Sovereign Bank and they had come up      10:58:47

24   with a new advertising slogan, "Sovereign Bank      10:58:50

25   always by your side" or something like that.  I     10:58:54
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              61

```
1   can't remember.  I'm sorry, you know, I'd have to       10:58:59

2   look up the slogan now, but I testified on the          10:59:01

3   part of Sovereign that the new slogan they wanted       10:59:04

4   to use was not synonymous with Nationwide at your       10:59:10

5   side."                                                   10:59:14

6           Oh, no, "Nationwide on your side,"              10:59:14

7   That's it.  "Nationwide on your side" versus            10:59:17

8   "Sovereign Bank always at your side."  And I            10:59:19

9   testified that they are not synonymous, yeah.           10:59:22

10  I had a really good punch line.  You want to hear       10:59:30

11  my punch line?                                          10:59:33

12      Q    Not really --                                  10:59:34

13      A    Oh, too bad.                                   10:59:35

14      Q    -- but it seems like you want to tell          10:59:35

15  me.                                                     10:59:36

16      A    That's okay.                                   10:59:36

17      Q    What was it?                                   10:59:36

18      A    Well, it's about truth conditions.  So        10:59:36

19  the attorney for Nationwide was cross-examining me      10:59:39

20  and he said, you know -- he was questioning my          10:59:45

21  analysis and I just said to him that -- I agreed        10:59:49

22  that, yeah, I thought he would have to agree that       10:59:52

23  the point where he was standing was at the side of      10:59:55

24  the attorney for Sovereign Bank.  He agreed that       10:59:58

25  was true.                                              11:00:02
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    62

| | | |
|---|---|---|
| 1 | And I said you are certainly not on his | 11:00:03 |
| 2 | side, are you?  And he agreed that that was not | 11:00:05 |
| 3 | true. | 11:00:08 |
| 4 | So, I made the point that they were not | 11:00:08 |
| 5 | truth conditionally synonymous and in linguistic | 11:00:11 |
| 6 | terms, that means they're not synonymous. | 11:00:14 |
| 7 | Q    Okay, so let's -- | 11:00:18 |
| 8 | A    Sorry, may -- the reason I told that | 11:00:19 |
| 9 | you is that I think it has a -- | 11:00:20 |
| 10 | -- (overspeaking) -- | 11:00:21 |
| 11 | Q    That's okay.  That's fine. The next -- | 11:00:23 |
| 12 | you don't have to continue.  The next thing on | 11:00:24 |
| 13 | here is Deters and Benzinger. | 11:00:29 |
| 14 | A    That's the one we talked about -- | 11:00:35 |
| 15 | -- (overspeaking) -- | 11:00:36 |
| 16 | A    -- the Kentucky magistrate. | 11:00:36 |
| 17 | Q    Okay.  There's a matter on here about | 11:00:37 |
| 18 | midway down, Dritz, PLL interpretation of email | 11:00:56 |
| 19 | correspondence at issue in a criminal case. | 11:01:01 |
| 20 | A    Yes, that's correct. | 11:01:09 |
| 21 | Q    What were your opinions in that case? | 11:01:10 |
| 22 | A    I did not write an expert opinion.  I | 11:01:10 |
| 23 | gave them informal information about my | 11:01:10 |
| 24 | interpretation. | 11:01:13 |
| 25 | Q    Are any of these other cases ones in | 11:01:16 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                      63

| | | |
|---|---|---|
| 1 | which you actually wrote a report? | 11:01:23 |
| 2 | A     Several of them are ones in which I | 11:01:26 |
| 3 | wrote a report, yeah. | 11:01:27 |
| 4 | Q     And you've indicated here if you wrote | 11:01:29 |
| 5 | a report or not? | 11:01:31 |
| 6 | A     Sorry, I didn't put that on the CV. | 11:01:33 |
| 7 | I'd have to look at my records to tell you which | 11:01:34 |
| 8 | ones I actually ended up writing formal reports | 11:01:37 |
| 9 | for. | 11:01:39 |
| 10 | Q     Okay, in some -- a few of these cases | 11:01:40 |
| 11 | it appears that the testimony you gave was about | 11:01:44 |
| 12 | interpretation of statutes or contracts; is that | 11:01:46 |
| 13 | correct? | 11:01:49 |
| 14 | A     Yes. | 11:01:49 |
| 15 | Q     In interpreting a statute or a | 11:01:55 |
| 16 | contract, have you done work where you're | 11:02:00 |
| 17 | examining solely the language of the contract to | 11:02:04 |
| 18 | interpret intent or have you looked to any other | 11:02:07 |
| 19 | resources, such as -- well, let me just stop right | 11:02:10 |
| 20 | there. | 11:02:13 |
| 21 | A     When I give my report, my expert | 11:02:19 |
| 22 | opinion as a linguist, I am not giving you my | 11:02:23 |
| 23 | expert opinion as someone with expertise in the | 11:02:26 |
| 24 | law.  The hardest thing about teaching a course on | 11:02:28 |
| 25 | language in the law is that I'm not an expert on | 11:02:31 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    64

| | | |
|---|---|---|
| 1 | the law.  So when I write an opinion or give an | 11:02:33 |
| 2 | opinion in testimony, I'm talking about the plain | 11:02:36 |
| 3 | meaning of whatever it is I am analyzing. | 11:02:40 |
| 4 | Q    Let me ask you this though.  If you -- | 11:02:44 |
| 5 | in one of these cases, let's talk about the Sparks | 11:02:44 |
| 6 | case here just to be specific. | 11:02:47 |
| 7 | A    Which one is this? | 11:02:48 |
| 8 | Q    It's about midway through -- | 11:02:50 |
| 9 | A    Commercial contracts. | 11:02:51 |
| 10 | Q    On the interpretation of a commercial | 11:02:51 |
| 11 | contract. | 11:02:53 |
| 12 | A    Yes. | 11:02:54 |
| 13 | Q    In that case did you interpret solely | 11:02:54 |
| 14 | the language of the contract? | 11:02:57 |
| 15 | A    Yes. | 11:02:58 |
| 16 | Q    And did you consider any other | 11:02:59 |
| 17 | information, such as statutory history? | 11:03:09 |
| 18 | A    No, I was not told to do so.  These are | 11:03:12 |
| 19 | cases where the plain language of the document was | 11:03:15 |
| 20 | at issue. | 11:03:17 |
| 21 | Q    Okay.  Let's go to the beginning of | 11:03:18 |
| 22 | your report here.  Back to the beginning. | 11:03:36 |
| 23 | Actually, if you go back to the very first page of | 11:03:37 |
| 24 | the caption to the "Plaintiff's Rule 26(a)(2) | 11:03:49 |
| 25 | Disclosures (Phase One)." | 11:03:50 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    65

| | | |
|---|---|---|
| 1 | A    Sorry, where are you?  Oh, yes, okay. | 11:03:50 |
| 2 | Yes. | 11:03:54 |
| 3 | Q    Got that?  Okay.  That indicates you're | 11:04:03 |
| 4 | going to testify at trial for Nicholas Sandmann; | 11:04:06 |
| 5 | is that correct? | 11:04:10 |
| 6 | A    Yes, I have agreed to do so. | 11:04:10 |
| 7 | Q    And do you understand what Phase I | 11:04:12 |
| 8 | means in this case? | 11:04:14 |
| 9 | A    No.  I mean, I know what the English | 11:04:15 |
| 10 | means but I don't really know the legal | 11:04:20 |
| 11 | implications. | 11:04:22 |
| 12 | Q    Okay, your report is dated | 11:04:23 |
| 13 | November 10th, as we talked about before and is | 11:04:24 |
| 14 | attached to this.  When were you first contacted | 11:04:26 |
| 15 | about this matter? | 11:04:31 |
| 16 | A    I believe that was in September of '21. | 11:04:33 |
| 17 | Q    September of '21, okay.  And who were | 11:04:42 |
| 18 | you contacted by? | 11:04:42 |
| 19 | A    Todd McMurtry. | 11:04:43 |
| 20 | Q    Was anyone else present? | 11:04:45 |
| 21 | A    No, it was an email contact initially | 11:04:46 |
| 22 | and then phone. | 11:04:48 |
| 23 | Q    And what -- you spoke with Mr. McMurtry | 11:04:50 |
| 24 | by phone? | 11:04:56 |
| 25 | A    Initially, yes. | 11:04:57 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              66

| | | |
|---|---|---|
| 1 | Q    And what was said in that conversation? | 11:04:58 |
| 2 | A    He told me that there was a case | 11:05:02 |
| 3 | involving defamation.  He told me roughly what it | 11:05:04 |
| 4 | was about. | 11:05:07 |
| 5 | I remembered having seen the news | 11:05:08 |
| 6 | report of the initial -- the initial news reports | 11:05:10 |
| 7 | about the encounter between Mr. -- I didn't | 11:05:14 |
| 8 | remember the name, Sandmann or Phillips and he | 11:05:17 |
| 9 | asked me if I would be willing to give my expert | 11:05:22 |
| 10 | opinion about the meaning of two passages, and I | 11:05:24 |
| 11 | said I would but I reminded him that I only say | 11:05:26 |
| 12 | what I think it actually means.  I'm not | 11:05:30 |
| 13 | testifying to an end. | 11:05:34 |
| 14 | Q    And did you discuss the matter with | 11:05:40 |
| 15 | anyone else? | 11:05:43 |
| 16 | A    No, I was asked to retain -- to keep | 11:05:44 |
| 17 | this in confidence. | 11:05:48 |
| 18 | Q    When did you begin preparing your | 11:05:53 |
| 19 | report? | 11:05:56 |
| 20 | A    I'm sorry, I'd have to look at my | 11:05:57 |
| 21 | records but I think it was in September, to my | 11:05:59 |
| 22 | recollection. | 11:06:01 |
| 23 | Q    And -- | 11:06:03 |
| 24 | A    Maybe it wasn't until October.  I'm | 11:06:07 |
| 25 | sorry, I think -- I'm not sure exactly when I | 11:06:09 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          67

| | | |
|---|---|---|
| 1 | started doing the work. | 11:06:12 |
| 2 | Q    Did you do it over a long period of | 11:06:16 |
| 3 | time in October -- or not a long period.  I | 11:06:19 |
| 4 | shouldn't characterize it that way -- did you do | 11:06:22 |
| 5 | it over a month -- | 11:06:23 |
| 6 | -- (overspeaking) -- | 11:06:24 |
| 7 | A    I think I -- no, I think I wrote the | 11:06:24 |
| 8 | report.  I think what happened in September was | 11:06:26 |
| 9 | that I initially had access to the videos and the | 11:06:28 |
| 10 | passages that I was to look at and I gave -- I | 11:06:32 |
| 11 | reviewed those and I gave Todd a preliminary | 11:06:37 |
| 12 | assessment of whether I thought those passages | 11:06:40 |
| 13 | were true or not of what I saw in the videos.  And | 11:06:44 |
| 14 | then he came back later, probably in late October | 11:06:46 |
| 15 | and said we'd like you to write a report, and | 11:06:49 |
| 16 | I believe it took me about seven or eight days to | 11:06:52 |
| 17 | write the report. | 11:06:57 |
| 18 | Q    Did you have any in-person meetings | 11:06:58 |
| 19 | with anyone or just telephone calls -- | 11:07:03 |
| 20 | -- (overspeaking) -- | 11:07:04 |
| 21 | A    No. | 11:07:05 |
| 22 | Q    -- with Mr. -- | 11:07:05 |
| 23 | A    Telephone calls and video ...used Zoom. | 11:07:07 |
| 24 | Q    Can you look on your report at page -- | 11:07:13 |
| 25 | continuing on from where we were before, page 5 -- | 11:07:20 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    68

| | | | |
|---|---|---|---|
| 1 | A | The report. | 11:07:23 |
| 2 | Q | -- at the end of your legal work. | 11:07:23 |
| 3 | A | Oh, you're talking about my appendix? | 11:07:31 |
| 4 | Q | I know you took the clip off of it, so | 11:07:34 |
| 5 | | it's a little out of order.  You might want to put | 11:07:36 |
| 6 | | the clip back on. | 11:07:38 |
| 7 | A | There's separate numbers on the CV.  I | 11:07:40 |
| 8 | | wasn't sure you were talking about the report or | 11:07:42 |
| 9 | | the CV. | 11:07:44 |
| 10 | Q | Yes, I'm sorry, I'm talking about the | 11:07:44 |
| 11 | | report at this time. | 11:07:46 |
| 12 | A | Okay.  Page 5. | 11:07:47 |
| 13 | Q | Page 5. | 11:07:48 |
| 14 | A | Yes. | 11:08:03 |
| 15 | Q | Okay, "IV Bases for Opinions and | 11:08:03 |
| 16 | | Materials Considered." | 11:08:03 |
| 17 | | It says here, "I have been provided | 11:08:06 |
| 18 | | with the following materials on which to base my | 11:08:09 |
| 19 | | opinion" and then it goes on page 5, 6 and | 11:08:10 |
| 20 | | continues onto page 7; is that correct? | 11:08:15 |
| 21 | A | Correct. | 11:08:16 |
| 22 | Q | Are the materials -- strike that. | 11:08:21 |
| 23 | | Are all the materials that you reviewed | 11:08:22 |
| 24 | | in connection with your report listed here on | 11:08:23 |
| 25 | | Pages 5 to 7? | 11:08:25 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    69

| | | |
|---|---|---|
| 1 | A    That's correct. | 11:08:27 |
| 2 | Q    Okay, so those that are listed here on | 11:08:27 |
| 3 | pages 5 to 7 are the only materials you reviewed, | 11:08:30 |
| 4 | correct? | 11:08:32 |
| 5 | A    That is correct. | 11:08:34 |
| 6 | Q    On page -- | 11:08:34 |
| 7 | -- (overspeaking) -- | 11:08:35 |
| 8 | A    May I say, in the original material, | 11:08:35 |
| 9 | set of materials I was given, there was some more | 11:08:37 |
| 10 | videos, but they were parts of the videos that | 11:08:40 |
| 11 | I have listed here so I didn't see any other | 11:08:42 |
| 12 | additional materials. | 11:08:45 |
| 13 | In other words, there were snippets of | 11:08:46 |
| 14 | some of these videos that were separate from them | 11:08:50 |
| 15 | for some reason in among the original materials I | 11:08:50 |
| 16 | looked at but they are all included in the videos | 11:08:50 |
| 17 | here on the report. | 11:08:55 |
| 18 | Q    So just to clarify, you have videos of | 11:08:56 |
| 19 | scene in front of the Lincoln Memorial on January | 11:08:59 |
| 20 | 18th of 2019 -- | 11:09:02 |
| 21 | A    Correct. | 11:09:02 |
| 22 | Q    -- and it lists video 1 through video | 11:09:02 |
| 23 | 18. | 11:09:04 |
| 24 | A    Correct. | 11:09:06 |
| 25 | Q    Correct?  And what you're talking about | 11:09:07 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              70

| | | |
|---|---|---|
| 1 | is those are the 18 videos that you had? | 11:09:08 |
| 2 | A    That's right. | 11:09:11 |
| 3 | Q    And that there may have been additional | 11:09:12 |
| 4 | videos, but they were just snippets of the same 18 | 11:09:13 |
| 5 | videos, correct? | 11:09:16 |
| 6 | A    That's correct. | 11:09:18 |
| 7 | Q    And other than those videos and the | 11:09:18 |
| 8 | newspaper articles listed and the other materials | 11:09:25 |
| 9 | listed on pages 6 and 7, there were no other | 11:09:28 |
| 10 | materials that you reviewed? | 11:09:31 |
| 11 | A    That's correct. | 11:09:34 |
| 12 | Q    On page 5 it states: "I have been | 11:09:34 |
| 13 | provided with the following materials on which to | 11:09:36 |
| 14 | base my opinion," at the bottom there.  Do you see | 11:09:40 |
| 15 | that? | 11:09:44 |
| 16 | A    Yeah. | 11:09:44 |
| 17 | Q    Who provided the materials to you? | 11:09:45 |
| 18 | A    Mr. McMurtry's office.  His secretary | 11:09:47 |
| 19 | sent them. | 11:09:49 |
| 20 | Q    So under videos we just talked about, | 11:09:57 |
| 21 | the next category is newspaper articles reporting | 11:10:00 |
| 22 | on the incident of interest on page 6.  And is | 11:10:05 |
| 23 | this list here a complete list of all the news | 11:10:09 |
| 24 | articles you were provided and reviewed in | 11:10:13 |
| 25 | connection with your report? | 11:10:15 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    71

```
1        A     That is correct.                    11:10:16
2        Q     And did you review any of the TV news    11:10:17
3   broadcasts or video news segments that accompanied    11:10:20
4   the online news articles or did you just review    11:10:23
5   the online articles?                          11:10:25
6        A     If you go to those links, if on the    11:10:27
7   link there was a video of the news reporter, I    11:10:30
8   looked at that or there was, you know -- and that    11:10:32
9   is to say, if embedded in the news article there    11:10:35
10  was a video, I watched it.                     11:10:38
11       Q     Umm...                             11:10:42
12       A     But that's all.                    11:10:44
13       Q     So, for example, in the second entry    11:10:44
14  here on page 6 for ABC's on-line article, Chris    11:10:51
15  Francescani and Bill Hutchinson you reviewed the    11:10:52
16  online article and if there was a video segment    11:11:02
17  linked to that you would have reviewed that, as    11:11:05
18  well?                                         11:11:07
19       A     I would have watched it, yes.      11:11:08
20       Q     Do you recall watching it?         11:11:10
21       A     No, I do not.                      11:11:11
22       Q     So for the next one, the CBS online    11:11:12
23  article it just lists the online article, Native    11:11:15
24  American veteran in viral video by Justin      11:11:18
25  Carissimo.  Did you review just that online    11:11:18
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                72

| | | |
|---|---|---|
| 1 | article or a broadcast linked within that article? | 11:11:27 |
| 2 | A    I'm sorry, I'd have to look at the | 11:11:33 |
| 3 | links that I was sent and look exactly at what I | 11:11:34 |
| 4 | saw. | 11:11:37 |
| 5 |         As I recall, the only videos embedded | 11:11:38 |
| 6 | in these articles in general -- I don't remember | 11:11:40 |
| 7 | which was which, were either a news reporter | 11:11:43 |
| 8 | saying this is what happened and -- or a short | 11:11:46 |
| 9 | clip from one of the 18 videos that we have seen | 11:11:51 |
| 10 | here. | 11:11:54 |
| 11 | Q    Okay, so sitting here today with | 11:11:54 |
| 12 | respect to CBS's online article that you have | 11:11:56 |
| 13 | listed do you recall whether or not you also | 11:11:59 |
| 14 | watched the video segment, went to that article? | 11:12:02 |
| 15 | A    I do not recall about specific | 11:12:06 |
| 16 | articles.  The reason I do not recall is that | 11:12:09 |
| 17 | after I had viewed all this material I decided to | 11:12:11 |
| 18 | base my report entirely on the videos 1 through | 11:12:14 |
| 19 | 18, which is what I have done so I did not review | 11:12:18 |
| 20 | those subsequently, those newspaper articles. | 11:12:23 |
| 21 | Q    And would that be the same if I asked | 11:12:30 |
| 22 | you for the other newspaper articles -- | 11:12:32 |
| 23 | A    Yes, yes. | 11:12:34 |
| 24 |         -- (overspeaking) . | 11:12:35 |
| 25 | Q    Let me finish the question.  Okay, | 11:12:36 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           73

| | | |
|---|---|---|
| 1 | thank you.  As to the other news articles listed | 11:12:37 |
| 2 | here, you don't recall sitting here today whether | 11:12:41 |
| 3 | you reviewed anything but the online article; | 11:12:43 |
| 4 | you'd have to go back and... | 11:12:46 |
| 5 | A    I do recall that I did not seek out | 11:12:48 |
| 6 | additional information linked to or associated | 11:12:50 |
| 7 | with the articles. | 11:12:54 |
| 8 | If there was in the article a video | 11:12:54 |
| 9 | clip, I clicked on that and watched it, otherwise | 11:12:58 |
| 10 | I did not go further. | 11:13:02 |
| 11 | Q    Sitting here today you don't recall | 11:13:07 |
| 12 | which specific ones you would have clicked on | 11:13:09 |
| 13 | links within the articles, correct? | 11:13:11 |
| 14 | A    No, I do not. | 11:13:13 |
| 15 | Q    Under "other materials" on page 7, I | 11:13:16 |
| 16 | list four other materials; do you see that there? | 11:13:23 |
| 17 | A    Yes. | 11:13:29 |
| 18 | Q    Final investigative report.  Letter | 11:13:31 |
| 19 | from Nick Sandmann to Bob Rowe.  Transcription of | 11:13:33 |
| 20 | Nick Sandmann's deposition.  Statement of Nick | 11:13:38 |
| 21 | Sandmann.  Are these the only materials that you | 11:13:40 |
| 22 | reviewed in connection with your report? | 11:13:44 |
| 23 | A    That is correct. | 11:13:46 |
| 24 | Q    And on page 8 you list at the top of | 11:13:47 |
| 25 | page 8, you know, you consulted several of the | 11:13:56 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    74

| | | |
|---|---|---|
| 1 | most respected dictionaries.  And you list three | 11:13:58 |
| 2 | dictionaries there:  The Oxford English Dictionary | 11:14:01 |
| 3 | on Historical Principles, Oxford University Press, | 11:14:03 |
| 4 | the Merriam-Webster's Collegiate Dictionary (11th | 11:14:08 |
| 5 | Edition) and The American Heritage Dictionary of | 11:14:11 |
| 6 | the American Language."  You consulted those three | 11:14:16 |
| 7 | dictionaries, correct? | 11:14:20 |
| 8 | A    That's correct. | 11:14:21 |
| 9 | Q    Did you consult any other dictionaries? | 11:14:22 |
| 10 | A    No, I did not. | 11:14:23 |
| 11 | Q    We have been going about an hour now; | 11:14:36 |
| 12 | is that right?  Should we take like a five-minute | 11:14:39 |
| 13 | break?  Is that okay? | 11:14:42 |
| 14 | MR. McMURTRY:  Sure. | 11:14:44 |
| 15 | MS. SPEARS:  Okay, thanks. | 11:14:46 |
| 16 | THE VIDEOGRAPHER:  The going | 11:14:48 |
| 17 | off-the-record, the time is 11:14 a.m. | 11:14:48 |
| 18 | (Recess taken from 11:14 a.m. to 11:29 a.m.) | 11:14:51 |
| 19 | THE VIDEOGRAPHER:  We are going back on | 11:29:36 |
| 20 | the record.  The time is 11:29 a.m. | 11:29:37 |
| 21 | BY MS. SPEARS: | 11:29:41 |
| 22 | Q    Okay, we're back on the record.  So in | 11:29:42 |
| 23 | your report -- going back to your report | 11:29:52 |
| 24 | (indiscernible) on page 1 of the actual report | 11:29:55 |
| 25 | (indiscernible) the page that's dated November | 11:29:55 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    75

| | | |
|---|---|---|
| 1 | 10th 2021. | 11:29:55 |
| 2 | A    Yes. | 11:29:55 |
| 3 | Q    Because there's several page ones. I | 11:29:55 |
| 4 | want to make sure I'm on (inaudible) you state | 11:29:55 |
| 5 | that you have been retained to answer the | 11:30:15 |
| 6 | following two questions pertaining to the above | 11:30:15 |
| 7 | cases basing my answers on the videos provided to | 11:30:15 |
| 8 | me (listed in section IV) below.  And then those | 11:30:15 |
| 9 | are -- just let me stop there for a second.  Those | 11:30:33 |
| 10 | are videos 1 through 18, correct? | 11:30:36 |
| 11 | A    Correct. | 11:30:39 |
| 12 | Q    And then you state later in the report, | 11:30:39 |
| 13 | that you've relied on videos provided to acquaint | 11:30:43 |
| 14 | you with as much details as possible of the | 11:30:48 |
| 15 | situation, correct? | 11:30:51 |
| 16 | A    Correct. | 11:30:52 |
| 17 | Q    How did you use the videos 1 to 18 in | 11:30:52 |
| 18 | reaching your decision?  What was your process? | 11:30:55 |
| 19 | A    I watched them many times and tried to | 11:30:58 |
| 20 | grab what was going on in each one and how they | 11:31:04 |
| 21 | correlated with each other, what was going on | 11:31:06 |
| 22 | generally in the situation and then, very | 11:31:09 |
| 23 | specifically, I watched repeatedly the segments of | 11:31:11 |
| 24 | the videos, especially the ones that I mentioned | 11:31:15 |
| 25 | in the report, where there was the lead-up to the | 11:31:18 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    76

