# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

NICHOLAS SANDMANN, by and            :          CASE NO. 2:20-CV-00023-WOB-CJS
through his parents and natural guardians,  :
TED SANDMANN and JULIE               :
SANDMANN,                            :
                                     :
      Plaintiff,                  :
                                     :
v.                                   :
                                     :
THE NEW YORK TIMES COMPANY           :
d/b/a THE NEW YORK TIMES,            :
                                     :
      Defendant.                  :


NICHOLAS SANDMANN, by and            :          CASE NO. 2:20-CV-00024-WOB-CJS
through his parents and natural guardians,  :
TED SANDMANN and JULIE               :
SANDMANN,                            :
                                     :
      Plaintiff,                  :
                                     :
v.                                   :
                                     :
CBS NEWS, INC., et al.,              :
                                     :
      Defendants.                 :


NICHOLAS SANDMANN, by and            :          CASE NO. 2:20-CV-00025-WOB-CJS
through his parents and natural guardians,  :
TED SANDMANN and JULIE               :
SANDMANN,                            :
                                     :
      Plaintiff,                  :
                                     :
v.                                   :
                                     :
ABC NEWS, INC., et al.,              :
                                     :
      Defendants.                 :

NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE
SANDMANN,

       Plaintiff,

v.

GANNETT CO., INC. AND GANNETT
SATELLITE INFORMATION
NETWORK, LLC,

       Defendants.

:    CASE NO. 2:20-CV-00026-WOB-CJS
:
:
:
:
:
:
:
:
:
:
:
:
:
:

NICHOLAS SANDMANN, by and
through his parents and natural guardians,
TED SANDMANN and JULIE
SANDMANN,

       Plaintiff,

v.

ROLLING STONE, LLC, et al.,

       Defendants.

:    CASE NO. 2:20-CV-00027-WOB-CJS
:
:
:
:
:
:
:
:
:
:
:
:

**DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 3

I.     THE BLOCKING STATEMENTS ARE NON-ACTIONABLE OPINION. .................. 3

    A.     The Opinion Issue Is Properly Before the Court. ................................... 3

        1.     The Law of the Case Doctrine Actually Precludes Sandmann's Procedural Arguments. ............................................................... 3

        2.     This Court's Prior Rulings Simply Held That the Allegations of Sandmann's Amended Complaints Plausibly Alleged a Claim for Defamation. ...................................................................... 4

        3.     The Scheduling Orders Specifically Provide for the Discovery That Defendants' Motions Rely on and Sandmann Contends Is Irrelevant. ............................................................................ 8

    B.     The Blocking Statements Are Protected Opinion. ................................ 10

        1.     Defamation Law Does Not Categorically Designate Statements as Either Factual or Opinion. .................................................... 11

        2.     The Blocking Statements Are Non-Actionable Opinion. ................ 13

II.     ALTERNATIVELY, THE BLOCKING STATEMENTS ARE SUBSTANTIALLY TRUE. ............................................................................ 20

    A.     The Substantial Truth Doctrine Applies to All Words. ......................... 20

    B.     The Gist or Sting of the Blocking Statements Is Accurate. ................... 21

    C.     There Are No Material Disputes of Fact Regarding the Videos. ............ 23

CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Barnette v. Grizzly Processing, LLC*,
    809 F. Supp. 2d 636 (E.D. Ky. 2011), *amended*, No. CV 10-77-ART, 2011
    WL 13233209 (E.D. Ky. Oct. 25, 2011)................................................................................30

*Bentkowski v. Scene Mag.*,
    637 F.3d 689 (6th Cir. 2011) ......................................................................................................7

*Blessing v. Cable News Network, Inc.*,
    No. 2:20-cv-15, 2020 WL 7647530 (E.D. Ky. Dec. 23, 2020)................................................11

*Cutter v. Ethicon, Inc.*,
    No. CV 5:19-443-DCR, 2020 WL 2060342 (E.D. Ky. Apr. 29, 2020)....................................4

*Daunt v. Benson*,
    999 F.3d 299 (6th Cir. 2021) ......................................................................................................4

*Devlin v. Kalm*,
    630 F. App'x 534 (6th Cir. 2015) ...............................................................................................4

*Garrett v. Tandy Corp.*,
    295 F.3d 94 (1st Cir. 2002)......................................................................................................11

*Gooden v. City of Memphis Police Dep't*,
    67 F. App'x 893 (6th Cir. 2003) ...............................................................................................30

*Greenbelt Co-op. Publ'g Ass'n v. Bresler*,
    398 U.S. 6 (1970)......................................................................................................................13

*Hanson v. Madison Cty. Det. Crt.*,
    736 F. App'x 521 (6th Cir. 2018) .............................................................................................23

*Hildebrant v. Meredith Corp.*,
    63 F. Supp. 3d 732 (E.D. Mich. 2014).....................................................................................21

*Hogan v. Winder*,
    762 F.3d 1096 (10th Cir. 2014) ...............................................................................................13

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2015) .....................................................................................................3

*In re B & P Baird Holdings, Inc.*,
    759 F. App'x 468 (6th Cir. 2019) ...............................................................................................3

*Jenkins v. Snyder*,
   No. 00CV2150, 2001 WL 755818 (E.D. Va. Feb. 6, 2001) ...................................................13

*Lassiter v. Lassiter*,
   456 F. Supp. 2d 876 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008) ..........7, 12, 13

*Loftus v. Nazari*,
   21 F. Supp. 3d 849 (E.D. Ky. 2014) ....................................................................................7

*Lucas v. Chance*,
   121 F. App'x. 77 (6th Cir. 2005) ..........................................................................................24

*Macineirghe v. Cty. of Suffolk*,
   No. 13-CV-1512 ADS SIL, 2015 WL 4459456 (E.D.N.Y. July 21, 2015).......................13, 14

*McCray v. Infused Solutions, LLC*,
   No. 4:14-cv-158, 2018 WL 2392507 (E.D. Va. May 25, 2018).............................................12

*McKenzie v. BellSouth Telecommunications, Inc.*,
   219 F.3d 508 (6th Cir. 2000) ................................................................................................3

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).........................................................................................................11, 12

*Miller v. Maddox*,
   866 F.3d 386 (6th Cir. 2017) ................................................................................................4

*Nichols v. Moore*,
   477 F.3d 396 (6th Cir. 2007) ..............................................................................................21

*Parry v. Mohawk Motors of Michigan, Inc.*,
   236 F.3d 299 (6th Cir. 2000) ..............................................................................................21

*Parsons v. FedEx Corp.*,
   360 F. App'x 642 (6th Cir. 2010) ........................................................................................24

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986)............................................................................................................20

*Samons v. Nat'l Mines Corp.*,
   No. 20-3209, 2022 WL 420539 (6th Cir. Feb. 11, 2022) ........................................................4

*Sandmann v. CNN*,
   No. 2:19-cv-31 (E.D. Ky. 2019) ...........................................................................................5

*Sandmann v. NBC*,
   No. 2:19-cv-56 (E.D. Ky. 2019) ........................................................................................5, 6

*Sandmann v. WP Company, LLC*,
No. 2:19-19-cv-19 (E.D. Ky. 2019) ................................................................... *passim*

*Scott v. Harris*,
550 U.S. 372 (2007) .................................................................................................23

*Seaton v. TripAdvisor LLC*,
728 F.3d 592 (6th Cir. 2013) ...................................................................................11

*Simonson v. United Press Int'l, Inc.*,
654 F.2d 478 (7th Cir.1981) .....................................................................................21

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
135 F. Supp. 3d 219 (S.D.N.Y. 2015) .....................................................................21

*Tiwari v. NBC Universal, Inc.*,
No. C-08-3988, 2011 WL 5079505 (N.D. Cal. Oct. 25, 2011) ..............................21

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ...............................................................................14

*Wilkins v. Jakeway*,
44 F. App'x 724 (6th Cir. 2002) ................................................................................4

**State Cases**

*Agar v. Judy*,
151 A.3d 456 (Del. Ch. 2017) ..................................................................................13

*Biber v. Duplicator Sales & Serv., Inc.*,
155 S.W.3d 732 (Ky. Ct. App. 2004) ..................................................................7, 13

*Buchholtz v. Dugan*,
977 S.W.2d 24 (Ky. Ct. App. 1998) ..........................................................................7

*Cromity v. Meiners*,
494 S.W. 3d 499 (Ky. Ct. App. 2015, *review denied*, Aug. 17, 2016) .........7, 11, 12

*Estepp v. Johnson Cty. Newspapers, Inc.*,
578 S.W.3d 740,744 (Ky. Ct. App. 2019) ...............................................................21

*Franklin v. Dynamic Details, Inc.*,
116 Cal. App. 4th 375 (2004) ..................................................................................13

*Glaze v. Marcus*,
729 P.2d 342 (Az. App. 1986) .................................................................................12

*Jacobson v. Gimbel*,
2013 IL App (2d) 120478 .........................................................................................13

*Murphy v. Modrall*,
No. 2005-CA-001559-MR, 2006 WL 2328588 (Ky. Ct. App. Aug. 11, 2006)........................7

*Nat'l Coll. of Kentucky, Inc. v. WAVE Holdings, LLC*,
536 S.W.3d 218 (Ky. Ct. App. 2017) ........................................................................................7

*Ponzio v. Biscaglio*,
2016 IL App (1st) 143069-U ....................................................................................................13

*Samuels v. Tschechtelin*,
763 A.2d 209 (Md. App. 2000)................................................................................................12

*Trump Vill. Section 4, Inc. v. Bezvoleva*,
78 N.Y.S.3d 129 (2018)..........................................................................................................13

*Williams v. Blackwell*,
487 S.W.3d 451 (Ky. Ct. App. 2016), *as modified* (Mar. 4, 2016) ........................................7

*Yancey v. Hamilton*,
786 S.W.2d 854 (Ky. 1989) ....................................................................................................11

*Yates v. Iowa West Racing Ass'n*,
721 N.W.2d 762 (Iowa 2006) ..................................................................................................12

**Rules**

Rule 12 ..........................................................................................................................................1

Rule 56 ..............................................................................................................................1, 10, 23

## INTRODUCTION

Sandmann primarily seeks to avoid summary judgment by accusing the Defendants of trying to "re-litigate" the opinion issue.  Defendants seek nothing of the kind.  Their motions merely ask the Court to do what Defendants have always understood the Court expected the parties to do following its rulings at the motion to dismiss stage that the pleadings plausibly state a claim: have the Court "consider them [the Blocking Statements] anew on summary judgment" after conducting discovery "regarding these statements and their context."  *Sandmann v. WP Company, LLC* ("*Post*"), No. 2:19-cv-19, Doc. 64 at 2 (E.D. Ky. 2019).  That is also what Rules 12 and 56 contemplate.