| | | |
|---|---|---|
| 1 | interaction between Phillips and Sandmann and the | 11:31:22 |
| 2 | actual confrontation and the time at which it | 11:31:26 |
| 3 | broke off and what followed immediately after | 11:31:35 |
| 4 | that. | 11:31:35 |
| 5 | So I watched those many, many times. | 11:31:36 |
| 6 | Stopped them, went back, tried to see at which | 11:31:37 |
| 7 | point which things happened and what evidence I | 11:31:40 |
| 8 | could have about -- could see in the videos about | 11:31:41 |
| 9 | the nature of the interaction. | 11:31:45 |
| 10 | Q    Where did you watch the videos? | 11:31:49 |
| 11 | A    In my home office. | 11:31:50 |
| 12 | Q    And what type of screen or device did | 11:31:52 |
| 13 | you watch the videos on? | 11:31:54 |
| 14 | A    I have two large Dell monitors and I | 11:31:55 |
| 15 | put usually documents on one and videos on the | 11:31:58 |
| 16 | other. | 11:32:00 |
| 17 | Q    And did you utilize any software to | 11:32:01 |
| 18 | watch them faster or slower or frame-by-frame? | 11:32:05 |
| 19 | A    No. | 11:32:08 |
| 20 | Q    How much time did you say you spent | 11:32:09 |
| 21 | watching the videos?  You say you spent a lot of | 11:32:11 |
| 22 | time, quantify it for me. | 11:32:15 |
| 23 | A    My.  Well, I did it over the course of, | 11:32:18 |
| 24 | you know, first a couple of days when I gave my | 11:32:21 |
| 25 | initial and formal opinion and then over a week. | 11:32:25 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    77

| | | |
|---|---|---|
| 1 | I must have spent at least two or three | 11:32:28 |
| 2 | hours looking at those segments of the videos. | 11:32:32 |
| 3 | Q    So in total you'd say you spent what | 11:32:36 |
| 4 | two or three hours looking at the -- | 11:32:38 |
| 5 | -- (overspeaking) -- | 11:32:39 |
| 6 | A    The relevant segments. | 11:32:39 |
| 7 | Q    -- 18 videos? | 11:32:39 |
| 8 | -- (overspeaking) -- | 11:32:41 |
| 9 | A    The relevant segments.  Some of the | 11:32:41 |
| 10 | videos I just reviewed quickly. | 11:32:45 |
| 11 | They were much more overall characters | 11:32:48 |
| 12 | of what's going on in the situation at the time, | 11:32:49 |
| 13 | for example with the Black Hebrew Israelites and | 11:32:50 |
| 14 | things like that. | 11:32:54 |
| 15 | I subsequently didn't pay much | 11:32:54 |
| 16 | attention to the segments, except for ones that | 11:32:57 |
| 17 | pertained to the -- immediate lead-up to the | 11:32:59 |
| 18 | Phillips Sandmann confrontation. | 11:33:03 |
| 19 | Q    And so what was your goal then in | 11:33:05 |
| 20 | reviewing the videos? | 11:33:10 |
| 21 | A    My methodology is very simple: As I | 11:33:13 |
| 22 | told you, as a linguist I tried to get the truth | 11:33:17 |
| 23 | conditions. | 11:33:20 |
| 24 | Meaning is very rich and we talked | 11:33:21 |
| 25 | about slurs, for example, so there's many aspects | 11:33:23 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                78

| | | |
|---|---|---|
| 1 | of meaning that you can't characterize in terms of | 11:33:25 |
| 2 | true or false and straightforward.  There's | 11:33:28 |
| 3 | emotional responses and offence and things.  I | 11:33:29 |
| 4 | wasn't looking for that. | 11:33:33 |
| 5 | I was trying to look at getting at when | 11:33:34 |
| 6 | would one of these passages that I was asked to | 11:33:36 |
| 7 | weigh in on, what would the situation be like in | 11:33:40 |
| 8 | order for that to be true and then I needed to | 11:33:45 |
| 9 | look at the videos to see, is this a situation in | 11:33:47 |
| 10 | which, given those truth conditions as I | 11:33:49 |
| 11 | understand them, given the plain language there, | 11:33:51 |
| 12 | is this a situation in which this passage is true. | 11:33:55 |
| 13 | So in order to do that I had to | 11:33:58 |
| 14 | acquaint myself as thoroughly as possible with the | 11:34:01 |
| 15 | events of that day as presented in the videos. | 11:34:03 |
| 16 | That's the only evidence that I had about what | 11:34:05 |
| 17 | actually occurred. | 11:34:07 |
| 18 | Q    Okay, and so you were reviewing the | 11:34:10 |
| 19 | videos to determine the facts of what happened? | 11:34:13 |
| 20 | A    Correct, insofar as they're represented | 11:34:16 |
| 21 | in the videos. | 11:34:20 |
| 22 | Q    And trying to reconstruct from the | 11:34:20 |
| 23 | videos what happened, correct? | 11:34:23 |
| 24 | A    Right. | 11:34:24 |
| 25 | Q    And later in your opinion on page 8, | 11:34:25 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    79

| | | |
|---|---|---|
| 1 | that last paragraph there on page 8, you explain | 11:34:33 |
| 2 | that, "Although (you) subsequently read | 11:34:37 |
| 3 | statements, interviews and depositions by Mr. | 11:34:37 |
| 4 | Phillips and Mr. Sandmann pertaining to their | 11:34:37 |
| 5 | encounter (that you) endeavored to form (your) | 11:34:37 |
| 6 | opinion not on the basis of those subsequent | 11:34:37 |
| 7 | statements, but solely on the basis of the | 11:34:37 |
| 8 | evidence in the videos," is that right? | 11:34:37 |
| 9 | A    Correct. | 11:34:55 |
| 10 | Q    And I think you said that before. | 11:34:56 |
| 11 | Why -- or when did you decide to base your report | 11:34:58 |
| 12 | solely on the videos 1 through 18? | 11:35:00 |
| 13 | A    As soon as I had reviewed all the | 11:35:03 |
| 14 | materials in the initial informal reviews that I | 11:35:05 |
| 15 | did, I -- knowing what my expertise is, is my | 11:35:08 |
| 16 | expertise is solely is were these statements, as I | 11:35:14 |
| 17 | understand them, as a native speaker and a | 11:35:18 |
| 18 | linguist, were these statements true of the | 11:35:23 |
| 19 | situation? | 11:35:24 |
| 20 |         The only evidence I have about what | 11:35:25 |
| 21 | actually occurred there is the videos.  All the | 11:35:27 |
| 22 | statements subsequent are people's opinions about | 11:35:29 |
| 23 | it or the way they represented it.  That has no | 11:35:32 |
| 24 | bearing on whether the statements were true. | 11:35:35 |
| 25 | Q    Okay, and so that's why -- well, strike | 11:35:43 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    80

| | | |
|---|---|---|
| 1 | that.  So why was it important to form your | 11:35:43 |
| 2 | opinions solely on the basis of the videos then? | 11:35:45 |
| 3 | A    The video is the only direct evidence | 11:35:53 |
| 4 | we have of what actually -- or that I have, | 11:35:54 |
| 5 | anyway, of what occurred there.  I wasn't there | 11:35:55 |
| 6 | and anything anybody tells me, they'd be skewed by | 11:35:58 |
| 7 | their own -- you know, what's at stake for them. | 11:36:03 |
| 8 | Q    And you note that on page 8 here: | 11:36:05 |
| 9 | "Someone's memory or construal of an event may not | 11:36:07 |
| 10 | correspond to the facts about the situation in | 11:36:07 |
| 11 | which it occurred.  It is only the situation | 11:36:07 |
| 12 | itself that is relevant to the truth of a | 11:36:07 |
| 13 | statement purporting to describe it." What do you | 11:36:07 |
| 14 | mean by their construal of an event?  Do you mean | 11:36:20 |
| 15 | the way a person perceives an event or what do you | 11:36:25 |
| 16 | mean? | 11:36:27 |
| 17 | A    "Perceives" is too crude.  I think | 11:36:28 |
| 18 | people interpret what's happening to them all the | 11:36:31 |
| 19 | time it and that that can lead them to distort or | 11:36:33 |
| 20 | misrepresent what they're actually seeing right in | 11:36:37 |
| 21 | front of them.  And so as we know, in the law, | 11:36:40 |
| 22 | testimony always has to be understood relative to | 11:36:43 |
| 23 | the state of the person testifying, so I'm much | 11:36:45 |
| 24 | more interested in what I could see with my own | 11:36:50 |
| 25 | eyes in the videos. | 11:36:51 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                        81

| | | |
|---|---|---|
| 1 | Q    So what do you mean by "construal" | 11:36:53 |
| 2 | then? | 11:36:59 |
| 3 | A    Construal's like, for example -- in the | 11:36:59 |
| 4 | statements, Mr. Phillips says that "the guy..." | 11:37:03 |
| 5 | Let me find one of the passages, that Sandmann | 11:37:13 |
| 6 | positioned himself in front of him.  Well, it's no | 11:37:16 |
| 7 | doubt true that Sandmann was in front of Phillips. | 11:37:19 |
| 8 | Did Sandmann position himself in front | 11:37:23 |
| 9 | of Phillips?  That's another matter.  That's | 11:37:26 |
| 10 | Phillips' construal of the interaction that took | 11:37:29 |
| 11 | place between them.  So I didn't want to consider | 11:37:32 |
| 12 | anybody else's interpretation of the situation | 11:37:38 |
| 13 | because they might have interests that lend them | 11:37:40 |
| 14 | to misunderstand what happened in front of them. | 11:37:42 |
| 15 | Q    So that's his interpretation of that | 11:37:48 |
| 16 | situation. | 11:37:50 |
| 17 | A    That's his -- it's his representation | 11:37:50 |
| 18 | of the situation.  I'm not a psychologist.  I'm | 11:37:51 |
| 19 | not trying to say why he represented it that way. | 11:37:53 |
| 20 | Q    What -- so, a person can perceive an | 11:37:57 |
| 21 | event in a certain way but their perception may be | 11:38:03 |
| 22 | mistaken, is that what you're saying? | 11:38:07 |
| 23 | A    It may be that their perception is | 11:38:11 |
| 24 | mistaken or they may interpret what they actually | 11:38:12 |
| 25 | see, in terms of intentions in particular in a way | 11:38:15 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    82

| | | |
|---|---|---|
| 1 | that does not necessarily reflect what occurred. | 11:38:18 |
| 2 | Q    Okay, so you'd -- by design your | 11:38:20 |
| 3 | ultimate opinions are purposefully based only on | 11:38:23 |
| 4 | the videos and not based on what anyone who was | 11:38:27 |
| 5 | there said about what they remembered or construed | 11:38:31 |
| 6 | about the event, correct? | 11:38:34 |
| 7 | A    That's correct. | 11:38:35 |
| 8 | Q    And so in forming your opinions to | 11:38:35 |
| 9 | answer the two questions you were asked in this | 11:38:37 |
| 10 | case you did not rely on Mr. Sandmann's deposition | 11:38:39 |
| 11 | transcript or his other statements about the | 11:38:44 |
| 12 | incident; is that correct? | 11:38:45 |
| 13 | A    That is correct.  In fact, I didn't | 11:38:47 |
| 14 | even finish reading the Sandmann deposition.  I | 11:38:48 |
| 15 | decided that it would be a waste of their time and | 11:38:51 |
| 16 | money for me to do that. | 11:38:53 |
| 17 | Q    I take it you did not interview | 11:38:55 |
| 18 | Mr. Sandmann either? | 11:38:56 |
| 19 | A    I have never met him or talked with | 11:38:57 |
| 20 | him. | 11:38:59 |
| 21 | Q    Why not? | 11:39:00 |
| 22 | A    I don't think that bears on my expert | 11:39:02 |
| 23 | witness testimony.  My expertise is about:  Were | 11:39:04 |
| 24 | these true in the situation as it actually | 11:39:09 |
| 25 | occurred?  The only evidence I have of what | 11:39:12 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          83

| | | |
|---|---|---|
| 1 | actually occurred is the video. | 11:39:14 |
| 2 | Q    Okay, and in forming your opinions to | 11:39:16 |
| 3 | answer the two questions you were asked in this | 11:39:19 |
| 4 | case, you also did not interview Mr. Phillips or | 11:39:20 |
| 5 | rely on any of Mr. Phillips' other statements | 11:39:24 |
| 6 | about the incident for the same reasons then, | 11:39:27 |
| 7 | correct? | 11:39:28 |
| 8 | A    That's correct. | 11:39:29 |
| 9 | Q    And I take it you also did not discuss | 11:39:30 |
| 10 | the facts of the incident with any Covington | 11:39:35 |
| 11 | Catholic High School students or chaperones or any | 11:39:41 |
| 12 | of the bystanders or participants who were present | 11:39:44 |
| 13 | for the same reasons; is that correct? | 11:39:47 |
| 14 | A    So far as I know, I've never met any of | 11:39:47 |
| 15 | these people or spoken to them and for that reason | 11:39:50 |
| 16 | I would not want to. | 11:39:52 |
| 17 | Q    Okay, so if I understand you're | 11:39:53 |
| 18 | endeavoring to be as objective as possible, to | 11:39:54 |
| 19 | review the video evidence and tell the court | 11:39:57 |
| 20 | objectively what happened here, based solely on | 11:40:00 |
| 21 | your review of the videos; right? | 11:40:02 |
| 22 | A    That's what I endeavored to do. | 11:40:04 |
| 23 | Q    Let's look at page 13 of your report. | 11:40:14 |
| 24 | In page 13 of the report, in the last paragraph | 11:40:43 |
| 25 | you conclude, based on your review of the videos | 11:40:45 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    84

| | | |
|---|---|---|
| 1 | that -- if you look at that last paragraph there: | 11:40:49 |
| 2 | "Phillips' outward behavior was consistent with | 11:40:49 |
| 3 | his merely intending to confront Sandmann. Hence | 11:40:49 |
| 4 | Phillips' claim that Sandmann intended to block | 11:40:49 |
| 5 | Phillips' way seems to be a conjecture on his | 11:40:49 |
| 6 | part." | 11:40:49 |
| 7 | So Phillips' statement seems to you, to | 11:41:03 |
| 8 | be his conjecture that Sandmann intended to block | 11:41:05 |
| 9 | him, right? | 11:41:08 |
| 10 | A     That is his interpretation of the | 11:41:08 |
| 11 | situation.  That's the way he represents it. | 11:41:09 |
| 12 | Q     So it's his conjecture, as you say? | 11:41:12 |
| 13 | A     That's the best understanding I have of | 11:41:14 |
| 14 | it, yes. | 11:41:16 |
| 15 | Q     Did you consider that Phillips' | 11:41:17 |
| 16 | experience as a Native American may have | 11:41:18 |
| 17 | influenced how he perceived Mr. Sandmann's intent? | 11:41:21 |
| 18 | A     I have no doubt that that's true but | 11:41:25 |
| 19 | that does not fall within my expertise. | 11:41:27 |
| 20 | Q     Are you a Native American? | 11:41:30 |
| 21 | A     No, I'm not. | 11:41:32 |
| 22 | Q     You didn't grow up with Mr. Phillips' | 11:41:33 |
| 23 | life experiences, right? | 11:41:35 |
| 24 | A     Of course I did not. | 11:41:37 |
| 25 | Q     And you are not trying to suggest that | 11:41:38 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    85

| | | |
|---|---|---|
| 1 | you understand what his life experiences are as a | 11:41:39 |
| 2 | Native American or his experiences earlier in the | 11:41:45 |
| 3 | day in March, such that you know what he was | 11:41:47 |
| 4 | thinking during the encounter with Mr. Sandmann, | 11:41:52 |
| 5 | right? | 11:41:54 |
| 6 | MR. McMURTRY: Objection. Go ahead. | 11:41:55 |
| 7 | THE WITNESS: I have no idea of what | 11:41:56 |
| 8 | those are, no. I did not represent myself as | 11:41:56 |
| 9 | understanding that. | 11:42:01 |
| 10 | BY MS. SPEARS: | 11:42:01 |
| 11 | Q And you wouldn't deny the legitimacy of | 11:42:02 |
| 12 | someone else's cultural experiences or | 11:42:05 |
| 13 | perceptions, right? | 11:42:08 |
| 14 | MR. McMURTRY: Objection. | 11:42:09 |
| 15 | THE WITNESS: I think that has no | 11:42:09 |
| 16 | bearing on my expert witness testimony. | 11:42:10 |
| 17 | BY MS. SPEARS: | 11:42:13 |
| 18 | Q But you're not trying to substitute | 11:42:15 |
| 19 | your perception for Mr. Phillips' perception as a | 11:42:17 |
| 20 | Native American, right? | 11:42:20 |
| 21 | MR. McMURTRY: Objection. | 11:42:22 |
| 22 | THE WITNESS: Again, I think that has | 11:42:22 |
| 23 | no bearing on what I have done here. I'm not | 11:42:23 |
| 24 | doing that. | 11:42:26 |
| 25 | BY MS. SPEARS: | 11:42:27 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    86

1      Q    People expressing their perceptions and          11:42:29
2   experiences, as we talked about before, typically        11:42:30
3   filter them through their own life experiences and       11:42:33
4   cultural references.  You'd agree with that,             11:42:37
5   right, we all do?                                        11:42:39
6      A    Most people do, yes.                             11:42:40
7      Q    Yes.  And you've done that before in            11:42:46
8   your life, right?                                        11:42:47
9          MR. McMURTRY:  Objection.  Go ahead.              11:42:49
10         THE WITNESS:  I presume I have, yes.              11:42:50
11  BY MS. SPEARS:                                           11:42:52
12     Q    And you've seen others do so, right?             11:42:52
13     A    I have seen that.                                11:42:54
14     Q    Isn't that also the case where someone           11:42:57
15  is trying to decipher another person's intent,           11:42:59
16  they reference their own life experiences and            11:43:03
17  cultural experiences?                                    11:43:06
18     A    You are asking me for opinions that              11:43:07
19  I have as a private person and I have views about        11:43:09
20  these things but they have no bearing on what I've       11:43:12
21  done in this report.                                     11:43:15
22     Q    No, I'm asking in your capacity as an            11:43:16
23  expert here.  Isn't it the case when somebody is         11:43:18
24  speaking and trying to decipher someone else's           11:43:24
25  intent, they filter through their life experiences       11:43:26

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    87

| | | |
|---|---|---|
| 1 | when doing so -- | 11:43:30 |
| 2 | -- (overspeaking) -- | 11:43:31 |
| 3 | A    It may very well be that -- | 11:43:32 |
| 4 | -- (overspeaking) -- | 11:43:34 |
| 5 | Q    Sorry. | 11:43:34 |
| 6 | A    It may very well be that people do this | 11:43:34 |
| 7 | but it has no bearing on the truth of what occurs. | 11:43:35 |
| 8 | Q    But they may be expressing their | 11:43:41 |
| 9 | perception, based on their life experiences, their | 11:43:43 |
| 10 | cultural references, what they are perceiving in | 11:43:48 |
| 11 | the world at the time; is that fair? | 11:43:50 |
| 12 | A    I would not agree with what you said | 11:43:52 |
| 13 | unless you interpret perception not as perception | 11:43:54 |
| 14 | of the actual circumstances, but as construable | 11:43:57 |
| 15 | and that is not the same thing. | 11:44:01 |
| 16 | Q    Okay, what do you mean? | 11:44:04 |
| 17 | A    One can construe what is happening in | 11:44:06 |
| 18 | front of one's eyes, especially when it comes to | 11:44:08 |
| 19 | intent, without actually having heard evidence and | 11:44:11 |
| 20 | may be incorrect, one's construal. | 11:44:14 |
| 21 | That construal may be in part a | 11:44:17 |
| 22 | function of one's background and experience.  I | 11:44:19 |
| 23 | don't dispute that; we do that all the time. | 11:44:21 |
| 24 | That's how misunderstanding arises.  But that has | 11:44:26 |
| 25 | no bearing on the truth of what actually occurs | 11:44:28 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    88

| | | |
|---|---|---|
| 1 | and that only the truth of what I saw was what | 11:44:29 |
| 2 | bore on my report. | 11:44:32 |
| 3 | Q    Have you ever studied Native Americans | 11:44:36 |
| 4 | culture before? | 11:44:38 |
| 5 | A    Not as an expert.  I have no expertise | 11:44:39 |
| 6 | in it.  I've been interested, but that's a | 11:44:41 |
| 7 | distinct issue -- | 11:44:45 |
| 8 | Q    What do you know Mr. Phillips' | 11:44:47 |
| 9 | background, anything? | 11:44:48 |
| 10 | A    Not as an expert. | 11:44:51 |
| 11 | Q    Do you know how old Mr. Phillips is? | 11:44:52 |
| 12 | A    I believe it said in one of the | 11:44:57 |
| 13 | reports, but I don't remember.  He might have been | 11:44:59 |
| 14 | in his 60s or 70s.  Not reports, the articles. | 11:45:01 |
| 15 | Q    Do you know where he was born or what | 11:45:03 |
| 16 | tribe he's affiliated with? | 11:45:05 |
| 17 | A    Again, I believe it said in one of the | 11:45:08 |
| 18 | articles but I don't remember that. | 11:45:09 |
| 19 | Q    At the your conclusion of your report | 11:45:11 |
| 20 | at page 14, in one of the penultimate, sort of, | 11:45:14 |
| 21 | paragraphs there, you say that you endeavored to | 11:45:16 |
| 22 | be completely neutral about the apparent views of | 11:45:19 |
| 23 | the individuals involved, not speculating about | 11:45:23 |
| 24 | motives or intentions and paid attention solely to | 11:45:26 |
| 25 | the facts as evident in the videos; do you see | 11:45:29 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              89

| | | |
|---|---|---|
| 1 | that there? | 11:45:33 |
| 2 | A    Yes, I do. | 11:45:34 |
| 3 | Q    And that's right?  You did that? | 11:45:35 |
| 4 | A    I did say that, yes. | 11:45:37 |
| 5 | Q    And that's what you did? | 11:45:38 |
| 6 | A    And that is what I did. | 11:45:40 |
| 7 | Q    When you refer to the individuals | 11:45:41 |
| 8 | involved, are you talking about Mr. Phillips and | 11:45:42 |
| 9 | Mr. Sandmann? | 11:45:43 |
| 10 | A    Those are the people I was primarily | 11:45:44 |
| 11 | talking about, yes. | 11:45:46 |
| 12 | Q    And you write that you tried to be | 11:45:48 |
| 13 | completely neutral about their apparent views.  So | 11:45:50 |
| 14 | obviously it appears to you that they -- Sandmann | 11:45:54 |
| 15 | and Phillips each have expressed views about what | 11:45:57 |
| 16 | happened, right? | 11:46:00 |
| 17 | A    Each what? | 11:46:00 |
| 18 | Q    Have expressed views about what | 11:46:02 |
| 19 | happened, correct? | 11:46:03 |
| 20 | A    Yes. | 11:46:03 |
| 21 | Q    And so with respect to Mr. Phillips' | 11:46:04 |
| 22 | expression that Sandmann intended to block | 11:46:07 |
| 23 | Phillips' way, you're not taking the position that | 11:46:10 |
| 24 | Mr. Phillips was lying, right? | 11:46:13 |
| 25 | A    No, I'm making no attributions to them | 11:46:15 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           90