Rather, it is Sandmann who is attempting to avoid the results of the discovery that he successfully convinced the Court to permit him to take, but never did.  To this end Sandmann's former counsel told the Court, during oral argument on his motion to reconsider the Court's initial decision in the *Post* case, that it was premature to resolve the opinion issue at the pleadings stage because it "needs a fully developed factual record . . .[Y]ou just don't see a term and go, that's opinion. You have to look at the factual circumstances to determine whether the speaker -- in this instance, Mr. Phillips -- was expressing an opinion . . . ."  *Post*, Doc. 60 at 50 (emphasis added). But now that Defendants have presented the uncontroverted testimony of seven eyewitnesses, Sandmann claims that "[n]one of Phillips' story, true or fictitious, matters to the issue of opinion vs. fact" and "[n]o court would order discovery to determine whether or not a statement constituted protected opinion."  Pl. Opp. at 23, 34.  But neither Rule 56, nor the law of the case doctrine, nor this Court's prior rulings permit Sandmann to avoid summary judgment by ignoring the record.

On the merits of the opinion issue Sandmann principally claims that the doctrine exempts wholesale certain words from its purview, including "transitive verbs" such as "block."  But this

finds no support in well-settled defamation law, which instead requires that courts look to the full context of a statement, including any facts disclosed to support it and their accuracy, to assess whether it is fact or opinion.  Moreover, Sandmann does not even seriously try to rebut—nor can he—the fact that discovery has confirmed the Court's initial ruling in the *Post* case that the Blocking Statements reflect Phillips' subjective perceptions and were supported by disclosed facts. Indeed, even his own purported linguistics expert treats the Blocking Statements as expressing Phillips' opinion; she just disagrees with it.

Regarding substantial truth, Sandmann again misstates defamation law by proclaiming that the doctrine only applies to figurative language.  That position is erroneous, and here too he offers no meaningful response to the point that his own testimony establishes that the "gist and sting" of the Blocking Statements—that Sandmann deliberately stood in Phillips' way to obstruct his path— is true.  Instead, to try to avoid that conclusion, his Opposition misstates his own sworn words.

In a final effort to avoid the results of discovery, Sandmann constructs a long list of supposedly "material facts in dispute" based on inadmissible opinions by a linguist who expressly disregarded his testimony, and on that basis contends that the Court should disregard all eyewitness testimony.  But the list of "disputes" is a proverbial house of cards.  Stripped of its sinister-sounding rhetoric, the only actual "facts" within the list are undisputed truisms such as what directions persons moved in, what words they spoke, or who was holding cameras or smartphones.

Defendants are entitled to summary judgment because the uncontroverted eyewitness testimony explaining the words and movements depicted in the videos (including those of Sandmann himself) is consistent with what the videos show.  So what Sandmann actually relies on to try to avoid summary judgment is not the videos, but rather an effort to explain what they depict by resorting to a linguist's patently inadmissible opinions and his own speculation about

other people's actions and words that he told the Court at the pleadings stage he would prove through discovery.  However, he cannot rely on that same speculation to avoid summary judgment.

## ARGUMENT

## I.   THE BLOCKING STATEMENTS ARE NON-ACTIONABLE OPINION.

### A.   The Opinion Issue Is Properly Before the Court.

Sandmann's principal argument on the opinion issue is self-contradictory.  On the one hand, he contends the Court already decided the opinion issue and ordered discovery on the element of falsity.  On the other, he maintains that the discovery the Court ordered is irrelevant to both opinion and falsity.  That position finds no support in either the law of the case doctrine invoked by Sandmann or this Court's prior orders.

### 1.   The Law of the Case Doctrine Actually Precludes Sandmann's Procedural Arguments.

The law of the case doctrine applies only to issues that were "actually decided."  *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015).  As discussed below, Sandmann's contention that this Court has decided the opinion issue "by necessary implication" misstates the Court's prior Orders.  In any event, the law of the case doctrine actually precludes Sandmann's arguments because it does not apply to "earlier proceedings where a different legal standard governs," including at summary judgment where a court previously denied motions to dismiss.  *In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 477 (6th Cir. 2019); *see also McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("[O]ur holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery.").  This is especially true where, as here, the earlier motion to dismiss ruling specifically "acknowledged that discovery would develop the factual allegations of the complaint."  *Id.* at 513.  Put even more bluntly, where "considerable

3

discovery supplements the pleadings," the "law-of-the-case doctrine [is left] *with no role to play*." *Devlin v. Kalm*, 630 F. App'x 534, 539 (6th Cir. 2015) (emphasis added).  *See also Wilkins v. Jakeway*, 44 F. App'x 724, 727-28 (6th Cir. 2002) (law of the case doctrine inapplicable where only the pleadings were before the court at motion to dismiss, but at summary judgment, the court could review factual evidence).[1]

### 2.    This Court's Prior Rulings Simply Held That the Allegations of Sandmann's Amended Complaints Plausibly Alleged a Claim for Defamation.

Sandmann all but acknowledges that no opinion this Court issued after its initial dismissal of the *Post* case explicitly ruled that the Blocking Statements are either fact or opinion.  Instead, Sandmann points to the subsequent Scheduling Orders entered by Magistrate Judge Smith to argue that the Court reached that result by "necessary implication."  Pl. Opp. at 1, 2, 17, 20, 22.  Even at first blush, the notion that this Court (or any court) would omit the resolution of a crucial dispositive issue from its substantive opinions, only to have a magistrate judge resolve it "implicitly" by burying it within an order approving a discovery schedule proposed by the parties, is improbable.  Defendants recognize that the Court does not need the assistance of the parties to construe its own words, and it seems a bit presumptuous to engage in this exercise.  *Id.* at 3, 19. Nonetheless, given that Sandmann relies so heavily on this argument, this Reply will lay out why Defendants believe Sandmann's position is incorrect.

First, the Court's order granting reconsideration in the *Post* case, which all parties recognize set the stage for the second wave of cases Sandmann has since filed, simply held that

---

[1] Moreover, the doctrine is primarily invoked to "enforce a district court's adherence to an appellate court's judgment." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021); *see also Miller v. Maddox*, 866 F.3d 386, 390 (6th Cir. 2017) (same).  As there has been no appellate ruling, the doctrine is also inapplicable for this reason.  Further, even where the doctrine applies—and it plainly does not here—it is a prudential one that is "discretionary when applied to a coordinate court or the same court's own decisions."  *Cutter v. Ethicon, Inc.*, No. CV 5:19-443-DCR, 2020 WL 2060342, at *2 (E.D. Ky. Apr. 29, 2020).  A court may "reassess" an issue if it "believes good reasons exist to do so[.]"  *Samons v. Nat'l Mines Corp.*, No. 20-3209, 2022 WL 420539, at *5 (6th Cir. Feb. 11, 2022).

Sandmann's proposed Amended Complaint had plausibly alleged a defamation claim.  Consistent with that holding, the Court ordered that the defendant(s) conduct discovery on the Blocking Statements and their context, and stated it would consider them "anew" on summary judgment:

> The Court will adhere to its previous rulings . . . except Statements 10, 11, and 33, to the extent that these three statements state that plaintiff "blocked" Nathan Phillips and "would not allow him to retreat."  Suffice to say that the Court has given this matter careful review and concludes that "justice requires" that discovery be had regarding these statements and their context.  The Court will then consider them anew on summary judgment.

*Post*, Doc. 64 at 2.  *See also id*. at 3 ("Of course, these allegations will be subject to discovery and summary judgment practice.  However, they do pass the requirement of 'plausibility.'"); *Sandmann v. CNN*, No. 2:19-cv-31, Doc. 43 at 2 (E.D. Ky. 2019) ("Naturally, following a sufficient period for discovery, these issues will again be reviewed at the summary judgment stage under a more stringent standard."); *Sandmann v. NBC*, No. 2:19-cv-56, Doc. 43 at 3 (E.D. Ky. 2019) ("At the pleading stage, plaintiff is entitled to have all inferences drawn in his favor.").

To argue that the Court implicitly resolved the opinion issue, Sandmann cites the same *Post* Order for the proposition that the Court "ordered the parties to conduct discovery on the truth or substantial truth of the blocked/retreat statements."  Pl. Opp. at 1-2.  But Sandmann puts words in the Court's order that are not there.  To the contrary, the Order stated that the Amended Complaint's "allegations will be subject to discovery and summary judgment practice."  *Post*, Doc. 64 at 3.  Moreover, Sandmann now contends that nearly all the discovery the parties have conducted pursuant to the Court's orders (other than merely stipulating to the authenticity of some videos) is totally irrelevant to the substantial truth issue, so he construes the Court to have required the parties to engage in a pointless exercise.