| | | |
|---|---|---|
| 1 | about his intent or what he meant to say -- why he | 11:46:18 |
| 2 | meant -- said what he said. | 11:46:20 |
| 3 | Q    You are not disputing that that may be | 11:46:22 |
| 4 | Mr. Phillips' opinion, right? | 11:46:25 |
| 5 | A    I am not disputing it. | 11:46:27 |
| 6 | Q    And the same for Mr. Sandmann.  You are | 11:46:28 |
| 7 | not taking a position on his motives, right? | 11:46:29 |
| 8 | A    No. | 11:46:32 |
| 9 | Q    But it's your opinion that the view | 11:46:32 |
| 10 | Mr. Phillips expressed about Sandmann's intent was | 11:46:34 |
| 11 | mistaken? | 11:46:39 |
| 12 | A    No, I am not talking about what he said | 11:46:40 |
| 13 | about his intent, except insofar as it said that | 11:46:42 |
| 14 | he -- that he attributed to Sandmann moving in | 11:46:45 |
| 15 | specific ways so as to block him.  I saw no | 11:46:49 |
| 16 | evidence of that in the videos. | 11:46:52 |
| 17 | Q    So -- | 11:46:57 |
| 18 | A    I'm not bringing any psychological | 11:46:57 |
| 19 | analysis to bear on this. | 11:47:00 |
| 20 | Q    So, it's your opinion that the view | 11:47:01 |
| 21 | that Mr. Phillips expressed about Mr. Sandmann's | 11:47:04 |
| 22 | intent was not correct? | 11:47:06 |
| 23 | A    I think he misrepresented the | 11:47:08 |
| 24 | situation.  For whatever reason, I do not know. | 11:47:10 |
| 25 | Q    How do -- let's talk a bit more about | 11:47:19 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    91

| | | |
|---|---|---|
| 1 | how people convey intent. | 11:47:22 |
| 2 | In your experience, other than by | 11:47:26 |
| 3 | speaking or using words, how do people convey | 11:47:27 |
| 4 | their intent? | 11:47:30 |
| 5 | A    I can only testify as a non-expert | 11:47:35 |
| 6 | about that.  Do you want me to say my personal | 11:47:37 |
| 7 | opinion?  It has no bearing on the report. | 11:47:40 |
| 8 | Q    Because you don't have expertise in | 11:47:45 |
| 9 | answering that question. | 11:47:49 |
| 10 | A    I am not here as a psychologist. | 11:47:51 |
| 11 | I have no expertise in that domain.  Yes. | 11:47:52 |
| 12 | Q    So, you have no expertise in how people | 11:48:01 |
| 13 | convey intent? | 11:48:03 |
| 14 | A    I do.  How they convey intent | 11:48:04 |
| 15 | linguistically.  Linguistic meaning is something | 11:48:08 |
| 16 | people who are native speakers of the language | 11:48:13 |
| 17 | intend to convey when they make an utterance, as | 11:48:13 |
| 18 | long as they are not delusionary or talking in | 11:48:15 |
| 19 | their sleep. | 11:48:17 |
| 20 | I don't think that that has a bearing | 11:48:18 |
| 21 | on this case, so what Mr. Phillips said is | 11:48:19 |
| 22 | something he had a -- had a meaning that he | 11:48:21 |
| 23 | intended to convey.  And it is that meaning, | 11:48:24 |
| 24 | taking it -- him to be a native speaker of the | 11:48:27 |
| 25 | language which I was assessing and whether it is | 11:48:30 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    92

| | | |
|---|---|---|
| 1 | true with respect to the videos that I observed. | 11:48:32 |
| 2 | That is all. | 11:48:35 |
| 3 | Q    Okay, so you don't have any expertise. | 11:48:36 |
| 4 | You are not here portraying yourself as having | 11:48:37 |
| 5 | expertise about how people might convey intent | 11:48:43 |
| 6 | through movement or body language or facial | 11:48:45 |
| 7 | expressions, correct? | 11:48:48 |
| 8 | A    Correct. | 11:48:50 |
| 9 | Q    In addition to life experiences in | 11:48:58 |
| 10 | culture which we talked about can impact the way | 11:49:00 |
| 11 | people perceive things, can someone else's body | 11:49:04 |
| 12 | language and facial expressions influence how | 11:49:09 |
| 13 | someone, potentially perceives another person's | 11:49:12 |
| 14 | intent? | 11:49:14 |
| 15 | A    I am told that that is the case.  Again | 11:49:15 |
| 16 | I have no expertise. | 11:49:17 |
| 17 | Q    Have you experienced that in your own | 11:49:18 |
| 18 | life? | 11:49:20 |
| 19 | A    Of course I have.  Yes, of course. | 11:49:20 |
| 20 | Q    How about the setting or atmosphere of | 11:49:22 |
| 21 | the situation?  In other words, what's happening | 11:49:23 |
| 22 | around someone, what others around someone are | 11:49:25 |
| 23 | doing in that moment, can that affect perception? | 11:49:28 |
| 24 | A    Of course it does. | 11:49:30 |
| 25 | Q    You agree, by the way, and it's also on | 11:49:36 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          93

| | | |
|---|---|---|
| 1 | page 14 of your report if you want to reference | 11:49:38 |
| 2 | that, on the videos you see the other students | 11:49:40 |
| 3 | parted for Mr. Phillips as he approached and | 11:49:43 |
| 4 | Mr. Sandmann did not, right? | 11:49:45 |
| 5 | A    I did not say that all the other | 11:49:48 |
| 6 | students did.  I said that some students moved | 11:49:50 |
| 7 | aside as he walked up, yes. | 11:49:52 |
| 8 | Q    And some students let him go by, but | 11:49:54 |
| 9 | Mr. Sandmann stayed put, correct. | 11:49:57 |
| 10 | A    It wasn't that he was the only person | 11:49:59 |
| 11 | remaining.  The way you put the question, I think | 11:50:01 |
| 12 | distorts the situation. | 11:50:04 |
| 13 | Q    Right.  But you just -- you have it | 11:50:05 |
| 14 | here in your report on 14.  "Some of the other | 11:50:07 |
| 15 | boys..." | 11:50:11 |
| 16 | A    Some of them. | 11:50:12 |
| 17 | Q    "...moved away from Phillips as the | 11:50:12 |
| 18 | latter approached and let him go by, while | 11:50:14 |
| 19 | Sandmann stayed in one place," right? | 11:50:18 |
| 20 | A    And that's what I was saying.  "Some of | 11:50:19 |
| 21 | the other boys," yes.  Thank you. | 11:50:20 |
| 22 | Q    Absent somebody saying "this is my | 11:50:24 |
| 23 | intent," can one ever be sure what someone else's | 11:50:26 |
| 24 | intent is? | 11:50:30 |
| 25 | A    Again, I have no expertise but I doubt | 11:50:32 |

```
1    it.                                              11:50:34

2         Q    And you are not considering whatever   11:50:36

3    Mr. Sandmann said his intent was, obviously      11:50:38

4    because you didn't talk to him or review his     11:50:41

5    deposition, correct?                             11:50:43

6              MR. McMURTRY:  Objection, go ahead.    11:50:45

7              THE WITNESS:  That's correct.  I do not 11:50:46

8    have any idea what his intent was in that        11:50:47

9    circumstance.  That would be pure speculation as a 11:50:50

10   private person.                                  11:50:53

11   BY MS. SPEARS:                                   11:50:53

12        Q    Okay, what you're trying to infer      11:50:56

13   though is Sandmann and Phillips' intention solely 11:50:57

14   from watching the videos, right?                 11:51:00

15        A    No --                                  11:51:01

16             MR. McMURTRY:  Objection.  Go ahead.   11:51:02

17             THE WITNESS:  -- that is not what I'm   11:51:02

18   doing.  I am not inferring intentions.  I'm      11:51:04

19   looking at the meanings of the words that Phillips 11:51:07

20   said in his -- those two statements.  I know what 11:51:09

21   the meanings are, the expertise that bears on    11:51:13

22   that.                                            11:51:15

23             Then I look at the videos and I see,   11:51:16

24   given the truth conditions, what would have to be 11:51:18

25   the case for those two statements to be true.    11:51:20
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           95

| | | |
|---|---|---|
| 1 | I'd look at what I see in the video and | 11:51:23 |
| 2 | I decide whether that seems to be true, given that | 11:51:25 |
| 3 | video evidence.  I have no -- I do not bring any | 11:51:29 |
| 4 | evidence of intent to bear here except for | 11:51:33 |
| 5 | linguistic intent.  Phillips uttered the | 11:51:37 |
| 6 | statement.  He was conscious.  He's a native | 11:51:40 |
| 7 | speaker of English.  He know what they mean.  I | 11:51:43 |
| 8 | take him to mean what he meant, so that's | 11:51:46 |
| 9 | intention.  Apart from that, I attribute no | 11:51:48 |
| 10 | intention no anyone in my report. | 11:51:50 |
| 11 | BY MS. SPEARS: | 11:51:52 |
| 12 | Q   By the way, in your report you | 11:51:53 |
| 13 | described the situation as a confrontation.  Why | 11:51:54 |
| 14 | do you use that word? | 11:51:57 |
| 15 | A   I think that is, in fact, what | 11:51:58 |
| 16 | happened.  It was a confrontation.  If you look up | 11:51:59 |
| 17 | the word "confrontation" in the dictionary, it's | 11:52:01 |
| 18 | two people standing face-to-face unmoving.  In | 11:52:04 |
| 19 | this case, very, very close range.  I would call | 11:52:07 |
| 20 | that a confrontation. | 11:52:10 |
| 21 | Q   Is a confrontation indicative that | 11:52:11 |
| 22 | people are on opposing sides? | 11:52:15 |
| 23 | A   I think it has that connotation, yes. | 11:52:18 |
| 24 | This was not a friendly interaction.  It wasn't, | 11:52:24 |
| 25 | you know -- yeah. | 11:52:27 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                96

| | | |
|---|---|---|
| 1 | Q    Why was it not friendly? | 11:52:28 |
| 2 | A    Oh, well, we can discuss that.  That | 11:52:31 |
| 3 | has to do with intentions and history and that's | 11:52:32 |
| 4 | not my expertise. | 11:52:34 |
| 5 |         I'm just looking at what I saw in the | 11:52:36 |
| 6 | video.  Two people extremely close, face-to-face. | 11:52:37 |
| 7 | One person beating a drum in the other's face. | 11:52:42 |
| 8 | The other one's eyes blinking because the drum is | 11:52:46 |
| 9 | disturbing and -- | 11:52:49 |
| 10 |         -- (overspeaking) -- | 11:52:51 |
| 11 | Q    Why wasn't it friendly? | 11:52:52 |
| 12 |     MR. McMURTRY:  Can she finish her guess | 11:52:53 |
| 13 | -- answer? | 11:52:54 |
| 14 |     MS. SPEARS:  Oh sure.  I thought she | 11:52:54 |
| 15 | was done. | 11:52:55 |
| 16 |     THE WITNESS:  So, I'm simply saying | 11:52:56 |
| 17 | that it did not look like a comfortable | 11:52:57 |
| 18 | interaction and it was unusually close range. | 11:52:59 |
| 19 |     Most people who don't know each other | 11:53:01 |
| 20 | and I took it these individuals did not know each | 11:53:03 |
| 21 | other, do not come so close to each other in that | 11:53:06 |
| 22 | way. | 11:53:09 |
| 23 | BY MS. SPEARS: | 11:53:09 |
| 24 | Q    Okay, anything else about the | 11:53:11 |
| 25 | atmosphere that was not friendly, you said a | 11:53:11 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    97

| | | |
|---|---|---|
| 1 | second ago? | 11:53:13 |
| 2 | A    I think -- | 11:53:14 |
| 3 | Q    The history of it, you said. | 11:53:15 |
| 4 | A    The history meaning the (inaudible) -- | 11:53:17 |
| 5 | that particular circumstance. | 11:53:17 |
| 6 | -- (overspeaking) -- | 11:53:18 |
| 7 | Q    You said, we can talk about the history | 11:53:18 |
| 8 | of it. | 11:53:20 |
| 9 | A    Okay, I'm not sure exactly what I was | 11:53:21 |
| 10 | alluding to.  But if you look at the situation | 11:53:23 |
| 11 | where there are two, three groups of people in DC | 11:53:25 |
| 12 | for different kinds of protests, and some of them | 11:53:30 |
| 13 | are on different sides of various kinds of | 11:53:33 |
| 14 | political issues and they all know that about each | 11:53:36 |
| 15 | other, as evident in their attire and their | 11:53:38 |
| 16 | behavior and what they're saying, so I would say | 11:53:41 |
| 17 | that that was not a friendly interaction because | 11:53:44 |
| 18 | of that.  That is part of the context and they all | 11:53:46 |
| 19 | knew that. | 11:53:49 |
| 20 | Q    They had cultural differences? | 11:53:50 |
| 21 | A    I didn't say they were cultural.  There | 11:53:53 |
| 22 | were very clear political differences in this | 11:53:56 |
| 23 | case. | 11:53:58 |
| 24 | Q    And that impacted the atmosphere in the | 11:54:00 |
| 25 | sense of the participants involved, correct? | 11:54:05 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    98

| | |
|---|---|
| 1    A    I would say so. | 11:54:08 |
| 2    Q    Some other places in your report you | 11:54:15 |
| 3  use the word "encounter."  Any difference in the | 11:54:17 |
| 4  word choices there? | 11:54:21 |
| 5    A    That's just a -- I wasn't using that to | 11:54:22 |
| 6  be -- make a particular point.  It's a slightly | 11:54:24 |
| 7  more neutral term than confrontation. | 11:54:26 |
| 8        Encounter is more neutral and it's more | 11:54:29 |
| 9  vague.  Two people can encounter each other | 11:54:31 |
| 10  accidentally.  I don't think this was an | 11:54:34 |
| 11  accidental encounter.  So the confrontation means | 11:54:37 |
| 12  it's not friendly and it's not accidental. | 11:54:41 |
| 13    Q    In terms of the clear political | 11:54:44 |
| 14  differences you noted, how do you know | 11:54:47 |
| 15  Mr. Phillips' political -- | 11:54:50 |
| 16        -- (overspeaking) -- | 11:54:53 |
| 17    A    I actually don't know his political | 11:54:54 |
| 18  views, but I do know, like I said, that he was | 11:54:58 |
| 19  there to protest for Native American rights.  And | 11:54:59 |
| 20  I know that he -- as a -- I'm assuming as a person | 11:55:03 |
| 21  who knows some -- has some background about | 11:55:10 |
| 22  American politics at the time of this occasion, | 11:55:13 |
| 23  that someone who was protesting for Native | 11:55:15 |
| 24  American rights and also given other things that | 11:55:19 |
| 25  other protestors with Phillips were saying to the | 11:55:23 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    99

| | | |
|---|---|---|
| 1 | boys from Covington Catholic High about "Go back | 11:55:26 |
| 2 | to Europe" and stuff like that, that they -- there | 11:55:31 |
| 3 | was a lot of bad feeling at that time between | 11:55:35 |
| 4 | Native Americans and people on the far right | 11:55:38 |
| 5 | which, wearing a MAGA hat identifies oneself as | 11:55:40 |
| 6 | being.  There were -- so political differences | 11:55:46 |
| 7 | about what constituted being native but -- and | 11:55:48 |
| 8 | that these things were evident to all of the | 11:55:50 |
| 9 | participants in that interaction. | 11:55:57 |
| 10 | Q     And that is what you talked about in | 11:56:00 |
| 11 | terms of contributing to the atmosphere that | 11:56:01 |
| 12 | made it -- | 11:56:04 |
| 13 | A     Yes. | 11:56:04 |
| 14 | Q     -- unfriendly, correct? | 11:56:04 |
| 15 | A     That's correct.  I think so. | 11:56:05 |
| 16 | Q     Let's go back to your report at the | 11:56:13 |
| 17 | beginning on page 1 and 2 of the actual report. | 11:56:16 |
| 18 | A     Yes. | 11:56:20 |
| 19 | Q     Where the date, November 10, 2021 was | 11:56:20 |
| 20 | on page 1.  Are you there? | 11:56:23 |
| 21 | A     Yes. | 11:56:30 |
| 22 | Q     And you were asked to provide your | 11:56:30 |
| 23 | opinion on two questions, correct? | 11:56:32 |
| 24 | A     Correct. | 11:56:34 |
| 25 | Q     And who came up with those questions? | 11:56:34 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    100

| | | |
|---|---|---|
| 1 | A    Mr. McMurtry so far as I know.  He's | 11:56:37 |
| 2 | the one that posed them to me. | 11:56:40 |
| 3 | Q    Okay, and when was that? | 11:56:41 |
| 4 | A    That was probably in October.  It was | 11:56:42 |
| 5 | probably -- it was either late October or the | 11:56:45 |
| 6 | beginning of November.  I really only worked on | 11:56:47 |
| 7 | this report part-time for seven or eight or ten | 11:56:50 |
| 8 | days.  I can't remember exactly.  I have the | 11:56:53 |
| 9 | notes, if you need to know. | 11:56:56 |
| 10 | Q    And that was in October? | 11:56:57 |
| 11 | A    Either late October or early November. | 11:56:58 |
| 12 | It might have just all been in November.  I don't | 11:57:00 |
| 13 | remember exactly when I started working on the | 11:57:02 |
| 14 | formal report, but I have the notes. | 11:57:04 |
| 15 | Q    Did you have the questions that -- when | 11:57:06 |
| 16 | did you have the questions? | 11:57:08 |
| 17 | A    I believe -- first of all, I knew he | 11:57:10 |
| 18 | was interested in those passages in September when | 11:57:12 |
| 19 | we had the informal discussion about the case | 11:57:14 |
| 20 | because he informally asked me what I thought | 11:57:17 |
| 21 | these passages meant and whether they were true in | 11:57:22 |
| 22 | those videos.  But the formal questions that he | 11:57:24 |
| 23 | posed were posed -- you know, let's say it's | 11:57:26 |
| 24 | either the last of October or the beginning of | 11:57:29 |
| 25 | November. | 11:57:31 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              101

| | | |
|---|---|---|
| 1 | Q    Okay. | 11:57:32 |
| 2 | A    But I knew he -- previously that he was | 11:57:32 |
| 3 | interested in those passages. | 11:57:35 |
| 4 | Q    Okay, and how did you develop your | 11:57:36 |
| 5 | processes for how you would approach answering | 11:57:38 |
| 6 | those questions? | 11:57:40 |
| 7 | A    Pretty simple.  As I told you, I had | 11:57:43 |
| 8 | already informally reviewed the material.  I gave | 11:57:45 |
| 9 | more careful consideration.  I didn't have the | 11:57:48 |
| 10 | deposition when I did the first -- had the first | 11:57:50 |
| 11 | informal conversations with Mr. McMurtry, and so | 11:57:53 |
| 12 | then I was given the deposition and some of the | 11:57:57 |
| 13 | other report from the investigator and so forth | 11:58:00 |
| 14 | and the formal questions.  So I had these | 11:58:04 |
| 15 | materials. | 11:58:11 |
| 16 | I spent another day or so looking | 11:58:12 |
| 17 | through all the materials and then quickly decided | 11:58:13 |
| 18 | that I wanted to ignore everything except what was | 11:58:15 |
| 19 | in the videos, that that would be the most | 11:58:20 |
| 20 | appropriate methodology given that, as I told you, | 11:58:21 |
| 21 | my methodology is to determine the truth | 11:58:25 |
| 22 | conditional character of the passages. | 11:58:28 |
| 23 | When would they be true, on the basis | 11:58:31 |
| 24 | of a linguistic analysis of the plain meaning and | 11:58:34 |
| 25 | then look at the evidence that we have about what | 11:58:41 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                      102

| | | |
|---|---|---|
| 1 | actually occurred, which I think the most -- which | 11:58:41 |
| 2 | I think the only high quality evidence we have of | 11:58:45 |
| 3 | what actually occurred was the videos because I | 11:58:48 |
| 4 | told you I want to disregard people's opinions | 11:58:48 |
| 5 | about them or reports on them.  So I decided the | 11:58:51 |
| 6 | best thing to do was just do my linguistic | 11:58:53 |
| 7 | analysis, look at the videos and see whether I | 11:58:56 |
| 8 | thought these things were true in those | 11:58:59 |
| 9 | circumstances as represented in the videos. | 11:59:00 |
| 10 |     Q    And you talk about reasonable reader in | 11:59:11 |
| 11 | your -- in question 1. Would a reasonable | 11:59:12 |
| 12 | reader under -- and question 2 -- | 11:59:15 |
| 13 |     A    Yes. | 11:59:15 |
| 14 |     Q    You used the phrase "reasonable | 11:59:15 |
| 15 | reader," right? | 11:59:17 |
| 16 |         MR. McMURTRY:  Objection.  She said | 11:59:17 |
| 17 | that I posed the questions. | 11:59:18 |
| 18 |         THE WITNESS:  Yeah. | 11:59:20 |
| 19 |         MS. SPEARS:  Fair enough. | 11:59:20 |
| 20 |         THE WITNESS:  Todd posed the question. | 11:59:20 |
| 21 | BY MS. SPEARS: | 11:59:23 |
| 22 |     Q    Fair enough.  Let me rephrase that. | 11:59:23 |
| 23 |         Mr. McMurtry in his question 1 says -- | 11:59:25 |
| 24 | or uses the phrase "reasonable reader." | 11:59:29 |
| 25 |         Do you use that phrase and what does it | 11:59:33 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    103

1   mean to you?                                          11:59:41

2       A    As an expert, I would be more inclined      11:59:42

3   to say a rational native speaker of the language     11:59:43

4   in question --                                       11:59:47

5       Q    This --                                     11:59:49

6       A    -- who read and understood the             11:59:49

7   passages, yes; that's what I'm looking at.           11:59:51

8       Q    Is that just a more highbrow way of        11:59:52

9   saying "reasonable reader"?                          11:59:55

10      A    It's more accurate, in some ways.  I        11:59:56

11  mean, if you were a reader of -- if you're a         11:59:59

12  French person who doesn't speak English very well    12:00:01

13  and you read this, I'm not sure if they're the       12:00:03

14  person we're aiming at.  We want plain meaning of    12:00:06

15  English, so we want a native speaker.  That's why    12:00:09

16  just any old reader isn't good enough.  That's why   12:00:11

17  I say a native speaker.  And I want rational         12:00:14

18  because irrationality can lead people to             12:00:17

19  misinterpret all kind of things so, yeah.            12:00:20

20      Q    So, it doesn't -- so reasonable reader     12:00:23

21  doesn't just mean an ordinary person reading the     12:00:25

22  statements?                                          12:00:27

23      A    Oh, it does -- ordinary people are         12:00:28

24  typically not insane, so they're rational and if     12:00:30

25  they're native speakers they fall within this        12:00:33

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          104

| | | |
|---|---|---|
| 1 | group so, yes, your ordinary native speaker who is | 12:00:36 |
| 2 | not out of their mind would be a reasonable reader | 12:00:41 |
| 3 | that we had in mind here. | 12:00:42 |
| 4 | Q    Does culture matter? | 12:00:46 |
| 5 | A    No. | 12:00:48 |
| 6 | Q    Does context matter? | 12:00:48 |
| 7 | A    In so far as you've got words like "I" | 12:00:49 |
| 8 | and "now" and "tense," yes, that matters.  Yes. | 12:00:49 |
| 9 | Q    And that's part of your study -- | 12:00:56 |
| 10 | A    Yes, that's correct. | 12:00:57 |
| 11 | Q    -- in your background in pragmatics, | 12:00:58 |
| 12 | correct? | 12:01:00 |
| 13 | A    Correct. | 12:01:00 |
| 14 | Q    See, I'm learning already. | 12:01:02 |
| 15 | A    You are. | 12:01:03 |
| 16 | Q    Are there unreasonable readers? | 12:01:03 |
| 17 | A    Umm... well -- | 12:01:07 |
| 18 | Q    Would that be someone who is insane; is | 12:01:10 |
| 19 | that -- | 12:01:13 |
| 20 | A    Well, there's another matter here.  So, | 12:01:14 |
| 21 | understand the following statement to be false in | 12:01:16 |
| 22 | view of the videos.  A person might watch the | 12:01:18 |
| 23 | videos and have very strong prejudices.  For | 12:01:22 |
| 24 | example, be a far right-wing person and have an | 12:01:27 |
| 25 | interpretation of what Mr. Phillips does that | 12:01:32 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    105