Likewise, the Court's Orders denying the motions to dismiss filed by each of the present Defendants simply reiterated its conclusion in the *Post* and the other two initial cases (*CNN* and

*NBC*) that the pleadings plausibly stated a claim, to be tested again following discovery. In fact, those Orders barely mentioned the opinion issue, but where they did, the Court treated it no differently than other elements of the alleged defamation claims:

> The Complaint *alleges that this statement was provably false* in that Sandmann did not position himself to impede Phillips or interfere with him in any way, and that it conveys a defamatory meaning because it imputes to Sandmann racist conduct . . .. Sandmann further alleges that [D]efendants ignored an available video that showed the full context of the January 18 encounter, demonstrating the falsity of Phillips's statements . . . [and] that defendants published the statements negligently and maliciously . . . and that Sandmann suffered public hatred, scorn and emotional damages as a result . . . . *These allegations clearly state a valid claim for defamation. Defendants attack the significance of these allegations and deny some of them, but that raises matters for discovery.*

*CBS*, Doc. 33 at 5-6 (emphasis added). *See also Rolling Stone*, Doc. 35 at 3; *N.Y. Times*, Doc. 27 at 3; *ABC*, Doc. 36 at 4 ("Therefore, the Court holds that the Complaint states a claim for relief and that discovery is warranted on both plaintiff's claims and defendants' defenses thereto.").[2]

The Court's decision to consider the opinion issue (along with potentially other issues) anew following discovery is also consistent with the way the fact/opinion distinction is resolved in many defamation cases. Because the opinion doctrine ordinarily implicates the context of the statements at issue, including often the underlying facts that may have been disclosed and their accuracy, it is common for defamation plaintiffs (like Sandmann) to allege that such facts were misstated and survive the pleadings stage on that basis. Courts thus regularly determine whether statements are non-actionable opinion after considering the factual record developed in discovery.

---

[2] The Gannett Defendants did not file a motion to dismiss addressing the plausibility of the Complaint with respect to any element of defamation other than causation, so the Court's Order in that case did not speak to the sufficiency of other elements of defamation pled. *Gannett*, Doc. 39. With respect to the other Defendants, the Court's Orders focused on the allegations of defamatory meaning and whether Sandmann's claims are time-barred. For the most part, each individual defendant's summary judgment motion on defamatory meaning does not implicate the larger discovery record, and focuses more narrowly on presenting the Court, at this juncture, with the broader corpus of materials published by various Defendants than it may have considered at the motion to dismiss stage. Because each Defendant's motion is specific to its publications, that issue is not addressed in this Joint Reply.

For instance, in *Cromity v. Meiners*, the Court of Appeals of Kentucky affirmed a summary judgment ruling that a statement the plaintiff was an "out and out liar" was non-actionable opinion, reached only after the court considered the discovery record to "look to the facts [defendant] shared and determine whether they are provable as false." 494 S.W. 3d 499, 504 (Ky. Ct. App. 2015, *review denied*, Aug. 17, 2016). In *Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014), this Court held at summary judgment that statements about medical care the defendant had received were protected opinion based on disclosed facts, and rejected the relevance of a proffer of the plaintiff's expert who (like Sandmann's purported expert) disagreed with the defendant's opinion. And in *Lassiter v. Lassiter*, 456 F. Supp. 2d 876 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008), after a bench trial this Court held a statement that the defendant was an "adulterer" to be protected opinion because it was a conclusion premised on disclosed facts. Likewise, many other cases in this jurisdiction have resolved at the summary judgment stage whether statements were protected opinion. *See, e.g.*, *Bentkowski v. Scene Mag.*, 637 F.3d 689, 696 (6th Cir. 2011) (affirming summary judgment as to statements that were protected opinion); *Nat'l Coll. of Kentucky, Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218, 226 (Ky. Ct. App. 2017) (same); *Williams v. Blackwell*, 487 S.W.3d 451, 455 (Ky. Ct. App. 2016), *as modified* (Mar. 4, 2016) (same); *Murphy v. Modrall*, No. 2005-CA-001559-MR, 2006 WL 2328588, at *2 (Ky. Ct. App. Aug. 11, 2006) (same); *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004) (same); *Buchholtz v. Dugan*, 977 S.W.2d 24, 28 (Ky. Ct. App. 1998) (same). Sandmann's assertion that fact discovery is irrelevant to the opinion inquiry flies in the face of decades of jurisprudence. Pl. Opp. at 19.

Moreover, Sandmann has acknowledged this. When he moved to reconsider the Court's initial dismissal order in the *Post* case, his former counsel argued that it was premature to resolve the opinion issue at the pleadings stage—precisely the opposite of what Sandmann now contends:

Mr. Baine says – and this is a quote – "I think what he meant was."  Your Honor is trying to look at these various videos to figure out what was Phillips saying.  The problem is, the only way to answer that question is to depose Mr. Phillips.

One of the reasons that we believe this case has to go beyond motion to dismiss is because it needs a fully developed factual record.  *Because under defamation law, Your Honor, you just don't see a term and go, that's opinion.  You have to look at the factual circumstances* to determine whether the speaker -- in this instance, Mr. Phillips -- was expressing an opinion or whether Mr. Phillips was expressing a factual narrative.

*Post*, Doc. 60 at 50 (emphasis added).  To be sure, when it issued its prior rulings the Court was not bound by any positions the parties advanced.  But it strains the limits of credulity for Sandmann to now argue that the Court granted the requested discovery related to the opinion issue, but then "implicitly" proceeded to do exactly what his former counsel argued would be legally improper without the benefit of that discovery:  to "see a term and go, that's [not] opinion."  *Id.*

3.    **The Scheduling Orders Specifically Provide for the Discovery That Defendants' Motions Rely on and Sandmann Contends Is Irrelevant.**

Finally, Sandmann's efforts to parse Magistrate Judge Smith's scheduling orders to locate the "necessary implication" he posits are especially disingenuous.  Sandmann contends that those orders reflect that this summary judgment motion "by stipulation of the parties was to be limited to the question of the truth or falsity of the block/retreat statements."  Pl. Opp. at 20.  But on their face the orders are explicitly broader than that.[3]  The Scheduling Orders adopted the parties' Joint Report, which provided that summary judgment motions in this phase of the case would address "whether the Blocking Statements are "true or substantially true, *or otherwise not actionable based on the undisputed facts developed during initial discovery and the issues defined in the Court's prior decisions*."[4]  Sandmann's view would render most of that superfluous.

---

[3] *ABC*, Doc. 49; *New York Times*, Doc. 38; *CBS*, Doc. 44; *Gannett*, Doc. 50; *Rolling Stone*, Doc. 45.
[4] *ABC*, Doc. 45 at 2 (emphasis added); *New York Times*, Doc. 36; *CBS*, Doc. 42; *Gannett*, Doc. 49; *Rolling Stone*, Doc. 43 (emphasis added).

Moreover, the orders make clear that any discovery and motion practice related to several elements of Sandmann's defamation claims, including fault (negligence or actual malice), causation and damages, would be deferred to a Phase 2 of the case, should Sandmann's claims survive Phase 1.[5]  Once those issues were excluded from Phase 1, the only remaining "issues defined in the Court's prior decisions" were opinion, defamatory meaning, and whether statements were "of and concerning" Sandmann (which for the Blocking Statements has never been disputed). The point of expressly mentioning the truth/substantial truth issue in the joint reports and scheduling orders was that it was the only issue included in Phase 1 that had *not* been previously discussed by the Court, not that it was the sole issue to be presented at summary judgment.

Similarly, the scope of the discovery the Scheduling Orders specified for Phase 1 reflected the Court's directive to explore "the statements and their context," and even more specifically reflected the very discovery Sandmann's counsel told the Court was necessary to resolve the opinion issue.  *Post*, Doc. 60 at 50 (criticizing the Court for "trying to look at these various videos to figure out what was Phillips saying.  The problem is, the only way to answer that question is depose Mr. Phillips.");  *id.* at 56-57 ("We want to go to the principals; Nathan Phillips, the eyewitnesses, the reporters.  We want to get the facts and fully develop the facts.").  Since discovery on the fault element was deferred, the parties agreed there would be no depositions of reporters (nor damage witnesses), and thus Phase 1 discovery was limited to "the facts pertaining to the encounter between Plaintiff and Nathan Phillips."  Any depositions were specifically limited to eyewitnesses to the incident (up to a maximum of twelve), including Phillips and Sandmann.[6]

---

[5] *ABC*, Doc. 45 at 3; *New York Times*, Doc. 38 at 3; *CBS*, Doc. 44 at 3; *Gannett*, Doc. 50 at 2; *Rolling Stone*, Doc. 45 at 3.
[6] *ABC*, Doc. 45 at 2, 4; *New York Times*, Doc. 38 at 2, 4; *CBS*, Doc. 44 at 2,4; *Gannett*, Doc. 50 at 1, 3; *Rolling Stone*, Doc. 45 at 2, 4.

The factual record Defendants have now submitted reflects exactly what the Scheduling Orders contemplated, except that Defendants were able to rely on sworn declarations since Sandmann did not depose *any* of the eyewitnesses whom his Amended Complaints accused of all manner of nefarious conduct.  To try to avoid the uncontroverted testimony, Sandmann now argues that the very discovery he requested is irrelevant.  Pl. Opp. at 5 ("There is no need to piece together oral testimony and fading memories of various eyewitnesses to determine the conduct of the parties. We have the video.").  At bottom, Sandmann's procedural arguments amount to an attempt to convince the Court to bypass Rule 56 and ignore an evidentiary record replete with uncontroverted facts.  Nothing supports that approach to these summary judgment motions, and the Court  need only consider those  undisputed facts to conclude that summary judgment for the Defendants is warranted.