```
1    attributes him -- things to him or intentions that      12:01:34

2    he did not have, right?                                 12:01:36

3            So, I think the reasonable (sic) there          12:01:38

4    could be if you're going to set aside prejudice         12:01:40

5    and distortion of what you see, given what you can      12:01:43

6    see in the video and you're a native speaker and       12:01:48

7    you're rational, would you take this to be false?       12:01:51

8        Q    Go to page 5 of your report.  This is a       12:01:58

9    summary in the middle of the page under III,            12:02:09

10   "Summary of Opinions."                                  12:02:12

11       A    Yes.                                           12:02:15

12       Q    Is that right?                                 12:02:15

13       A    Correct.                                       12:02:16

14       Q    Are all of the opinions you intend to         12:02:17

15   offer in this case expressed in your written           12:02:19

16   report that we've marked here?                          12:02:21

17       A    Yes.                                           12:02:22

18       Q    So you don't have any other opinions          12:02:24

19   that are not expressed in your written report           12:02:26

20   here?                                                   12:02:28

21       A    I have not been asked as an expert to         12:02:29

22   give any additional opinions.  These are they.         12:02:31

23       Q    Let's go on that same page.  Again, I         12:02:37

24   want to ask you about this reasonable native           12:02:40

25   speaker and I think you just answered it, but I        12:02:44
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              106

1   want to make sure I'm clear.  So you say:                    12:02:47

2              "A reasonable native speaker of English           12:02:50

3   reading (each) passage would take it to be false            12:02:50

4   in the circumstances captured in the videos of the          12:02:50

5   encounter which have been provided to me."                  12:02:50

6              And we talked about a reasonable                  12:03:04

7   reader. So is a reasonable reader a native speaker          12:03:04

8   of English or are you qualifying your opinion to            12:03:06

9   pertain to native English speakers?                         12:03:10

10       A    I didn't understand your question.                12:03:14

11       Q    What are you -- by saying "Native                 12:03:15

12  speaker of English," who are you excluding?                 12:03:17

13       A    I'm excluding people who might have not           12:03:19

14  learned English perfectly.  So by saying "native            12:03:23

15  speaker" I'm talking about people who command the           12:03:26

16  English language.                                           12:03:29

17       Q    And what does -- "would take it to be             12:03:33

18  false" mean?                                                12:03:36

19       A    If they were to watch the video and               12:03:39

20  they were a native speaker and they only looked at          12:03:41

21  what actually occurred in the video, they would             12:03:45

22  say this was false.                                         12:03:47

23       Q    And what does: "In the circumstances              12:03:50

24  captured in the videos of the encounter" mean?              12:03:53

25       A    That means what the video showed                  12:03:55

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    107

| | | |
|---|---|---|
| 1 | occurred.  Videos do not show intent; they show | 12:03:56 |
| 2 | action, behavior, what actually occurs. | 12:04:01 |
| 3 |     Q    And again, this is you -- well, strike | 12:04:05 |
| 4 | that.  Let's go to page 7 of your report. | 12:04:07 |
| 5 |         Page 7 of your report, you say:  "In | 12:04:35 |
| 6 | determining truth conditions, the science of | 12:04:37 |
| 7 | linguistics is purely descriptive aiming to | 12:04:37 |
| 8 | determine the plain meaning of an expression that | 12:04:37 |
| 9 | is understood by ordinary speakers of the language | 12:04:37 |
| 10 | in which it is couched." | 12:04:37 |
| 11 |         What you mean by "purely descriptive"? | 12:04:47 |
| 12 |     A    Many times people think that either a | 12:04:53 |
| 13 | dictionary or grammar is prescriptive, telling you | 12:04:55 |
| 14 | how you should speak, what something should mean. | 12:04:59 |
| 15 | You shouldn't say "ain't."  You should say "whom" | 12:05:02 |
| 16 | instead of "who" in certain cases. | 12:05:05 |
| 17 |         This is not what we do in linguistics. | 12:05:09 |
| 18 | We describe what native -- ordinary people, who | 12:05:10 |
| 19 | have never even necessarily had a grammar class | 12:05:14 |
| 20 | say and understand by what they say.  That's the | 12:05:17 |
| 21 | crucial point. | 12:05:21 |
| 22 |     Q    Okay, and page 7 you also discuss what | 12:05:23 |
| 23 | you call truth conditions. | 12:05:27 |
| 24 |     A    Correct. | 12:05:28 |
| 25 |     Q    You describe truth conditions as, "What | 12:05:29 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    117

| | | |
|---|---|---|
| 1 | Q    Okay.  And now on page -- let's | 12:15:45 |
| 2 | continue on then.  Page 8 you talked about | 12:15:48 |
| 3 | syntactic structure and we talked about that at | 12:15:52 |
| 4 | the beginning of the morning, right? | 12:15:55 |
| 5 | A    Correct. | 12:15:57 |
| 6 | Q    And you say you also considered | 12:16:01 |
| 7 | syntactic structure? | 12:16:02 |
| 8 | A    Yes. | 12:16:03 |
| 9 | Q    How does syntactic structure matter to | 12:16:09 |
| 10 | truth conditions? | 12:16:13 |
| 11 | A    May I give you an example from one of | 12:16:14 |
| 12 | the passages? | 12:16:17 |
| 13 | Q    Sure. | 12:16:18 |
| 14 | A    In the first passage, the one in | 12:16:18 |
| 15 | question 1 at the bottom of page 1, Mr. Phillips | 12:16:19 |
| 16 | is heard as saying, "He" -- Sandmann -- "just | 12:16:21 |
| 17 | blocked my way and wouldn't allow me to retreat." | 12:16:26 |
| 18 | Now, as you pointed out "blocked" is ambiguous or | 12:16:27 |
| 19 | it has not -- well, you'd say it was ambiguous. | 12:16:33 |
| 20 | Anyway, it has some very -- two or three closely | 12:16:36 |
| 21 | related senses that one might -- that one might | 12:16:40 |
| 22 | take to relevant to a circumstance like this. | 12:16:44 |
| 23 | One of them is a more passive sense so | 12:16:45 |
| 24 | you can say an inanimate object blocked your way | 12:16:48 |
| 25 | like the construction, you know -- the crane | 12:16:52 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                              118

| | | |
|---|---|---|
| 1 | blocked my way, right?  Or the crane, you know -- | 12:16:57 |
| 2 | was in the way, in effect, without the crane -- | 12:16:58 |
| 3 | without attributing any intention to the crane, | 12:17:00 |
| 4 | correct?  But in this particular passage there's | 12:17:04 |
| 5 | another active sense of block, which is moved to | 12:17:07 |
| 6 | block or intended to block my way, okay?  And I | 12:17:10 |
| 7 | thought that in this context it was more | 12:17:13 |
| 8 | probable -- likely, that Phillips intended or | 12:17:16 |
| 9 | would expect his audience to understand him as | 12:17:18 |
| 10 | meaning that Sandmann actively blocked his way. | 12:17:20 |
| 11 | If you look at the second conjunct, it | 12:17:24 |
| 12 | said "Wouldn't allow me to retreat," which does | 12:17:27 |
| 13 | attribute intention to refuse to let Phillips do | 12:17:31 |
| 14 | what he wanted to do.  So I took the first | 12:17:39 |
| 15 | conjunct, the sense of block to have the active | 12:17:41 |
| 16 | sense of intending to be in the way. | 12:17:44 |
| 17 | There is an example where syntax in | 12:17:47 |
| 18 | this particular case, if he said, "He was blocking | 12:17:50 |
| 19 | way," that is not as clear, when you have an | 12:17:54 |
| 20 | agentive "block my way," that seems more likely | 12:17:58 |
| 21 | that it would be agentive, and there is also | 12:18:03 |
| 22 | passive "block" where there is not even an agent. | 12:18:05 |
| 23 | So in this particular case, the fact that it was | 12:18:06 |
| 24 | transitive use of "block" and that it was | 12:18:09 |
| 25 | conjoined with another sentence where there was an | 12:18:12 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                         119

| | | |
|---|---|---|
| 1 | attribution of intent to Mr. Phillips seemed to | 12:18:15 |
| 2 | disambiguate which sense of "block" Phillips would | 12:18:20 |
| 3 | have expected his native speaker interlocutor to | 12:18:23 |
| 4 | understand him to mean. | 12:18:29 |
| 5 | Q    Okay.  At page 8 at the bottom you | 12:18:34 |
| 6 | conclude that you used these resources and | 12:18:37 |
| 7 | techniques to determine the truth conditions of | 12:18:46 |
| 8 | the sentences which you took to be crucial in | 12:18:53 |
| 9 | these passages; is that right? | 12:18:55 |
| 10 | A    Correct. | 12:18:58 |
| 11 | Q    And by "resources" you mean the | 12:18:59 |
| 12 | dictionaries, correct? | 12:19:01 |
| 13 | A    The dictionaries and my knowledge of | 12:19:01 |
| 14 | grammar.  I didn't refer to grammars here but if | 12:19:06 |
| 15 | you wanted me to I could, and my knowledge of how | 12:19:09 |
| 16 | context influences interpretation which is -- | 12:19:11 |
| 17 | again, I could give you long bibliographies, but I | 12:19:15 |
| 18 | refrained from doing that.  They are in the | 12:19:20 |
| 19 | report. | 12:19:22 |
| 20 | Q    And you also consulted the | 12:19:23 |
| 21 | dictionaries, correct? | 12:19:24 |
| 22 | A    I did consult the dictionaries, yes. | 12:19:24 |
| 23 | Q    And then you say, continuing on page 8, | 12:19:33 |
| 24 | that you "considered the video evidence provided | 12:19:36 |
| 25 | to me to understand the situation in which the | 12:19:37 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    145

| | | |
|---|---|---|
| 1 | patterns that they use.  A chant does have | 01:51:32 |
| 2 | specific sounds that are regularly uttered in -- | 01:51:35 |
| 3 | usually typically jointly with -- rhythmically | 01:51:40 |
| 4 | with the music and I couldn't say whether they | 01:51:44 |
| 5 | were saying, like, an English, "Yes, yes, yes," or | 01:51:46 |
| 6 | whether they were just saying, "Wah, wah, wah," | 01:51:49 |
| 7 | okay?  But the -- because I don't know what | 01:51:52 |
| 8 | language it would be and I wouldn't know whether | 01:51:56 |
| 9 | it was a word in that language. | 01:51:59 |
| 10 | Q    Do you think it's possible that | 01:52:00 |
| 11 | Mr. Phillips was praying? | 01:52:02 |
| 12 | A    Oh, yes, definitely.  I think it | 01:52:03 |
| 13 | likely. | 01:52:05 |
| 14 | Q    You state that Mr. Phillips was: | 01:52:11 |
| 15 | "... leading a group of Native | 01:52:12 |
| 16 | Americans towards the boys." | 01:52:13 |
| 17 | What do you mean by stating that | 01:52:16 |
| 18 | Mr. Phillips was leading the group? | 01:52:19 |
| 19 | A    The reason I seemed to think he was | 01:52:21 |
| 20 | leading was that he was the one who was doing the | 01:52:24 |
| 21 | performance, which was the ceremonial chant, | 01:52:26 |
| 22 | whatever its content, and beating the drum loudly | 01:52:32 |
| 23 | to draw attention and that the others were | 01:52:35 |
| 24 | trailing behind him or photographing him. | 01:52:37 |
| 25 | Q    You say -- well, how did you make that | 01:52:41 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    146

```
1    determination?                                    01:52:43

2         A    I watched the videos.                   01:52:43

3         Q    You say on page 10:                     01:52:45

4         "It is not clear how many are in             01:52:48

5    Mr. Phillips' group at this point and how many are 01:52:50

6    mere onlookers following the show, but I might    01:52:54

7    guess there are 10 or 20 people in that encourage, 01:52:57

8    including a cameraman filming the situation."      01:53:02

9         I want to talk about a couple of things      01:53:05

10   you say in there.  What do you mean by            01:53:05

11   "Mr. Phillips' group," group of what?             01:53:07

12        A    I did not mean it was an organized      01:53:08

13   group.  I have no idea how it came to follow along 01:53:10

14   after him.  Some of the people who were there,    01:53:13

15   given their behavior once the confrontation began 01:53:16

16   were clearly members of the indigenous people's   01:53:19

17   group given the arguments that they had with the  01:53:23

18   boys and the things they were yelling at the      01:53:27

19   Covington boys.                                   01:53:29

20        Q    What do you mean by "indigenous         01:53:29

21   people's group"?                                  01:53:31

22        A    Well, they were dressed as if they had  01:53:32

23   come for the ceremonial dance and so forth.       01:53:34

24   Another one had another drum and was drumming     01:53:36

25   along with Phillips.  And one of them was a       01:53:40
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    147

| | | |
|---|---|---|
| 1 | cameraman who was -- who, like the Black Hebrew | 01:53:43 |
| 2 | Israelites' videographer, focusing on them, one of | 01:53:47 |
| 3 | the camera people in this group of people was | 01:53:51 |
| 4 | focusing on Phillips and his group, so I assumed | 01:53:56 |
| 5 | he was with them. | 01:53:58 |
| 6 | Q    So that's based on your assumptions, | 01:53:59 |
| 7 | though, you don't know for sure. | 01:54:01 |
| 8 | A    I could say -- yeah, I don't know for | 01:54:03 |
| 9 | sure.  I only know what I saw in the videos. | 01:54:06 |
| 10 | Q    And you are making an assumption about | 01:54:08 |
| 11 | who was with who? | 01:54:10 |
| 12 | A    Yes, I am -- on the bases of what I saw | 01:54:11 |
| 13 | and their behavior in the group. | 01:54:13 |
| 14 | Q    But you don't know for sure? | 01:54:15 |
| 15 | A    I think I do know what I saw and I do | 01:54:18 |
| 16 | think those people were together. | 01:54:21 |
| 17 | Q    And again, those are based on | 01:54:25 |
| 18 | assumptions you made about what they were wearing | 01:54:26 |
| 19 | and watching the videos, correct? | 01:54:29 |
| 20 | A    On their -- an assumption about their | 01:54:30 |
| 21 | behavior. | 01:54:34 |
| 22 | Q    Mm-hmm. | 01:54:35 |
| 23 | A    And when they entered the scene. | 01:54:35 |
| 24 | Q    Why do you call it a "show"?  Why do | 01:54:38 |
| 25 | you use that word? | 01:54:41 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          148

```
1        A    I just meant that Phillips did that to      01:54:42

2   draw attention, for whatever reason, he approached    01:54:44

3   from outside.  There was an interaction going on      01:54:47

4   between the boys and the Black Hebrew Israelites.      01:54:50

5   And he came from the side, beating a drum loudly       01:54:53

6   and chanting, in such a way as to draw attention.      01:54:57

7   That's a show.                                         01:54:59

8        Q    And you talk about an entourage, why        01:55:00

9   did you use the phrase "entourage"?                    01:55:04

10       A    I used it because I do believe from          01:55:08

11  what I saw in the video that many of those people      01:55:09

12  followed him to support him in what he was doing.      01:55:11

13       Q    At one point you say 10 to 20 people in      01:55:20

14  the entourage.  In what video did you see 10 to 20     01:55:22

15  people in the entourage --                             01:55:27

16       A    I didn't count, again, as in these           01:55:29

17  other cases, I did not count, so that number is        01:55:32

18  not intended to be accurate, but I did see a small     01:55:34

19  clot of people following Phillips from different       01:55:37

20  angles in the different videos and I assumed that      01:55:40

21  those were the people with him.                        01:55:44

22       Q    Okay.  And you referenced a cameraman,       01:55:45

23  why do you call a person a cameraman?                  01:55:47

24       A    Well, videographer.                          01:55:49

25       Q    And who was the cameraman or                 01:55:51
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    152

```
1        A    No.                                        01:59:06

2        Q    Did you think the cameraman, as you        01:59:08

3   called him, was somebody Mr. Phillips brought with   01:59:10

4   him to film the video?                               01:59:13

5        A    I don't know, no.  He might have been      01:59:15

6   just somebody who just trailed along with him.       01:59:17

7        Q    There were lots of people in the videos    01:59:19

8   holding cameras up, correct?                         01:59:21

9        A    Correct.                                   01:59:22

10       Q    Students included?                         01:59:24

11       A    Absolutely.                                01:59:25

12       Q    Let's go back to -- you can take that      01:59:34

13   down.  Thank you.                                   01:59:36

14            Let's go back to page 10 of your           01:59:37

15   report.  You describe Mr. Phillips as walking up    01:59:41

16   to the boys and ignoring, is the word you used,     01:59:43

17   the BHI, the Black Hebrew Israelites.               01:59:47

18            Why did you say "ignoring"?                01:59:51

19       A    From what I could see when Mr. Phillips    01:59:54

20   came on the scene, he, from what I described as     01:59:55

21   the north of the steps, coming down, he passed      01:59:59

22   between the boys and the Black Hebrew Israelites    02:00:05

23   but his attention was focused on the boys, the     02:00:09

24   direction he moved and the direction of his gaze,  02:00:12

25   so it seemed to me that he -- that was his         02:00:14
```

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          155

| | | |
|---|---|---|
| 1 | front of him.  That's a guess, I don't know how | 02:02:19 |
| 2 | far he was. | 02:02:21 |
| 3 | Q    Okay.  Weren't there multiple rows of | 02:02:22 |
| 4 | students at first between Phillips and | 02:02:25 |
| 5 | Mr. Sandmann? | 02:02:27 |
| 6 | A    Yes, yes, but some were on the ground | 02:02:28 |
| 7 | and some were on the steps. | 02:02:30 |
| 8 | Q    And how did Mr. Phillips get to the | 02:02:36 |
| 9 | place where Mr. Sandmann was standing? | 02:02:37 |
| 10 | A    From what I saw he walked along and he | 02:02:40 |
| 11 | actually walked into the group of boys who were on | 02:02:43 |
| 12 | the ground and some of them -- | 02:02:45 |
| 13 | -- (overspeaking) -- | 02:02:46 |
| 14 | Q    Sorry. | 02:02:50 |
| 15 | A    It's okay, he walked into that group of | 02:02:51 |
| 16 | boys.  He just began to walk past Sandmann and | 02:02:52 |
| 17 | then for some reason Sandmann caught his | 02:02:55 |
| 18 | attention.  He turned around and faced Sandmann -- | 02:02:59 |
| 19 | face on, direct on, and walked up to him on the | 02:03:04 |
| 20 | steps. | 02:03:06 |
| 21 | Q    That's your interpretation after | 02:03:07 |
| 22 | reviewing the videos? | 02:03:10 |
| 23 | A    I have it on the video there, yes. | 02:03:13 |
| 24 | Q    That's your interpretation? | 02:03:15 |
| 25 | A    That's what I saw on the video. | 02:03:16 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    160

| | | |
|---|---|---|
| 1 | it at the 8-second mark or where we are at right | 02:08:41 |
| 2 | now and play on until the 20-second mark. | 02:08:45 |
| 3 | MS. MEEK:  Restarting Video 2 at 8 | 02:08:48 |
| 4 | seconds. | 02:08:51 |
| 5 | (Video 2 played.) | 02:08:51 |
| 6 | MS. MEEK:  I just paused Video 2 at | 02:09:03 |
| 7 | 20 seconds. | 02:09:06 |
| 8 | BY MS. SPEARS: | 02:09:06 |
| 9 | Q    Okay, and at these seconds that we just | 02:09:06 |
| 10 | walked, Phillips just turns to his own right, | 02:09:08 |
| 11 | correct? | 02:09:10 |
| 12 | A    Yes, to his right. | 02:09:11 |
| 13 | Q    And towards the right side of the crowd | 02:09:13 |
| 14 | of boys, correct? | 02:09:15 |
| 15 | A    Correct. | 02:09:16 |
| 16 | Q    Do you know why? | 02:09:17 |
| 17 | A    I don't know where this -- the angle is | 02:09:18 |
| 18 | on this one so I can't tell you what he's doing. | 02:09:19 |
| 19 | I think he is just wading into the boys, but -- I | 02:09:21 |
| 20 | don't know why, but he's wading into the crowd of | 02:09:24 |
| 21 | boys. | 02:09:27 |
| 22 | MS. SPEARS:  Okay, and restart it at | 02:09:27 |
| 23 | where we just left off, the 20-second mark, and | 02:09:31 |
| 24 | pause at the 32-second mark. | 02:09:34 |
| 25 | MS. MEEK:  Restarting Video 2 at | 02:09:39 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                        165

| | | |
|---|---|---|
| 1 | Q    In your report in reference to Video 2, | 02:13:37 |
| 2 | you say that between 41 and 46 seconds, | 02:13:38 |
| 3 | Mr. Phillips was continuing south; what do you | 02:13:40 |
| 4 | mean by that?  Or is that incorrect? | 02:13:43 |
| 5 | A    Let's see what I say. | 02:13:46 |
| 6 | Q    Because you were referring to the wrong | 02:13:46 |
| 7 | video. | 02:13:48 |
| 8 | A    (Reading): | 02:13:49 |
| 9 | "21 seconds one sees Sandmann one or | 02:13:49 |
| 10 | two steps above Phillips in the crowd wearing his | 02:13:54 |
| 11 | hat laughing, grinning.  Phillips continued south, | 02:13:56 |
| 12 | nearly walks past Sandmann" -- I don't say how | 02:13:59 |
| 13 | long it took -- "who is on his right and slightly | 02:14:02 |
| 14 | above, still grinning.  Then Phillips pulls up and | 02:14:05 |
| 15 | turns right to face Sandmann." | 02:14:08 |
| 16 | Q    Stop there a second.  Where -- I want | 02:14:09 |
| 17 | to ask you about it.  You say he's continuing | 02:14:10 |
| 18 | south; what do you mean by that?  Continuing from | 02:14:13 |
| 19 | what? | 02:14:15 |
| 20 | A    For a while he had been walking from | 02:14:15 |
| 21 | the right to the left.  If you back up to 40, you | 02:14:17 |
| 22 | will see he had been walking from the right to the | 02:14:21 |
| 23 | left and then for some reason he turned and went | 02:14:24 |
| 24 | to face Sandmann. | 02:14:26 |
| 25 | Q    Okay, so is it your contention that | 02:14:27 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          166