### B.      The Blocking Statements Are Protected Opinion.

Turning to the merits of the opinion issue, Sandmann relies entirely on two related arguments that also ignore the discovery record.  First, he maintains that under defamation law words are *a priori* divided into two categories—fact or opinion—and nothing about the context in which words are used or any facts underlying those words makes any difference.  Pl. Opp. at 28-29.  Put another way, he now contends that the law requires that the Court "just see a term and go, that's opinion," precisely what at the pleadings stage his former counsel told the Court would be plain error.  *Post*, Doc. 60 at 50.  And based on that view of defamation law, he contends that the word "blocking" is always a statement of fact, along with all other statements using any "transitive verb."  Pl. Opp.  at 29, 35-38.  In essence, Sandmann circularly claims that the Blocking Statements are statements of fact because they are statements of fact.  His arguments are simply incorrect.

1.  **Defamation Law Does Not Categorically Designate Statements as Either Factual or Opinion.**

First, it is axiomatic that defamation law rejects "an artificial dichotomy between 'opinion' and fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990).  Rather, a court must assess whether a statement is fact or opinion (which the parties agree presents a question of law) by considering "the whole context of its publication."  *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989).  That context can include a range of factors.  For example, it may include whether in context the words "are of an "inherently subjective nature," *Blessing v. Cable News Network, Inc.,* No. 2:20-cv-15, 2020 WL 7647530, at *6 (E.D. Ky. Dec. 23, 2020) (quoting *Seaton v. TripAdvisor LLC,* 728 F.3d 592, 598-601 (6th Cir. 2013)), as well as "the identity of the speaker, the identity of the audience, the circumstances in which the statement is made, what else is said in the course of the conversation, and a myriad of other considerations."  *Garrett v. Tandy Corp.*, 295 F.3d 94, 104, 106 (1st Cir. 2002) (discovery required on opinion issue "in order to clarify exactly what was said and to develop the facts necessary to put what was said in a meaningful context"); *see also* Sack on Defamation § 4:3.1 (central to the opinion inquiry are "custom (how words are ordinarily used) and context (both in terms of the language used and the situation in which it is used)").

Because the opinion inquiry is dependent on context, there are myriad examples in which the identical word or phrase has been found to be either fact or opinion, depending on the nature of the word, the circumstances in which it was uttered, or whether the speaker expressed it as an isolated statement or a conclusion based on disclosed facts.  Sandmann purports to provide a list of words that cases have found to be statements of fact, Pl. Opp. at 37, but every one of his examples has also been held to a statement of opinion in other contexts.  *See, e.g.*, *Milkovich*, 497 U.S. at 19 (statement that plaintiff was a "liar" held to be statement of fact); *Cromity*, 494 S.W. 3d at 504 (statement that plaintiff was "an out and out liar" held to be non-actionable opinion).  *See*

11

*also Samuels v. Tschechtelin*, 763 A.2d 209, 245 (Md. App. 2000) (statement that employee was terminated for "poor performance" was statement of fact); *Yates v. Iowa West Racing Ass'n*, 721 N.W.2d 762, 772 (Iowa 2006) (statement that contract was terminated due to "poor performance" was non-actionable opinion); *McCray v. Infused Solutions, LLC*, No. 4:14-cv-158, 2018 WL 2392507, at *8 (E.D. Va. May 25, 2018) (court assumed *arguendo* statement that an "[e]mployee is extremely confrontational and exhibiting constant insubordinate behavior" was a statement of fact); *Glaze v. Marcus*, 729 P.2d 342, 344 (Az. App. 1986) (statement that employee's behavior was "unprofessional, insubordinate or abusive" was non-actionable opinion).

The accusation that someone is a "liar" provides a paradigmatic example. In the abstract whether a person did or did not actually "lie" may be a fact, and indeed may be an ultimate issue for the fact-finder in a host of crimes and torts ranging from perjury to fraud. But whether accusing someone of being a "liar" is treated as fact or opinion for purposes of a defamation claim depends on the context. For example, in *Milkovich*, the Supreme Court held that the statement that anyone "knows in his heart that Milkovich and Scott lied at the hearing" was actionable because it implied the assertion of defamatory facts, 497 U.S. at 19-21, while in *Cromity* an accusation that the plaintiff was an "out-and-out liar" was nonactionable because it was stated as a conclusion based on disclosed facts that discovery demonstrated were not provably false. 494 S.W. 3d at 504.

Sandmann's treatment of this Court's opinion in *Lassiter* further illustrates why his newly-found view of defamation law is misguided. He maintains this Court recognized that as a general matter accusing someone of being an "adulterer" is "a matter of opinion," but then concluded that it might nonetheless be actionable were it "to imply certain facts (specifically an illicit sexual liaison) that itself could be defamatory." Pl. Opp. at 30-31. Defendants respectfully submit that is an incorrect reading of this Court's analysis. Engaging in "an illicit sexual liaison" is the

12

definition of adultery, not a distinct fact that is implied by the word.  Moreover, as this Court held, to accuse someone of being an "adulterer" is defamatory *per se*.  *Lassiter*, 456 F. Supp. 2d at 880.

Rather, this Court held that in the context of the defendant's book, the accusation that the defendant was an "adulterer" was stated as a "conclusion that the plaintiff had committed adultery on the basis of rumor and circumstantial evidence which was persuasive to her. *The facts on which she based the conclusion were disclosed in the book*." *Id.* at 882 (emphasis in original).  And like numerous other defamation cases cited in Part A of this Reply, *Lassiter* also demonstrates why Sandmann's sweeping claim that "[n]o court would order discovery" before deciding the opinion issue fails.  Initially, this Court held that the statements at issue regarding the defendant's alleged adultery were not opinion.  *Id.* at 881.  But following a bench trial, this Court re-considered that position and held that they were protected opinion.  *Id.*  Nor does defamation law indiscriminately label certain parts of speech, such as transitive verbs, as inherently either statements of fact or opinion.  Pl. Opp. at 29, 32.  Indeed, a host of cases have found that statements involving transitive verbs are protected opinion.[7]

### 2.     The Blocking Statements Are Non-Actionable Opinion.

Sandmann's arguments about the word "block" mirrors his mistaken arguments about transitive verbs.  He never tries to explain how the only other case to consider the word, *Macineirghe v. Cty. of Suffolk*, No. 13-CV-1512 ADS SIL, 2015 WL 4459456, at *14 (E.D.N.Y.

---

[7] *See Greenbelt Co-op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14, 21 (1970) (accusation that someone "committed blackmail" was opinion); *Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014) ("accusations of extortion"); *Jenkins v. Snyder*, No. 00CV2150, 2001 WL 755818, at *5 (E.D. Va. Feb. 6, 2001) (statement that a football team's grounds keepers were "trying to kill someone with their crappy fields"); *Biber*, 155 S.W.3d at 737  (statement that company president "felt like he had been conned by the world's greatest con man"); *Trump Vill. Section 4, Inc. v. Bezvoleva*, 78 N.Y.S.3d 129, 133 (2018) (allegations that plaintiff was attempting to "destroy" another); *Ponzio v. Biscaglio*, 2016 IL App (1st) 143069-U, ¶ 24 (statement that someone was "trying to deceive"); *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 38 (statements that plaintiff "helped [defendant's husband] kill himself"); *Agar v. Judy*, 151 A.3d 456, 481 (Del. Ch. 2017) (statements that plaintiffs "looted" a company); *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 389 (2004) (statements that plaintiff "stole" copyrighted material and "plagiarized" data).

July 21, 2015), can be reconciled with his theories about language and the law.  In *Macineirghe*, the statement that the first plaintiff "blocked" the defendant's squad car from following the second plaintiff was premised on a series of observations: the second plaintiff running away from the police officers; police officers indicating that they were going to chase him; the defendant getting into his squad car; the first plaintiff falling near the squad car before it could be started; and the first plaintiff's inconsistent remarks.  *Id.*  These "ample facts" available to the speaker "reasonably form[ed] the opinion" at issue.  *Id.*  And more broadly, to state that someone "blocked" another is often to express the perception that another's intentions were to stand in the blocked party's way. *Macineirghe* is just one example of where courts have found that "subjective assessment[s]" of a "[plaintiff's] conduct" are often not "readily capable of being proven true or false" and as such, can qualify as opinion.  *Turner v. Wells*, 879 F.3d 1254, 1264 (11th Cir. 2018).[8]

Even Sandmann's own proffered linguistics expert explains that in her view the Blocking Statements can best be characterized as Phillips' *opinion* about what transpired.  Dr. Roberts' testimony is inadmissible for the reasons set forth in the Motion to Strike filed by Defendants, and Defendants do not suggest that the Court should selectively rely on them for purposes of the opinion issue.  But Sandmann likewise may not have it both ways, so if the Court were to deny the Motion to Strike, then Dr. Roberts' views would require summary judgment for Defendants on the grounds that the Blocking Statements are non-actionable opinion.  Dr. Roberts testified:

> Q:     So Phillips' statement seems to you, to be his conjecture that Sandmann
>         intended to block him, right?

---

[8] Sandmann also repeatedly invokes the hypothetical of a person saying "I smell smoke."  Pl. Opp. at 33, 36-37.  While that hypothetical has nothing to do with the Blocking Statements, in any event it does not help his argument.  For the reasons discussed herein, hypothetical words divorced from their context cannot be definitively assessed, but in general two persons in the same room may experience and voice different sensory perceptions – one says "I smell smoke" while the other says "I do not smell anything."  While smoke detection equipment might resolve the existence of a fire hazard, that does not render either person's expression of their subjective sensory perceptions provably false.