| | | |
|---|---|---|
| 1 | before Phillips got to where Mr. Sandmann was | 02:14:30 |
| 2 | standing, he was not moving in the direction of | 02:14:33 |
| 3 | Lincoln Memorial? | 02:14:36 |
| 4 | A    No, that's not the direction -- yeah, | 02:14:37 |
| 5 | he was walking in front of the boys, not up the | 02:14:39 |
| 6 | steps. | 02:14:42 |
| 7 | Q    Okay, so -- | 02:14:44 |
| 8 | A    I never saw him go up toward the | 02:14:45 |
| 9 | Memorial in this, until the end of the videos. | 02:14:46 |
| 10 | Q    And that's -- | 02:14:51 |
| 11 | A    I saw him walking into the group of | 02:14:51 |
| 12 | boys along the front of the steps. | 02:14:53 |
| 13 | Q    And so it's your position that he was | 02:14:55 |
| 14 | not walking towards the Memorial? | 02:14:56 |
| 15 | A    I cannot comment on his intentions.  I | 02:14:59 |
| 16 | can only say I did not see him go toward the steps | 02:15:00 |
| 17 | to go up until after this encounter. | 02:15:03 |
| 18 | Q    You didn't see him going in the | 02:15:10 |
| 19 | direction of the steps? | 02:15:11 |
| 20 | A    No.  It looks to me like he's walking | 02:15:12 |
| 21 | in front of the steps into the crowd of boys, | 02:15:14 |
| 22 | until he turns and goes towards Sandmann. | 02:15:16 |
| 23 | Q    And that's part of what informs your | 02:15:18 |
| 24 | opinion that the blocking statement is false? | 02:15:21 |
| 25 | A    That's only part of it. | 02:15:25 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           167

| | | |
|---|---|---|
| 1 | Q    Let's go back to page 10 of your | 02:15:30 |
| 2 | report. | 02:15:31 |
| 3 | A    You could review the video if you want | 02:15:32 |
| 4 | to look one more time.  I don't see him going up | 02:15:33 |
| 5 | the steps. | 02:15:36 |
| 6 | Q    Well, hang on for a second.  In terms | 02:15:37 |
| 7 | of the direction he's facing, that's one thing. | 02:15:41 |
| 8 | And then actually physically going up the steps | 02:15:43 |
| 9 | that's another thing. | 02:15:45 |
| 10 | -- (overspeaking) -- | 02:15:46 |
| 11 | A    -- the direction -- | 02:15:46 |
| 12 | -- (overspeaking) -- | 02:15:47 |
| 13 | Q    Do you agree that he was facing -- | 02:15:47 |
| 14 | (overspeaking) -- | 02:15:48 |
| 15 | A    No, not until he turned to face | 02:15:49 |
| 16 | Sandmann, no. | 02:15:51 |
| 17 | Q    Let's go to page 10 in your report. | 02:15:54 |
| 18 | You say: | 02:15:57 |
| 19 | "Phillips nearly walks past Sandmann." | 02:16:01 |
| 20 | What does this mean? | 02:16:04 |
| 21 | A    The way I saw it in multiple videos, | 02:16:06 |
| 22 | including this one, he's walking from north to | 02:16:08 |
| 23 | south, roughly, along the front edge of the steps | 02:16:11 |
| 24 | into the crowd of boys, many of whom are on the | 02:16:14 |
| 25 | ground.  I didn't see him make a gesture to turn | 02:16:17 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                        168

```
1    towards the west, toward the Memorial as if going       02:16:20

2    up the steps, until he turns around and faces           02:16:23

3    Sandmann.                                                02:16:26

4              So he was walking from north to south         02:16:26

5    and -- Sandmann is facing east, so he's walking         02:16:29

6    from north to south in front -- roughly, in front       02:16:36

7    of -- perpendicular to the line of Sandmann's           02:16:39

8    gaze.  He walks slightly past him and then he           02:16:44

9    turns and goes up to face Sandmann directly.            02:16:47

10   That's what I see in the video.                         02:16:50

11        Q    That's your interpretation.                   02:16:51

12        A    It is not my interpretation; it's what        02:16:52

13   I see in the videos.                                    02:16:54

14        Q    Based on your personal review of the          02:16:55

15   videos?                                                 02:16:57

16        A    To use your language, it is what I see        02:17:01

17   in the videos.                                          02:17:03

18        Q    And you're saying -- when you say he          02:17:06

19   nearly walked past Sandmann, you are talking about      02:17:12

20   a moment when Phillips turns to his left, correct?      02:17:14

21        A    No, he turns to his right.  He was            02:17:16

22   walking from north to south past -- slightly past       02:17:20

23   Sandmann, then for some reason he turns back and        02:17:24

24   comes to face him which is turning to his --            02:17:26

25   toward his right.  So he was walking -- he was          02:17:30
```

| | | |
|---|---|---|
| 1 | have felt surrounded in certain moments of the | 02:26:29 |
| 2 | encounter, like this one? | 02:26:31 |
| 3 |     A   I think he waded into the middle of a | 02:26:33 |
| 4 | crowd of boys, so in a sense he was surrounded. | 02:26:35 |
| 5 |     Q   If he felt surrounded, would he be | 02:26:39 |
| 6 | wrong? | 02:26:41 |
| 7 |     A   No, he was surrounded by the boys.  He | 02:26:41 |
| 8 | walked into the middle of the crowd. | 02:26:43 |
| 9 |     Q   And you believe that this part of | 02:26:46 |
| 10 | Video 16, which you cite in your report here, | 02:26:49 |
| 11 | supports your opinion that Phillips' statements | 02:26:51 |
| 12 | that Sandmann was blocking him or sort of stopping | 02:26:55 |
| 13 | him -- stopping his exit was incorrect? | 02:26:58 |
| 14 |     A   There are two aspects to that | 02:27:01 |
| 15 | statement.  One of them is that he was not | 02:27:05 |
| 16 | passively blocking, meaning that his being there, | 02:27:07 |
| 17 | where he was on the steps did not prevent Phillips | 02:27:09 |
| 18 | from going further up the steps.  That is a fact | 02:27:13 |
| 19 | that you can see in this video, as well as in part | 02:27:15 |
| 20 | of Video 2, which we didn't discuss when we saw | 02:27:18 |
| 21 | it, as well as earlier in this video. | 02:27:20 |
| 22 |       Second, I see no evidence at all that | 02:27:23 |
| 23 | Phillips has, in any way, moved to prevent -- | 02:27:25 |
| 24 |       MR. McMURTRY:  Sandmann -- | 02:27:32 |
| 25 | (overspeaking) -- | 02:27:33 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    177

| | | |
|---|---|---|
| 1 | THE WITNESS:  Sorry, I'm getting my | 02:27:34 |
| 2 | names mixed up. | 02:27:35 |
| 3 | Sandmann has not done anything to | 02:27:37 |
| 4 | prevent Phillips from moving up the steps.  That | 02:27:39 |
| 5 | is not to say he is not -- as an agent blocking | 02:27:40 |
| 6 | Phillips. | 02:27:44 |
| 7 | So neither is he passively blocking | 02:27:47 |
| 8 | him, there is room to his left, nor is he actively | 02:27:50 |
| 9 | blocking him in the sense of his intention | 02:27:52 |
| 10 | being -- putting himself in the way.  That's what | 02:27:55 |
| 11 | I'm saying. | 02:27:57 |
| 12 | BY MS. SPEARS: | 02:27:58 |
| 13 | Q    But you don't know of Sandmann's | 02:27:58 |
| 14 | intent, you are not -- | 02:28:02 |
| 15 | A    It doesn't matter his intent.  He did | 02:28:03 |
| 16 | not move. | 02:28:05 |
| 17 | Q    Let me ask you this.  Video 16 and this | 02:28:06 |
| 18 | 3-foot corridor you say you see, you say that | 02:28:08 |
| 19 | supports your opinion that Phillips' statements | 02:28:12 |
| 20 | that Sandmann was blocking him or sort of stopping | 02:28:14 |
| 21 | his exit is incorrect.  In other words, you are | 02:28:16 |
| 22 | relying on this corridor you see in the video as | 02:28:19 |
| 23 | part of your opinion, correct? | 02:28:23 |
| 24 | A    Part of the opinion.  That is not the | 02:28:24 |
| 25 | whole thing.  I want to emphasize that. | 02:28:25 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    182

| | | |
|---|---|---|
| 1 | come on to the scene with Phillips.  Some of them | 03:05:20 |
| 2 | are drumming.  I think he might have been one of | 03:05:21 |
| 3 | the ones drumming, but I don't remember, I'd have | 03:05:23 |
| 4 | to look at the video again, and chanting, they | 03:05:25 |
| 5 | were all chanting, and they were walking with | 03:05:27 |
| 6 | Phillips in front of -- between the two groups, | 03:05:30 |
| 7 | the Black Hebrew Israelites and the Covington | 03:05:32 |
| 8 | boys, and he accompanied Phillips with that small | 03:05:34 |
| 9 | group of people walking together into the middle | 03:05:37 |
| 10 | of the group of Covington boys and then he follows | 03:05:40 |
| 11 | him up the steps and above Sandmann there and | 03:05:43 |
| 12 | turns and starts to argue with one of the other | 03:05:47 |
| 13 | Covington boys. | 03:05:49 |
| 14 |      Q     And so your assumption that he's a | 03:05:50 |
| 15 | companion is because he's walking behind | 03:05:54 |
| 16 | Mr. Phillips? | 03:05:57 |
| 17 |          MR. McMURTRY:  Objection.  Go ahead. | 03:05:58 |
| 18 |          THE WITNESS:  I mean by "companion" | 03:05:59 |
| 19 | he's one of the people who accompanied | 03:06:01 |
| 20 | Mr. Phillips into this group. | 03:06:03 |
| 21 | BY MS. SPEARS: | 03:06:05 |
| 22 |      Q     You have no idea whether he knows | 03:06:05 |
| 23 | Mr. Phillips -- | 03:06:08 |
| 24 |      A     I said I do not know. | 03:06:09 |
| 25 |      Q     And your assumptions are based on | 03:06:13 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    183

| | | |
|---|---|---|
| 1 | watching the videos, correct? | 03:06:15 |
| 2 | A    All I know is from the videos, yes. | 03:06:16 |
| 3 | Q    And you are not claiming that | 03:06:30 |
| 4 | Mr. Phillips knew all the people in the -- what | 03:06:31 |
| 5 | you call the group behind him, correct? | 03:06:35 |
| 6 | A    He very well may not have known them | 03:06:38 |
| 7 | all.  I don't know. | 03:06:41 |
| 8 | Q    He may not have known any of them; you | 03:06:42 |
| 9 | don't know. | 03:06:44 |
| 10 | A    I don't know. | 03:06:45 |
| 11 | MS. SPEARS:  Let's go in that video to | 03:06:45 |
| 12 | 3:18 and pause at 3:33. | 03:07:03 |
| 13 | MS. MEEK:  I'm starting Video 3 at | 03:07:12 |
| 14 | 3:18. | 03:07:14 |
| 15 | (Video 3 played.) | 03:07:14 |
| 16 | MS. MEEK:  I just paused Video 3 at | 03:07:17 |
| 17 | 3 minutes and 33 seconds. | 03:07:34 |
| 18 | BY MS. SPEARS: | 03:07:36 |
| 19 | Q    You described one of the companions as | 03:07:36 |
| 20 | yelling something like "We won."  What does "we | 03:07:41 |
| 21 | won" mean? | 03:07:44 |
| 22 | A    I don't know.  That's what he says. | 03:07:44 |
| 23 | The same guy in the red hat we were just | 03:07:44 |
| 24 | discussing, is a guy who then says, "We won, | 03:07:47 |
| 25 | Grandpa, we won," and he shakes his hands in the | 03:07:48 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    196

| | | |
|---|---|---|
| 1 | A      Yes. | 03:20:58 |
| 2 | Q      -- right?  Does that mean it's fair to | 03:20:58 |
| 3 | say you also think they have valid definitions of | 03:21:00 |
| 4 | the word block in those two dictionaries? | 03:21:03 |
| 5 | A      Sure do. | 03:21:06 |
| 6 | Q      Do you believe that lay persons and | 03:21:08 |
| 7 | folks with without a Ph.D. in linguistics would | 03:21:11 |
| 8 | generally agree with the definitions you provided | 03:21:14 |
| 9 | for block and will, and impasse? | 03:21:19 |
| 10 | A      Well, what people tend to do -- first | 03:21:21 |
| 11 | of all, I don't think any native speaker could | 03:21:22 |
| 12 | doubt that the words have all the meanings that | 03:21:25 |
| 13 | are given in those dictionary entries. | 03:21:27 |
| 14 |         I don't like the word "definition" | 03:21:30 |
| 15 | because it -- that suggests the lexicographer is | 03:21:31 |
| 16 | deciding what they mean, they are just discerning | 03:21:33 |
| 17 | what they mean, it's the plain meanings of the | 03:21:37 |
| 18 | words. | 03:21:39 |
| 19 | Q      Right, so -- but my point is anybody | 03:21:39 |
| 20 | could go to a dictionary and look up those usages, | 03:21:41 |
| 21 | correct? | 03:21:44 |
| 22 | A      Right, but I'm not just looking at the | 03:21:45 |
| 23 | dictionary.  People think that's what a linguist | 03:21:47 |
| 24 | does.  You've got it wrong.  You start with the | 03:21:49 |
| 25 | dictionary but I also look at the syntax and the | 03:21:52 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                                    197

| | | |
|---|---|---|
| 1 | context and all the things I'm doing here look at | 03:21:54 |
| 2 | all three factors. | 03:21:56 |
| 3 | Q   So if, hypothetically, one agrees with | 03:21:58 |
| 4 | the definition of block that you chose, is the one | 03:22:00 |
| 5 | that Phillips intended in his statement, what are | 03:22:03 |
| 6 | you offering beyond that as a linguist? | 03:22:06 |
| 7 | A   Well, first of all, I don't think | 03:22:09 |
| 8 | anybody else in this trial has said what I said, | 03:22:11 |
| 9 | so you tell me. | 03:22:13 |
| 10 | Secondly, I think that the -- the | 03:22:15 |
| 11 | understanding of what truth condition is -- this | 03:22:25 |
| 12 | is the thing people don't understand.  Everybody | 03:22:27 |
| 13 | uses language, like everything drives a car but | 03:22:30 |
| 14 | they don't know how it works, just like most | 03:22:32 |
| 15 | people don't know how a car works. | 03:22:35 |
| 16 | I spent 40 years learning a little bit | 03:22:37 |
| 17 | about how it works.  We don't completely | 03:22:40 |
| 18 | understand it yet.  It's very deep and very | 03:22:42 |
| 19 | complex.  So, by bringing to bear these different | 03:22:44 |
| 20 | factors it may seem perfectly natural and simple | 03:22:47 |
| 21 | when I give you the explanation because I thought | 03:22:50 |
| 22 | hard about how to try to explain it to a lay | 03:22:53 |
| 23 | person, but it isn't obvious to everybody where | 03:22:55 |
| 24 | the truth conditional meaning ends and other | 03:22:58 |
| 25 | factors come in because, as I said, at an earlier | 03:23:01 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                           198

| | | |
|---|---|---|
| 1 | point in this deposition, meaning is much richer | 03:23:04 |
| 2 | than truth conditions, much richer. | 03:23:07 |
| 3 | I gave the example of slurs.  But I'm | 03:23:09 |
| 4 | saying the truth conditional content of an | 03:23:11 |
| 5 | utterance is where the rubber hits the road. | 03:23:13 |
| 6 | If the utterance is true, in virtue of | 03:23:15 |
| 7 | the plain meaning, then there's something -- you | 03:23:20 |
| 8 | can assess that by looking at the facts in the | 03:23:22 |
| 9 | situation.  If it's false you can point to a | 03:23:25 |
| 10 | particular fact and say, like in the other thing, | 03:23:27 |
| 11 | "he wouldn't allow me to retreat." | 03:23:30 |
| 12 | I said Sandmann's standing there, he | 03:23:33 |
| 13 | doesn't move.  He's got his hands behind his back. | 03:23:35 |
| 14 | Wait, so I'm saying I don't think so that's true | 03:23:38 |
| 15 | that he wouldn't allow him to retreat. | 03:23:40 |
| 16 | Q    Okay.  So as I understand it, there are | 03:23:43 |
| 17 | two parts to your analysis.  In the first part you | 03:23:45 |
| 18 | look at the passages -- | 03:23:47 |
| 19 | A    Yeah. | 03:23:49 |
| 20 | Q    -- to determine the meaning of the | 03:23:49 |
| 21 | usage of the words, right?  And then the second | 03:23:51 |
| 22 | part -- | 03:23:55 |
| 23 | A    Not just the words, the whole sentences | 03:23:56 |
| 24 | in which they pertain. | 03:23:58 |
| 25 | Q    The whole sentences. | 03:23:59 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    199

| | | |
|---|---|---|
| 1 | And then in the second part of your | 03:24:00 |
| 2 | analysis you review the videos to determine the | 03:24:02 |
| 3 | meaning -- whether the meaning of the two passages | 03:24:05 |
| 4 | seems to be true? | 03:24:08 |
| 5 | A    That it's consistent with the facts | 03:24:08 |
| 6 | that I observed in the videos, yes. | 03:24:09 |
| 7 | Q    And you are not more qualified than | 03:24:13 |
| 8 | anyone else to perform part 2 of the analysis, | 03:24:16 |
| 9 | right? | 03:24:19 |
| 10 | A    No, I'm not -- (overspeaking) . | 03:24:19 |
| 11 | Q    So once you've determined the meaning | 03:24:21 |
| 12 | of the passages, that's where your expertise ends | 03:24:23 |
| 13 | as a witness, right? | 03:24:26 |
| 14 | A    Well, I understand what truth | 03:24:29 |
| 15 | conditions are and I can see what's in front of my | 03:24:31 |
| 16 | eyes, so I'm as competent as anybody else to | 03:24:33 |
| 17 | assess whether, given the truth conditions, it is | 03:24:38 |
| 18 | true or false. | 03:24:40 |
| 19 | Q    But anyone could review the videos in | 03:24:41 |
| 20 | the same way you did and determine whether the | 03:24:43 |
| 21 | meaning you assigned to them seems to be true; | 03:24:46 |
| 22 | right? | 03:24:48 |
| 23 | A    I think so. | 03:24:48 |
| 24 | Q    Let's look at your report again and you | 03:24:54 |
| 25 | also lay out the definitions from the dictionaries | 03:25:04 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    204

| | | |
|---|---|---|
| 1 | where he had been standing prior to Phillips' | 03:29:05 |
| 2 | approach."  What do you mean? | 03:29:07 |
| 3 | A   I reviewed every single video and | 03:29:10 |
| 4 | looked where Nick Sandmann was standing and from | 03:29:12 |
| 5 | the time that Mr. Phillips was anywhere near the | 03:29:15 |
| 6 | front of the steps where Sandmann was standing, I | 03:29:18 |
| 7 | never saw Sandmann move a foot, left, right, up or | 03:29:20 |
| 8 | down. | 03:29:25 |
| 9 | Q   And which videos did you review to | 03:29:28 |
| 10 | reach that conclusion? | 03:29:30 |
| 11 | A   All of them.  All 18.  And in | 03:29:30 |
| 12 | particular, I didn't see him move an inch from | 03:29:41 |
| 13 | where he was standing from the time that | 03:29:43 |
| 14 | Sandmann -- that Phillips walked in front of him | 03:29:46 |
| 15 | and then turned and walked away. | 03:29:49 |
| 16 | Q   Why do you say "in particular"? | 03:29:55 |
| 17 | A   Because that's where it bears on | 03:29:56 |
| 18 | whether they were at an impasse or whether | 03:29:58 |
| 19 | Sandmann blocked Phillips way by moving, as he | 03:30:02 |
| 20 | says in the second passage. | 03:30:06 |
| 21 | I could also point out that from what | 03:30:16 |
| 22 | -- (overspeaking) -- | 03:30:20 |
| 23 | Q   There's not a question pending. | 03:30:21 |
| 24 | A   Well, it bears on one of the questions | 03:30:22 |
| 25 | you've been asking me.  But you if you don't want | 03:30:24 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                    217

| | | |
|---|---|---|
| 1 | any of the words that are in there in the | 03:45:52 |
| 2 | dictionary, as you had with the others? | 03:45:53 |
| 3 | A    Not necessary. | 03:45:56 |
| 4 | Q    And so let's discuss, just a few points | 03:45:57 |
| 5 | here in your review.  You state: "I saw no | 03:46:00 |
| 6 | evidence that Sandmann moved as Phillips passed by | 03:46:06 |
| 7 | and then turned back to approach him." | 03:46:08 |
| 8 | What do you mean by that first | 03:46:12 |
| 9 | sentence?  Is that just what we've talked about | 03:46:13 |
| 10 | before that -- | 03:46:17 |
| 11 | A    Yes, that Sandmann -- as Phillips | 03:46:18 |
| 12 | passed by and turned and then approached him, I | 03:46:20 |
| 13 | saw no evidence that Sandmann moved his feet | 03:46:22 |
| 14 | at all to -- in order to slide to the left or to | 03:46:24 |
| 15 | the right or go up or go down.  I saw no evidence | 03:46:27 |
| 16 | that he moved in that way. | 03:46:31 |
| 17 | Q    Okay, and that's based on your | 03:46:32 |
| 18 | review -- | 03:46:35 |
| 19 | A    Review of all the videos -- | 03:46:36 |
| 20 | Q    You've got to wait until I'm done with | 03:46:37 |
| 21 | the question. | 03:46:39 |
| 22 | A    Sorry. | 03:46:39 |
| 23 | Q    That's based on your review of the | 03:46:40 |
| 24 | videos 1 to 18? | 03:46:42 |
| 25 | A    Correct. | 03:46:44 |