> A:      That is his interpretation of the situation.  That's the way he represents it.
>
> Q:      So it's his conjecture as you say?
>
> A:      That's the best understanding I have of it, yes.

Roberts Dep. 84:7-19.[9]

* * * *

> Q:      You are not disputing that that may be Mr. Phillips' opinion, right?
>
> A:      I am not disputing it.

Roberts Dep. 90:3-5.

In fact, Dr. Roberts testified that, for that very reason, her Report's conclusions concerning the truth of the Blocking Statements were based "solely" on videos:

> Q:      And I think you said that before.  Why -- or when did you decide to base your report solely on the videos 1 through 18?
>
> A:      As soon as I had reviewed all the materials in the initial informal reviews that I did, I -- knowing what my expertise is, is my expertise is solely is were these statements, as I understand them, as a native speaker and a linguist, were these statements true of the situation?
>
>          The only evidence I have about what actually occurred there is the videos.  *All the statements subsequent are people's opinions about it or the way they represented it.*  That has no bearing on whether the statements were true.

Roberts Dep. 79:10-25 (emphasis added). *See also id.* at 81:1-14.

More broadly, the very fact that Sandmann has proffered an expert whose opinion is that she disagrees with Phillips' opinion reinforces the point that the Blocking Statements are not actionable.  Indeed, other than his arguments about grammar and the law, Sandmann offers no response at all to the detailed showing on pages 31-43 of Defendants' Joint Memorandum as to

---

[9] Defendants attached Dr. Roberts' deposition transcript as Exhibit A to their Motion to Strike.  *ABC*, Doc. 78-2; *New York Times*, Doc. 64-2; *CBS*, Doc. 72-2; *Gannett*, Doc. 78-2; *Rolling Stone*, Doc. 72-2.

why the Blocking Statements were Phillips' perception based on accurately disclosed facts; how multiple other eyewitnesses perceived the events much like Phillips did; and how the conspiracy theories alleged about the state of mind of Phillips and alleged "companions" have no basis in fact.

Sandmann also acknowledges his testimony that, at a later point in the encounter, he himself was blocked.  However, he maintains that "[j]ust because it can happen to [him] does not make Phillips' statement into an opinion."  Pl. Opp. at 34; *see also* Joint Memo Statement of Facts ("SF") ¶ 50.  To the contrary, the point is that both Phillips' and Sandmann's blocking statements are properly categorized as opinions.  In fact, if Sandmann were to apply his own rigid definition of "blocking," Pl. Opp. at 44, to himself then he was not blocked since he acknowledged that "there was never a point where I was unable to walk – to walk away."  Deposition of Nicholas Sandmann ("S.D.") at 221:2-3.[10]  But the reasonable construction of his words is not that Sandmann was lying when he says he was blocked or that his blocking statements were "false," but rather that in a tense situation in the middle of a large crowd he perceived himself to be blocked.  S.D. 284:7-10 ("Q: …So you said you *felt* like you were being, at least at one point, at some point in the encounter, right, blocked by the crowd? A. Right.") (emphasis added).  *See also* Joint Memo Ex. M (S.D. Ex. 20) at 2 ("I never *felt* like I was blocking the Native American protestor.") (emphasis added).

Sandmann also attempts to dismiss his testimony that Phillips could well have perceived Sandmann to be blocking him as "inadmissible speculation."  Pl. Opp. at 12.  But this argument also misses the mark.  The point of that testimony is not that it establishes the *truth* of the matter – *i.e.*, whether Phillips did perceive that he was being blocked.  Phillips' unrebutted testimony

---

[10] For ease of reference, this Joint Reply largely cites to Sandmann's deposition transcript ("S.D.") and other exhibits as filed in Sandmann's case against ABC (E.D. Ky. Case No. 2:20-cv-00025-WOB-CJS, Doc. 65-1 through 65-22), which all defendants have filed in their individual cases.  Specifically, Sandmann's deposition transcript is Doc. 65-10, and the declarations are Docs. 65-2 through 65-8.  Any citations to "Sandmann Dep." reference Sandmann's attached excerpts from his deposition transcript to his Opposition at Doc. 75-1 in the ABC case.  For the stipulated videos, this Joint Reply cites to Doc. 61 (the Stipulation) and Doc. 62 (the thumb drive) in the ABC case. The rest of this Joint Reply cites to the Videos simply by their number (Video 1, Video 2, etc.).

serves that purpose.  Phillips Decl. ¶¶ 24-26.  Instead, Sandmann's acknowledgments that he and Phillips could have formed different opinions about whether any blocking took place are remarkable because they contradict his core claims in his Complaint that (1) he "did not engage in any conduct whatsoever that could even remotely be described or characterized as . . . blocking" and (2) Phillips affirmatively made up the entire encounter.[11]

Indeed, the allegations in his Amended Complaints about Sandmann's own intentions, which were allegedly at all times to have been merely "to diffuse the situation," *see Post*, 401 F. Supp. 3d 781,792, do not comport with Sandmann's sworn testimony about what transpired at the Lincoln Memorial.  This Court need only compare the various words of the Blocking Statements with Sandmann's testimony about the same events to recognize that his central claim that nothing "whatsoever" that he did could be perceived as blocking Phillips has no support in the record.  Rather, his own words support the Court's original conclusion that Phillips "interpreted Sandmann's action (or lack thereof) as blocking him and not allowing him to retreat."  *Id.*

### *Phillips*:  "It was getting ugly . . ."

| Sandmann Testimony |
|---|
| "Q. . . . [W]ould it be fair to say that others could perceive that [chant accompanying the tomahawk chop] as disrespectful to Mr. Phillips? A. Yes."  S.D. 155:14-17. |
| "Q. And it's a given that some people there perceived the students' behavior as mocking Mr. Phillips? A. Yes. I think that was people that were either a part of the Hebrew Israelites or a part of Nathan Phillips' group."  S.D. 157:9-14. |
| "Q. Okay. I will ask you, as for any of the Native Americans – any person who was a Native American who was there, would you agree that some of them perceived the students' behavior as mocking Mr. Phillips? . . . A. I would agree. Q. Do you think that they were dishonest in perceiving that? A. I don't think they were dishonest. I think they just came to the wrong conclusion. Q. You disagree with their perception? A. Yes."  S.D. 157:19-158:7. |
| "Q. So earlier you said that you felt insulted and, you know, mocked by the BHIs. Is it your contention that you felt that you were mocked by the BHIs but Mr. Phillips couldn't have felt |

---

[11] *ABC* Compl. ¶¶ 68-69; *N.Y. Times* Compl. ¶¶ 67-68; *CBS* Compl. ¶¶ 68-69; *Rolling Stone* Compl. ¶¶ 67-68; *Gannett* Compl. ¶¶ 54-55.

that he was being mocked by the students at that point? A. I never claimed that he felt like we weren't mocking him. I mean, he's entitled to feel however he wants to. What I'm saying is that I – from my perception, it didn't seem like anyone ever was mocking him." S.D. 211:14-24.

"Q. So, it could – I mean, it's just a matter of opinion, right? Somebody could perceive that there are students now [Video 2 at 00:32-00:44] who have sort of swarmed around Phillips on both sides, right? A. Yeah. I mean, someone could look at it that way if they wanted to."  S.D. 214:13-19.

*Phillips*: ". . . and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,' Phillips recalled. 'I started going that way. . .'"

| **Sandmann Testimony** |
|---|
| "Q. [T]here certainly are a fair number of people who are physically behind him [Phillips], right? A. Right."  S.D. 167:10-12.<br><br>"Q. And in this video [Video 10 at 00:12-00:26], the direction he's [Phillips] moving in is towards the Lincoln Memorial, right? A. Right."  S.D. 161:21-24.<br><br>"Q: …So you knew that some of the other students were parting? A: That's correct.  Q: They were moving out of Phillips' way? A: Yes. Q: To allow a path for him? Okay. And you saw that Phillips was starting to walk through your group? A: Yes. Q: All right. He was going forward, right? A: Right." S.D. 158:15-159:1. |

*Phillips*:  ". . .and that guy in the hat stood in my way, and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."

| **Sandmann Testimony** |
|---|
| "A. . . . I figured was it time for someone to plant their foot and stand there where I had been and just face up. And to me, that was standing up for the school, because I wasn't going to move."  S.D. 175:10-14.<br><br>"A. . . And at one point, I just felt like enough is enough, we don't need to respond to them anymore with chants: Someone's just got to stand here, be still and put their foot down." S.D. 176:15-20.<br><br>"Q:  I mean, if he just continued to move forward, he would have physically knocked into you?  A: He would have hit me, yes." S.D. 276:17-20<br><br>Friend:  "Can [I] ask what made you stand in front of the [I]ndian guy? |

[Sandmann]:  yeah[.]  the whole thing with the black people calling us things and the guy moving through the crowd trying to intimidate us[.]  it just made me want to stand up for the school."  Joint Memo Ex. E at 1-2.

Sandmann:  "[M]embers of an indigenous people's march approached me ([I] was wearing a maga hat).  The man played his drum in my face but unlike others at my school [I] didn't step out of the way because he was trying to intimidate us."  Joint Mem. Exs. F-G.

"Q: So your perception was that Phillips realized you were not moving, and then he locked eye contact with you? A. Correct." S.D. 263:1-4.

"Q. Did you feel like the two of you were at an impasse? . . . A. In some form of it, yes."  S.D. 263:7-10.