Transcript of Craige Roberts, Ph.D.
Conducted on December 7, 2021                          224

```
1     CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC:

2              I, Lisa M. Barrett, the officer before

3     whom the foregoing deposition was taken, do hereby

4     certify that the foregoing transcript is a true

5     and correct record of the testimony given; that

6     said testimony was taken by me stenographically

7     and thereafter reduced to typewriting under my

8     direction; that reading and signing was not

9     requested; and that I am neither counsel for,

10    related to, nor employed by any of the parties to

11    this case and have no interest, financial or

12    otherwise, in its outcome.

13            IN WITNESS WHEREOF, I have hereunto

14     set my hand this 11th day of December, 2021

15

16     _____

17     Lisa M. Barrett, RPR, CRR, CRC, CSR

18      My commission expires:  06/23/2023

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION AT COVINGTON

**CIVIL ACTION NO. 19-56-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**NBCUNIVERSAL MEDIA, LLC**                    **DEFENDANT**

*** *** *** ***

**CIVIL ACTION NO. 20-23-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**
**v.**
**THE NEW YORK TIMES COMPANY
d/b/a THE NEW YORK TIMES**                    **DEFENDANT**

*** *** *** ***

**CIVIL ACTION NO. 20-24-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**

**CBS NEWS, INC., et al.**                    **DEFENDANTS**

*** *** *** ***

**CIVIL ACTION NO. 20-25-WOB-CJS**

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                    **PLAINTIFF**

**v.**



Exhibit #

Exhibit A

12/07/2021 -SM

ABC NEWS, INC., et al.                                      **DEFENDANTS**

*** *** *** ***

CIVIL ACTION NO. 20-27-WOB-CJS

**NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE SANDMANN**                          **PLAINTIFF**

**v.**

**ROLLING STONE, LLC, et al.**                             **DEFENDANTS**

## PLAINTIFF'S RULE 26(a)(2) DISCLOSURES (PHASE ONE)

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiff Nicholas Sandmann ("Nicholas") hereby submits the following disclosures to the defendants in the above-captioned cases. Nicholas reserves the right to supplement these disclosures, they do not constitute waiver of any privileges, including without limitation the work product privilege, and they are without prejudice to any other issue or argument.

1.      Nicholas intends to call the following individual to testify as an expert witness at trial for the above-referenced cases: **Craige Roberts, Ph.D.**

2.      Pursuant to Fed. R. Civ. P. 26(a)(2)(B), the written report of Dr. Craige Roberts is attached hereto as ***Exhibit A***.

Respectfully submitted,

**/s/ *Todd V. McMurtry***

Todd V. McMurtry (KBA #82101)
Jeffrey A. Standen (*pro hac vice*)
J. Will Huber (KBA #99339)
HEMMER DEFRANK WESSELS PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, KY 41017
Phone:  (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
jstanden@hemmerlaw.com
whuber@hemmerlaw.com

*Trial Attorneys for Plaintiff,*
*Nicholas Sandmann*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via email and/or regular first-class mail, postage prepaid, on November 10, 2021, upon the following:

J. Stephen Smith
Darren W. Ford
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
ssmith@graydon.com
dford@graydon.com

John C. Greiner
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
jgreiner@graydon.law

Robert B. Craig
TAFT STETTINIUS & HOLLISTER LLP
1717 Dixie Highway, Suite 910
Covington, KY 41011
craigr@taftlaw.com

Natalie J. Spears
Gregory R. Naron
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
natalie.spears@dentons.com
gregory.naron@dentons.com

Jared A. Cox
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, KY 40202
jared.cox@dentons.com

Jessica Laurin Meek
DENTONS BINGHAM GREENEBAUM, LLP
10 West Market Street, Suite 2700
Indianapolis, IN 46204
jessica.meek@dentons.com

Nathan Siegel
Meenakshi Krishnan
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C., 20006
nathansiegel@dwt.com
meenakshikrishnan@dwt.com

Kevin T. Shook
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215
kshook@fbtlaw.com

Theresa A. Canaday
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
tcanaday@fbtlaw.com

Michael E. Nitardy
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY 41042
mnitardy@fbtlaw.com

Ryan W. Goellner
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
rgoellner@fbtlaw.com

*/s/ Todd V. McMurtry*
Todd V. McMurtry

# EXHIBIT A

Craige Roberts
501 W 123rd St., Apt 20F
New York, NY 10027

November 10, 2021

Todd V. McMurtry
HEMMER DeFRANK WESSELS, PLLC
250 Grandview Drive, Suite 500
Ft. Mitchell, KY 41017-5649

> Re:   *Sandmann v. NBCUniversal* Media, *LLC,* E.D. Ky. Case No. 2:19-cv-00056; *Sandmann v. The New York Times Company, et al.,* E.D. Ky. Case No. 2:20-cv-00023; *Sandmann v. CBS News, et al.,* E.D. Ky. Case No. 2:20-cv-00024; *Sandmann v. ABC News,* Inc., et *al.,* E.D. Ky. Case No. 2:20-cv-00025; *Sandmann v. Gannett Co.,* Inc., *et al.,* E.D. Ky. Case No. 2:20-cv-00026; *Sandmann v. Rolling Stone, et al.,* E.D. Ky. Case No. 2:20-cv-00027

Dear Mr. McMurtry,

This is the report you asked me to write, giving my expert witness opinion in the above-captioned cases.

## I.   Nature of Engagement

I am a U.S. citizen residing in New York, NY. I have been retained by Nicholas Sandmann as an expert in the following six cases:  *Sandmann v. NBCUniversal Media, LLC,* E.D. Ky. Case No. 2:19-cv-00056; *Sandmann v. The New York Times Company, et al.,* E.D. Ky. Case No. 2:20-cv-00023; *Sandmann v. CBS News, et al.,* E.D. Ky. Case No. 2:20-cv-00024; *Sandmann v. ABC News, Inc., et al.,* E.D. Ky. Case No. 2:20-cv-00025; *Sandmann v. Gannett Co., Inc., et al.,* E.D. Ky. Case No. 2:20-cv-00026; *Sandmann v. Rolling Stone, et al.,* E.D. Ky. Case No. 2:20-cv-00027.

I have been retained to answer the following two questions pertaining to the above cases, basing my answers on the videos provided to me (listed in section IV) below:

> ### QUESTION 1: Would a reasonable reader understand the following statement to be false?
>
> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial' ... I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

1

**QUESTION 2: Would a reasonable reader understand the following statement to be false?**

Phillips said Sandmann "positioned himself" in front of him, stopping his exit. Phillips said he sang in front of Sandmann for about three minutes. "When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slided to the right, and he slided to the right. I slided to the left and he slided to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."

My compensation in this case is $300 per hour of work.

## II.    Qualifications

I have a Ph.D. in Linguistics from the University of Massachusetts at Amherst (1987). As part of my graduate training, in 1979-1980 at Indiana State University I studied Lexicography with Professor Edward Gates, a former Associate Editor of Webster's Third New International Dictionary (The G. & C. Merriam Company, Springfield, MA) and the Secretary of the Dictionary Society of North America. After my graduate work, I had a post-doctoral fellowship for two years at the Center for the Study of Language and Information at Stanford University (1986-1988). I then accepted a position at The Ohio State University, Columbus, Ohio, where I was on the faculty from 1988 until my retirement in 2016. During that time, I was promoted from Assistant Professor to Associate Professor (1994) and then to Full Professor (2007). During that period, I also served as a Visiting Research Fellow in the Faculty of Philosophy at the University of Amsterdam in the Netherlands (1992, 2002), as a Visiting Professor in the Department of Philosophy at the University of Michigan (2009), and as a Fellow at the National Humanities Center, Durham, NC (2012-2013) and a Senior Fellow at the Institute for Advanced Studies of Central European University, Budapest, Hungary (2014-2015). Recently, I was a Visiting Professor in the Linguistics Department at New York University (2016-2019). I am currently a Professor Emerita at OSU, and an Affiliate of the Rutgers University Center for Cognitive Science.

My area of specialization in linguistics is semantics and pragmatics. Semantics is the study of the underlying regularities in lexical meaning and syntactic form that permit native speakers to convey (sometimes complex) meaning. Pragmatics is the study of how context influences interpretation (for example, how context permits us to understand what a speaker means in using a pronoun). In these areas, I have published the following articles and chapters in the past ten years:

"*only*: A case study in projective meaning". In Barbara H. Partee, Michael Glanzberg & Jurgis Skilters (ed.) (2011) *Formal Semantics and Pragmatics: Discourse, Context and Models*. Special issue of the *Baltic International Yearbook of Cognition, Logic and Communication*, Riga, Lattvia.

2

"Topics". In Claudia Maienborn, Klaus von Heusinger & Paul Portner (eds.) (2012) *Semantics: An International Handbook of Natural Language Meaning*. Mouton de Gruyter. Reprinted in Portner, Maienborn & von Heusinger (eds.) (2019) *Semantics: Sentence and Information Structure*, Berlin/Boston: Mouton de Gruyter, 381-412.

"Information Structure: Toward an integrated theory of formal pragmatics". *Semantics and Pragmatics* 5.6:1-69. (Invited as a classic unpublished paper.) . http://dx.doi.org/10.3765/sp.5.6.

"Information Structure: Afterword" with bibliography of related work. *Semantics and Pragmatics* 5.7:1-19. http://dx.doi.org/10.3765/sp.5.7.

"Towards a taxonomy of projective content", with Judith Tonhauser, Mandy Simons & David Beaver. *Language* 89.1:66-109, 2013. Awarded the Linguistic Society of America's award for Best Paper in Language 2013.

"Accommodation in a Language Game". In Barry Loewer & Jonathan Schaffer (eds.) *A Companion to David Lewis*. Blackwell/Wiley, Hoboken, NJ, 2015.

"Plans and imperatives: A semantics and pragmatics for imperative mood". *Proceedings of the Amsterdam Colloquium 2015*. ILLC, University of Amsterdam.

"Review of Robert Stalnaker, *Context*, Oxford University Press, 2014". *Notre Dame Philosophical Reviews* 2016.06.20: http://ndpr.nd.edu/news/67831-context-2/, 2016.

"The best question: Explaining the projection behavior of factives". *Discourse Processes* 54.3:187-206, a special issue on the Question In Discussion, 2017. With Mandy Simons, David Beaver & Judith Tonhauser.

"Questions Under Discussion: Where information structure meets projective content". *Annual Review of Linguistics* 3, 2017. With David Beaver, Mandy Simons & Judith Tonhauser.

"Ontology via semantics?: Introduction to the special issue on the semantics of cardinal numbers". With Stewart Shapiro. *Linguistics and Philosophy* 40.4:321-329, 2017.

"Linguistic convention and the architecture of interpretation". *Analytic Philosophy* 58.4:418-439, 2017.

"Speech acts in discourse context". In Daniel Fogal, Daniel Harris & Matt Moss (eds.) *New Work on Speech Acts*. Oxford University Press, 2018, 317-359.

"Contextual influences on reference". In Barbara Abbott & Jeannette Gundel (eds.) *Oxford Handbook of Reference,* Oxford University Press, 2018, 260-280.

"Open texture and analyticity". With Stewart Shapiro. In Dejan Makovec & Stewart Shapiro (eds.) *Friedrich Waismann: The Open Texture of Analytic Philosophy*. Palgrave Macmillan, Cham, Switzerland, 189-210, 2019.

"Modal Subordination: *It would eat you first!*". In Daniel Gutzmann, Lisa Matthewson, Cécile Meier, Hotze Rullmann & Thomas Ede Zimmermann (eds.) *The Wiley Blackwell Companion to Semantics*. Wiley. 2021.

"Open Texture and Mathematics", with Stewart Shapiro. *Notre Dame Journal of Formal Logic* 62(1):173-192, 2021.

I also co-edited the following during this period:

*Special issue on the Semantics of Cardinals*. Edited with Stewart Shapiro. *Linguistics & Philosophy* 40.4, 2017.

During my career, I have also been awarded six grants from the U.S. National Science Foundation for advanced research in linguistics, as noted in my Curriculum Vitae ("Selected Grants").

During my time on the faculty at The Ohio State University, I developed and taught a course on Language and the Law for advanced undergraduates, from 2005 through 2016.

I attach my Brief Curriculum Vitae as Exhibit A. My full Curriculum Vitae, along with most of my publications, are available on my professional website: https://www.asc.ohio-state.edu/roberts.21/.

As listed in the Curriculum Vitae ("Legal Work"), I have been hired as an expert witness for several law firms since 2004, rendering opinions and giving testimony in cases pertaining to trademark law and the interpretation of an advertising slogan, the interpretation of statutes in law, the interpretation of several types of contracts, and the interpretation of a passage of email. The following is a list of the firms who have retained my services, along with case information for those cases where I wrote an opinion or gave testimony:

> Dinsmore & Shohl, LLP, Cincinnati, OH, to provide testimony in August, 2004 in Columbus, OH, in the case of Nationwide Mutual Insurance Company vs. Sovereign Bank and Sovereign Bankcorp., Inc., in a Civil matter pertaining to trademark law and the interpretation of an advertising slogan. Testified in court.
>
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, regarding the interpretation of Kentucky Revised Statute 216B.020(2)(a), pertaining to licensure of health care facilities. Testified at a magistrate's hearing of the Kentucky Cabinet for Health and Family Services, September, 2004, Frankfort, KY, in the case of John W. Gilbert, M.D., et al. v. Commonwealth of Kentucky, Cabinet for Health and Family Services, et al. Commonwealth of Kentucky Franklin Circuit Court Division II Civil Action No. 05-CI-00275.
>
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in October, 2004, on the interpretation of a legal contract.
>
> Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in May, 2006 on the interpretation of a legal contract.
>
> Parry, Deering, Futscher & Sparks, p.s.c., Covington, KY, on the interpretation of an insurance contract.
>
> Cull, Hayden & Vance, p.s.c., Frankfort, KY, August, 2006, on the interpretation of statutes in Kentucky law pertaining to licensure of health care facilities.
>
> Zeiger, Tigges & Little, LLP, Columbus, OH, September, 2006 and July 2007, on the interpretation of contracts.
>
> Keating, Meuthing & Klekamp PLL, Cincinnati, OH, October 2007, on the interpretation of a statute pertaining to contracts.
>
> Cull, Hayden & Vance, p.s.c., Frankfort, KY, September, 2009, on the interpretation of a statute of Kentucky law pertaining to licensure of health care facilities.
>
> Sparks PLL, Covington, KY, September, 2010, on the interpretation of a commercial contract.

4

Dritz, PLL, Columbus, OH, May, 2012, on the interpretation of email correspondence at-issue in a criminal case.

Deters, Benzinger & LaVelle, Crestview Hills, KY, in June, 2016, on the interpretation of a Kentucky statute pertaining to the licensure of health care facilities.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2019, expert witness report on the interpretation of a legal contract in Kestra Investment Services, LLC v. The Ohio National Life Insurance Company, et al., US District Court, Western District of Texas, Case No: 1:19-cv-0687. In 2020, prepared a Rebuttal to the report of an expert witness for the plaintiff.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2020, expert witness report on the interpretation of a legal contract in RBC Capital Markets, LLC v. The Ohio National Life Insurance Company, et al., US District Court, District of Minnesota, Case No: 1:19-cv-00062. Recently retained to provide a report in a related case.

Apart from this legal work, I have served as a linguistic consultant for Motorola, Inc. (from 1998-2000) and was invited to give professional presentations at SRI International, Menlo Park, CA (1987) and Google (2020).

I am a member of the Linguistic Society of America.


## III.    Summary of Opinions

After studying the videos of the encounter between Nick Sandmann and Nathan Phillips at the Lincoln Memorial in Washington, D.C. on January 18, 2019, in my professional opinion the answers to the questions posed in §I above are as follows:

Question 1:  A reasonable native speaker of English reading this passage would take it to be false in the circumstances captured in the videos of the encounter which have been provided to me.

Question 2:  A reasonable native speaker of English reading this passage would take it to be false in the circumstances captured in the videos of the encounter which have been provided to me.

I am more than reasonably certain that these opinions are correct, based on the videos provided to me (section IV below) and standard methods of analysis in my professional field, linguistic semantics.


## IV.    Bases for Opinions and Materials Considered

I have been provided with the following materials on which to base my opinion:

Videos of the scene in front of the Lincoln Memorial on January 18, 2019:

     Video 1.Viral Video.N.S. 000118.mpr:                                        1:01

5

| | |
|---|---|
| Video 2.Second Taitano Video.N.S. 000119.mp4 | 4:45 |
| Video 3. Video Cited by CovCathStudent.N.S. 000121.mp4 | 9:14 |
| Video 4.Banyamyan Video.N.S. 000116.mp4 | 1:46:18 |
| Video 5.First Portion of WhatsApp Video.(Proposed by Def…lly 0010-0… | 5:24 |
| Video 6.KC Noland Video 1.(Part of N.S. 128 at 1040).mp4 | :59 |
| Video 7.Taitano Video 3.mp4 | 1:00 |
| Video 8.Hooligan Instagram Video 1.mp4 | :50 |
| Video 9.Time.com Clip (Proposed by Defendants).mp4 | :35 |
| Video 10.First Portion of N.S. 128.N.S. 000128.mp4 | :27 |
| Video 11.Second Portion of WhatsApp Video.(Originally 070…e N.S. 00… | 2:24 |
| Video 12.Twitter Video 1.N.S. 001802.mp4 | :37 |
| Video 13.Twitter Video 3.N.S. 001804.mp4 | :20 |
| Video 14.Fries Video 1.N.S. 001735.mov | :23 |
| Video 15.Miscellaneous Video 1.N.S. 000125.mp4 | 1:18 |
| Video 16.Aerial View.GCI 000018.mp4 | :59 |
| Video 17.Miscellaneous Video 2.mp4 | 7:37 |
| Video 18.Maria Judy Video.mp4 | :20 |

Newspaper Articles reporting on the incident of interest:

ABC's First Online Article:  "Teen accused of taunting Native American protesters in viral video says he's receiving death threats: Sandmann was accused of mocking a Native American protester on Friday". Karma Allen. ABC News on-line article, January 20, 2019, 10:16pm. https://absnews.go.com/US/teen-accused-taunting-native-american-protesters-breaks-silence/story?id=60512874.

ABC's Fourth Online Article:  "Viral video of Catholic school teens in 'MAGA' caps taunting Native Americans draws widespread condemnation: prompts a school investigation". ABC News on-line article, Chris Francescani & Bill Hutchinson. January 20, 2019, 9:49pm. https://abcnews.go.com/US/viral-video-catholic-school-teens-taunting-native-americans/story?id=60498772.

CBS's Online Article:  "Native American veteran in viral video of confrontation speaks out". CBS News on-line article, January 20, 2019. Justin Carissimo.

Enquirer's First Online Article:  "NKY Catholic school faces backlash after video of incident at Indigenous Peoples March surfaces". Max Loudberg & Sarah Brookbank, *Cincinnati Enquirer*. January 19, 2019, 11:45am. https://ww.cincinnati.com/story/news/2019/01/19/video-shows-apparent-incident-indigenous-peoples-march/2623820002/.

Enquirer's Second Online Article:  "Analysis: What the video from the incident at the Indigenous Peoples March tells us about what happened". Sarah Brookbank, *Cincinnati Enquirer*. January 20, 2019, 5:34pm. https://www.cincinnati.com/story/news/2019/01/20/analyzing-video-incident-indigenous-peoples-march/2631412002/.

Louisville Courier-Journal's Online Article:  "Stormy Daniels calls out 'disgusting punks' from Covington Catholic". Billy Kobin, *Louisville Courier Journal*, January 19, 2019, 7:58pm. On-line article.

NBC's First Article:  "Catholic diocese apologizes after students in 'MAGA' hats mock Native American: Videos circulating online show a youth standing extremely close to an

elderly Native American as he chanted and played a drum". Adam Beam & Brian Melly, *NBC News*, January 19, 2019, 2:42pm. On-line article: https://www.nbcwashington.com/news/local/Kentucky-Diocese-Investigates-After-Students-Mock-Native-Americans-Indigenous-Peoples-March-DC-50....

NBC's Fifth Article:  "Nathan Phillips, Native American activist in D.C. standoff, forgives Catholic school students: "Even though I'm angry, I still have that forgiveness in my heart for those students," said Nathan Phillips." Elisha Fieldstadt, *NBC News*, January 24, 2019, 7:46am. https://www.nbcnews.com/news/us-news/nathan-phillips-native-american-activist-d-c-standoff-forgives-catholic-n962131.

NBC's Sixth Article:  "Nathan Philips on viral encounter with Nick Sandmann: 'I forgive him': The Native American elder said Nick Sandmann's responses seemed "coached" but said he has forgiven him." Eun Kyung Kim, *NBC News Today*, January 24, 2019, 8:01am. https://www.today.com/news/nathan-phillips-talks-today-show-s-savannah-guthrie-about-viral-t147369.

NY Times' January 19 Article:  "Boys in 'Make America Great Again' Hats Mob Native Elder at Indigenous Peoples March". Sarah Mervosh, *New York Times*, January 19, 2019.

NY Times' Second Version of January 19 Article:  "Viral Video Shows Boys in 'Make America Great Again' Hats Surrounding Native Elder". Sarah Mervosh. *New York Times*, January 19, 2019.

Rolling Stone's January 22 Article:  Trump Comes to the Rescue of the MAGA Teens: Right-wing media is using confusion over what exactly happened to paint the Covington Catholic teenagers as victims". Ryan Bort, *Rolling Stone*, January 22, 2019.

Other materials:

Final Investigative Report from Greater Cincinnati Investigation, Inc., February 11, 2019.

Letter from Nick Sandmann to Bob Rowe, January 19, 2019, 1:59:54pm.

Transcription of Nick Sandmann's Deposition, Planet Depos, September 13-14, 2021 in the case of Sandmann, et al. -v- NBCUniversal Media, LLC, et al.

"Statement of Nick Sandmann, Covington Catholic High School Junior, Regarding Incident at the Lincoln Memorial", on Twitter: https://twitter.com/jaketapper/status/1087137470670663680?lang=en

Here is how these materials are relevant to my opinion: In contemporary linguistic semantics, the meaning of a declarative sentence (one in the indicative mood, as opposed to a question or directive) is characterized as its *truth conditions*—what a situation would have to be like in order for the sentence to truthfully describe that situation. In determining truth conditions, the science of linguistics is purely descriptive—aiming to determine the plain meaning of an expression as that is understood by ordinary speakers of the language in which it is couched. In reaching my decision, I relied on the videos provided to acquaint me in as much detail as possible with the situation in which the confrontation between Mr. Phillips and Mr. Sandmann occurred. I then considered whether, given the plain meanings of the passages in question—their truth conditions, those passages were true or false in the situation depicted in the videos.

In determining the truth conditions for sentences in the passages in question I used standard methods in linguistic semantics and pragmatics. For example, to ascertain the plain meaning of

words in the passages of interest, I consulted several of the most respected dictionaries of modern English, including the most up-to-date online versions of:

> *The Oxford English Dictionary on Historical Principles*, Oxford University Press, Oxford, England, 2021 version on-line (first published 1899).
> *Merriam-Webster's Collegiate Dictionary* (11th Edition), Merriam-Webster Company, Springfield, MA, 2012.
> *The American Heritage Dictionary of the American Language*, 6th Edition, Houghton Mifflin, Boston, MA, 2016.

The best lexicographic practice since the early 20th century has emphasized that lexicography is the art of *describing* the plain meanings of expressions as evident to native speakers; it does not prescribe what those meanings should be. Accordingly, a lexicographer studies the plain meaning of a word by first gathering examples of its use both in printed material (for example, from fiction, official documents, or journalism) and in spoken usage (for example, from radio and television usage), and also, in current practice, from the internet. The Oxford English Dictionary has collected such uses from the earliest known published work in English, documenting how the meanings of our words have evolved over the centuries; Merriam Webster and American Heritage focus solely on contemporary American English. The collected examples of usage are then sorted into groups reflecting different senses, often closely related but slightly different in their truth conditional contributions. On the basis of such collections, dictionary definitions are then developed to reflect those different senses.

In addition to lexicographic resources, in preparation for this report I considered the syntactic structure of the sentences in the passage, since that, of course, matters to truth conditions: *John loves Mary* might be false while *Mary loves John* is true, though both sentences contain the same words. And, as native speakers do, I used the context in which a given sentence occurs in the passages in question to determine the meanings of pronouns like *I*, *my, he, him* and other context-sensitive expressions like *that guy in the hat* and *to the left*.