*Phillips*:  **"When the others were moving aside and letting me go, he decided that he wasn't going to do that . . .**

| Sandmann Testimony |
|---|
| "Q:  So again, you were -- you were aware that others -- other students were stepping out of Phillips' way? A. Right. Q:  But you didn't because you thought he was trying to intimidate you collectively? A. Yes, me and other students at the school."  S.D. 180:22-181:4.<br><br>"Q: "So he locked eye contact with you because you were the only student who wasn't moving, right? A. Yes."  S.D. 269:9-12.<br><br>"Q. And I think you said before, that originally, you were – you were making a decision, right, that you didn't want to move because you felt he was trying to intimidate you? A. Correct." S.D. 193:20-24.<br><br>Sandmann:  "[M]embers of an indigenous people's march approached me ([I] was wearing a maga hat).  The man played his drum in my face but unlike others at my school I didn't step out of the way because he was trying to intimidate us."  Joint Mem. Exs. F-G. |

*Phillips*:  **" . . . When I was coming up the steps, I seen him start putting himself in front of me, so I slid to the right, and he slid to the right. I slid to the left and he slided to the left—so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."**

| Sandmann Testimony |
|---|
| "Q.  . . . Can you say that it's absolutely not noticeable [Sandmann's movement to the left] to somebody who was watching this at the time? A. No. I'm – I'm just saying that the movement in which I did was minimal. It's not like I slid over a foot or two. I moved six inches at the most . . .Q. So at this point, you are right in front of Nathan Phillips, right? A. Right." S.D. 247:16-248:8. |

"Q. So we have established that initially you and Phillips came face to face? A: Right. Q: And Phillips turns to his left? A: Right. Q: He is looking at Cammeron [the student next to Sandmann]? A: Right. Q: Right? And Cammeron moves-- A: Right. Q: -- to the right? And then Phillips turns back towards you, right? A: Right."   S.D. 236:24-237:10.

"Q. Is it possible that [Phillips] was trying to see if Cammeron and you would move out of his way . . . A. That's possible."  S.D. 232:11-14.

"A. . . And at one point, I just felt like enough is enough, we don't need to respond to them anymore with chants: Someone's just got to stand here, be still and put their foot down." S.D. 176:16-20.

"Q. Couldn't Phillips have perceived that you intended to stop his path forward? . . . A. He could have . . ." S.D. 199:3-6.

In short, the factual record demonstrates that Phillips "disclosed the reasons for his perception" and the "reader was in as good a position as Phillips to judge whether the conclusion he reached – that he was 'blocked'" and not allowed to retreat – was correct.  *Post*, 401 F. Supp. 3d at 792.  Summary judgment is therefore warranted for each Defendant.

## II.   ALTERNATIVELY, THE BLOCKING STATEMENTS ARE SUBSTANTIALLY TRUE.

While the conclusion that the Blocking Statements are protected opinion would moot the need to consider the material falsity element of Sandmann's defamation claims, if the statements are treated as statements of fact then summary judgment would be warranted on this ground as well.  Put another way, discovery has shown that Phillips' perception that Sandmann was blocking him turned out to be substantially correct, and that at a minimum Sandmann cannot meet his constitutional burden of proving that it was materially false.  *Philadelphia Newspapers, Inc.  v. Hepps*, 475 U.S. 767, 777 (1986).

### A.   The Substantial Truth Doctrine Applies to All Words.

As he did in his motion for partial summary judgment, Sandmann maintains that the "substantial truth" doctrine is only relevant in cases involving metaphorical, non-literal language. Pl. Opp. at 43.  He does not cite a single case or authority that says that, and indeed there are none.

20

Instead, he points to *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 235 (S.D.N.Y. 2015), but that is simply a case in which the specific words at issue happened to involve metaphorical language.  There are numerous examples of cases applying the doctrine where no figurative language was at issue.[12]  The contention that substantial truth is limited to cases involving non-literal language is simply incorrect.

### B.    The Gist or Sting of the Blocking Statements Is Accurate.

Because Sandmann dismisses the relevance of the substantial truth doctrine, he never tries to explain how he can avoid summary judgment if he is wrong about that.  And the record makes clear that he cannot avoid it.  The "gist" or "sting" of the Blocking Statements is that Sandmann stood in Phillips' way to obstruct his path, and because that is accurate, Defendants must prevail. *Estepp v. Johnson Cty. Newspapers, Inc.*, 578 S.W.3d 740,744 (Ky. Ct. App. 2019); *see also Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 312 (6th Cir. 2000).  At numerous points throughout his Opposition, Sandmann concedes that standing in someone's way is *synonymous* with blocking.  *See* Pl. Opp. at 32-33 ("One could engage in circumlocution, substituting the definition of "blocked" for the word itself (such as 'X stood in Y's way'; or 'X didn't let Y through the door'), but these are just other ways of using the word 'blocked.'); *id.* at 37 ("dictionary definition" of "block" is "along the lines of 'you know, he stood in my way to prevent me from advancing,' which is 'blocked' in so many words").   As set forth in Defendant's Joint

---

[12] *See, e.g.*, *Nichols v. Moore*, 477 F.3d 396, 401 (6th Cir. 2007) (statement that plaintiff was "arrested in connection to the Oklahoma City bombing" substantially true where plaintiff did not actually participate in the bombing itself but whose arrest was "sufficiently in connection" to the bombing); *Simonson v. United Press Int'l, Inc.*, 654 F.2d 478 (7th Cir.1981) (substantially true to report person charged with rape when actually charged with second degree sexual assault); *Parry*, 236 F.3d at 312 (characterization of a driver as "immediately disqualified" under drug tests substantially true though "refusal to test" would have been more accurate); *Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 739 (E.D. Mich. 2014) (substantially true to report statement that police officers were "accused of stealing 'during a raid'" when they were investigated for a possible larceny); *Tiwari v. NBC Universal, Inc.*, No. C-08-3988, 2011 WL 5079505, at *15 (N.D. Cal. Oct. 25, 2011) (broadcast was substantially true where it erroneously reported that plaintiff had been convicted of a felony rather than a misdemeanor); *see also Estepp*, 578 S.W.2d at 746 (substantially true that plaintiff was "removed" from his employments despite plaintiff's argument that he voluntarily resigned).

Memorandum, Sandmann's own testimony establishes that not only did he stand in Phillips' path, he did so intentionally.  Joint Memo SF ¶¶ 38-41.  Rather than join his classmates by moving out of the way, Sandmann planted his feet in Phillips' path to try to send him a pointed message that he and his classmates would not be intimidated.  *Id*.

In order to try to avoid summary judgment on this ground, Sandmann flatly misstates his own testimony.  He tries to repeat the allegations of his Amended Complaint, stating that "his intention when encountered aggressively by Phillips [] was *at all times* to 'diffuse the situation'", while citing to just a few pages in the 465-page transcript to try to support that.  Pl. Opp. at 42 (citing Sandmann Dep. 189, 414-415) (emphasis added).  But those pages do not say that.  In fact, the words "diffuse the situation" in that transcript were spoken by ABC's counsel asking Sandmann whether he had "any understanding that *Mr. Phillips* says, in substance, that initially he approached the students in order to diffuse the situation . . . ?"  Sandmann Dep. 415:21-416:1 (emphasis added).  Sandmann's actual testimony is unambiguous that when Phillips approached his intentions were to stand up for the school and deliver a pointed message to Phillips, not to diffuse anything.

Finally, if construed to be a statement of fact, then Sandmann's own blocking statement further demonstrates why Phillips' statement is substantially true.  As discussed previously, Sandmann maintains that he was blocked even though he believes he could have physically walked away, since his classmates likely would have made room for him.  S.D. 221:2-3; *see also id.* 283:9-284:10.  But when it comes to Phillips, Sandmann insists on applying a rigid definition of "blocking" that goes well beyond even the dictionary to require Phillips to have kept testing on the steps of the Lincoln Memorial whether Sandmann would continue to block him.  Pl. Opp. at 44. Sandmann cannot have it both ways.

### C.      There Are No Material Disputes of Fact Regarding the Videos.

Finally, Sandmann argues that summary judgment is not warranted because he compiles a list of roughly 30 items under the heading "Material Disputes of Fact," all of which involve purported descriptions of cited video excerpts (often no more than a second long) reflecting Dr. Roberts' opinions about what snippets of the videos alone supposedly show.  At bottom, Sandmann maintains the Court should ignore the sworn testimony of seven persons whose actions and words are depicted in the videos, as well as large amounts of Sandmann's own testimony about what those same videos depict, and instead credit Dr. Roberts' views and his counsel's conjecture to find some material fact disputes.  Pl. Opp. at 6-7, 12-16.  That is not how Rule 56 works, and the list is nothing more than a charade to try to avoid summary judgment.

The only case cited by Sandmann to support his position actually demonstrates the flaw in his approach.  Pl. Opp. at 5, 7, 16, 43 (citing *Hanson v. Madison Cty. Det. Crt.*, 736 F. App'x 521 (6th Cir. 2018)).  *Hanson* stands for the uncontroversial proposition that where a witness's sworn testimony about an event is "blatantly contradicted" by a video showing all pertinent aspects of the exact same event, the Court may credit the video and discredit the testimony.  *Id.* at 527; *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007).   Likewise, where there are material inconsistencies between video and testimony about the same event, then an issue of fact may be created.  *Hanson*, 736 F. App'x at 536-37.  But Sandmann never tries to point to any specific inconsistency between the *actual* testimony of any eyewitness and any *actual* segment of video.