Use of all of these resources and techniques is standard in contemporary semantics and pragmatics. I used them, as described in more detail in §VII below, to determine the truth conditions of the sentences which I took to be crucial in these passages. Then I considered the video evidence provided to me to understand the situation in which the confrontation occurred, and on the basis of that understanding, I considered whether the truth conditions of the passages were satisfied in that situation. Although I subsequently read statements, interviews and depositions by Mr. Phillips and Mr. Sandmann pertaining to their encounter, I endeavored to form my opinion not on the basis of those subsequent statements, but solely on the basis of the evidence in the videos. Someone's memory or construal of an event may not correspond to the facts about the situation in which it occurred. It is only the situation itself that is relevant to the truth of a statement purporting to describe it. The only other materials I considered relevant to my opinion are those providing background for the event: information about who was involved (the students from Covington Catholic School, the Black Hebrew Israelites, and the Native Americans) and about what were they doing in D.C. and at the Lincoln Memorial (protesting, marching, etc.), as well as the names of the individuals in the confrontation at issue, Mr. Nathan Phillips and Mr. Nicholas Sandmann.

## V.    Facts

Here are the facts about the January 18, 2019 incident as I am aware of them from the materials provided to me, principally the videos listed in §IV above.

Three different groups interacted in the event in question, as well as various bystanders who seemed to be unrelated to any of these groups.  The groups were:

- a small group who called themselves the Black Hebrew Israelites, African Americans who were there to preach a religious and political message. I think there may have been five or six of them standing together, perhaps others circulating in the crowd in front of the Lincoln Memorial. One had a microphone and amplifier, another filmed their activities, and others held up signs and engaged informally with passers-by. Throughout the period in the videos, they engaged with a number of people and other groups in the area, often using incendiary language to insult or degrade those they engaged with, including stray passersby of several races and apparent ethnic backgrounds, the Native Americans, and the boys from Covington Catholic School.
- a larger group of people who (according to the articles that I read about the event, cited in section IV above) had come to D.C. for the Indigenous Peoples March. Mr. Phillips was a member of this group, as (it seems) at least one of those who made videos of the interaction with the boys from Covington Catholic School. These people sang, danced, and chanted to drums, sometimes forming a large circle as they did so. During the circle dance, there appeared to be at least as many people participating as there were boys from Covington, though I cannot give a reliable estimate of their number.
- a group of boys, possibly 30 – 50 of them, from Covington Catholic School, Covington, Kentucky, who had come to D.C. that morning to participate in a Right to Life march earlier that day. They were free to explore the city after the march, and had been told by the school chaperones to meet on the Lincoln Memorial steps by 5pm, where they would board buses to return home. For some minutes before and throughout the encounter between Phillips and Sandmann, the boys were ranged up the stairs to the Monument and spilling down onto the flat area in front of them.

The Hebrew Israelites had set up their tables and equipment in front of the Lincoln Memorial steps, facing the Memorial. One could see behind them the reflecting pool with the Washington Monument in the distance. Prior to the encounter of interest, the Native Americans seemed to perform their chanting and dancing a bit further away from the Memorial, perhaps toward the pool (not clear exactly where they were in the early parts of the videos). The Covington boys gathered on the steps of the Memorial, about 30 – 40 feet from the Hebrew Israelites, facing them. (I cannot judge distances from the videos, so this is a very rough impression.)

At various points, as filmed by the Hebrew Israelite cameraman [I believe this is Video 4.Banyamyan Video.N.S. 000116.mp4], the Israelites had engaged in verbal sparring with the Native Americans, calling them names and insulting them with racist slurs, similarly with several African American bystanders, and then as the afternoon wore on, with the Covington boys, in each case using racist and insulting language. Finally, one of the Covington boys raced down the

9

steps in front of the school group, faced the boys, tore off his shirt and led what seemed to be a sports cheer, which the boys enthusiastically took up, making a lot of noise and cheering, jumping up and down as if at a pep rally. After that, the boys cheered and generally acted as if they were rowdy spectators in a sports encounter between their team and the Hebrew Israelites, laughing and making rah-rah gestures, while the Israelites continued to insult them.

Not long after the cheer, one hears drumming and chanting from somewhere off behind the Hebrew Israelites, approaching the scene on the Memorial steps, and soon Mr. Phillips appears, walking between the Israelites and the steps to the Memorial, beating his upraised hand drum rhythmically and chanting loudly in a language other than English, leading a group of Native Americans toward the boys. It is not clear how many are in Mr. Phillips' group at this point and how many are mere onlookers following the show, but I might guess there are ten or twenty people in that entourage, including a cameraman filming the situation. Mr. Phillips walks right up to the group of boys on the stairs, ignoring the Hebrew Israelites, and walks along the front of the group; the Monument faces east, so Mr. Phillips was walking roughly northeast to south along the front of the group of boys, at close range. I couldn't see whether he climbed any of the steps, but if so, he was still down near the the flat area in front of the stairs, with most of the boys either higher on the steps as he moved along or in front of him to the south.

At the beginning of Video 2 (Second Taitano Video.N.S. 000119.mp4), shot from in front of the Hebrew Israelites and facing the Lincoln Memorial, Mr. Phillips walks from the right along the front edge of the group of boys, drumming and chanting loudly. At about :41 seconds in the video, one sees Mr. Sandmann one or two steps above Phillips in the crowd of boys, wearing his red MAGA hat, laughing and grinning at his companions. Phillips (continuing south) nearly walks past Sandmann, who is on his right and slightly above, still grinning. But then Phillips pulls up and turns right to face Sandmann. By :46 seconds, Phillips has walked directly up to face Sandmann on a step above him. Phillips brings the hand drum up to approximately 4"- 6" immediately in front of Sandmann, so that the drum stick appears to come very close to Sandmann's face while Phillips beats the drum, continuing to chant loudly. (In Video 17, one can see at several points that the bottom of Phillips' drum was touching Phillips' jacket collar, for example at 5:50 and 6:50.) Sandmann doesn't move, but stands stock still, grinning and blinking slightly at the drum beat directly in his face. At 1:30 Sandmann looks down slightly, then back up to Phillips. In another short video (Video 14.Fries Video 1.N.S. 001735, shot from above and behind Sandmann to his left), one can see that Sandmann has his hands clasped behind his back. This confrontation is still on-going at 3:20 when Video 2 ends, approximately two minutes and 34 seconds from when Phillips turns to face Sandmann.

Early in the encounter, when Phillips has turned to face Sandmann, there is room to Sandmann's left/Phillips' right going up the stairs to the Memorial. There is at least a 3 foot corridor between Sandmann and the group of students to his left going up the stairs; you can see this clearly in Video 16 (Aerial View.GCI 000018.mp4), starting at 0:06. In none of the eighteen videos of the incident that I reviewed did find any evidence (a) that Phillips tries to move up the stairs after he turns to face Sandmann, (b) that he moves to one side or the other to go around Sandmann, (c) that he attempts to continue along his previous north-south trajectory, or (d) that he turns to see whether he could retrace his path either back to the north the way he had come or east toward the Hebrew Israelites. Instead, as he turns to face Sandmann, Phillips immediately locks eyes with

10

the young man and stands drumming and chanting in very close proximity throughout the confrontation.

When Phillips' group first approaches them, the Covington boys continue their spectator cheers. Then many of them begin clapping their hands in rhythm with the drum, or joining the chant in an awkward way. Just before Phillips confronts Sandmann, some of the boys make the Tomahawk Chop (a controversial gesture seen in Atlanta baseball games and other sporting events) and do more sports cheers, still laughing, some jumping up and down. After a couple of minutes of the face-to-face confrontation, one of Phillips' companions (judging by his apparel and what he says) starts to argue with another boy standing a couple of steps up behind Sandmann, saying that the boys should "go back to Europe", that this is not their land, etc., as documented in the videos. By this point Sandmann had stopped smiling, and during the argument he turns to look up behind him at the arguing schoolmate to make a gesture that I took to be a suggestion to back off from the argument; we can see this in Video 3 (Video Cited by CovCathStudent.N.S. 000121.mp4) at about 2:26. Then Sandmann turns back to Phillips, who continues as he had throughout. At about 3:36 in Video 3, we see Sandmann walking away to the south, the main group of the boys walking to the south (toward what they later said was waiting buses).

Phillips continues to drum and chant as the boys are leaving, turns to face the east and the Washington Monument, and one of his companions yells something like "We won!". After a few more moments, Phillips stops drumming, and the group around him cheers and raises their arms in triumph at about 3:27 on Video 3, congratulating him. Phillips raises his arms and calls something to the crowd around 4:00. Then the crowd gradually moves away. The Hebrew Israelites stay where they were throughout, continuing to interact with the remaining visitors.


**VI.    Relevant Law**

The firm that retained me has provided me with the following explanations of falsehood under the law:

> A statement is false when it has a different effect on the mind of the reader from that which the truth (i.e., the truth pled by the plaintiff, Nicholas Sandmann) would have produced. *Masson v. New Yorker Magazine,* 501 U.S. 496, 517 (1991) (internal citations omitted). In the instant matter, the "pleaded truth" is that Nick did not block Nathan Phillips' path or prevent his retreat.

> Truth is a defense to a libel action. *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776 (1986). The defense of truth overlooks minor inaccuracies and concentrates upon substantial truth. *E.g., Masson,* 501 U.S. at 517 (internal citations omitted). A statement containing minor inaccuracies is substantially true when "the substance, the gist, the sting, of the libelous charge [is] justified." *Id.* (internal quotations omitted).

11

I have kept these explanations in mind in forming my opinion on the questions posed, as reported in §III above, and explained in §VII below.


## VII.    Analysis and Reasoning

Here is my analysis of the passage in question 1. The passage is a quotation from Nathan Phillips, describing the encounter with Sandmann:

> "It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial' ... I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

Consider the following entry for the verb *block* in the Oxford English Dictionary (see Appendix A for full list of senses of *block* in that dictionary and comparable entries from the Merriam-Webster and American Heritage dictionaries):

*block*, verb
1.  a. *transitive*. To obstruct or close with obstacles (a passage). Predicated either of the personal agent, or of the obstructions. Also *figurative*.
    b. [not applicable]
2.  To shut *up* or *in* by obstructing ingress and egress, to prevent access to or exit from. Predicated of the agent or the obstruction, as in sense 1.
3.  [not applicable]
4.  a. To obstruct the way or course of.
. . .[other definitions not applicable]

As definition 1a makes clear, an entity can block someone's passage either passively (to 'be in the way of', possibly accidentally or inadvertently) or as an agent, intentionally. I take it in the passage quoted that Phillips has in mind the active, intentional type of blocking, because he says of the same situation that "that guy in the hat" (Sandmann) "wouldn't let me retreat". Here *would* is the past tense of the auxiliary verb *will*, with the following relevant sense, from the *Oxford English Dictionary* (again, see the full entry for auxiliary *will* in Appendix A, as well as entries from the Merriam-Webster and American Heritage dictionaries; other senses are not applicable here):

*will*, auxiliary verb
II.  As an auxiliary verb, usually with a following bare infinitive. . .
12. Expressing determination, wish, or intention to bring about some action, event, or state of things in the future: intend to, mean to. In the negative: refuse or decline to.

In the passage under analysis, *will* is used in the past tense negative form, *wouldn't*, and the following bare infinitive is *allow*, so that Phillips is attributing to Sandmann a determination in the past situation under discussion to refuse to allow Phillips to retreat. Presumably Phillips also takes this determination to be present in Sandmann's blocking Phillips' desired path up the steps

to the Memorial, so that Phillips has in mind the agentive sense 1 or 4 of *block*. (Note that this is also consistent with the analysis of the second passage, provided below.]

OED sense 2 of *block* would also pertain to Phillips' claim that the two men were "at an impasse", so that Phillips could not exit the situation. Here the noun *impasse* is used figuratively, as in the following definition from the *Oxford English Dictionary*:

*impasse*, noun
A road or way having no outlet; a blind alley, 'cul-de-sac'. Also *figurative*, a position from which there is no way of escape, a 'fix'.

When *be at an impasse* has a subject which denotes two or more agents (here *we* in Phillips' claim "We were at an impasse"), it is typically used to imply a situation in which the agents are unable to negotiate movement, real or figurative, in this case about whether Phillips could proceed up the stairs to make his exit. Definition 4 of *block* with the agentive sense is related to definition 2, in that it implies that the agent doing the blocking is doing so intentionally by using his body to obstruct the other individual's progress.

So in the passage, Phillips claims:
a. that he intended to exit the situation and finish his song at the Lincoln Memorial, so that he intended to go up to the top of the stairs to get away from the group of boys;
b. that he started going up toward the Memorial and found himself in an impasse with Sandmann;
c. that Sandmann intentionally blocked his way,
and therefore
d. that Sandmann intentionally refused to allow Phillips to retreat (presumably up the stairs).

But as noted in my rehearsal of the facts in §V, when Phillips turned toward Sandmann, Sandmann did not move from where he had been standing prior to Phillips' approach. Moreover, shortly after Phillips turned, there was a clear passage up the stairs to the Memorial to Sandmann's left/Phillips' right. This argues that Sandmann did not serve as a block to Phillips' progress should Phillips have wished to go up the stairs, so that there was no impasse in that sense.

Phillips ignored the available passage and instead appeared to intentionally approach Sandmann at close range, locking eyes. Phillips made no movement to turn either right or left, to go up or to back away from the stairs in the direction from which he had come.

Moreover, since Phillips stood still confronting Sandmann, there was no publicly evident indication that Phillips wanted to go up the steps, no reason that Sandmann should have recognized that this was his intention. In other words, Phillips' outward behavior was consistent with his merely intending to confront Sandmann. Hence Phillips' claim that Sandmann intended to block Phillips' way seems to be a conjecture on his part.

Thus, I find Phillips' statement not to be a true description of the situation as it appears in the available videos.

Here is my analysis of the passage in question 2:

> Phillips said Sandmann "positioned himself" in front of him, stopping his exit. Phillips said he sang in front of Sandmann for about three minutes. "When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slid to the right, and he slided to the right. I slided to the left and he slided to the left – so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."

In the videos I reviewed, I saw no evidence that Sandmann moved as Phillips passed by and then turned back and approached him. Hence, the videos show no evidence that Sandmann "positioned himself" in front of Phillips, or "start[ed] putting himself in front of [Phillips]". Moreover, I saw no evidence that Phillips himself slided to the left or the right after he turned to face the unmoving Sandmann. So far as I could see, Sandmann stood in one place throughout the incident, never moving or (re)positioning himself in any way with regard to Phillips. Similarly, Phillips stood still throughout, drumming and chanting. Hence, though it is true that some of the other boys moved away from Phillips as the latter approached, while Sandmann stayed in one place, it seems to have been Phillips who aligned himself with Sandmann, and not the other way around. Just after Phillips turned, he could have proceeded up the steps to his right/to the left of the unmoving Sandmann.

Finally, as discussed above, I saw no reason for the Covington boys to think that Phillips was attempting to exit the situation. Phillips waded directly into the crowd, turned to move face-to-face with Sandmann, made no evident attempt to continue on up the stairs, and made no evident attempt to come back the way he had come. He stayed in position facing Sandmann until the latter left to go to the buses; only then did Phillips turn around to complete his drumming and interact further with his colleagues in place.

## VIII.    Conclusion

In my analysis, I have endeavored to be completely neutral about the apparent views of the individuals involved, not speculating about their motives, intentions, or understanding of what transpired on that occasion. I have paid attention solely to the facts as evident in videos of the encounter and to standard linguistic analysis of the plain meanings of the passages in question.

My careful linguistic analysis of the passages in questions 1 and 2 yields meanings whose truth is inconsistent with the facts as evident in multiple videos of the encounter between Nathan Phillips and Nicholas Sandmann on January 18, 2019, in front of the Lincoln Memorial.

Please let me know if you have any questions about my analysis.

## IX.   Signature

Sincerely,

Craige Roberts, Professor Emerita, The Ohio State University

Attachments:

|  |  |
|---|---|
| Appendix A: | Full Dictionary definitions for the expressions under analysis. |
| Exhibit A: | Craige Roberts' current curriculum vitae. |
| Exhibit B: | Table of Videos viewed by Craige Roberts, with dropbox links |

**Appendix A: Full dictionary definitions for the expressions under analysis.**

Dictionaries consulted:

**AH**: *The American Heritage Dictionary of the American Language*, 6th Edition, Houghton Mifflin, Boston, MA, 2016.

**MW**: *Merriam-Webster's Collegiate Dictionary* (11th Edition), Merriam-Webster Company, Springfield, MA, 2012.

**OED**: *The Oxford English Dictionary on Historical Principles*, Oxford University Press, Oxford, England, 2021 version on-line (first published 1899).

Throughout, I have ignored senses with the dictionaries label as *Obsolete*, since these are not used in plain contemporary American English.

Definitions of the transitive verb *block*:

AH:

*block*, v. tr.

**1. a.** To stop or impede the passage of or movement through; obstruct: block traffic; mud that blocked the pipe.

  **b.** To prevent from happening, succeeding, or progressing: blocked every attempt to reform the rules.

  **c.** To shut out from view: a curtain blocking the stage.

  **d.** To stop the passage of (a motion or bill) in a legislative assembly.

  **e.** Sports To prevent or slow the movement of (an opponent) by using one's body, as by making a block in football.

  **f.** Sports To stop or deflect (a ball or puck) by using one's body.

  **g.** Medicine To interrupt or obstruct the functioning of (a physiological process), especially by the use of drugs.

  **h.** Psychology To fail to remember.

MW:

*block²*, transitive verb

**1 a :** to make unsuitable for passage or progress by obstruction

  **b** *archaic* **:** blockade

  **c :** to hinder the passage, progress, or accomplishment of by or as if by interposing an obstruction

  **d :** to shut off from view

  **e :** to interfere usu. legitimately with (as an opponent) in various games or sports

  **f :** to prevent normal functioning or action of

  **g :** to restrict the exchange of (as currency or checks)

**2:** to mark or indicate the outline or chief lines of   *block* out a design

**3:** to shape on, with, or as if with a block   *block* a hat

**4:** to secure, support, or provide with a block   *blocking* a plate for printing   *block* up the rear wheels

**5:** to work out (the principal positions and movements) for the performers (as of a play
)*also* **:** to work out the players' positions and movements for (a scene or a play) —
often used with *outblock* out a scene before the actors arrive on set

**6** *typesetting* **:** to make (two or more lines of writing or type) flush at the left or at both left
and right

**7** *golf* **:** to hit (a ball or shot) inaccurately toward the right from a right-handed swing or
toward the left from a left-handed swing **:** PUSH

OED:

**block, v.**

5. a. *transitive*. To obstruct or close with obstacles (a passage). Predicated either of the personal
agent, or of the obstructions. Also *figurative*.

6. To shut *up* or *in* by obstructing ingress and egress, to prevent access to or exit from.
Predicated of the agent or the obstruction, as in sense 1.

7. *spec*.
   a. To blockade, invest.
   b. *Draughts*. To force (one's opponent's men) into such a position that they cannot move.
   c. *Cards*.

8. a. To obstruct the way or course of.
   b. *Neurology*. To obstruct the passage of a nervous or muscular impulse.
   c. **to block off**: to stop, to head off. *U.S. colloquial.*
   d. To restrict the use or conversion of currency of other assets. Cf. FREEZE.
   e. *American Football*. To obstruct (an opponent, esp. a defensive player) by interposing
      one's body. Also *absol.* or *intransitive.*

5. *Cricket*. To stop (a ball) with the bat, so as merely to protect the wicket, without attempting to
   hit so as to score runs; also *absol*. and with wicket as object.

6. *Parliament*. To prevent or postpone the passage of a bill; *spec*. to give notice of opposition to
   a bill in the House of Commons, which prevents it from being taken after half past twelve
   (midnight).

7. *intransitive*. To bargain. *Scottish*.

8. a. *transitive*. To shape on a block. See BLOCK *n*. 4.
   b. To hammer smooth or into a particular shape on a block.
   c. To emboss the covers of books by pressure from a block.

9. a. To sketch out, mark out roughly (work to be finished afterwards); to lay out, plan. Now
      usually with *out*; also *in*.
   b. *Theatre*.

10. a. To cut *out* or make into blocks…
    b. *Drapery*. To make into a block…

11. a. To support or fit with blocks of wood.
    b. To pave (a street) with blocks.

12. *Sheep-shearing. To block out. . .*

We see that each of these entries covers roughly the same range of meanings. In particular, AH
1a + 1b together cover something like the same range of meanings as MW 1a + 1c and OED 1a +
2 + 4.  Thus, the lexicographers in each case found senses that could be paraphrased 'be in the

way of', for a non sentient entity, not necessarily indicate any agency or intent on the part of the individual or entity blocking the path of the individual denoted by the direct object. And each found a sense in which the verb's subject denotes an agent who intentionally prevents the direct object from progressing.

Definitions of the noun *impasse*:

AHD:
1.  A road or passage having no exit; a cul-de-sac.
2.  A situation that is so difficult that no progress can be made; a deadlock or stalemate: *reached an impasse in the negotiations*.

MW:
1.  a. A predicament affording no obvious escape
    b. deadlock
2.  an impassable road or way: cul-de-sac

OED:
A road or way having no outlet; a blind alley, 'cul-de-sac'. Also *figurative*, a position from which there is no way of escape, a 'fix'.

Definitions of the auxiliary verb *will* (past tense *would*, negative form *wouldn't*):

AHG:
**1.** Used to indicate simple futurity: They will appear later.
**2.** Used to indicate likelihood or certainty: You will regret this.
**3.** Used to indicate willingness: Will you help me with this package?
**4.** Used to indicate requirement or command: You will report to me afterward.
**5.** Used to indicate intention: I will too if I feel like it.
**6.** Used to indicate customary or habitual action: People will talk.
**7.** Used to indicate capacity or ability: This metal will not crack under heavy pressure.
**8.** Used to indicate probability or expectation: That will be the messenger ringing.

MW:
1.  used to express desire, choice, willingness, or in negative constructions refusal
2.  used to express frequent, customary, or habitual action or natural tendency or disposition
3.  used to express futurity
4.  used to express capability or sufficiency
5.  used to express probability and often equivalent to the simple verb
6.  a. used to express determination, insistence, persistence, or willfulness
    b. used to express inevitability
7.  used to express a command, exhortation, or injunction

18

OED:

II. As an auxiliary verb, usually followed with a bare infinitive. . .

7. Expressing a desire: desire to, wish to, want to, have a mind to (do something); often implying intention. *Obsolete*

8. a. *Obsolete*. . .
   b. Expressing a request in the second person, in the interrogative or in a subordinate clause after a verb such as *beg*.