Rather, as set forth below, in virtually every instance the "facts" listed by Sandmann merely consist of various persons' recorded movements or words.  There is no dispute that those movements and words are captured in the videos he cites.  But his list just ignores all the uncontroverted testimony explaining those movements and words, or tries to dismiss it all by resorting to *ad hominem* name-calling like "fabricating speaker," "bully," and "accomplices."

Rather than identify any material contradictions between the video and the testimony, he tries to substitute for testimony a combination of his expert's inadmissible views and the same conjecture pled in his Amended Complaints.  Neither provides a basis to avoid summary judgment.  *Lucas v. Chance*, 121 F. App'x. 77, 79 (6th Cir. 2005) ("only admissible evidence can be used to oppose a motion for summary judgment"); *Parsons v. FedEx Corp.*, 360 F. App'x 642, 648 (6th Cir. 2010) ("Unsupported speculation cannot overcome a motion for summary judgment.").  Compounding this error, the list also just omits multiple events, including most notably Sandmann's own account of how the standoff began.  Indeed, if there were any "disputes of fact" to be found within the list they would be between Sandman and his own expert, because where his own testimony is inconvenient he attempts to substitute his expert's inadmissible opinions.

Most of the "facts" that Sandmann first lays out on pages 12-13 of his Opposition pertain to Phillips' movements as he approached the students:

| |
|---|
| Phillips approached the two groups from a distance with a group of companions who appeared to be participants in the Indigenous Peoples' March happening on the same day. (Sandmann Dep. 132-33, 163; Stip. Videos 1-18; Roberts Dep. 145-48). |
| Phillips and his group walked from the northeast to the south b approximately 40 to 50 feet to approach the student group. (Sandmann Dep. 137; Stip. Video 12; Roberts Dep. Ex. A). |
| In walking towards the students, Phillips ignored the Hebrew Israelites and focused on the students. (Stip. Video 17 at 00:01-01:30; Roberts Dep. at 152, Ex. A). |
| As Phillips and his companions began approaching the crowd of students, Phillips began beating a drum and singing loudly. (Stip. Video 12 at 00:08-38). |
| When Phillips and his companions reached the crowd of students, Phillips was still traveling on his northeast-to-south trajectory. (Stip. Video 4 at 01:12:18; Stip. Video 5 at 03:55; Stip. Video 12; Stip. Video 15 at 00:37-00:40; Stip. Video 17 at 01:18; Roberts Dep. Ex. A). |
| In traveling on this trajectory, Phillips bypassed and ignored clear pathways on his right (to the west) leading to the top of the Lincoln Memorial. (Stip. Video 12 at 00:01-00:35; Roberts Dep. Ex. A). |
| When he reached the crowd of students, Phillips walked from the right along the front edge of the group of the students, drumming and chanting loudly. (Stip. Video 4 at 01:12:18; Stip. Video 5 at 03:55; Stip. Video 12; Stip. Video 15 at 00:30; Stip. Video 17 00:0101:30). |

In almost every instance these "facts" merely recite Roberts' opinions and are therefore inadmissible, but in any event Phillips' actual movements here are undisputed.  It is undisputed that Phillips approached the students by walking from northeast to south (or "from the right") while drumming and chanting, and that he focused on the students.  It is also undisputed that when he approached the students, Phillips did not go to the Lincoln Memorial.  That is because, as the uncontroverted testimony indicates, he was not going there.  Rather, at that point he was walking up to the students.  Phillips Decl. ¶¶ 15-17, 22; *see* Video 5 at 3:52-4:10, Video 4 at 1:12:18-1:12:32 (showing Phillips' initial trajectory toward the students); *see also* Frejo Decl. ¶ 15; Bell Decl. ¶ 13; Andrade Decl. ¶ 11; Stegenga Decl. ¶¶ 9-10; Tee Decl. ¶¶ 12.

What Sandmann omits from this list are all the facts that are genuinely material, i.e., the uncontroverted testimony explaining *how* Phillips and several other persons came to approach the students as the videos depict and *why* they did so.  That testimony establishes that the whole episode was an impromptu response to what multiple persons perceived to be an escalating confrontation between students and the Black Hebrew Israelites, based on religious and cultural beliefs that song and prayer have the power to calm tense situations.  Joint Memo SF ¶¶ 14-31.

Sandmann's "facts" then describe Phillips' movements once he began moving forward through the crowd of students:

| Phillips then waded into the crowd of students, coming closer and closer to Nicholas, who was standing three or four rows into the crowd on an icy step. (Sandmann Dep. 147, 158, 161, 193, 203-204, 213; Stip. Video 4 at 00:38:57 (icy step visible); Stip. Video 17 at 02:33; Roberts Dep. at 160). |
|---|
| As Phillips entered the crowd of students, he bumped up against one student standing in front of Nicholas, coming into physical contact with him. (Sandmann Dep. 135; 137). |
| As he continued to wade through the crowd, Phillips nearly walked past Nicholas, who was standing on Phillips' right and slightly above him, in the place he had been standing prior to Phillips walking through the crowd. (Stip. Video 2 00:41-00:46; Roberts Dep. at 165-68, Ex. A). |

> Just before Phillips walked past Nicholas, Phillips stopped, turned right, locked eyes with Nicholas, moved towards him, and stopped within inches of his face. (Stip. Video 2 at 00:41-00:46; Roberts Dep. at 155, 165-68, Ex. A).

Tellingly, this list begins by omitting almost two minutes between the time that Phillips approached the students and when he started walking forward.  The same videos cited here (as well as others) show, and the testimony of multiple eyewitnesses (including Sandmann) confirms, that after Phillips approached, he stood in front of the student crowd for almost two minutes while continuing to drum and sing.  During that time, Phillips was surrounded by students and other onlookers, some of whom were shouting and doing tomahawk chops.  Joint Memo SF ¶¶ 32, 35.

As to the "facts" Sandmann does list, it is undisputed that Phillips then began to walk forward through the crowd of students (or "wade into" the crowed as Sandmann characterizes it), but once again the videos do not explain *why* he did that.  Phillips' unrebutted testimony is that he only decided to go towards the Lincoln Memorial upon being surrounded by the crowd as a way to exit the situation, and his movements on the videos are consistent with that.  Phillips Decl. ¶ 22; Video 2 at 00:10-00:23; Video 10 at 00:00-00:26.  Sandmann's "facts" also omit that Sandmann acknowledges that at this point, the video shows that Phillips was in fact moving in the direction of the Memorial.  S.D. 161:21-24 ("Q: And in this video [Video 10 at 0:12-0:26], the direction he's moving in is towards the Lincoln Memorial, right? A: Right.").  Likewise, he omits that all students except for Sandmann moved out of Phillips' way.  Joint Memo SF ¶¶ 37-38.[13]

---

[13] Tellingly, as to the assertion that Phillips "bumped up against" a student, Sandmann does not even purport to cite any video.  His own cited testimony demonstrates this is neither a fact, nor is it material to whether Sandmann blocked Phillips. The cited testimony was about Video 5 at 4:45-4:55, more than a minute before Phillips started to walk towards the Memorial, and he was nowhere near Sandmann at that point.  The video shows that a student in front of Phillips who was wearing a backpack started rotating around to use his camera and  the backpack swung towards Phillips.  As the backpack swung, the student and Phillips may have momentarily grazed each other.  Sandmann's actual testimony is that "maybe not intentionally" Phillips might have "bumped into him a little bit," but "I don't know . . . I was on, like three or four rows of people back" at the time.  S.D. 136:25-137:7.

Moreover, almost all of these "facts" are inadmissible because they just quote *verbatim* Dr. Roberts' characterizations of videos, such as her words that Phillips "nearly walked past" Sandmann.  It is not even clear what that means, but if there were any dispute on that point it would be between Dr. Roberts' inadmissible opinions and Sandmann, whose testimony about Phillips' movements on the videos is clear and is consistent with Phillips' testimony.  Both Sandmann and Phillips testified that Phillips moved forward in the direction of the Memorial, other students moved out of the way, but Sandmann did not.  Indeed, he was standing "right in front of Nathan Phillips" when Phillips first reached where Sandmann stood.  Joint Memo SF ¶¶ 41-42.

Sandmann's purported "facts" then turn to the blocking incident itself:

| |
|---|
| At the time Phillips turned right to lock eyes with Nicholas, there was a three-foot opening to Nicholas' left and to Phillips' right. (Stip. Video 2 at 00:54; Stip. Video 16 at 00:06). This opening provided a clear path for Phillips to continue ascending the stairs to the Lincoln Memorial. (Stip. Video 2 at 00:54; Stip. Video 16 at 00:06; Sandmann Dep. 170). |
| Phillips could have also retreated the same way he walked in, but Phillips never tried to do so. (Sandmann Dep. 149, 166-67, 170, 277). |
| Phillips intentionally stood in front of Nicholas and did not move other than to beat his drum and sing. (Sandmann Dep. 339; Stip. Video 2 at 00:52-03:45). |
| When he locked eyes with Nicholas, Phillips brought his drum up to approximately 4 to 6 inches in front of Nicholas' face, beating the drum stick loudly and causing it to bounce violently in front of Nicholas' face. (Stip. Video 17 at 06:48). |
| Phillips put his drum so close to Nicholas' face that the bottom of the drum made physical contact with Nicholas' jacket collar near his shoulder. (Stip. Video 17 at 05:50, 06:50; Sandmann Dep. 169). |
| Nicholas did not move, but stood stock still, smiling and blinking slightly. (Stip. Video 2 at 00:51-03:45). |
| Nicholas clasped his hands behind his back. (Stip. Video 14 at 00:03). |
| Phillips continued to beat his drum in Nicholas' face for over two and a half minutes, never trying to move away. (Stip. Video 2 at 00:51-03:45). |
| During the entirety of the encounter between Nicholas and Phillips, the stipulated videos show that Phillips never tried to move up the stairs after he turned to face Nicholas; that Phillips never moved to one side or the other to go around Nicholas; that Phillips never attempted to continue along his previous trajectory; and that Phillips never turned to see whether he could retrace his path either back to the north the way he had come or east toward the Hebrew Israelites. (*See* Stip. Videos 1-18; Sandmann Dep. 173, 277, 279-80; Roberts Dep. Ex. A). |

27

Tellingly, this list omits Sandmann's own sworn account of what is by far the most material fact when it comes to whether Sandmann can prove material falsity: how the standoff began. Sandmann knew other CovCath students were moving out of the way to make room for Phillips, but he alone intentionally stood his ground to send Phillips the message that his school could not be intimidated. Joint Memo SF 38-40. Sandmann even confirms that Phillips "locked eye contact with [Sandmann] because [he was] the only student who wasn't moving." S.D. 269:9-12.