9. *Obsolete*…

10. Expressing habitual or characteristic action: has the habit or characteristic of willing…

11. a. Expressing ironic or critical force, expressing doubt about another person's assertion or opinion. Chiefly with *have* followed by object and infinitive or *that*. . .
    b.  In emphatic use. Be fully determined to; insist on or persist in. . .

12. Expressing determination, wish or intention to bring about some action, event, or state of things in the future: intend to, mean to. In the negative: refuse or decline to.

13. *Obsolete*…

14. Expressing prediction of future events.

15. Expressive prediction of a contingent future event, or a result to be expected, in a supposed case or under particular conditions (with the condition expressed by a conditional, temporal, or imperative clause, or implied): must as a necessary consequence.

16. a. In the first person, expressing the speaker's or writer's immediate intention. . .
    b. *figurative*. *Obsolete*. . .
    c. In the first person plural, expressing a proposal…

17. Expressing potentiality, capacity, or sufficiency: can, may, be able to, be capable of –ing; is (large) enough or sufficient to.

The past tense *would* with temporal function.

18. a. *Obsolete*. . .
    b. *Obsolete*. . .

19. a. *Obsolete*. . .
    b. *Obsolete*. . .

20. Expressing habitual or characteristic action: had the habit or characteristic of –ing, had a way of –ing; was accustomed to –ing; used to.

21. In indirect reported speech or thought, or its virtual equivalent, in statements in the second and third persons reporting an original statement (esp. of intention) in the first person: intended to, meant to; was going to.

22. a. Expressing past prediction of a future event in a subordinate clause or in virtual reported speech or thought. . .
    b. Expressing past prediction of a contingent future event, or a result to be expected, in a supposed case or under particular conditions (with the condition expressed by a conditional or temporal clause, or implied): was bound to, was going to.
    c. In the past, with personal subject (usually third person singular), expressing a voluntary act or choice in a supposed case, or a conditional promise or undertaking: was bound to, undertook to. . .
    d. Expressing the past likelihood of an action or fact with little or no future reference, as in *would be* 'probably or presumably was'.  . .

23. Expressing potentiality, capacity, or sufficiency: was capable of –ing; could.

19

24. *Obsolete*.
25. In emphatic use: was fully determined to; insisted on or persisted in –ing. . .
The past tense *would* with modal function.
26. a. Used with potential or conditional force to tone down the effect of the present tense in sense 7, and hence virtually equivalent to it: should like to; wish, desire, or 'want' to (sometimes implying 'intent'). . .
    b. In less assertive use: am (is, are) disposed or inclined to; often (in the first person singular) in tentative, polite, or deferential contexts with the sense 'I wish to. . .if I may'.
   c. *Obsolete*.
27. In the main clause (apodosis) of a hypothetical proposition (expressed or implied) indicating that the supposition is a possibility or contingent or conditional upon something. . . .
28. a. In the main clause (apodosis) of a hypothetical proposition (expressed or implied), with personal subject, with implication of intention or volition. . . .
29. a. In a conditional (or equivalent) clause originally and chiefly with a personal subject, with implication of intention or volition: chose to, was willing to. . .
   b. *Obsolete*.
   c. *Obsolete*.
30. a. In a conditional clause expressing a hypothetical condition or supposition, without implication of intention or volition: were to, should.
   b. *Obsolete*.
31. In a hypothetical question or indirect statement in the second or third person (where *should* was formerly usual in the corresponding direct statement in the first person. . .): could possibly, might possibly.
32. *Rare*.
33.  *colloquial*.
III. With ellipsis of the dependent infinitive clause.  [Since this is not the syntactic structure of the passage in question in question 1, I ignore this here.]
IV. Special uses of the past participle as an auxiliary verb.  [These are either *Obsolete* or regional in the U.S. south, so not relevant here.]

November 2021

# Craige Roberts
## Brief Curriculum Vitae

## Education

1979, A.B., Indiana University

1979 – 1980, studied Lexicography with Professor Edward Gates (former Associate Editor of Webster's Third New International Dictionary, The G. & C. Merriam Company, Springfield, Massachusetts), Indiana State University.

February 1987, Ph.D. in Linguistics, University of Massachusetts at Amherst. Dissertation: *Modal Subordination, Anaphora, and Distributivity*. Supervisor: Barbara H. Partee.

## Academic Positions

**Current**:  Professor Emerita, Linguistics Department, The Ohio State University.
Visiting Professor, New York University, 2016 to 2019.
Affiliate, Rutgers University Center for Cognitive Science, May 2016 to present.

Full Professor with tenure, Linguistics Department, Ohio State University, 2007 - 2016: undergraduate and graduate courses and seminars in syntax, semantics, and pragmatics. Associate Professor 1994 – 2007, Assistant Professor 1988 – 1994.

Postdoctoral Fellow, Center for the Study of Language and Information, Stanford University, 1986 – 1988.

Visiting Research Fellow, Faculty of Philosophy, University of Amsterdam, The Netherlands, Spring 1992, and again Autumn 2002.

Visiting Professor, Department of Philosophy, University of Michigan, Autumn, 2009.

## Honors

Fellow, National Humanities Center, Durham, North Carolina, 2012-2013.

Senior Fellow, Institute for Advanced Studies, Central European University, Budapest, Hungary, 2014-15.

## Legal Work

I developed and regularly taught a course on Language and the Law, Linguistics 597.02, at the Ohio State University, from 2005 through 2016.

I have been retained as an expert witness in a variety of legal matters, including work for:
Dinsmore & Shohl, LLP, Cincinnati, OH, to provide testimony in August, 2004 in Columbus, OH, in the case of Nationwide Mutual Insurance Company vs. Sovereign Bank and Sovereign Bankcorp., Inc., in a Civil matter pertaining to trademark law and the interpretation of an advertising slogan. **Testified in court**.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, regarding the interpretation of Kentucky Revised Statute 216B.020(2)(a), pertaining to licensure of health care facilities. Testified at a magistrate's hearing of the Kentucky Cabinet for Health and Family Services, September, 2004, Frankfort, KY, in the case of John W. Gilbert, M.D., et al. v. Commonwealth of Kentucky, Cabinet for Health and Family Services, et al.

Commonwealth of Kentucky Franklin Circuit Court Division II Civil Action No. 05-CI-00275.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in October, 2004, on the interpretation of a legal contract.

Deters, Benzinger & LaVelle, p.s.c., Crestview Hills, KY, in May, 2006 on the interpretation of a legal contract.

Parry, Deering, Futscher & Sparks, p.s.c., Covington, KY, on the interpretation of an insurance contract.

Cull, Hayden & Vance, p.s.c., Frankfort, KY, August, 2006, on the interpretation of statutes in Kentucky law pertaining to licensure of health care facilities.

Zeiger, Tigges & Little, LLP, Columbus, OH, September, 2006 and July 2007, on the interpretation of contracts.

Keating, Meuthing & Klekamp PLL, Cincinnati, OH, October 2007, on the interpretation of a statute pertaining to contracts.

Cull, Hayden & Vance, p.s.c., Frankfort, KY, September, 2009, on the interpretation of a statute of Kentucky law pertaining to licensure of health care facilities.

Sparks PLL, Covington, KY, September, 2010, on the interpretation of a commercial contract.

Dritz, PLL, Columbus, OH, May, 2012, on the interpretation of email correspondence at-issue in a criminal case.

Deters, Benzinger & LaVelle, Crestview Hills, KY, in June, 2016, on the interpretation of a Kentucky statute pertaining to the licensure of health care facilities.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2019, expert witness report on the interpretation of a legal contract in Kestra Investment Services, LLC v. The Ohio National Life Insurance Company, et al., US District Court, Western District of Texas, Case No: 1:19-cv-0687. In 2020, prepared a Rebuttal to the report of an expert witness for the plaintiff.

Zeiger, Tigges & Little LLP, Columbus, OH, in 2020, expert witness report on the interpretation of a legal contract in RBC Capital Markets, LLC v. The Ohio National Life Insurance Company, et al., US District Court, District of Minnesota, Case No: 1:19-cv-00062.

Hemmer, DeFrank, Wessels, Attorneys at Law, Ft. Mitchell, KY, 2021, retained as expert witness in a defamation suit, preparing a report.

## Books

Albert Valdman, Sarah Yoder, Craige Roberts & Yves Joseph: *Haitian Creole - English - French Dictionary*. Bloomington, Indiana: Indiana University Creole Institute, 1981. [Volume One, 582pp.; Volume Two: French - Creole and English - Creole Indices, 156pp.]

*Modal Subordination, Anaphora, and Distributivity*. Garland Press, Outstanding Dissertations in Linguistics Series, New York, 1991. [255 pp., revised Ph.D. thesis.]

Special issue of *Linguistics & Philosophy* on the semantics of cardinals. Editor with Stewart Shapiro. To appear, August, 2017.

## Selected Refereed Publications

"Modal Subordination and Pronominal Anaphora in Discourse". *Linguistics and Philosophy* 12.6:683 - 721, 1989. Also CSLI Report No.88-127, May 1988. Reprinted in Javier Gutíerrez-Rexach (ed.) (2003) *Semantics: Critical concepts in linguistics*, Routledge.

"Domain Selection in Dynamic Semantics". In Emmon Bach, Eloise Jelinek, Angelika Kratzer, and Barbara H. Partee (eds.) (1995), *Quantification in Natural Languages*, Kluwer, Dordrecht, pp.661-700.

"Anaphora in intensional contexts". In Shalom Lappin (ed.) (1996) *The Handbook of Contemporary Semantic Theory*, Basil Blackwell, pp.215-246.

"Focus, the Flow of Information, and Universal Grammar". In Peter Culicover and Louise McNally (eds.) (1998), *The Limits of Syntax*, Academic Press, pp.109-160

"Spanish *imperfecto* and *preterito*: Truth conditions and aktionsart effects in a situation semantics". With Alicia Cipria. *Natural Language Semantics* 8.4:297-347, 2000.

"Demonstratives as definites". In Kees van Deemter and Roger Kibble (eds.) (2002) *Information Sharing: Reference and Presupposition in Language Generation and Interpretation*, CSLI Press, pp.89-196.

"Uniqueness in definite noun phrases". *Linguistics and Philosophy* 26:287-350, 2003.

"Discourse context in dynamic interpretation". In Laurence Horn and Gregory Ward (eds.) (2004) *Handbook of Contemporary Pragmatic Theory*, Blackwell, pp.197-220.

"Pronouns as definites". In Anne Bezuidenhout and Marga Reimer (eds.) (2004) *Descriptions and Beyond*, Oxford University Press, pp.503-543.

"*know-how*: A compositional approach".  In Erhard Hinrichs & John Nerbonne (eds.) Theory and Evidence in Semantics. CSLI Publications. 183-213.

"*only*: A case study in projective meaning". In Barbara H. Partee, Michael Glanzberg & Jurgis Skilters (ed.) (2011) *Formal Semantics and Pragmatics: Discourse, Context and Models*. Special issue of the *Baltic International Yearbook of Cognition, Logic and Communication*, Riga, Lattvia.

"Topics".  In Claudia Maienborn, Klaus von Heusinger & Paul Portner (eds.) (2012) *Semantics: An International Handbook of Natural Language Meaning*. Mouton de Gruyter.

"Information Structure: Toward an integrated theory of formal pragmatics". *Semantics and Pragmatics* 5.6:1-69. (Invited as a classic unpublished paper.) . http://dx.doi.org/10.3765/sp.5.6.

"Information Structure: Afterword" with bibliography of related work. *Semantics and Pragmatics* 5.7:1-19.  http://dx.doi.org/10.3765/sp.5.7.

"Accommodation in a Language Game". In Barry Loewer & Jonathan Schaffer (eds.) *A Companion to David Lewis*. Blackwell/Wiley, Hoboken, NJ, 2015.

"Plans and imperatives: A semantics and pragmatics for imperative mood". *Proceedings of the Amsterdam Colloquium 2015*. ILLC, University of Amsterdam.

"Review of Robert Stalnaker, *Context*, Oxford University Press, 2014". *Notre Dame Philosophical Reviews* 2016.06.20: http://ndpr.nd.edu/news/67831-context-2/, 2016.

"The best question: Explaining the projection behavior of factives". *Discourse Processes* 54.3:187-206, a special issue on the Question In Discussion, 2017. Available open-access at: http://www.tandfonline.com/doi/pdf/10.1080/0163853X.2016.1150660?needAccess=true. With Mandy Simons, David Beaver & Judith Tonhauser.

"Questions Under Discussion: Where information structure meets projective content". *Annual Review of Linguistics* 3, 2017. With David Beaver, Mandy Simons & Judith Tonhauser.

"Linguistic convention and the architecture of interpretation". *Analytic Philosophy* 58.4:418-439, 2017.

"Ontology via semantics?: Introduction to the special issue on the semantics of cardinal numbers". With Stewart Shapiro. *Linguistics and Philosophy* 40.4:321-329, 2017.

"Speech acts in discourse context". In Daniel Fogal, Daniel Harris & Matt Moss (eds.) (2018) *New Work on Speech Acts*. Oxford University Press.

"Contextual influences on reference". In Barbara Abbott & Jeannette Gundel (eds.) *Oxford Handbook of Reference*, Oxford University Press, 2018, 260-280.

"Open texture and analyticity". With Stewart Shapiro. In Dejan Makovec & Stewart Shapiro (eds.) *Friedrich Waismann: The Open Texture of Analytic Philosophy*. Palgrave Macmillan, Cham, Switzerland, 189-210, 2019.

"Modal Subordination: *It would eat you first!*". In Daniel Gutzmann, Lisa Matthewson, Cécile Meier, Hotze Rullmann & Thomas Ede Zimmermann (eds.) *The Wiley Blackwell Companion to Semantics*. Wiley. 2021.

"Open Texture and Mathematics", with Stewart Shapiro. *Notre Dame Journal of Formal Logic* 62(1):173-192, 2021.

## Selected Recent Invited Talks and Colloquia

MayFest, invited talk, University of Maryland Cognitive Science, May 6, 2016, "Context in Linguistic Pragmatics".

Institute on Reasoning, University of Quebec at Montreal, June, 2016: "Constrained practical reasoning in linguistic interpretation".

North American Summer School on Logic, Language and Information (NASSLLI), Rutgers University, New Brunswick, NJ, July, 2016, Intensive short course: "The Question Under Discussion", joint with David Beaver, Mandy Simons and Judith Tonhauser.

CUNY GradCenter Cognitive Science Colloquium, October, 2016: "Agreeing and Assessing: Epistemic modals and the question under discussion".

Cornell Workshop on Speech Acts, November, 2016: "Speech acts in discourse context."

NY Philosophy of Language Colloquium, December, 2016 (at NYU): "Character assassination: *de se* semantics for indexicals".

NYU short course on Indexicality, January – February, 2017.

UMass/Amherst Linguistics Department invited talk (Seminar on anaphora, Daniel Altshuler and Barbara H. Partee): "*de se* semantics for indexicals". March, 2017.

Conference on What Contexts Can and Cannot Do, University of Hamburg, invited speaker: "Indexicality: Center and Perspective". April, 2017.

Zentrum für Allgemeine Sprachwissenschaft (ZAS) Colloquium, Berlin: "Indexicality: Center and Perspective". April, 2017.

Yale University Linguistics and Philosophy Colloquium: "Agreeing and Assessing: Epistemic modals and the question under discussion." April, 2017.

UIO-XPrag.de Workshop on Non-At-Issue Meaning and Information Structure, Oslo, invited speaker: "Agreeing and Assessing". May, 2017.

Universitat Pompeu Fabra, Barcelona, Spain: "Agreeing and Assessing". May, 2017.

University of São Carlos, Brazil, September, 2017, Short course on "Anaphora in Discourse".

Rutgers University Linguistics Department Colloquium: "*de se* semantics for indexicals". October, 2017.

Carnegie Mellon University seminar, invited speaker: "Anaphora and Coherence". October, 2017.

Logic and Engineering of Natural Language Semantics (LENLS) 14, Hokkaido University, Tokyo, invited speaker: "Character Assassination". November, 2017.

University of Connecticut Philosophy Department Colloquium: "Character Assassination: *de se* semantics for indexicals". March, 2018.

University of Pennsylvania Department of Linguistics Colloquium: "Character Assassination: *de se* semantics for indexicals". April, 2018.

Society for Exact Philosophy Annual Meeting, University of Connecticut, invited keynote: "The Character of Epistemic Modality". May, 2018.

University of Toronto Philosophy Department Colloquium: "The Character of Epistemic Modality". November, 2018.

New York Philosophy of Language Workshop, NYU: "The character of epistemic modality". April, 2019.

Philosophy of Language and Mind Biannual Meeting, St. Andrews, Scotland: "The character of epistemic modality". August, 2019.

University of Tübingen Workshop on Information structure and ambiguity, Tübingen, Germany, invited speaker: "The Question Under Discussion in anaphora resolution". October, 2019.

Google, invited on-line talk: "What are you talking about? Expectation and the architecture of interpretation". June, 2020.

SemDial 24 (WatchDial), invited keynote: "Perspective and indexicality: A NeoLocalist approach". Virtual workshop organized by Brandeis University, July, 2020.

OSU Pragmatics Group: "Slurs". November 30, 2020 (on-line).

EXPRESS workshop on Non-Assertoric Speech Acts, invited talk: "Imperatives in a dynamic pragmatics". January 28, 2021, Amsterdam, Netherlands (on-line).

Workshop on QUD annotation, Zentrum für Allgemeine Sprachwissenschaft (ZAS), Berlin (invited talk): "Some desiderata for QUD annotation". October, 2021 (on-line).

MECORE Workshop on Approaches to the semantics of clause-embedding predicates, at the Universities of Edinburgh, Konstanz and Amsterdam (invited talk): "Background content, meaning postulates, and presuppositions". October, 2021 (on-line).


## Ph.D. Dissertations Supervised

Katherine A. Welker (1994) *Plans in the Common Ground: Towards a generative account of conversational implicature*, Linguistics Department, The Ohio State University.

Jae-Hak Yoon (1996) *Temporal Adverbials and Aktionsarten in Korean*. Linguistics Department, The Ohio State University.

Alicia Cipria (1996) *The Interpretation of Tense in Spanish Complement Clauses*, Department of Spanish and Portuguese, The Ohio State University (co-advisor with Professor Dieter Wanner).

Svetlana Godjevac (2000) *Word Order, Intonation, and Focus Projection in Serbo-Croatian*. Linguistics Department, The Ohio State University.

Jean Godby (2001) *English Compound Nominals: a Study of Lexicalization*. Linguistics Department, The Ohio State University.

E. Allyn Smith (2010) *English Correlational Comparatives*. Linguistics Department, The Ohio State University.

Scott Martin (2013) *The Dynamics of Projective Meaning*, Linguistics Department, The Ohio State University.

Jefferson Barlew (2016) *The semantics and pragmatics of perspectival expressions in English and Bulu: The case of deictic motion verbs* (co-advisor with Judith Tonhauser).

## Selected Grants

Principal Investigator, National Science Foundation Grant #NBS-9022934, for $59,714: "Semantic Interactions between Modality and Tense", 1991 – 1995. Awarded supplement to National Science Grant #NBS-9022934, for $7,876, to organize and conduct a research workshop on the Semantic Interactions between Modality and Tense, Ohio State University, 1993.

Principal Investigator (co-PI with Robert T. Kasper of OSU during 1998-00), Motorola, Inc. University Partnership in Research grant, $46,250: "Modeling Natural Language Dialogue for a Voice-Mail System", 1998 – 2001.

Principal Investigator (co-PI with Donna Byron, OSU CSE), National Science Foundation Grant #60006402, $26,371, "Presupposition Accommodation Conference and Intensive Course", 2006 – 2007.

Principle Investigator (co-PI with David Beaver, University of Texas, Mandy Simons, Carnegie Mellon University, and Judith Tonhauser, OSU), National Science Foundation Grant (# pending), $396,000, "Projective Meanings", 2010-2012.

Principal Investigator (co-PI with David Beaver (Texas/Austin), Mandy Simons (Carnegie Mellon) and Judith Tonhauser (OSU)), National Science Foundation Collaborative Grant, $530,000 total (#1452674 to OSU for $286,420), "What's the question? A cross-linguistic investigation into compositional and pragmatic constraints on the question under discussion", 2015-2021.  June, 2015: supplement for $11,900 for project-related workshops.

**Table of Videos viewed by Craige Roberts**

| Video Title | Dropbox Link to Video | Description |
|---|---|---|
| Video 1 | https://www.dropbox.com/s/wz29kgpvi5szx57/Video%201.Viral%20Video.N.S.%20000118.mp4?dl=0 | "Viral Video" |
| Video 2 | https://www.dropbox.com/s/hlo0r6pnckijus4/Video%202.Second%20Taitano%20Video.N.S.%20000119.mp4?dl=0 | "Second Taitano Video" |
| Video 3 | https://www.dropbox.com/s/ccj1jri6nwam0np/Video%203.Video%20Cited%20by%20CovCath%20Student.N.S.%20000121.mp4?dl=0 | "Video Cited by CovCath Student" |
| Video 4 | https://www.dropbox.com/s/r669sphtcafllx1/Video%204.Banyamyan%20Video.N.S.%20000116.mp4?dl=0 | "Banyamyan Video" |
| Video 5 | https://www.dropbox.com/s/dncy7g5c419p3mu/Video%205.First%20Portion%20of%20WhatsApp%20Video.%28Proposed%20by%20Defendants%29%20%28Originally%200010-0534%29.mp4?dl=0 | "First Portion of WhatsApp Video" |
| Video 6 | https://www.dropbox.com/s/bssh229je1socwq/Video%206.KC%20Noland%20Video%201.%28Part%20of%20N.S.%20128%20at%201040%29.mp4?dl=0 | "KC Noland Video 1" |
| Video 7 | https://www.dropbox.com/s/1z1a7kcj4hr6wn0/Video%207.Taitano%20Video%203.mp4?dl=0 | "Taitano Video 3" |
| Video 8 | https://www.dropbox.com/s/asi18roehztkj56/Video%208.Hooligan%20Instagram%20Video%201.mp4?dl=0 | "Hooligan Instagram Video" |
| Video 9 | https://www.dropbox.com/s/3yg38oolsap3iac/Video%209_%20TIME.com%20Clip.mp4?dl=0 | "Time.com Clip" |
| Video 10 | https://www.dropbox.com/s/7xj6mish81ezr2s/Video%2010.First%20Portion%20of%20N.S.%20128.N.S.%20000128.mp4?dl=0 | "First Portion of N.S. 128" |
| Video 11 | https://www.dropbox.com/s/3ej3nk9saqlxe4k/Video%2011.Second%20Portion%20of%20WhatsApp%20Video.%28Originally%20200705-0930%29%20%28also%20appears%20to%20be%20N.S.%20000117%29.mp4?dl=0 | "Second Portion of WhatsApp Video" |
| Video 12 | https://www.dropbox.com/s/aje87abzyuxfyn8/Video%2012.Twitter%20Video%201.N.S.%20001802.mp4?dl=0 | "Twitter Video 1" |
| Video 13 | https://www.dropbox.com/s/y5z0lbtuo2tnx28/Video%2014.Twitter%20Video%203.N.S.%20001804.mp4?dl=0 | "Twitter Video 3" |

| Video 14 | https://www.dropbox.com/s/1mmb5jt0ee906fx/Video%2014.Fries%20Video%201.N.S.%20001735.mov?dl=0 | "Fries Video 1" |
| Video 15 | https://www.dropbox.com/s/z4ntolz5w2qs7vi/Video%2015.Miscellaneous%20Video%201.N.S.%20000125.mp4?dl=0 | "Miscellaneous Video 1" |
| Video 16 | https://www.dropbox.com/s/kgeelapduuw0wxx/Video%2016.Aerial%20View.GCI%20000018.mp4?dl=0 | "Aerial View" |
| Video 17 | https://www.dropbox.com/s/j4okqo8wz7228m9/Video%2017.Miscellaneous%20Video%202.mp4?dl=0 | "Miscellaneous Video 2" |
| Video 18 | https://www.dropbox.com/s/3mgfjlic4vsd9zn/Video%2018.Maria%20Judy%20Video.mp4?dl=0 | "Maria Judy Video" |

Craige Roberts
Sandmann deposition notes
December 7, 2021

Four typos/errors in my expert witness report of November 10, 2021:

- p.9, 2nd bullet point, third line, should say "…as was (it seems) at least one of those who made videos…" (omitted *was*).
- p.10, 2nd paragraph from the bottom (beginning "At the beginning of Video 2…"), line 11, should say "the bottom of Phillips' drum was touching Sandmann's jacket collar. . .", rather than "Phillips' jacket collar".
- p.10, same paragraph, line 16: video ends at 3:45, not 3:20
- p.11, first full paragraph, line 13, should say "At about 2:36 in Video 3, we see…", replacing the typo "3:36".

Videos I cite in the report:

**Video 4 "Banyamyan Video":**

**Video 2 "Second Taitano Video"**    [3:45]

  0:26    Tomahawk Chop
  0:30    Just before this, we can see that Sandmann is standing on a higher step than the boys at the level where Phillips and his crew are walking.
  0:41    Sandmann is 1-2 steps above Phillips in the crowd of boys, wearing red MAGA hat, laughing and grinning at his companions, as Phillips comes along
  0:46:    Phillips has walked directly up to face Sandmann on a step above him
  0:50    You can see a passage up the stairs to Sandmann's left, there til about 1:50 when other boys come closer behind him
  1:30    Sandmann looks down slightly, then back up to Phillips
  3:32    cameraman climbs steps to Sandmann's right, ending up behind him; can clearly see that cameraman climbs at least 3 steps, ends up with Sandmann one step below him, Phillips at least 2.
  3:34    video ends, confrontation still on-going

**Video 3 "Video Cited by CovCathStudent":**        [9:15]
         at beginning, Phillips is already immediately in front of Sandmann
  1:38    by now, one of Phillips' companions is arguing with another Covington boy standing a couple steps up behind Sandmann.
  2:16:    Sandmann has stopped smiling, turns to look back up at arguing classmate, makes gestures that (presumably) mean that the classmate should back off from the argument.
  2:36:    Sandmann is walking away to the south, other boys leaving to go to the bus. Phillips walks up steps after Sandmann has departed.
  3:27    Phillips stops drumming, group around him cheers,
  4:00    Phillips raises his arms and calls out something to the group.



Exhibit #

Exhibit B

12/07/2021 -SM

**Video 14 "Fries Video 1":**

        shot from above and behind Sandmann to his left:  Sandmann has his hands clasped behind his back.

**Video 16  "Aerial View":**

0:06    after Phillips has turned to face Sandmann, can see a ~3-4 foot corridor between Sandmann and the group of students to his left going up the stairs.

**Video 17 "Miscellaneous Video 2":**     [7:58]

~2:30   first see Sandmann in the crowd as Phillips wades in

~3:47   Phillips reaches Sandmann

4:15    can see open corridor up stairs to Sandmann's left, open until at least 4:45 when other boys fill in behind their classmate

5:50    can see that Phillips' drum was touching Sandmann's jacket collar

6:50    ditto, and drum is pressing on Sandmann's collar at 7:05

7:58    at the end, confrontation still on-going, with close-up of Phillips