There is also no genuine dispute with respect to the facts Sandmann does list. It is undisputed that Phillips stood still in front of Sandmann while drumming and singing, and that Sandmann remained standing in front of Phillips. There is also no genuine dispute about the "three foot opening" (the width of a household door with raucous students as the doorposts) that Sandmann refers to. Sandmann's list implies that space existed when the standoff began, but his citations to the videos shows that space was created about 15 seconds later when two *other* students changed their position. Defendants made the same point in their opening Joint Memorandum, which actually shows screenshots from the same video excerpts Sandmann cites. *See* Joint Memo at 48.[14] By that point Sandmann had already stood in Phillips' way and Phillips "believed Mr. Sandmann did not want to let me pass." Phillips Decl. ¶ 26; Joint Memo SF ¶¶ 43-44.

Sandmann's list also asserts that Phillips "could have also retreated the same way he walked in," but he nowhere cites to any video to even try to support that claim. If he means to imply that Phillips had some clear path to his rear, the undisputed record (including Sandmann's testimony about the videos) is to the contrary. The undisputed facts are that there were "a bunch

---

[14] Specifically, Sandmann accurately states that the standoff began when the two "locked eyes" starting at 00:41-00:46 on Video 2, but at *that* point, video shows there was no "opening." *See* Joint Memo at 48 (screenshot from Video 2 at 0:44, with no opening). Sandmann cites to the same video, but about 13 seconds later, as the point when the other two students moved (Video 2 at 00:54). *See id.* at 48 (screenshot from Video 2 at 00:54, with an opening).

of people" behind Phillips even before he started walking towards the Memorial, and the crowd to his rear only grew larger once the standoff began.  Joint Memo SF ¶¶ 35, 49.

Not only are the underlying facts here undisputed, so are the conclusions of law that follow. There is no genuine dispute that Sandmann, a teenager, intentionally stood in the path of Phillips, a much older man, to hinder his progress and communicate the message that he could not try to intimidate the students by walking through their crowd.  Had Sandmann chose instead to just move out of the way like every other student, there is no evidence this incident would ever have happened. Moreover, the very fact that Sandmann claims that after the standoff began Phillips should have tried to further test his resolve by seeking out some escape route only confirms that Sandmann was hindering his path.  The notion that putting someone in the position of having to consider completely reversing direction is not "blocking" them strains any common-sense understanding of the word.

Finally, all the remaining "facts" listed by Sandmann, which are scattered throughout pages 12-16 of his Opposition, are undisputed words and movements in videos upon which he superimposes his speculative and discredited conspiracy theories:

| |
|---|
| Phillips' companions were holding cameras pointed towards the students. (Stip. Video 15 at 00:32). |
| During the long period of time, Phillips' companions got close to Nicholas and Phillips and pointed large cameras with lights at the two of them. (Stip. Video 2 at 03:00, 03:39). |
| Immediately after the school chaperone called for the students to walk south, Phillips' companions instigated a confrontation with her. (Stip. Video 11 at 01:00-20). |
| One of Phillips' companions, who held a camera to film the encounter between Phillips and Nicholas, was standing right next to Phillips, and was wearing a red hat, angrily called out to the chaperone: "Ma'am! We had a demonstration here, and you come here and you do this, alright?" (Stip. Video 11 at 01:08-23). |
| As Nicholas and the students were leaving, Phillips turned away from the Lincoln Memorial back towards his companions. (Stip. Video 11 at 01:25-40). |
| The same companion who moments earlier described the interaction between Phillips and Nicholas as a "demonstration" yelled, "I got him man," apparently referring to Nicholas. (Stip. Video 11 at 01:29). |

| |
|---|
| The same companion told another companion, as he grabbed Phillips' right arm, "he won, man; he fucking won, man!", apparently referring to Phillips. (Stip. Video 11 at 01:42; Stip. Video 3 at 03:18-03:33). |
| Moments later, the same companion put his left fist into the air and shouted out, "we won, grandpa; we fucking won, grandpa!", apparently referring again to Phillips. (Stip. Video 11 at 01:58). |
| After a few more moments, Phillips stopped drumming, and the group around him cheered and raised their arms in triumph. (Stip. Video 3 at 03:27). |

There is no dispute that the videos show these snippets of words and faces. What is material is how and why each of those persons came to approach the students, the relationship of each of them (or lack thereof) to Phillips, and the context behind what each of them were talking about and doing in the videos. Those facts are set forth in the detailed, uncontroverted declarations of six eyewitnesses that are all consistent with what is depicted in the videos. Joint Memo at 37-43.

In the final analysis, while Sandmann's allegations may have been sufficient to survive the motion-to-dismiss stage, his abject failure to support them now with admissible evidence, or point to any material contradictions in the fully developed record submitted by Defendants, requires that summary judgment be entered for each of the Defendants. *See Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment."); *Barnette v. Grizzly Processing, LLC*, 809 F. Supp. 2d 636, 657 (E.D. Ky. 2011), *amended*, No. CV 10-77-ART, 2011 WL 13233209 (E.D. Ky. Oct. 25, 2011) ("Neither guesses nor speculation can withstand a properly supported motion for summary judgment.").

## CONCLUSION

For all the foregoing reasons, as well as the reasons set forth in the separate memoranda filed by each Defendant, each of the Defendants respectfully requests that this Court grant their motions for summary judgment and dismiss all claims against them.

Dated: March 14, 2022                    Respectfully submitted,


                                         Nathan Siegel (*pro hac vice*)
                                         Meenakshi Krishnan (*pro hac vice*)
                                         DAVIS WRIGHT TREMAINE LLP
                                         1301 K Street NW, Suite 500
                                         Washington, DC 20005
                                         Phone: (202) 973-4237
                                         Fax: (202) 973-4437
                                         nathansiegel@dwt.com
                                         meenakshikrishnan@dwt.com


                                         */s/ Robert B. Craig*
                                         Robert B. Craig (KBA 15590)
                                         TAFT STETTINIUS & HOLLISTER LLP
                                         50 East RiverCenter Blvd.
                                         Suite 850
                                         Covington, KY 41011-1683
                                         Ph: (859) 547-4300
                                         Fax: (513) 381-6613
                                         craigr@taftlaw.com


                                         *Counsel for Defendants ABC News, Inc., ABC News
                                         Interactive, Inc., and The Walt Disney Company*


                                         */s/ Darren W. Ford*
                                         John C. Greiner (*pro hac vice*)
                                         GRAYDON HEAD & RITCHEY LLP
                                         312 Walnut Street, Suite 1800
                                         Cincinnati, OH 45202
                                         Phone: (513) 629-2734
                                         Fax: (513) 333-4316
                                         jgreiner@graydon.law

                                         J. Stephen Smith (KBA 86612)
                                         Darren W. Ford (KBA 95373)
                                         GRAYDON HEAD & RITCHEY LLP
                                         2400 Chamber Center Drive
                                         Suite 300
                                         Ft. Mitchell, KY 41017
                                         Phone: (859) 578-3070
                                         Fax: (859) 578-3071
                                         ssmith@graydon.com
                                         dford@graydon.com


31

*Counsel for Defendant The New York Times*
*Company d/b/a The New York Times*

*/s/ Natalie J. Spears*
Natalie J. Spears *(pro hac vice)*
Gregory R. Naron *(pro hac vice)*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Phone: (312) 876-8000
Natalie.spears@dentons.com
Gregory.naron@dentons.com

Jessica Laurin Meek (*pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
10 West Market Street, Suite 2700
Indianapolis, IN 46204
Phone: (317) 635-8900
Jessica.meek@dentons.com

Jared A. Cox
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, KY 40202
Phone: (502) 589-4200
Jared.cox@dentons.com

*Counsel for Defendants CBS News Inc.,*
*ViacomCBS Inc., and CBS Interactive Inc.*

*/s/ Michael P. Abate*
Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
 710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (admitted *pro hac vice*)
Cyndy E. Neidl (admitted *pro hac vice*)
Kelly L. McNamee (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor

32

Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
neidlc@gtlaw.com
mcnameek@gtlaw.com

*Counsel for Gannett Co., Inc. and Gannett Satellite Information Network, LLC*

*/s/ Kevin T. Shook*
Kevin T. Shook *(pro hac vice)*
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215
Phone: (614) 464-1211
Fax: (614) 464-1737
kshook@fbtlaw.com

Theresa A. Canaday
Samuel W. Wardle
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Phone: (502) 589-5400
Fax: (502) 587-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY 41042
Phone: (859) 817-5900
Fax: (859) 283-5902
mnitardy@fbtlaw.com

Ryan W. Goellner *(pro hac vice)*
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants Rolling Stone, LLC and Penske Media Corporation*